# Exhibit M-J

Page 1

1

2     UNITED STATES DISTRICT COURT

      EASTERN DISTRICT OF NEW YORK

3     -------------------------------------------------------X

4     DAVID AGOADO, LEEANN McNALLY, CRAIG MOORE, CHRIS

5     PIERRE, THOMAS SHARKEY, MADGE SHIPMAN, and DOREEN

6     VAZQUEZ, Individually and on behalf of all others

7     similarly situated,

8                         Plaintiffs,

9              -against-

10    MIDLAND FUNDING, LLC and MIDLAND FUNDING, LLC, doing

11    business in New York as MIDLAND FUNDING OF DELAWARE,

12    LLC,

13                        Defendants.

14    Civil Action No.:  1:14-cv-00018-LDW-ARL

15    -------------------------------------------------------X

16                              5036 Jericho Turnpike

                                Commack, New York

17

18                              September 11, 2015

                                10:24 a.m.

19

20         DEPOSITION of DAVID AGOADO, a Plaintiff

21    herein, taken by the Defendants, pursuant to Federal

22    Rules of Civil Procedure and order, held at the

23    above-mentioned time and place, before Brittany E.

24    Bosak, a Notary Public of the State of New York.

25    Job No. 2138789

Page 10

D. AGOADO

1

2

3          (Whereupon, the previous portions

4            are in a separate transcript

5            entitled Confidential.)

6     Q    Okay.  So in the complaint that you are a

7  Plaintiff the claims involving you against Cohen &

8  Slamowitz and Midland have to do with two accounts,

9  a Chase account and a Household Bank account.  Are

10 you familiar with those accounts?

11    A    Yes.

12    Q    Have you read the complaint?

13    A    Yes.  My attorney -- we looked it over.

14 He brought it to me.  I hadn't looked at it before.

15    Q    Okay.  I'm going to start with the Chase

16 account.  Do you recall signing up or agreeing to a

17 card member agreement and starting this account?

18    A    No.

19    Q    Do you have any reason to think that you

20 didn't start the account?

21    A    Because I told my wife -- my wife had

22 certain issues with gambling, and she was very good

23 at forging my signature, and God rest her soul.  She

24 was a good woman, but she just had these -- these

25 quirks that she would do.  She was very good at it,

Page 11

D. AGOADO

1

2  and even her father could attest to that, so there

3  was only one time that I did something -- I did many

4  balance transfers for her, and one time I did the --

5  the house, the mortgaging of the house.  She

6  wanted -- you know, she needed money, and I did it

7  one time, so that I admit to.

8        MR. SALTZMAN:  Can I -- can I just advise

9     the witness to answer the question that is

10    being asked by Mr. Francoeur, please?

11       THE WITNESS:  Okay.  All right.  I thought

12    that there was -- there might have been a

13    little bit more to amplify on, so he wouldn't

14    follow up with a question.

15       MR. SALTZMAN:  His job is to ask

16    questions.  Your job is to answer questions.

17       THE WITNESS:  Yes, sir.

18       MR. SALTZMAN:  That's why we're here.

19       THE WITNESS:  Yes, sir.

20    Q    Okay.  So, well, you said a few things in

21 your answer, transferring balances for your wife.

22 Do you know today whether or not your wife opened up

23 a Chase credit card account in your name?

24    A    I found out later on.  I didn't know it at

25 the time, no.

Page 13

1                              D. AGOADO

2              MR. SALTZMAN:  Counsel, if I can, I think

3        the last page also, S&S000036 -- has that also

4        been mistakenly included?

5              MR. FRANCOEUR:  Yes, it is.

6        Q    So except for 36 and seven, the remaining

7    documents.

8              MR. FRANCOEUR:  Thank you, Counsel.

9              MR. SALTZMAN:  Thank you.

10       A    So far they don't look familiar.

11             MR. FRANCOEUR:  I'll have the court

12       reporter, while he's looking, mark the next

13       one.  This will be Agoado 2.

14             (Document Bates S&S000038 - S&S000040 was

15             marked as Agoado's Exhibit No. 2 for

16             identification, as of this date.)

17       A    I don't remember.

18       Q    Okay.  So in looking through the card

19   member agreements as part of Exhibit 1, that doesn't

20   refresh your recollection; you don't recall seeing

21   any of these documents?

22       A    No.

23       Q    Okay.  Thank you for your careful look.  I

24   appreciate it.

25             Okay, sir.  Just to back up, you said that

```
 1                          D. AGOADO
 2     your wife Lisa had some issues with gambling and
 3     that you believe that she may have opened up some
 4     accounts using your name and forging your signature;
 5     is that correct?
 6          A     That is my belief, yes.
 7          Q     Is it your belief that that's what
 8     happened with the Chase account?
 9          A     Yes.
10          Q     When was the first time you learned that a
11     Chase account was opened in your name?
12          A     I can't remember.  So many things have
13     gone.  You know, she's passed away, and I have a --
14     vague to remember those type of things.
15          Q     What year did your wife pass away?
16          A     2013.
17          Q     Again, I'm sorry for your loss.
18          A     Thank you.
19          Q     Were you still married in 2013 when she
20     passed away?
21          A     We were still married, yes.
22          Q     Did you find out about the existence of
23     the Chase account while she was still alive?
24                MR. SALTZMAN:  Objection.
25          Q     Before 2013?
```

D. AGOADO

1

2      A    I can't remember.

3           MR. SALTZMAN:  He testified he doesn't

4      remember when he learned about them.

5           MR. FRANCOEUR:  I know.  I'm just trying

6      to narrow down a time field.

7      A    No.  I really -- I don't remember.

8      Q    Do you recall having a conversation with

9  Lisa about the Chase account?

10     A    Not about that particular account, no.

11     Q    Okay.  Let me show you what's been marked

12 as Exhibit 2.  I ask you to take a look at this.

13          MR. FRANCOEUR:  And just for the record,

14     this is a letter from Midland Credit Management

15     to David Agoado dated September 26th, 2011.

16     A    No.

17     Q    Okay.  And you can just hold onto it for a

18 second.  You just said no.  I didn't ask a question,

19 though, yet, so my question would be, have you ever

20 seen this document before?

21     A    No.

22     Q    Do you have any reason to believe you have

23 not received this document?

24     A    No.

25     Q    In this document Midland Credit Management

D. AGOADO

1

2    says, quote, if we don't hear from you or receive

3    payment by November 10 of 2011, we may proceed with

4    forwarding this account to an attorney, period.  Do

5    you recall whether you contacted Midland Credit

6    Management on or before November 10, 2011?

7         A    I recall making a phone call to a large

8    debt.  I explained that the debt was not mine and I

9    would like to see a signature, and the person that I

10   spoke with, which I believe was a woman, apologized,

11   and I never heard from them again.

12        Q    Do you know who --

13        A    You are talking about Midland?

14        Q    Yeah.  I was going to ask --

15        A    Yeah.

16        Q    Do you know -- is Midland at some point --

17        A    I only know that from the --

18             MR. SALTZMAN:  He asks the questions.  You

19        answer questions.

20             MR. FINKEL:  Just answer the question.

21             MR. SALTZMAN:  You are not here to have a

22        conversation.

23        Q    Your counsel is right.  Let me --

24        A    No, no.  He's right.  It's just a matter

25   of, like --

Page 17

                            D. AGOADO

1

2              MR. SALTZMAN:  No, no, no.  Don't explain

3       to us why.

4              THE WITNESS:  No.

5              MR. SALTZMAN:  Don't explain anything.  He

6       asks questions.  You answer questions.  That's

7       all that goes on here today.  Okay?  We're not

8       all buddies.  He asks.  You answer.  That's it.

9              THE WITNESS:  Once again, I apologize.

10      Q     That's okay.  I would just ask if you let

11   me finish my question because the court reporter has

12   to type it down.  Wait one second, and then answer,

13   and we'll get you out of here quicker.

14      A     Yes, sir.

15      Q     Midland Credit Management contacted you

16   originally, but eventually they hired a law firm,

17   Cohen & Slamowitz, who is my client.  You just

18   testified a moment ago that you had a conversation

19   with a woman.  Do you recall whether that woman was

20   at Midland or Cohen & Slamowitz?

21      A     It had to do with the Slamowitz, I think.

22      Q     Okay.  So you believe you spoke with

23   somebody at Cohen & Slamowitz?

24      A     Yes.

25      Q     Okay.

                              D. AGOADO

1

2              marked as Agoado's Exhibit No. 4 for

3              identification, as of this date.)

4         Q    Sir, the same thing, if you can, just take

5    a very brief look.  Again, I don't think you have

6    any reason to have ever seen that before, but,

7    again, I'll show it to you.

8              MR. SALTZMAN:  I want to propose the same

9         objection to this document as redacted.

10             MR. FRANCOEUR:  That's fine.

11             MR. FINKEL:  Excuse me.  Joe, are we still

12        working on the same account?

13             MR. FRANCOEUR:  No.  This is actually --

14        these are the notes on the Household account.

15        Q    So, Mr. Agoado, if you look to the third

16   page, it says S&S000140 on the bottom.

17        A    One forty?

18        Q    Yeah.  Do you see the page 140?

19        A    Yes.

20        Q    Okay.  Midway down you'll see the date on

21   the left, 5/7/2012, and if you scroll over to the

22   column on the right -- I know it's a little hard to

23   see -- it says, "INCOMING CALL ELIZABETH."  Do you

24   see that, sir?

25        A    Yes.

Page 21

D. AGOADO

1
2    Q   And I'm just going to read this note for
3   the record.  Incoming call Elizabeth, sister, C-I,
4   space, D-B, space, came online, dot, dot, verified
5   info, dot, dot, gave permission, space, S-W, space,
6   her, dot, dot.  There's a redacted line.  Looking
7   for S-I-F, dot, dot.  Offered 1,500.00 on both
8   A-C-C-N-T-S, space.  It's misspelled, assessed.
9   Cannot do, misspelled, assessed facts over copy of
10  award letter, L-T-T-R, dot, dot.  Do you see that,
11  sir?
12     A   Yes.
13     Q   This is a note on Cohen & Slamowitz' notes
14  of a conversation that Cohen & Slamowitz had.  It
15  appears to be with your sister Elizabeth.
16        MR. SALTZMAN:  Objection.
17     Q   Are you familiar with that?
18        MR. SALTZMAN:  Objection.
19     A   No, I'm not.
20        MR. SALTZMAN:  And objection to the use of
21        these lines with redactions, which we don't
22        know what they say.
23        MR. FRANCOEUR:  Okay.
24        MR. SALTZMAN:  Go ahead.
25     Q   Do you --

Page 22

D. AGOADO

1
2          MR. SALTZMAN:  And objection --
3     A    No, I don't remember.  I don't --
4          MR. SALTZMAN:  Let me finish.  And
5     objection to the use of C-I D-B, which we also
6     don't know.  We don't know what S-I-F is.
7     Counsel said it's misspelled assessed, but we
8     don't know that for sure either and the second
9     time assessed also, so object on all those
10    bases, and you can continue.
11    Q    Again, so just for clarity, unless he
12 instructs you not to answer, you have to answer my
13 questions.  He's allowed to object, and I'll pause
14 to give him the opportunity to object, but unless he
15 says you cannot answer, you do have to answer the
16 question.
17         MR. SALTZMAN:  That's correct.
18         MR. FRANCOEUR:  Thank you.
19    Q    So do you have a sister Elizabeth?
20    A    Yes.
21    Q    Did she ever help you with financial
22 affairs of any kind?
23    A    No.
24    Q    Would you have any reason to believe that
25 Elizabeth would have a conversation with Cohen &

Page 23

D. AGOADO

1
2      Slamowitz on your behalf?

3          A     No.

4          Q     Is this the first time you are hearing

5      about this?

6          A     Yes.

7          Q     If I could draw your attention to the next

8      page, which is 141 -- do you still have the

9      document?  We're still on A-4, page 141.

10         A     One forty-one.

11         Q     So maybe ten rows from the top, the date

12     is 5/23/12, and the note on the right states, fax

13     received with -- W, slash, hardship letter, comma,

14     A-U-T-H, space, to speak with his sister, comma,

15     states does not recognize debt, comma, sister will

16     pay a small amount to settle per -- looks like a

17     semicolon.  Do you see that, sir?

18         A     Yes, I do.

19         Q     Now, this seems to be -- this is

20     May 23rd -- coming after the May 7th conversation.

21     Do you recall a May 23rd, 2012, fax being sent on

22     your behalf?

23         A     May I speak with my counsel for one

24     second?

25             MR. SALTZMAN:  No.

Page 25

```
 1                        D. AGOADO
 2         Ford dated May 22, 2012.
 3              (Document Bates S&S000133 - S&S000137 was
 4              marked as Agoado's Exhibit No. 5 for
 5              identification, as of this date.)
 6         Q    Sir, I ask that you just take a look
 7    through and flip through.  I'll ask you some
 8    questions about Exhibit 5.  You ready?
 9         A    Yes.
10         Q    So, sir, I presented to you a document,
11    five pages.  It's got a Staples fax cover page.  It
12    says, from D. Agoado to Carolyn Ford.  Do you see
13    that?
14         A    Yes.
15         Q    Is that your handwriting?
16         A    Nope.
17         Q    Have you ever seen this?
18         A    No, I've never seen it.
19         Q    And when you flip through all the
20    different pages, have you ever seen any -- any
21    portion of what's been marked as Exhibit 5?
22         A    No, sir.
23         Q    Okay.  So let me ask you, on the second
24    page of the document, which is page -- if you
25    wouldn't mind, yeah -- page two, it's got 134 on the
```

1                           D. AGOADO

2   bottom.   Is that your handwriting?

3        A      Where?

4        Q      Anywhere on the page.

5        A      No.

6        Q      Okay.   And --

7        A      It's too neat.

8        Q      And on the next page, sir, 135, is that

9   your handwriting?

10       A      No, sir.

11       Q      And you can see at the bottom --

12  unfortunately it's cut off.   It looks like there's a

13  signature, and then above the signature it looks

14  like somebody printed your name.   Is either the

15  portion of the signature that you can see, which is

16  very little, or the printed name your handwriting?

17       A      No.

18       Q      And staying on 135 --

19              MR. SALTZMAN:   I just want to object to

20          the use of any characterization of this as his

21          signature at the bottom since it is, by

22          Counsel's admission, almost completely cut off.

23          We can't see anything of what it is, so I want

24          to object to any questions having to do with

25          that signature.

Page 27

1                          D. AGOADO

2        Q     Staying on 135, I'm going to read to you

3   the first paragraph as best I can of this script.

4   It says, quote, "I give my sister Elizabeth Agoado

5   permission to speak on my behalf in all matters

6   pertaining to this collection," period.  Do you see

7   that, sir?

8        A     Yes, I do.

9        Q     Do you believe I read that correctly?

10       A     Yes.

11       Q     And at the top of this document it has two

12  CNS file numbers.  One is C499687, and the other one

13  is C499583.  Do you see that at the top, sir?

14       A     Yes, sir.

15       Q     Do you recall having a conversation -- and

16  I apologize.  I know I asked you this before, but

17  I'm going to keep showing you documents to see if

18  anything refreshes your recollection.  Does this

19  document refresh your recollection as to whether you

20  ever had a conversation with your sister about

21  giving her permission to speak on your behalf?

22            MR. SALTZMAN:  Objection.  You can answer.

23       A     No.

24       Q     No, it does not refresh your recollection?

25       A     No.

Page 28

D. AGOADO

1

2     Q     Okay.

3     A     Never had it.

4     Q     If you would be kind enough to turn the

5  page, sir, to 136, this appears to be -- and 137 --

6  photocopies of Social Security benefit statements,

7  and I don't want to ask details for your own

8  confidentiality, but can you look at that?  Do those

9  appear to be your statements?

10    A     They look like my statements, yes.

11    Q     And that's on page 136.  How about on 137

12  as well?

13    A     Yes.

14          MR. SALTZMAN:  I would like to stipulate

15       to both of these pages being confidential.

16          MR. FRANCOEUR:  Agree.

17    Q     Do you have any recollection or does this

18  refresh your recollection of you ever giving these

19  to Elizabeth --

20    A     No.

21    Q     -- for any purpose?

22    A     No.

23    Q     Do you have any understanding as to how

24  Elizabeth may have gotten possession of these?

25    A     I don't believe she did.

Page 29

```
1                    D. AGOADO
2           MR. SALTZMAN:  Objection.  You can answer.
3           THE WITNESS:  The thing is, like, how do I
4     answer this?
5           MR. SALTZMAN:  No, no, no.  Answer the
6     question.  He asked you a question.
7           THE WITNESS:  Right.
8           MR. SALTZMAN:  Just answer it.  Don't have
9     a conversation with me either.
10          THE WITNESS:  All right.
11    A     Well --
12    Q     Let me ask the question.
13    A     Okay.
14    Q     So you just said to me, I don't think she
15    did.  Can you explain what you meant by that?
16    A     I believe --
17    Q     Go ahead.
18    A     I believe my wife had something to do with
19    it -- and, in fact, everything to do with it.  She
20    was the one that was controlling it.  She was the
21    one that probably brought up Elizabeth's name
22    because she knows I have a sister Elizabeth, and
23    that's it.  Draw your own conclusions.  That's all I
24    can say.
25    Q     Is it your belief or understanding that
```

                              D. AGOADO

1

2    this letter was written by your wife?

3        A    Yes.

4        Q    Okay.  You are not a handwriting expert;

5    is that correct?

6        A    No, not a handwriting expert.

7        Q    But in your experience with your wife and

8    her handwriting, does this appear to be her

9    handwriting?

10       A    Yes.

11       Q    Okay.  And just to be clear, on all of the

12   pages, 133, 134, 135?

13       A    Yes, unfortunately.

14       Q    And do you have an understanding as to

15   why -- if your wife, Lisa, wrote the letter, why she

16   would say that it was being written by Elizabeth

17   Agoado?

18       A    No.

19            MR. SALTZMAN:  Objection.  Calls for

20       speculation.

21       Q    If you know.

22            MR. SALTZMAN:  Same objection.  Don't

23       guess.

24            THE WITNESS:  I'm not going to guess.

25            MR. FRANCOEUR:  Counsel, you are coaching

Page 34

D. AGOADO

1

2      Q      Again, you and I talked about this a

3  moment ago, so I apologize, but this is actually

4  another set of notes.  This is the Chase account

5  notes.  So it looks like Cohen & Slamowitz put the

6  note on both accounts, but you testified a moment

7  ago that you don't have a recollection of

8  conversations on May 7, 2012, to settle the account;

9  is that correct?

10     A      Not on that day, no.

11     Q      What's different about this note from

12 Exhibit 4 is that it says, "HE GAVE PERMISSION TO SW

13 HER."  I'm going to assume Counsel could object that

14 S-W means speak with.

15            MR. SALTZMAN:  I'll object.

16     Q      We don't know that for sure, but it reads

17 that way.  Do you have any reason to believe that

18 this is incorrect?

19     A      Yes.

20     Q      And what -- what is that?

21     A      Because I never gave any permission.

22     Q      Do you have -- is it possible you were on

23 the line and had the conversation and don't recall

24 today, or do you know this did not happen?

25     A      I know this didn't happen.

Page 35

D. AGOADO

1

2     Q    All right.  So if we look at this note

3  that says, "HE GAVE PERMISSION," if you know this

4  didn't happen, do you believe that Elizabeth had

5  another gentleman with her to make the call?

6          MR. SALTZMAN:  Objection, calls for

7       speculation.  You can answer.

8     A    Yes.

9     Q    Okay.  I'm not sure if I asked you this.

10  Do you believe your sister was actually involved?

11    A    No.

12    Q    Do you believe that she made any of these

13  phone calls or talked to Lisa?

14    A    No.

15    Q    Do you think -- is it your understanding

16  and belief that this was all Lisa?

17    A    Yes.

18    Q    And not Elizabeth?

19    A    Not Elizabeth.

20    Q    Actually, sir, one more -- do you have 153

21  in front of you?

22    A    Yes.

23    Q    Okay.  Towards the bottom, May 23rd, 2012,

24  10:25 a.m., there's a line that says, "FAX RECEIVED

25  FROM CSR."  Do you see that?

Page 37

                              D. AGOADO

1

2         MR. SALTZMAN:   Objection.

3    Q    -- or you just don't know?

4    A    I just don't know.

5         MR. FRANCOEUR:   Okay.  So we're going to

6    mark as Agoado's 6 a series of pages, S&S000042

7    to S&S000081, credit card statements from

8    Chase.

9         (Document Bates S&S000042 - S&S000081 was

10             marked as Agoado's Exhibit No. 6 for

11             identification, as of this date.)

12   Q    Sir, when you were married to -- you were

13   always married to your wife.  I apologize.  When

14   Lisa was alive did she drive?

15   A    Yes.

16   Q    And you lived together the entire time you

17   were married?

18   A    Yes.

19   Q    Okay.  So I've shown you what's been

20   marked as A-6 -- I'm sorry -- Agoado 6, which is a

21   series of credit card statements from Chase in the

22   name of David J. Agoado.  Do you see that at the top

23   of the first page, 42?

24   A    Yes.

25   Q    Okay.  I'm actually going to ask you to

Page 38

D. AGOADO

1

2    skip through towards the end to page marked 72.

3    It's close to the back.

4         A    Okay.

5         Q    Do you see that?  I'm going to talk to you

6    about some of the transactions at the bottom.  I

7    apologize for the small print.  If you can't read

8    some of these, let me know.  The first entry,

9    August 12th, says, OnStar Subscription.  Do you

10   recall ever having an OnStar subscription in your

11   name?

12        A    Nope, no.

13        Q    Are you aware if Lisa had an OnStar

14   subscription?

15        A    No.

16        Q    Do you know what an OnStar subscription

17   is?

18        A    No, not really.

19        Q    The next one is Wendy's, North Babylon.

20   Have you ever been to Wendy's in North Babylon?

21        A    I don't go to Wendy's, no.

22        Q    The next one is Parkmark in North Babylon.

23   Have you ever been to Pathmark?

24        A    Yes.

25        Q    GameStop in North Babylon, have you ever

Page 39

D. AGOADO

1

2    been there?

3        A    With my son, yes.

4        Q    Wendy's, Pathmark -- Getty in East

5    Farmingdale, do you recall ever going to Getty in

6    East Farmingdale in or about -- I'm sorry.  Let me

7    give you a date.  This is actually 8/16 of 2008.

8        A    No.

9        Q    Were you married in 2008?

10       A    Yes.

11       Q    I'm sorry.  When -- when did you get

12   married?

13       A    I got married in 1992.

14       Q    '92?

15       A    Yeah.

16       Q    Dairy Barn stores, East Rockaway, have you

17   ever been there?

18            MR. SALTZMAN:  Ever?

19            MR. FRANCOEUR:  Well --

20       Q    In 2008.

21            MR. SALTZMAN:  Particularly this time

22       frame with this account -- in other words, for

23       this entry?

24            MR. FRANCOEUR:  Well, I'm going to ask in

25       two ways.

1                           D. AGOADO

2        Q    Counsel is right.  I wasn't clear.  I'm

3   going to ask have you ever been there, and then I'm

4   going to ask have you been there on or about August

5   of 2008.

6        A    Yes, I have been there.  No, I hadn't been

7   there in 2008.

8        Q    Do you recall one way or the other about

9   2008?

10       A    No.  Because I don't really -- I haven't

11  gone there in a very long time.

12       Q    I understand.  2008 is a very long time

13  ago.

14       A    Even longer than that.

15       Q    Do you believe you were not there in 2008?

16            MR. SALTZMAN:  Objection.

17       Q    Well, you just said even longer, so now

18  I'm just responding.

19       A    No.  It's like the '90s.

20       Q    Okay.  Have you ever been to CVS Pharmacy

21  in Rockville Centre?

22       A    Yes.

23       Q    Hess in North Babylon, have you been

24  there?

25            MR. SALTZMAN:  Ever?

Page 41

1                         D. AGOADO

2              MR. FRANCOEUR:  Ever.

3      A    Maybe.  I don't recall.  I don't know.

4      Q    Do you recall in 2008?

5      A    No.  Because I always thought their gas

6   prices were too high, so I didn't like going there.

7      Q    Okay.  Amazon, do you recall having an

8   Amazon account in 2008?

9      A    No.

10     Q    Do you have an Amazon account now?

11     A    No.

12     Q    Did you ever have an Amazon account?

13     A    Never.

14     Q    Staying on page 72, there seems to be a

15  series of charges on August 30th in New Jersey,

16  Ortley Beach, Toms River.  Have you ever had

17  occasion to go to the Jersey Shore in that area in

18  2008?

19     A    Not myself, no.

20     Q    What do you mean, not myself?

21     A    My wife went --

22     Q    Okay.

23     A    -- with my kids.  I never went.

24     Q    You had never went to the Jersey Shore?

25     A    Not -- because we would always get into

                                                        Page 42

1                          D. AGOADO

2    hassles.

3        Q    Okay.

4        A    So we didn't go together.

5        Q    Okay.  Were you separated in 2008?

6        A    Not in 2008, no.

7        Q    Were you ever separated?

8        A    Yes.

9        Q    When were you separated, sir?

10       A    In 2001.

11       Q    For how long?

12       A    I would say about six months.

13       Q    Was that a legal separation?

14       A    No, just weren't together.

15       Q    Was there any other time period between

16   1992 and 2013 that you were separated, other than

17   the six months in 2001?

18       A    Yes.

19       Q    When else were you separated, sir?

20       A    We were separated also right before she

21   bought the house.  We were separated for about three

22   months in 2004.

23       Q    And I apologize.  You mentioned when she

24   bought the house.  Is 1203 August Road a house?

25       A    Yes.

Page 43

                                    D. AGOADO

1

2        Q    Do you currently own that house?

3        A    Yes.

4        Q    And did you just tell me you purchased it

5   in -- when did you purchase the house, sir?

6        A    2004.

7        Q    Okay.

8        A    That's the best of my recollection.

9        Q    All right.  Do you recall -- did you buy

10  it together; were you both on the deed?

11       A    Yes, sir.

12       Q    Anyone else own the house --

13       A    No.

14       Q    -- or have an interest?

15       A    No.

16       Q    All right.  There's more charges in New

17  Jersey, but you are saying you did not go to New

18  Jersey in August of 2008?

19       A    No, sir.

20       Q    So Kmart, Dunkin' Donuts, Antonio's

21  Pizza...

22       A    No, no.

23       Q    And I'm going to draw your attention to

24  page 74.  There appears to be a few more charges.

25  Have you ever been to Doreen's Flowers in West

                                D. AGOADO

1

2    Babylon?

3         A    No.

4         Q    I don't know how to pronounce this place.

5    There seems to be on September 4th, Melaleuca, Inc.

6    Do you know what that is, or have you ever been

7    there?

8         A    Never heard of it.

9         Q    How about the Valbrook Diner in Valley

10   Stream?

11        A    No.

12        Q    Never been there?

13        A    I've been there, but I just haven't been

14   there in years.  We're talking since the '80s.

15        Q    Since the '80s?

16        A    Since the '80s.

17        Q    So you would not have been there in 2008?

18        A    My wife liked that restaurant a lot.

19        Q    Where is your wife from originally?

20        A    East Rockaway, which is very close.

21        Q    Close to Valley Stream?

22        A    Yes.

23        Q    Sir, I know I've taken you through a lot

24   of these charges.

25        A    No, no.  It's okay.  It's your job.

Page 45

```
 1                          D. AGOADO
 2        Q     Do you have an understanding that these
 3   charges were made by Lisa?
 4        A     Yes.
 5        Q     I'm trying to do this quicker.
 6        A     That's why it's very painful to go over
 7   it.
 8              MR. SALTZMAN:  This is not a conversation.
 9              THE WITNESS:  I'm sorry.
10              MR. SALTZMAN:  You have to wait for a
11        question.
12              THE WITNESS:  I'm sorry.
13        Q     Your counsel is right.  Sir, any time you
14   want to take a short break for the bathroom or just
15   to clear your head, that's fine.  All you have to do
16   is ask, just so long as there's a not a question
17   pending.
18        A     Okay.
19        Q     I'll try to speed up the credit cards
20   because this could take us a while.  Can I direct
21   you to page 76?
22        A     Okay.
23        Q     I just ask you to take a look at the
24   merchants on that page, Olympic Diner, Walgreens --
25   there's some New Jersey charges.  Do any of these
```

Page 46

```
1                          D. AGOADO
2    charges look familiar that you would have made the
3    charges?
4         A    No, I wouldn't have --
5              MR. SALTZMAN:  We're talking about at that
6         time period?
7              MR. FRANCOEUR:  At that time period.
8         A    I didn't make these charges, but I know
9    the places.
10        Q    You do know the places?
11        A    I know the places.  I know that's where
12   she liked to go.
13        Q    So consistent with your earlier
14   understanding that Lisa made the earlier charges,
15   you believe Lisa made these charges as well?
16        A    Yes.
17        Q    Let's see how quick we could do this.
18   Okay.  Sir, if I can direct your attention to page
19   60, same exhibit...
20        A    Got it.
21        Q    I have two questions only about this page.
22   If you can quickly look at charges, do these
23   charges -- do any of these charges look like charges
24   that you made?  That's the first question.
25        A    No.
```

Page 47

                              D. AGOADO

1

2        Q     And consistent with your understanding

3   before, do these look like charges that Lisa would

4   have made?

5        A     Yes.

6        Q     Okay.  And, sir, did you ever receive a

7   bill from Chase in the mail; did you ever open up

8   any letters you got from Chase?

9        A     No.

10       Q     Is there a reason why?

11       A     Because my wife would get the mail first.

12  I was always out.

13       Q     Was your arrangement with her that she

14  handled the bills, or she just happened to get all

15  the mail?

16       A     She wanted to handle the bills.  That was

17  her job.  She's -- she was very arbitrary in that

18  way.

19       Q     Okay.  Let me just -- I apologize.  I'm

20  going to try to do this as quick as I can.  Can I

21  bring you to 58?

22       A     Sure.

23       Q     I'm going to ask you the same two

24  questions.  So 58 in the middle of the page, sir,

25  there's a few charges.  If you can, just look at

                            D. AGOADO

1

2       Q    So if I'm understanding you correctly --

3   and I don't want to put words in your mouth -- this

4   was a trying time for you and overwhelming time, and

5   you had a general awareness that Lisa was doing

6   this, but not a specific awareness of a specific

7   account?

8       A    Not to -- not to the degree, no, that

9   we're talking about today.  I just thought that she

10  was doing it, and I thought, you know, eventually it

11  would stop, and -- and that's it, you know.

12      Q    You testified earlier that Lisa got the

13  mail and kept these things from you?

14      A    Yes.

15      Q    But at some point you became aware that

16  she was doing this, so I guess one time you got the

17  mail; is that how you found out?

18      A    She made --

19           MR. SALTZMAN:  Answer the questions.  It's

20      not a conversation.

21           THE WITNESS:  Okay.

22           MR. SALTZMAN:  Counsel will ask you

23      questions.  That's his job.

24      A    What was the question again, sir?

25      Q    The question is, how did you find out?

Page 57

D. AGOADO

1

2     A    Well, she started to laugh one day and

3  said, you are going to be getting slammed by

4  Slamowitz.  And I says, what are you talking about?

5  And I saw, and I says, that's it.  I got really mad.

6  We had an explosive argument, and she thought it was

7  funny.  She thought it was, like, the funniest

8  thing.  I called up the -- Slamowitz or whatever.  I

9  spoke to a woman.  I don't know what her name was.

10 I says, I did not do these things.  I said, my name

11 is not on it.  And I didn't want to implicate my

12 wife at the time.  I didn't want to do it, so I

13 just -- she said, no.  We'll take care of it, and

14 you won't be getting any more calls.

15     Q    Okay.

16     A    That's what the woman said, and that was

17 it.

18     Q    Did you ask for -- not to have any more

19 phone calls?

20     A    Well, I just said, show me my signature;

21 show me my signature.  That was it, and they never

22 did, so I thought it was a scam, you know, because

23 whatever Lisa did, she couldn't, you know, make my

24 signature, but she was good, you know.  That's all.

25     Q    When you say you thought it might have

Page 64

D. AGOADO

2   account or another account that you discovered; is

3   that correct?

4          A     I don't know if it was a Chase account.  I

5   don't know.  I know she was getting rid of some

6   accounts.  You know what I'm saying?  It was just

7   very discombobulated.

8          Q     You just don't -- you don't know?

9          A     I don't know.

10         Q     Okay.  Is it possible you saw a statement

11  at some point of the Chase accounts?

12         A     No, no, never seen any of the statements.

13         Q     Or any other document from Chase?

14         A     No.

15         Q     Do you recall how you found out that she

16  had the credit card accounts; did you see a

17  statement, or was there another way you found out?

18         A     I believe she told me.

19         Q     Okay.  So you didn't catch her with the

20  mail?

21         A     No.

22         Q     You think she just told you?

23         A     No.  She told me.

24         Q     Okay.  The next line in the complaint I'll

25  read for the record.  Although Defendants assert

Page 65

D. AGOADO

1
2   that the purported debts were purchased from
3   Household Financial Corporation and Chase Bank,
4   N.A., comma, upon information and belief Midland
5   does not possess and has never possessed,
6   parentheses, nor ever seen, parentheses, comma, any
7   documentary evidence supporting any of the purported
8   debts purchased from Household Financial Corporation
9   or Chase Bank, period.  Do you see that sentence,
10  sir?
11      A    Yes, yes.
12      Q    Now, we went through in a little bit of an
13  excruciating detail the Chase statements that were
14  in Cohen & Slamowitz' file.  Do you recall doing
15  that, sir?
16      A    No.
17      Q    No.  Just today with me, Exhibit 6.
18      A    Oh, the Chase?
19      Q    Yeah.
20      A    Yes.
21      Q    So this quote that I just read into the
22  record states that -- actually, it just says Midland
23  did not possess any of the evidence supporting
24  purported debts, but would you agree with me, sir,
25  that these credit card statements are evidence of

Page 66

                              D. AGOADO

1
2    the debt --
3              MR. SALTZMAN:  Objection.
4         Q    -- for Chase Bank?
5              MR. SALTZMAN:  Objection.  You can answer.
6         A    I guess so, yes.
7         Q    And I didn't show you the Household -- so
8    let me stop and show you that, so I can ask you for
9    Household as well.  I apologize.  I'm jumping
10   around.
11             MR. FRANCOEUR:  I would like to mark as
12        Exhibit 9 documents relating to the Household
13        account.
14             (Document Bates S&S000098 - S&S000106 was
15             marked as Agoado's Exhibit No. 9 for
16             identification, as of this date.)
17        Q    Sir, I'm going to ask you to just take a
18   moment and flip through Exhibit 9, and when you are
19   done I'm going to ask you to go to this middle page,
20   101.
21        A    And what is this; what am I looking at
22   here?
23             MR. FINKEL:  You can't ask him questions,
24        David.
25             THE WITNESS:  Oh, I can't?  Okay.

Page 67

D. AGOADO

1

2      Q    All I'm asking you to do, sir, is just

3   look through briefly and let me know when you are

4   done.  You don't have to read the whole document

5   unless you would like to, but I don't think you have

6   to for my questions.

7      A    All right.

8      Q    Okay.  Do you recall seeing this document

9   before?

10     A    No.

11     Q    If I can direct you to page 101, you

12  testified before you had a conversation with Cohen &

13  Slamowitz where you said, well, show me my

14  signature.  This document appears to have your

15  signature or at least it has your name and a

16  signature above it.  Do you see that in the middle

17  of the page, sir?

18     A    Yes, yeah, I do.

19          MR. SALTZMAN:  Objection.

20     Q    Is that your signature?

21     A    No.

22     Q    Do you recognize that handwriting?

23     A    Looks like my wife's.

24     Q    When you say it looks like your wife's, is

25  it the middle name where it says, print name, David

Page 68

D. AGOADO

1
2    Agoado, or the signature itself or both?

3         A    Well, it looks like -- the signature looks

4    like hers.  The middle -- the printing -- she prints

5    nicer than that unless she was trying to, you know,

6    make it look worse.

7         Q    Okay.

8         A    I couldn't tell you.

9         Q    Okay.  But the signature looks familiar to

10   you?

11        A    Yeah.

12        Q    Okay.  And then moving -- and clear it's

13   not your signature?

14        A    No.

15        Q    You didn't sign that?

16        A    I did not sign this.

17        Q    Okay.  And then on page 102 the top line

18   reads, "PERSONAL CREDIT LINE ACCOUNT AGREEMENT

19   VARIABLE RATE."  Do you see that?

20        A    Personal agreement?

21        Q    On the top line.

22        A    Oh, yeah, right there, yeah, I see it.

23        Q    And underneath that, sir, is a lender and

24   a borrower, the lender being Household Finance Corp.

25   III.  Do you see that?

Page 69

                            D. AGOADO

1

2       A     (No verbal response given.)

3       Q     And the borrower is David Agoado?

4       A     Yes.

5       Q     You've never seen this document?

6       A     I've never seen this document, no.

7       Q     And then, sir, on page 105 there's a

8    statement that says, "Do not sign this agreement

9    before you read it."  It goes on to say some more

10   information, but then there's a borrower's

11   signature, and your name is there, David Agoado,

12   with a signature.  Is that your signature, sir?

13      A     Doesn't look like it, no.

14      Q     Do you also recognize the handwriting as

15   possibly Lisa's?

16      A     It looks like -- yeah, like she was trying

17   to do my signature.

18      Q     Okay.  And then on the next page, 106,

19   again, I'll draw your attention to the signature of

20   borrower.  The name is typed David Agoado.  Is that

21   your signature, sir?

22      A     That looks like my signature.

23      Q     That does look like your signature?

24      A     Yeah, a little bit.

25      Q     Now, this document that you are

Page 70

                              D. AGOADO

1

2    recognizing the signature, at the top it says,

3    "REVOLVING LOAN VOUCHER," with the lender Household

4    Finance and borrower David Agoado.  Do you see that,

5    sir?

6         A    (No verbal response given.)

7         Q    And you see the loan appears to be for

8    $10,000?

9         A    Yes.

10        Q    And it looks like, sir, from this document

11   that the check to you was for 9,950, and that $50

12   was retained by the lender for an initial annual fee

13   of $50.  Do you see that?

14        A    Yeah.

15        Q    Do you recall receiving a check for

16   $9,950?

17        A    No.

18        Q    Does any of this refresh your recollection

19   of getting a revolving loan from Household Finance?

20        A    No.

21        Q    But the signature does look familiar to

22   you as possibly your own?

23        A    It looks -- it looks like my signature.

24        Q    It looks like your signature?

25        A    It does, but I don't -- I have a pretty

Page 71

```
 1                    D. AGOADO
 2  distinct signature.
 3       Q    Do you have any explanation, sir, as to
 4  how your signature would have gotten here?
 5       A    Forgery.
 6       Q    Okay.  So it's your belief and
 7  understanding that even though the signature appears
 8  to be close to your signature, it's still not made
 9  by your hand?
10       A    No.  My wife was very good at making my
11  signature.  She was very good at it.  She got better
12  over the years.
13       Q    Okay.
14            MR. SALTZMAN:  Okay.
15       Q    Okay.  We're all okay.
16            MR. SALTZMAN:  Do you need a break?  You
17       okay?
18            THE WITNESS:  I'm all right.
19            MR. SALTZMAN:  Want to take a two-minute
20       break just to stretch out?
21            THE WITNESS:  I'm good.
22       Q    So getting back to the complaint, sir, we
23  were just talking about whether Midland possessed
24  any documentary evidence of the debts.  Would you
25  agree with me, sir, that this is documentary
```

Page 72

                              D. AGOADO

1

2    evidence of the revolving loan for $10,000 from

3    Household Finance?

4         A    No.

5         Q    You do not?

6         A    No.  I mean, I don't -- I -- I've said

7    before.  I didn't agree that this was my signature.

8         Q    Oh, no.  I'm not saying it was.

9         A    Oh.

10        Q    All I meant to say is that this is

11   evidence that there was an actual loan.

12        A    Okay.

13        Q    That's all my question was.

14        A    Okay.  Yes.

15        Q    Okay.  So I'm going to direct your --

16   we're done with this one.

17             Okay.  Back to the complaint, 21, I'll

18   read the next sentence.  In fact, comma, Midland is

19   incapable of ever proving the existence of a debt or

20   debt agreement as, comma, on information and belief,

21   comma, Midland never reviewed, comma, nor has been

22   in possession of, comma, any documentary evidence of

23   the purported debts, comma, such as Agoado's credit

24   card applications or any credit card purchases,

25   period.  So, sir, with regard to that sentence,

D. AGOADO

 1    again, you know, we just talked about the evidence

 2    of the debt, the Chase statements and Exhibit 9,

 3    which is the loan from Household, and to be clear,

 4    I'm not saying this is your signature on these

 5    documents, but we just discussed that there is

 6    evidence, at least, of the debts; is that correct?

 7            MR. SALTZMAN:  Well, the complaint says

 8        that there was no evidence of Agoado's credit

 9        card applications --

10            MR. FRANCOEUR:  Sir, it's my question.

11            MR. SALTZMAN:  Okay.  Go ahead, but the

12        complaint is specific.

13            MR. FRANCOEUR:  Okay.

14            MR. SALTZMAN:  Your question is more

15        general.

16            MR. FRANCOEUR:  I know, but this objection

17        is not proper.

18            MR. SALTZMAN:  Go ahead.

19       Q    Do you understand the question, sir?

20       A    No.  I need to hear it one more time.

21       Q    This sentence is basically saying Midland

22    is incapable of proving the existence of a debt, and

23    we just discussed the evidence of the debt for the

24    Chase, the credit card statements, and then Exhibit

Page 74

                              D. AGOADO

1

2    9 for the Household loan.  So putting aside the

3    issue of the signature, would you agree with me,

4    sir, that these are evidence of the debt?

5         A     It's evidence.

6               MR. SALTZMAN:  Objection.

7         Q     Thank you.  Okay.  Moving on, I'm going to

8    read another sentence.  Midland alleges the debts

9    purchased from Household Financial and Chase Bank

10   are legitimate debts simply because Household

11   Finance [sic] Corporation and Chase Bank apparently

12   told them so, period.  Would you agree with me, sir,

13   that the basis for the debts are more than just

14   being apparently told so, that there is evidence in

15   the form of credit card statements and this loan

16   application on the Household account?

17              MR. SALTZMAN:  Objection.  You can answer.

18        Q     You can answer.  You have to answer.

19        A     Yes.

20        Q     Okay.  Thank you.  Sixty-nine, "Since

21   Defendants do not possess (nor have they ever

22   possessed) actual evidence of the purported debts, they

23   were forced to manufacture supporting evidence,"

24   period.  Sir, do you have any knowledge that any

25   evidence was manufactured by Midland or Cohen &

Page 75

D. AGOADO

1

2    Slamowitz?

3        A    No.

4        Q    Okay.  If I can draw your attention, sir,

5    to page 20 of the complaint, and towards the bottom

6    in B you'll see there's a quote indented, and right

7    underneath that there's a sentence I'm going to read

8    into the record.  As, comma, upon information and

9    belief, comma, neither Midland nor Cohen & Slamowitz

10   ever saw any purported account's purchase records,

11   comma, or any evidence of Plaintiff Agoado's use of

12   the account, comma, there is simply no basis for

13   this statement, period.  And the statement is the

14   statement above in the indented, which I'm going to

15   read.  Quote, Plaintiff's predecessor and interest,

16   Household Financial Corporation, dot, dot, dot,

17   offered to open a credit card account, dot, dot,

18   dot, in Defendant's name, period.  Defendant

19   accepted the offer by using the account, period.

20           Sir, do you have any information as to

21   Midland or Cohen & Slamowitz not seeing any of these

22   purchase records or evidence that we have just been

23   discussing as Exhibits 9 and 6?

24       A    No.

25       Q    Not to belabor the point, this is the last

D. AGOADO

1

2      time I'll ask you, Exhibits 9 and 6, aside from your

3      signature, are evidence of the two accounts,

4      correct?

5              MR. SALTZMAN:  Objection.  You can answer.

6      A     Well, I don't have -- except for the --

7      no, no.

8      Q     Signature aside?

9      A     Yes, signature aside, yes.

10             MR. SALTZMAN:  Objection, same objection.

11     Q     All right.  The next statement in 67 says,

12     the attorney defendants have flooded the New York

13     system with lawsuits during the class period, and it

14     goes on.  Do you have any knowledge as to how many

15     lawsuits Midland or Cohen & Slamowitz is filing?

16     A     Not exactly, no.

17     Q     Not exactly or do you have --

18     A     No.

19     Q     -- no knowledge?

20     A     No.  In the thousands -- I don't know.

21     Q     Well, I would ask you not to guess, sir.

22     A     All right.

23     Q     Yeah.

24     A     I don't know; I don't know.

25     Q     Okay.

Page 78

D. AGOADO

1

2     document before?

3          A    No.

4          Q    Okay.  You can put it to the side.

5               (Document Bates S&S000300 - S&S000303 was

6               marked as Agoado's Exhibit No. 11 for

7               identification, as of this date.)

8          Q    I would like to show you what's been

9     marked as Exhibit 11.  I ask you to take a very

10    brief look at it and let me know, have you ever seen

11    this document before?

12         A    No, sir.

13         Q    Do you know; has there been any

14    restraining in any of your accounts?

15              MR. SALTZMAN:  Objection.

16         A    I don't understand the question,

17    restraints.

18         Q    I'll represent to you, sir, that there are

19    judgments.  I've just shown you one for Chase.  I'm

20    going to show you the Household judgment in a

21    moment, but were there ever any restraints on your

22    bank accounts or any enforcement or collection

23    action taken with regard to those judgments that you

24    are aware of?

25              MR. SALTZMAN:  Objection.  You can answer.

Page 79

D. AGOADO

1

2      A     No, I'm not.

3      Q     Okay.  I'm going to mark as 12 a copy of

4   the judgment in the Household matter.  I ask you to

5   take a look at this document, sir, and let me know

6   if you have ever seen it before.

7              (Document Bates S&S000092 was marked as

8              Agoado's Exhibit No. 12 for

9              identification, as of this date.)

10     Q     Sir, have you ever seen that document

11  before?

12     A     No.

13     Q     Okay.  Without referring you to a

14  document, sir, I'm going to ask you, Lisa, your

15  wife, in 2012 was she a blonde-haired, white,

16  female, approximately 25 to 35 years of age, about

17  5'4"?

18     A     No.

19     Q     Could you give me a general description of

20  Lisa in 2012?

21     A     5'6", dark brown hair, Italian-looking.

22     Q     Do you know anyone blonde, white, female,

23  25 to 35, 5'4" tall, 120 to 160 pounds, who may have

24  been at your residence on or about April 19th of

25  2012?

Page 88

D. AGOADO

1

2       A     Yes.

3       Q     Are you aware of any accounts that she

4   opened in your name besides these two that we have

5   been discussing today?

6       A     I'm not sure.  It's been a while.

7       Q     Just -- are you aware of any accounts that

8   she opened in your name that weren't this Chase or

9   this Household account?

10      A     No.

11      Q     Okay.

12      A     No.

13      Q     And -- let's see.  Have you -- besides the

14  suit against the medical center regarding your

15  daughter and this present litigation, have you been

16  involved in any other litigation in the past five

17  years?

18      A     No.

19            MR. JOHNSON:  So I'll have this marked as

20        Agoado 13.

21            (Document Bates MCM-0127 - MCM-0129 was

22            marked as Agoado's Exhibit No. 13 for

23            identification, as of this date.)

24      Q     So you have been handed what's been marked

25  Exhibit Agoado 13.  This is Bates stamped MCM-0127

Page 89

D. AGOADO

1

2      through MCM-0129.  Just take a minute to take a look

3      at this.  You don't have to read everything, but

4      kind of evaluate what it is.  So this letter has an

5      address on it.  Is this letter properly addressed to

6      you at your residence?

7            A     1203 August Road, yes, that's my

8      residence.

9            Q     And that was also your residence in 2011?

10           A     Yes.

11           Q     Have you seen this letter before?

12           A     No.

13           Q     If this was mailed to you at that

14     address -- did you ever have any problems receiving

15     mail at that address?

16                 MR. SALTZMAN:  Objection.  You can answer.

17           A     No, no.  Like I said in the other

18     deposition, I never checked the mail.  My wife was

19     always in charge of getting the mail.  I was never

20     home when the mail came.

21           Q     And generally when the mail would come in

22     where would you be?

23           A     I would be assisting my father-in-law.  He

24     had some things that he was doing, and I would help

25     him out.

Page 100

D. AGOADO

1
2    review the account records of HCLU and HSBC.  I am
3    authorized to make this Affidavit on behalf of HCLU.
4    The facts stated herein are based upon my personal
5    knowledge from my review of business records of HSBC
6    and are true and correct."  Do you understand what
7    that sentence means or sentences?
8         A    No.
9         Q    Do you have any reason to believe that the
10   affiant in this document was not making these
11   statements according to that person's personal
12   knowledge from the review of business records of
13   HSBC?
14             MR. SALTZMAN:  Objection, calls for
15        speculation, no foundation.
16        A    Doesn't look familiar.
17        Q    Do you have any reason to believe that
18   what is stated in this document, though, is not true
19   and accurate?
20             MR. SALTZMAN:  Same objections.
21        A    Yeah, maybe.
22        Q    Why would you think it's not true and
23   accurate?
24        A    I don't know.  It just doesn't seem right.
25        Q    What doesn't seem right?

Page 101

D. AGOADO

1

2       A       I don't know.  It just -- like, you know,

3   sometimes you get a feeling.  You don't know how to

4   really answer it yes or no.  It just doesn't seem

5   right, the signatures, the -- the -- as far as the

6   notary goes.  It just doesn't seem -- I can't

7   explain.  I can't explain why I'm saying it this

8   way, but this is what I'm feeling.

9       Q       And you do see that this document is

10  notarized?

11      A       I do see it's notarized, but then again, I

12  saw Pain and Gain.  It doesn't mean much.

13      Q       Okay.  And then we'll go ahead to page

14  MCM-0125, "CERTIFICATE OF CONFORMITY."

15              MR. SALTZMAN:  Next page, that page.

16              THE WITNESS:  Oh, okay.

17      A       Got it.

18      Q       Do you see that page?

19      A       I'm on the page.

20      Q       Okay.  And as you can see -- I'll just

21  read it for the record.  "Peter M. Kubin, an

22  attorney-at-law admitted to practice in the State of

23  Virginia, certify that the foregoing document was

24  notarized by S.K. RENDON, a notary public in the

25  State of Virginia, in conformity with the laws of

```
                                           Page 102
 1                      D. AGOADO
 2    the State of Virginia."  Do you see that?
 3         A    Yeah.
 4         Q    Okay.  And do you have any reason to
 5    believe that's not true?
 6              MR. SALTZMAN:  Objection.
 7         A    Yeah.
 8         Q    Okay.
 9         A    Where is -- who is -- where is my wife's
10    signature?  Where is my signature?  I mean, what
11    is -- you know, wouldn't one of our signatures be on
12    there besides this?  What does this mean?
13         Q    This is an affidavit of sale of a bulk set
14    of accounts.  This is --
15         A    I have no --
16         Q    Well, one of things you allege, sir, is
17    that there was no certificate of conformity provided
18    concerning the account at issue.  Are you aware of
19    that?
20              MR. SALTZMAN:  Objection.
21         A    No, not aware of it.
22              MR. JOHNSON:  Okay.  Let's have this next
23         document marked.
24              (Document Bates S&S000096 - S&S000097 was
25              marked as Agoado's Exhibit No. 15 for
```

Page 103

D. AGOADO

2      identification, as of this date.)

3      Q    So you've just been handed what's been

4  marked Exhibit Agoado 15.  If you can, just take a

5  minute to review that as well.

6      A    Okay.

7      Q    Okay.  So looking at paragraph two of this

8  document, I'll read for the record what it states.

9  On or about August 24th, 2011, HSBC sold the account

10  numbered -- and then there's a portion redacted --

11  ending in 8468, now assigned account number --

12  there's a portion of the account number redacted --

13  ending in 5291 in the name of David Agoado with a

14  balance of $11,428.90, parens, identified in this

15  affidavit as the sold account, close parens, by a

16  purchase and sale agreement and a bill of sale to

17  Midland Funding, LLC, identified in this affidavit

18  as the debt buyer.  As part of the sale of the sold

19  account, certain of HSBC's records relating to

20  individual sold account were transferred to the debt

21  buyer.  Those records were made and/or recorded as

22  part of the regular course of business of HSBC at or

23  near the time of the acts, events, conditions or

24  methods recorded.  Because of the sale of the sold

25  account, HSBC acknowledges that debt buyer became

Page 104

1                    D. AGOADO
2    the owner of the sold account on the date of sale.
3    Did I read that accurately?
4              MR. SALTZMAN:  Objection.  The document
5         speaks for itself.
6         A    Yes.
7         Q    Do you understand what that paragraph is
8    saying?
9         A    Not really.
10        Q    If I was to --
11        A    Can you break it down?
12        Q    It's stating that HSBC sold an account
13   with a balance a of $11,428.90 to Midland Funding,
14   LLC.  Would you have any reason to dispute that?
15             MR. SALTZMAN:  Objection.
16        A    Yes.
17        Q    What would that be?
18        A    Because my name is not on it.  I don't
19   know why -- you know, don't remember seeing this
20   document, of course.
21        Q    This document does say in the name of
22   David Agoado, correct?
23        A    Well, that's -- there's a lot of things in
24   the name of David Agoado.
25        Q    Do you see that this document is notarized

Page 105

                        D. AGOADO

1

2    as well?

3            MR. SALTZMAN:  Objection.

4       A    It was notarized, yeah.

5       Q    And then if you flip to page two of this

6    document, and that's titled, "CERTIFICATE OF

7    CONFORMITY," correct?

8       A    Yes.

9       Q    Okay.  And that states, "I, Torrey Taylor,

10   an attorney-at-law admitted to practice in the State

11   of Florida, certify that the foregoing document was

12   notarized by Richard M. Carlson, a notary public in

13   the State of Florida, in conformity with the laws of

14   the State of Florida."  Again, do you have any

15   reason to dispute that statement?

16           MR. SALTZMAN:  Objection.

17      A    Yes.

18      Q    What would that be?

19      A    I -- why would it be in the state of

20   Florida?

21      Q    Do you have any other reason to dispute

22   that statement?

23      A    I don't know.  It just doesn't seem right

24   to me.  I don't know.  It just seems like it's just

25   off.

Page 106

D. AGOADO

1

2      Q    What seems off about it?

3      A    I don't know.  It just seems off.  It just

4  seems like -- like it's not real.  It seems like

5  it's -- like it's -- I don't know, like a

6  configuration of something.  I don't know, but it

7  doesn't seem like -- I have no memory of this stuff.

8  I don't even think Lisa -- you know, it just

9  seems -- I don't know.  I don't know.  I wish I

10  could put the words together.  I wish I was smarter.

11  What can I tell you?

12      Q    Do you have any reason to believe that

13  Midland Funding, LLC did not purchase the Household

14  account that was opened in your name?

15           MR. SALTZMAN:  Objection.  You can answer.

16      A    Yeah, I do.

17      Q    What would that be?

18      A    I don't know.  I guess probably the fact

19  that they don't know how to keep their records

20  correctly, and they probably -- you know, just off

21  from what they do, and they don't do things in a --

22  in a -- in a correlated manner.

23      Q    When you say they who are you referring

24  to?

25      A    Referring to what you just mentioned.

Page 107

D. AGOADO

1

2       Q     The creditor, HSBC?

3       A     No, Midland.

4       Q     Midland Funding, LLC?

5       A     Yes.

6       Q     And why --

7       A     Well, HSBC, like I said, I haven't done

8    business -- I've never really done business with

9    that bank.  My wife did.  That's all I can say.  I

10   never did any business with them, so all this stuff

11   is academic.

12             MR. JOHNSON:  So let's have this marked

13        please.

14             (Document Bates MCM-0130 was marked as

15             Agoado's Exhibit No. 16 for

16             identification, as of this date.)

17       Q     Just take a minute, yeah, and look at

18   that.  Just let me know when you have had a chance.

19       A     Okay.  I'm done looking at it.

20       Q     And do you see across the bottom of this

21   document it states, Data printed by Midland Credit

22   Management, Inc. from electronic records provided by

23   HSBC Consumer Lending, parens, USA, close parens,

24   Inc. pursuant to the bill of sale, slash, assignment

25   of accounts transferred on or about August 26th,

Page 108

                        D. AGOADO

1

2    2011, in connection with the sale of accounts from

3    HSBC Consumer Lending, parens, USA, close parens,

4    Inc. to Midland Funding, LLC.  Do you see that?

5         A    Yeah.

6         Q    Did I read that correctly?

7              MR. SALTZMAN:  Objection.

8         A    Yes.

9         Q    In looking up at the -- near the top of

10   this do you see the account number; it's partially

11   redacted?

12        A    The 8468?

13        Q    Yes.

14        A    Yes.

15        Q    And did -- do you see the name David

16   Agoado; is that --

17        A    Yes, underneath it.

18        Q    And the last four of the Social Security

19   number, are those the last four Social --

20        A    Yes.

21        Q    Are those yours?

22        A    That's mine.

23        Q    Okay.  And then there's a partial home

24   number listed, 940-1798.  Are you familiar with that

25   number?

Page 109

D. AGOADO

1

2    A    Where would the phone number be?

3    Q    I don't know.  I'm asking if you are

4    familiar with that number.

5    A    I'm looking for the phone number.

6    Q    Oh, it's right under SSN.  It says,

7    "HomePhone," and there's, 000940 --

8    A    Oh, yeah, I see it.  Yes, I see it now.

9    Q    Okay.

10   A    Yeah.  That's an old phone number of mine.

11   Q    Of yours?

12   A    Yeah.

13   Q    Was that a home phone?

14   A    That was a home phone number.

15   Q    When did you have that home phone number?

16   A    Quite a few years ago.

17   Q    When do you believe you last used that

18   number?

19   A    Probably around the time my wife was still

20   here, 2012/2013.

21   Q    On the next line down it says, "Work Phone

22   0008878877."

23   A    That was --

24        MR. SALTZMAN:  There's no question.

25   Q    Are you familiar with that number?

Page 110

D. AGOADO

1

2    A    I'm familiar with it.

3    Q    And what number is that?

4    A    My father-in-law's work number.

5    Q    And does he have his own company?

6    A    Yes.

7    Q    What company is that?

8    A    I think it's NARI, Inc.

9    Q    And what sort of company is that?

10   A    It's a construction company.

11   Q    Okay.  And is that -- your street address,

12   city, state, and zip code accurately represented

13   there?

14   A    Yes.

15   Q    Down a little lower there's,

16   "DateOfBirth."  It's partially redacted, and it

17   states 1961.  Is that the year of your birth?

18   A    Yes.

19   Q    And then it states, last payment amount

20   was 214.  Do you remember ever -- do you recall ever

21   making a payment on the Household account?

22   A    No.

23   Q    Do you know if your wife ever made a

24   payment on the Household account?

25   A    I don't know.

Page 112

D. AGOADO

1
2    this paragraph is stating that claims arising in
3    connection with this account can be compelled to be
4    arbitrated?
5            MR. SALTZMAN:  Objection.
6       A    I don't know.
7       Q    And what don't you know about that?
8       A    That's my answer.  I just don't know.
9       Q    When did you first become aware of the
10   existence of this Household account?
11      A    You mean the mortgage?
12      Q    Yeah -- well, the Household account that
13   we've been discussing today.
14      A    What are they referring to as the
15   Household account?  I don't understand.
16      Q    The HSBC account.
17      A    Oh, that.  That -- just like -- I knew of
18   it, but I never participated in it.
19      Q    Okay.  When did you first become aware
20   that --
21      A    That I can't give you an answer.  I don't
22   remember.
23      Q    Okay.  Did you ever contact Household or
24   HSBC about this account directly?
25      A    No.

Page 113

D. AGOADO

1
2     Q     But you were aware that your wife had

3     taken it out in your name?

4     A     I found that out at some point, yes.

5     Q     And at that point what did you do, if

6     anything?

7     A     Got very upset.

8     Q     And did you -- did you have -- did your --

9     did you discuss this with your wife?

10    A     Probably.  It probably was a loud

11    discussion.

12    Q     Okay.  And did your wife do anything --

13    did you have your wife do anything in connection

14    with this account?

15    A     I asked her to.  I says, you know, find

16    out what's going on, and get my name off of it.  I

17    don't want -- I said -- and at one point I -- I'm

18    saying too much.  I didn't want the house.  I wanted

19    her to take the house off my hands because I didn't

20    like what she did.  I felt like I was bamboozled,

21    the house, having it in my name, so-to-speak.

22    Q     Do you know if she then took any action?

23    A     I wouldn't know.  She started getting sick

24    at that point, and things started, you know,

25    winding.  You know, we got a -- what do they call

Page 116

D. AGOADO

1

2      Q     Do you believe that you were obligated to

3    pay the amounts borrowed on this account?

4      A     What is this account?

5      Q     I'll represent to you that this is the

6    HSBC account that we are discussing.

7      A     No.

8      Q     And why not?

9      A     Because I had nothing to do with this

10   account.

11     Q     Okay.  Do you believe that HSBC was aware

12   that your wife had forged your signature to open

13   this account?

14          MR. SALTZMAN:   Objection, calls for

15       speculation.

16     A     Calls for -- no.

17     Q     And did you -- okay.  To your knowledge,

18   nobody had notified HSBC that your wife had opened

19   this account in your name?

20     A     No.

21     Q     And then if you just look at the last

22   page, which is marked S&S000106, this page mentions

23   that a check was issued for $9,950.00.  It's dated

24   December 2nd, 2008.  At the time were you aware that

25   your wife obtained any money at that point?

```
                                              Page 131
 1                    D. AGOADO
 2            MR. SALTZMAN:   Objection.
 3      A    Yes.
 4      Q    And was she?
 5      A    She was.
 6      Q    Have you seen that letter today?
 7      A    No.  Because I didn't bother looking at it
 8   because I was too furious because I know why the
 9   letter was there.
10      Q    Do you know if you still have that letter?
11      A    No.  I looked, believe me.
12      Q    Okay.  And if you just go to the next
13   page, which is marked S&S000110 --
14            (Whereupon, Mr. Francoeur left the room.)
15      Q    -- up at the top it says, "STATUTE OF
16   LIMITATIONS."
17      A    Yes.
18      Q    "Based upon a reasonable inquiry, I have
19   reason to believe that the Statute of Limitations
20   did not expire at the time when this action was
21   commenced."  Do you see that?
22      A    Yes.
23      Q    Do you know if you make any claims
24   regarding whether Cohen & Slamowitz made an inquiry
25   into the statue of limitations on your HSBC account
```

Page 132

                          D. AGOADO

1

2  before they sued you?

3      A    No, no.

4          MR. SALTZMAN:  I want to suppose an

5      objection to that question.

6      Q    Okay.  That's it for that.  Just one more

7  thing on this.

8      A    Same page?

9      Q    Yep.  They state that they've searched

10  Department of Defense records, and they state, "I am

11  convinced that the defendant is not in any branch of

12  the United States military."  Have you ever served

13  in the military?

14     A    No.

15     Q    Okay.

16         MR. SALTZMAN:  Is this a good time for a

17     break?  It's three o'clock.  If you're almost

18     done and you want to push through, that's fine

19     too.

20         MR. JOHNSON:  No.  You're probably right.

21     It's probably a good time for a break.

22     (A discussion was held off the record.)

23              (A recess was taken from

24              2:59 p.m. until 3:16 p.m.)

25          (Whereupon, Mr. Francoeur returned.)

1                    D. AGOADO

2        229.

3              MR. SALTZMAN:  What date did you say it

4        was?

5              MR. JOHNSON:  This one's statement date is

6        12/13/09.

7              MR. SALTZMAN:  MCM-0228?

8              MR. JOHNSON:  Correct.  It's got a payment

9        due date of February 6th, 2010.

10             MR. SALTZMAN:  Okay.

11             MR. JOHNSON:  Okay.

12        Q    And I'll represent to you that these are

13   all addressed to you at the 1203 August Road

14   address.  Is it -- am I correct in understanding you

15   never saw a single one of these account statements?

16        A    I haven't seen the statements.  I just

17   recognize the -- the locations.

18        Q    And by locations you mean the businesses

19   to which charges were made?

20        A    Yes.

21        Q    And that's, you said, because your wife

22   would patronize those businesses?

23        A    You've got it.

24        Q    Did you ever contact Chase to say that

25   your wife had taken accounts out in your name

Page 142

                        D. AGOADO

1

2    without your permission?

3         A    No.

4              MR. SALTZMAN:  Objection.

5         Q    Did you ever give your wife permission to

6    take an account -- a Chase account out in your name?

7         A    No, I never gave her permission.

8         Q    Did you ever notify Chase or anybody else

9    that your wife had taken this account out in your

10   name without your permission?

11        A    No.

12        Q    Do you agree that your wife did open a

13   Chase account in your name and ran up a debt on it?

14        A    Well, I agree that you -- yeah, I see it,

15   yeah, yeah.

16        Q    Do you --

17        A    Now.  I didn't know it then.

18        Q    Are you aware if your wife ever made

19   payments in the Chase account?

20        A    I'm not aware of it, but I'm just figuring

21   she probably must have at one point or another.

22        Q    Do you know how your wife typically paid

23   her bills or bills on accounts in your name?

24        A    Yes.

25        Q    How would she pay those bills?

Page 150

                              D. AGOADO

1

2        A      Exhibit 2?

3               MR. SALTZMAN:   The notice?

4               MR. JOHNSON:   Yeah.

5        Q      Is this letter properly addressed to you,

6    to your address in 2011?

7        A      Yes, they made it out properly, yes.

8        Q      And I'll represent to you that this letter

9    labeled, "NOTICE OF NEW OWNERSHIP AND PRE-LEGAL

10   REVIEW," regards to the Chase Bank account that we

11   were just discussing, and the first paragraph

12   informs you that Midland Funding, LLC purchased your

13   Chase Bank account and that Midland Credit

14   Management, Inc. is servicing it.  I believe you

15   testified before you never -- you don't remember

16   ever seeing this letter?

17       A      That's true, yes.

18       Q      Do you have any reason to doubt that it

19   was mailed to you?

20       A      Yeah.

21       Q      What would that be?

22       A      The same reason, I think it's all just

23   show.

24              (Whereupon, Mr. Francoeur returned.)

25       Q      Do you believe that your wife actually did

Page 151

                              D. AGOADO

1

2    take out a Chase account in your name?

3         A    Well, I know she did.  I know she did

4    those things.

5         Q    Okay.  Do you know if there was some

6    time -- well, first, you stated your wife at --

7    well, you stated your wife had made payments on

8    certain accounts including some taken out in your

9    name?

10        A    I didn't say that.

11             MR. SALTZMAN:  Objection.

12        A    I did not say that.  I said that she

13   probably did.

14        Q    Okay.  Do you know if there was a time

15   when your wife started -- stopped making payments on

16   accounts in general; did she -- well, first, did she

17   stop making payments?

18             MR. SALTZMAN:  Objection.

19        A    Well, I know that she stopped when she got

20   really sick and left the house.  That's when there

21   were no more payments.  There were no bills coming

22   in.  There was no -- what do they call it --

23   legal -- legal-binding things, you know, things from

24   Slamowitz -- there was nothing coming in.  My wife

25   was gone quite a while, and I have not gotten

```
1                        D. AGOADO
2     tell me anything your counsel told you or what you
3     told your counsel.  You said you had seen this
4     document before.  Do you know if you reviewed it
5     before this document was filed with the court?
6          A    I couldn't remember.
7          Q    Okay.  Do you remember --
8          A    It was, like, a bad time.
9          Q    Oh.
10         A    Yeah, it was a bad time, and I can't.
11         Q    Do you remember where you reviewed this
12    document?
13         A    In my house.
14         Q    In the house.  Were you with anybody when
15    you reviewed it?
16         A    No.  I was alone.
17         Q    Would you -- just so I'm clear, do you
18    know about when that was?
19         A    That may have been sometime in April.
20         Q    How did you come to find out about this
21    lawsuit in the first place?
22         A    Well, I got a letter.
23         Q    Who sent the letter?
24         A    Mr.  -- my attorney, Mr. Alan Finkel.
25         Q    Do you know -- like I said before, I
```

Page 166

D. AGOADO

1
2  represent Midland Funding, LLC and Midland Credit

3  Management, Inc.  Do you know why you are suing

4  Midland Funding, LLC?

5      A    Well, I don't know.  It's a few reasons.

6  You know what?  I can't really, you know, put my

7  finger on it right this moment.  I would have to,

8  you know, get back to you on that question.  You

9  know, I'll retort that question.  Right now I can't

10 think of, you know...

11     Q    Well, right now is really my only

12 opportunity to ask you questions.

13     A    Yeah.  I really feel that.

14     Q    How about Midland Credit Management; do

15 you know why you are suing them?

16     A    Well, I think it's because of the fact

17 that -- the way they operate.  You know, it's -- for

18 the other people you are talking about too.  I don't

19 think they are really operating in the correct

20 manner.  I think they are doing things a little

21 off-kilter (phonetic), and, you know, like I said,

22 if -- just to go on as long as it did, you know,

23 and, you know, my wife getting away with what she's

24 gotten away with, you know, I wouldn't have --

25 obviously I wouldn't have called the police on her

Page 167

1                              D. AGOADO

2    or anything like that, but, you know, this was an

3    egregious thing that had happened, you know, and for

4    them to not recognize that there was somebody else

5    doing it, you know, and then here I am, sitting

6    here, today, at a deposition.  You know, that's just

7    not -- I just feel it's wrong, so...

8         Q    Did you ever pay any money on, say, the

9    Chase account to Midland?

10        A    I never had -- I never had -- like I said,

11   any -- any notification that this was even going on.

12   Like I said, my wife would do things, and I don't

13   want to use the word underhanded, but it was -- you

14   know, things that she did that led to this -- me

15   being here today.

16        Q    And you know that Cohen & Slamowitz

17   obtained a judgment against you on the Chase

18   account?

19        A    That's when I first learned about it, you

20   know, from my wife.  She made a joke out of it, like

21   I told you.

22        Q    Did you end up paying any money on that,

23   towards that judgment?

24        A    No, no.  I had called.  I had called up

25   because I wanted to, like, get my fingers out of the

Page 172

D. AGOADO

1
2  was doing.  You know, they should have known.  I
3  mean, she's smart, but she's not that smart.  She's
4  not Al Capone, but, then again, neither was Al
5  Capone.  I'm saying, you know, she -- that's it.  I
6  answered that to the best of my ability.
7      Q    I understand.  I appreciate it.
8           (Whereupon, Mr. Francoeur left the room.)
9      Q    Do you understand that this lawsuit is
10  brought on behalf of various classes of people,
11  groups of people?
12     A    Yeah, you know.
13     Q    Did you understand that you, as a named
14  plaintiff, are representing other people who are not
15  named plaintiffs in this suit, other than the people
16  appearing on the first page of this lawsuit?
17     A    Yes.
18     Q    Do you believe that you are an adequate
19  class representative to represent other people --
20  other unnamed people?
21     A    Yes.
22     Q    Okay.  And do you believe that your claims
23  are similar to those of the other people that are
24  named plaintiffs?
25     A    Yes, in some ways, maybe some of us, yeah.

Page 173

1                          D. AGOADO
2      We're all a little different.  This case is a little
3      bit different.
4            Q    Do you understand the risks of acting as a
5      class representative?
6                 MR. SALTZMAN:  Objection, vague.  If you
7            understand the question, you can answer it.
8            A    Yes, I know about the risks.
9            Q    Okay.  And what are the risks of
10     representing a class?
11           A    Well, that I would probably have to, you
12     know, compensate them in some way monetarily.
13           Q    If you just fip forward to page ten of
14     this exhibit, 8, it's paragraph 32A.
15           A    Which one is that now?
16           Q    It's page ten.
17           A    Page ten?
18           Q    Just have a look at page -- paragraph 32.
19     It's about several allegations.
20           A    Okay.  Do you have a question?
21           Q    Yes.  If you are looking at 32A, it
22     states, "Whether Midland purchased consumers'
23     alleged debt without verifying the validity of the
24     alleged debt they were purchasing."  Was your Chase
25     debt -- would you call it an alleged debt or an

Page 175

D. AGOADO

2    (Whereupon, Mr. Francoeur returned.)

3    Q    This suit seeks -- well, if you look at

4    paragraph H -- actually, paragraph 32H, it's on page

5    11.  That states, "Whether Plaintiffs and the other

6    members of the Class are entitled to damages,

7    including punitive damages, costs, or attorneys'

8    fees for Defendants' acts and conduct as alleged

9    herein."  Do you believe that you are entitled to

10   damages for the acts of omissions of Midland Credit

11   or Midland Funding?

12   A    Yes.

13   Q    Why do you believe that?

14   A    Defamation of character.

15   Q    How do you believe they defamed your

16   character?

17   A    By all the stuff that's right here, right

18   in front of me.  The fact that they are looking to

19   get money from a guy who has never took out a loan

20   or has done anything except one time, and that was

21   with my house, and I admitted that.  I admitted

22   that.

23   Q    And if you look at paragraph 36, please,

24   specifically the last sentence of that paragraph,

25   it's on page 12.

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

D. AGOADO

1
2    A    Last sentence?

3    Q    Yeah.  So that states, "Midland does not

4    purchase or obtain documents showing an indebtedness

5    between the original creditor and debtor, such as

6    the credit contract and amendments thereto, account

7    statements, customer service records, or customer

8    dispute records."  Do you believe that that's an

9    accurate statement, say, as to the Chase account

10   that we reviewed today?

11   A    I don't know.

12   Q    Did we review invoices from Chase

13   regarding your Chase -- the Chase account that was

14   issued in your name?

15   A    Did we review?

16        MR. SALTZMAN:  Today.

17   Q    Today.

18   A    Yes.

19   Q    So Midland produced those documents in

20   this lawsuit, the Chase statements, so how could it

21   be that Midland did not purchase or obtain documents

22   showing an indebtedness if Midland had those Chase

23   account statements that we reviewed today?

24        MR. SALTZMAN:  Objection.  If you can

25        answer, you can answer.

Page 177

```
 1                        D. AGOADO
 2      A    I really don't know; I really do not know.
 3      Q    Let's look at paragraph 38, the second
 4  sentence in particular, and the second sentence
 5  talks about Midland having no right to obtain or
 6  even request underlying documentation regarding
 7  debts that have purchases.
 8           MR. SALTZMAN:  Objection,
 9       mischaracterizes.
10           MR. JOHNSON:  Okay.
11      Q    Specifically that sentence states,
12  "Midland usually has no right to obtain, or even
13  request any of the underlying documentation of the
14  original alleged consumer debt that it purchases."
15  Did I read that correctly?
16           MR. SALTZMAN:  Objection.
17      A    Yes.
18      Q    Okay.  Do you have any basis to believe
19  that Midland doesn't have the right to retain or
20  even request underlying documentation on accounts
21  that are purchased?
22      A    I don't know, sir.
23      Q    Let's look at paragraph 40.  It's on page
24  13.
25      A    Okay.
```

Page 178

D. AGOADO

1

2      Q    It states, As Midland purchases this

3  consumer debt for pennies on the dollar, and the

4  purchase is nonrecourse, Midland does not receive

5  and cannot obtain this information.

6           MR. SALTZMAN:  Objection.  This

7       documentation.

8      Q    Oh, sorry.  This documentation.  I stand

9  corrected.  Do you know what the basis is for

10 alleging that Midland cannot obtain documentation

11 for the accounts that are purchases?

12     A    No.

13     Q    Do you have any idea what documentation

14 Midland can or cannot obtain regarding the debts

15 that are purchases?

16          MR. SALTZMAN:  Objection.

17     A    I don't know.

18     Q    You don't know what documents Midland

19 could obtain regarding debts and purchases?

20     A    Well, they can probably -- a few --

21          MR. SALTZMAN:  Objection.  I'm sorry.

22     Objection to the question.  If you know, you

23     can answer.  If you don't know, you don't know.

24     A    I don't know.  Social Security numbers, I

25 think anybody can, I guess, Social Security numbers,

Page 181

D. AGOADO

1

2      Q    Do you remember at any time having any
3  communication with Midland Credit Management or
4  Midland Funding?
5      A    Never.
6      Q    Do you feel that Midland Credit Management
7  or Midland Funding harassed you at any time?
8      A    No.  I had never heard of them.  You know,
9  this is all new.
10     Q    Okay.  Let's look -- can we go off for a
11  second?
12         (A discussion was held off the record.)
13             (A recess was taken from.
14             4:58 p.m. until 5:05 p.m.)
15             (Document Bates S&S000125 - S&S000128 was
16             marked as Agoado's Exhibit No. 27 for
17             identification, as of this date.)
18     Q    So you've been handed a document marked
19  Agoado 27.  It's titled, "AFFIDAVIT OF KAYLA HAAG IN
20  SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT,"
21  and it's captioned, Midland Funding, LLC, Plaintiff,
22  versus David Agoado, Defendant.
23             (Whereupon, Mr. Finkel returned.)
24     Q    And I'll represent to you that this
25  affidavit in regards the Chase Bank account that was

Page 190

                          D. AGOADO

 1
 2    provide affidavits of non-expiration of the statute
 3    of limitations for the specific debts that were
 4    purportedly accrued by Mr. Agoado.  Do you remember
 5    seeing anything regarding --
 6        A    No.
 7        Q    -- the statute of limitations?
 8        A    No.
 9        Q    Do you know if that paragraph applies to
10    you; do you know if, in fact, Midland did not
11    provide an affidavit of non-expiration of the
12    statute of limitations for the specific debts that
13    were purportedly approved by you?
14        A    No.
15             MR. SALTZMAN:  Objection.
16        Q    Do you believe that Cohen & Slamowitz
17    harassed you at all?
18        A    With one letter?  No.
19        Q    Do you feel that Midland was -- at the
20    time, say, the Chase suit was filed against you, do
21    you feel Midland was incapable of establishing that
22    the Chase account existed?
23             MR. SALTZMAN:  Objection, calls for
24         speculation.  You can answer.
25        A    I think somewhere down the line they

Page 191

D. AGOADO

1
2    should have.  You know, they should have done their
3    homework.  They should have really -- you know, this
4    is why so many people are against them.
5        Q    Do you know -- I guess -- I'm referring to
6    paragraph 90 of this complaint.  It's on page 31.
7    I'll get you to start at 90.  This set of
8    allegations brings claims under -- it's entitled,
9    New York -- this stands for New York General
10   Business Law, section 349.  See where it says N.Y.
11   GEN. BUS. LAW section 349; do you see that?
12       A    Are we looking at page 31?
13       Q    Yeah.  Right under -- it says, "AS AND FOR
14   A FIRST CAUSE OF ACTION," and then, parens, N.Y. --
15       A    I've got it, yes, yes.  I don't understand
16   it.
17       Q    Do you know what New York General Business
18   Law section 349 is?
19       A    No, sir.
20       Q    Do you believe you are representing a
21   class in this matter bringing claims under that
22   particular statute?
23       A    Well --
24            MR. SALTZMAN:  Objection, but you can
25       answer.

Page 198

D. AGOADO

1

2      A     I would have to get educated on that

3  particular word.

4      Q     Do you believe that -- speaking just for

5  yourself, did Midland Funding or Midland Credit

6  Management get money from you that they should not

7  have obtained?

8           MR. SALTZMAN:  Objection.

9      A     Not from me.

10     Q     So do you think that -- you know,

11  paragraph 111 states, "Defendants gained monetary

12  benefits in the form of payments on such default

13  judgments and statements, as well as the resulting

14  fees, to which the Defendants were not entitled."

15  Just thinking about yourself, would it be accurate

16  to say that Midland obtained payments from you?

17     A     Well, they -- yeah, without my --

18  unbeknownst to me.

19     Q     So you did pay money to Midland?

20     A     No, I didn't.

21     Q     Okay.

22     A     My wife did.

23     Q     And do you believe your wife paid money to

24  Midland or to the creditors HSBC and Chase?

25     A     That, I am not sure.  I don't know how it

Page 199

D. AGOADO

2  really works as far as, you know, that goes.

3       Q    Do you believe that Midland should return

4  any money to you?

5            MR. SALTZMAN:  Objection.

6       A    I don't want to answer that.  I would

7  rather see -- like I said, me, I don't even like to

8  put myself in the equation.  I would like to see

9  Midland get what's coming to them.  That's all I

10  could say.  You know, I don't want to talk about

11  monetary damages at this time.  I think, you know,

12  you have other plaintiff people -- other plaintiffs

13  that -- like I said, everybody has a different

14  reason for -- for this class action suit, and that's

15  all I'm going to say at this time.

16            (Whereupon, Mr. Francoeur returned.)

17            (Responses and Objections to Midland

18            Funding, LLC's First Set of Requests for

19            Admission Directed to Plaintiff David

20            Agoado was marked as Agoado's Exhibit No.

21            28 for identification, as of this date.)

22       Q    Okay.  You have been handed what's marked

23  Agoado 28.  It's titled, "RESPONSES AND OBJECTIONS

24  TO MIDLAND FUNDING, LLC'S FIRST SET OF REQUESTS FOR

25  ADMISSION DIRECTED TO PLAINTIFF DAVID AGOADO."  Have

Page 202

                              D. AGOADO

1

2    today?

3        Q    Yeah.

4        A    Those numbers sound familiar because my

5    wife's serial number -- Social Security number is

6    68.

7             (Whereupon, Mr. Finkel returned.)

8        Q    Let's --

9             MR. FINKEL:  Before you ask that question

10       can I just have one word with Counsel?

11        (A discussion was held off the record.)

12             (A recess was taken from

13                5:35 p.m. until 5:36 p.m.)

14       Q    Okay.  So if we go to page 15, we've got

15   request for admission 32.  This states, "Admit that

16   you have no evidence showing that Cohen & Slamowitz

17   lacked a reasonable basis to file suit on behalf of

18   MF to recover on your Household Account," and in the

19   answer there's objections, and then it states,

20   "Deny."  Do you know why you denied that request?

21       A    I denied that request?

22       Q    Yeah.  It's asking you to admit that you

23   have no evidence showing that Cohen & Slamowitz

24   lacked a reasonable basis to file suit on behalf of

25   Midland Funding to recover on your Household

Page 203

                         D. AGOADO

1

2    account, and the response is an objection, and then,

3    "Deny."  Do you -- do you have evidence showing that

4    Cohen & Slamowitz lacked a reasonable basis to bring

5    suit to collect the Household account?

6              MR. SALTZMAN:  Objection.  You can answer.

7        A    I would love to have evidence.

8        Q    Do you know of any?

9              MR. SALTZMAN:  Objection.

10       A    That's it.  I don't know of any.

11       Q    And next request for admission is 33.

12   That asks, "Admit that you have no evidence that

13   Midland furnished false information concerning your

14   Household Account to any credit reporting agency,"

15   and the response has some objections and it states,

16   "Deny."  Do you have any evidence that Midland

17   furnished false information regarding the Household

18   account to any credit reporting agency?

19       A    No evidence, feelings.

20       Q    Okay.

21             MR. SALTZMAN:  Objection to that question,

22       please.

23       Q    Let's move on to number 36.  That states,

24   admit that, at the time judgment was entered against

25   you in the Chase Suit, Midland Funding owned the

Page 209

D. AGOADO

1

2      A     That would be the only tangible evidence,

3   though, if it was one of them.

4      Q     So just to walk through the complaint

5   very, very quickly, are you aware of any specific

6   evidence that Cohen & Slamowitz used fraudulent,

7   deceptive, or misleading affidavits or affirmations

8   for the default judgments?

9      A     I don't know, truly; I don't know.

10     Q     You are not aware of anything specific?

11     A     Exactly, right.

12     Q     Are you aware of anything specific that

13  Cohen & Slamowitz commenced actions against

14  consumers without a sufficient factual basis and

15  used fraudulent, deceptive, or misleading affidavits

16  or affirmations?

17     A     Same, same.

18     Q     No specific --

19     A     No specific.

20     Q     -- information?  Then, also, are you aware

21  of any specific information that Cohen & Slamowitz

22  commenced actions against consumers without a

23  sufficient basis, predicated upon false allegations

24  knowing misrepresentations, yet backed by an

25  attorney's rule 130 certification?

Page 210

                        D. AGOADO

1

2    A    That's also I don't know.

3         MR. SALTZMAN:  Objection.  Go ahead.

4    Q    You are not aware of any specific --

5    A    I'm not aware of any specific.

6    Q    -- evidence --

7    A    Exactly.

8    Q    -- that would support that.  Okay.

9         MR. FRANCOEUR:  I have no further

10   questions.

11   Q    Thanks you for your time.

12

13        (5:46 p.m.)

14

15        David Agoado

16

17   Subscribed and sworn to before me

18   this _____ day of _____, 2015

19

20

21        NOTARY PUBLIC

22

23

24

25