# Exhibit M-K

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x

DAVID AGOADO, LEEANN MCNALLY,
CRAIG MOORE, CHRIS PIERRE, THOMAS
SHARKEY, MADGE SHIPMAN, and DOREEN
VAZQUEZ individually and on
behalf of all others similarly situated,
                  Plaintiffs,
        -against-
MIDLAND FUNDING, LLC, MIDLAND
FUNDING, LLC. doing business in
New York as MIDLAND FUNDING OF
DELAWARE, LLC, and MIDLAND
CREDIT MANAGEMENT, INC.,
              Defendants.
----------------------------------------x

                   5036 Jericho Turnpike
                   Commack, New York

                   June 26, 2015
                   10:10 a.m.


      Examination Before Trial of the

Plaintiff, LEEANN MCNALLY, pursuant to

Order, before CINDY A. AFANADOR, a Notary

Public of the State of New York.




      CINDY AFANADOR COURT REPORTING, INC.
               516-491-2694
          www.cindycourtreporting.com

18

1                    LeeAnn McNally

2          Q.      How many hours a week were you

3    working?

4          A.      35.

5          Q.      Have you ever worked as a debt

6    collector?

7          A.      No.

8          Q.      You said you currently live at

9    11 Chestnut Street in Coram?

10         A.      Yes.

11         Q.      Is Coram on Long Island?

12         A.      Yes.

13         Q.      Is it north shore or south shore?

14         A.      North shore.

15         Q.      When did you move to 11 Chestnut

16   Street?

17         A.      October of 2008.

18         Q.      Who do you live with at

19   11 Chestnut Street?

20                 MR. BIANCO:  Objection to the

21         form of the question.

22                 You mean from the beginning,

23         currently?

24                 It may not have changed.

25                 MR. CURTIS JOHNSON:  That's fine.

19

1                    LeeAnn McNally

2        Q.      Who do you currently live with at

3   11 Chestnut Street?

4        A.      Christopher McNally, my husband.

5        Q.      In your time living at

6   11 Chestnut Street, did anyone else ever live

7   there?

8        A.      No.

9        Q.      Did Christopher McNally live

10  there the whole time?

11       A.      No.

12       Q.      When did he move in?

13       A.      The same time I did, October

14  2008.   Sorry.

15       Q.      So he did live there the whole

16  time you've lived there?

17       A.      Oh, I'm sorry, yes.

18               I misunderstood.

19       Q.      I didn't mean the whole time

20  since the beginning of time.   That was an

21  imprecise question.

22               Where did you live before

23  11 Chestnut Street?

24       A.      151 Hilary Street, Oakdale,

25  New York 11769.

1                    LeeAnn McNally

2          Q.      And how long did you live at

3    151 Hilary Street?

4          A.      From the age of six months until

5    the age of 27.

6          Q.      So that's your parents' house?

7          A.      Yes.

8          Q.      Do they still live there?

9          A.      Yes.

10         Q.      What are your parents' names?

11         A.      Deborah and Dennis DeRosa.

12         Q.      Do you still talk to your

13   parents?

14         A.      Yes.

15         Q.      Do you have a good relationship

16   with them?

17         A.      Not really.

18         Q.      In your adult life, have you ever

19   lived anywhere else other than 151 Hilary

20   Street and 11 Chestnut Street?

21         A.      Yes.

22         Q.      Where?

23         A.      1427 Hallock Avenue, Port Jeff

24   Station.

25         Q.      Can you spell Hallock?

21

1                        LeeAnn McNally

2          A.        H-A-L-L-O-C-K.

3          Q.        When did you live there?

4          A.        I think from like 2007 -- it was

5      just a year.  2007 to 2008.  The year before I

6      got married.

7                    MR. BIANCO:  That's Port

8          Jefferson Station, right?

9                    THE WITNESS:  Port Jefferson

10         Station, yes.

11         A.        I don't remember the ZIP code.

12                   MR. BIANCO:  I think you said

13         Port Jeff.  I'm not sure these gentlemen

14         are from Long Island.

15                   I wanted to clarify.

16                   THE WITNESS:  Okay.  Sorry.

17                   MR. CURTIS JOHNSON:  Thank you.

18         Q.        When you moved from Hilary Street

19     to -- is it Hallock Street?

20         A.        It's Hallock Avenue.

21         Q.        Hallock Avenue.

22                   When you moved from Hilary Street

23     to Hallock Avenue, did you contact your banks

24     and other creditors and give them your updated

25     address?

22

1                     LeeAnn McNally
2          A.      No.
3          Q.      Did you set up mail forwarding at
4    the post office?
5          A.      Yes.
6          Q.      You had your mail forwarded from
7    Hilary Street to Hallock Avenue?
8          A.      Yes.
9          Q.      When you moved from Hallock
10   Avenue to 11 Chestnut Street, did you update
11   your creditors as to your new address?
12         A.      No.
13         Q.      Did you set up mail forwarding at
14   the post office?
15         A.      Yes.
16         Q.      When you lived at Hallock Avenue,
17   did you get mail that had been mailed to you
18   at 151 Hilary Street?
19         A.      Yes.
20         Q.      When you lived at 11 or now that
21   you live at 11 Chestnut Street, do you get
22   mail that's mailed to you at 151 Hilary
23   Street?
24         A.      Could you rephrase the question?
25         Q.      You live at 11 Chestnut Street,

29

                        LeeAnn McNally

1

2          to pay loans?

3                  It's ambiguous.

4          Q.      Which loans have you failed to

5   repay?

6          A.      A few of my student loans and my

7   Beneficial loan that I took out.

8          Q.      When did you start having to make

9   payments on your student loans?

10         A.      Six months out of school, so six

11  months from when I left Stony Brook.

12         Q.      Approximately 2001?

13         A.      Approximately.

14         Q.      And at what point did you stop

15  paying your student loans?

16         A.      I don't recall.

17         Q.      How many years did you pay your

18  student loans before you stopped paying them?

19         A.      A few; three, maybe four.  I

20  don't recall exactly.

21         Q.      Okay.

22                 Why did you stop paying your

23  student loans?

24         A.      I had no money.

25         Q.      When did you obtain your loan

32

1                    LeeAnn McNally
2         Q.      Do you know how much you borrowed
3    from Beneficial?
4         A.      $5,000.
5         Q.      Do you know what the terms of
6    that loan were?
7         A.      No.
8         Q.      Do you know if you had to pay it
9    back in installments or in a lump sum?
10        A.      I don't recall.
11        Q.      Do you know what the interest
12   rate was?
13        A.      I don't recall.
14        Q.      Do you believe there was an
15   interest rate?
16        A.      I'm sure there was.
17        Q.      What did you use the money you
18   got from Beneficial for?
19        A.      Pay bills, buy food, put gas in
20   my car.
21        Q.      And you already testified you
22   didn't repay the loan to Beneficial?
23        A.      No.
24        Q.      Have you ever heard of Midland
25   Funding?

45

                    LeeAnn McNally

1
2       can mark it.  I have copies.

3               MR. BIANCO:  I have been jotting

4       on this one, if you have a clean copy.

5               (McNally Exhibit 1, Second Amended

6       Class Action Complaint, marked for

7       identification.)

8       Q.      Showing you what's been marked as

9       Exhibit McNally 1.  It's a copy of the Second

10      Amended Class Action Complaint in this action.

11              (Handing.)

12      A.      (Witness reviewing.)

13      Q.      Do you recognize that document?

14      A.      Yes.

15      Q.      Do you see at the top where -- at

16      the very top of the document, Eastern District

17      of New York, United States District Court?

18      A.      Yes.

19      Q.      Okay.

20              Do you understand that that is

21      the court that your lawsuit is pending in?

22      A.      I do now.

23      Q.      When did you learn that?

24      A.      Just now.  I am not gonna lie.  I

25      don't know anything about this stuff, I really

46

                        LeeAnn McNally

1

2   don't.

3        Q.     Okay.  That's fine.

4              I will take that back for now.  I

5   am not going to ask questions about it at this

6   moment.

7              If you saw a document with a

8   litigation caption listing a court on the top

9   of it, would you contact that court for more

10  information about the lawsuit?

11             MR. BIANCO:  Objection to the

12        form of the question.

13       A.     No, 'cause I wouldn't think to do

14  that.

15       Q.     Okay.

16             Do you have any recollection of

17  being sued by Midland Funding?

18             MR. BIANCO:  Objection to the

19        form of the question.

20       A.     The only thing that I remember is

21  my husband saying our accounts were frozen and

22  that it was as a result of a lawsuit.  That is

23  all I remember.

24       Q.     Has anyone ever obtained a

25  judgment against you?

48

                    LeeAnn McNally

1

2          form of the question.

3                You can answer.

4          A.      I really didn't understand.

5          Q.      When did you learn that Midland

6    Funding had a judgment against you?

7          A.      When my husband told me that our

8    accounts had been frozen.

9          Q.      And what did you do in response

10   to learning that Midland Funding had a

11   judgment against you?

12         A.      I called -- I believe I called

13   Forster & Garbus.  I was told that they had

14   froze my account until I paid them $7,600,

15   which was way more than I owed.  I was

16   hysterical.  I called my father and went to

17   the bank and tried to get the thing unfrozen.

18   They told me they couldn't and that's when I

19   turned it over to my husband to negotiate.

20         Q.      You called them and they told you

21   you owed $7,600?

22         A.      That's correct.

23         Q.      And you didn't believe you owed

24   that amount?

25         A.      No.

49

1                   LeeAnn McNally

2          Q.      What amount did you believe you

3     owed?

4          A.      5,000.

5          Q.      Earlier you testified that you

6     got a loan from Beneficial; is that right?

7          A.      Yes.

8          Q.      And that you understood there was

9     interest on that loan?

10               MR. BIANCO:  Objection to the

11          form of the question.

12          A.      You know, I wasn't thinking that.

13          Q.      Thinking about it now, could some

14     of the additional money, the difference

15     between 5,000 and $7,600 have been interest?

16          A.      Thinking now, yeah.

17          Q.      Okay.

18               Did you have any reason to doubt

19     that you owed the amount that Forster & Garbus

20     told you you owed?

21               MR. BIANCO:  Objection to the

22          form of the question.

23          A.      I didn't want to believe I owed

24     $7,600, but I knew I owed them money.  I knew

25     I owed Beneficial money.

1                     LeeAnn McNally

2          Q.       But did you have any reason,

3     other than your desire, you said you didn't

4     want to, but did you have any reason to doubt

5     that you owed the money?

6                     MR. BIANCO:   Objection to the

7          form of the question.

8          A.       No.

9          Q.       You said when you learned of the

10    judgment against you you called your father;

11    your father is Dennis DeRosa; is that right?

12         A.       Yes.

13         Q.       What did you talk about with your

14    father?

15         A.       That my account was frozen, we

16    couldn't pay it and could he help us by giving

17    us some money.

18         Q.       When you talked to your father,

19    did he ever mention that he received a Summons

20    and Complaint from Forster & Garbus?

21         A.       No.

22         Q.       Was your father familiar with the

23    name Forster & Garbus when you talked to him?

24         A.       He didn't seem to be.

25         Q.       Had your father ever heard of

53

1                    LeeAnn McNally

2          A.      I don't understand what that

3    means.

4          Q.      Okay.

5                  When you learned there was a

6    judgment against you in connection with your

7    Beneficial loan, did you think you had any

8    reason that you didn't owe them money?

9                  MR. BIANCO:   Objection to the

10          form of the question.

11         A.      I just disputed the amount.

12         Q.      Okay.

13                 At some point you decided to pay

14   the judgment against you in connection with

15   your Beneficial loan; is that right?

16         A.      Like I said, my husband was the

17   one who negotiated it, because we needed to

18   get our accounts unfrozen.

19         Q.      Do you know when your husband

20   negotiated to pay the judgment?

21         A.      I don't recall.

22         Q.      You said that he found out about

23   your accounts being frozen in June of 2012 or

24   June of 2013; is that right?

25         A.      Approximately I know it was June.

54

                    LeeAnn McNally

1      I can't remember the year.

2         Q.     But one of those two?

3         A.     Yes.

4         Q.     Do you know how soon after

5  learning your accounts were frozen you

6  negotiated to pay the loan?

7              MR. BIANCO:  Objection.

8         Q.     Do you know how long after you

9  learned your accounts were frozen that you

10  decided to pay the judgment?

11             MR. BIANCO:  Objection to the

12             form of the question.

13        A.     As soon as we could.  We needed

14  to pay our mortgage.

15        Q.     You said that your husband

16  negotiated payment of the judgment; is that

17  right?

18        A.     Yes.

19        Q.     What do you mean by negotiated?

20        A.     We didn't have $7,600 to pay

21  them, so we talked to them about an amount we

22  could afford to pay them.

23        Q.     What was that amount?

24        A.     I believe 5,500.

55

                     LeeAnn McNally

1

2       Q.      And did you actually pay 5,500 to

3    settle the judgment?

4       A.      It could have been more.   I

5    couldn't tell you.

6       Q.      Did you pay less than the money

7    that Forster & Garbus said you owed?

8       A.      Yes.

9       Q.      And that was satisfaction in full

10   for the judgment, right?

11      A.      I believe so.

12              MR. FINKEL:  Good time to take a

13         break?

14              MR. CURTIS JOHNSON:  Yeah, it's a

15         little early, but I am happy to take a

16         break before I get into the documents.

17              (Recess taken from 11:04 a.m. to

18         11:17 a.m.)

19              (McNally Exhibit 2, Document

20         bearing Bates stamps MCM-0318 through

21         MCM-0319, marked for identification.)

22      Q.      Showing you what's been marked as

23   Exhibit McNally 2, bears Bates stamps MCM-0318

24   through MCM-0319.

25              Do you recognize this document?

56

                    LeeAnn McNally

1

2       A.      Yes.

3       Q.      What is it?

4       A.      The check.

5       Q.      Whose name is on the check?

6       A.      My name.

7       Q.      This is your maiden name, LeeAnn

8   DeRosa?

9       A.      Yes.

10      Q.      Who's the check from?

11      A.      Beneficial.

12      Q.      What is the address on the check?

13      A.      151 Hilary Street, Oakdale,

14  New York.

15      Q.      What is the date on the check?

16      A.      July 17, 2006.

17      Q.      Did you live at 151 Hilary Street

18  in Oakdale in 2006?

19      A.      Yes.

20      Q.      The check was for, I'm sorry?

21      A.      $5,000.

22      Q.      Can you turn to the second page?

23      A.      (Witness complying.)

24      Q.      The endorsement line, is that

25  your signature?

57

                        LeeAnn McNally

1
2          A.      Yes.
3          Q.      Do you remember receiving this
4    check?
5          A.      Yes.
6          Q.      What did you do with it when you
7    received it?
8          A.      I don't recall if I either
9    deposited it or cashed it.  I don't recall.
10         Q.      Okay.
11                 But you got the money that is
12   indicated on the check, right?
13         A.      Yes.
14         Q.      On the right side of the check in
15   bold letters, it says, "Signing this check
16   will result in a loan that must be repaid with
17   interest and fees."
18                 Do you see that?
19         A.      Yes.
20         Q.      Did you understand that when you
21   signed the check you were entering into a loan
22   with Beneficial?
23         A.      Yes.
24         Q.      Did you understand you would be
25   charged interest and fees on that loan?

58

1                    LeeAnn McNally

2         A.      Yes.

3         Q.      Okay.

4                 Do you remember the terms of the

5    loan at all?

6         A.      No.

7         Q.      Do you know if they were provided

8    to you?

9         A.      I don't recall.

10        Q.      Okay.

11                MR. BIANCO:  Can I interrupt for

12        a second?

13                MR. CURTIS JOHNSON:  Yes.

14                MR. BIANCO:  It looks like there

15        is possibly the last four digits of the

16        social security number on the back.

17                MR. CURTIS JOHNSON:  Which if we

18        were to redact, we would not redact the

19        last four, generally.

20                MR. BIANCO:  I want to make sure

21        that's what it is.

22                5196, is that the last four of

23        your social?

24                THE WITNESS:  No.

25                MR. BIANCO:  I was going to mark

61

                        LeeAnn McNally

1

2  say for sure.

3       Q.     Okay.

4              Do you believe it's possible that

5  the text following the check portion of

6  Exhibit McNally 3 was at one point attached to

7  Exhibit McNally 2 --

8              MR. BIANCO:  Objection to the

9         form of the question.

10             You can answer.

11      Q.     -- with your name on it instead

12 of Sample A. Sample?

13      A.     Yes.

14      Q.     What is your understanding of

15 everything after the check on Exhibit McNally

16 3; what is your understanding of what that is?

17             MR. BIANCO:  Objection to the

18        form of the question.

19             Maybe just give her a minute to

20        review it.

21             MR. CURTIS JOHNSON:  Of course.

22             You should look at both pages.

23      A.     (Witness reviewing.)

24             Could you repeat the question

25 about this paper?

62

                    LeeAnn McNally

1

2        Q.      Sure.

3                MR. CURTIS JOHNSON:  Can you read

4        it back?

5                (Record read.)

6        A.      It is a -- it's paperwork about a

7    loan.  That's my understanding.

8        Q.      You understand the terms and

9    conditions in connection with a loan that will

10   be extended if someone had cashed a real check

11   that wasn't written to Sample A. Sample?

12               MR. BIANCO:  Objection to the

13       form of the question.

14               You can answer.

15       A.      Yes.

16       Q.      Do you believe that this

17   documentation accompanied the check you

18   received from Beneficial?

19       A.      Yes.

20       Q.      What was your relationship with

21   Beneficial before receiving the check from

22   them?

23               MR. BIANCO:  Objection to the

24       form of the question.

25       A.      I don't believe I had one.

63

LeeAnn McNally

1

2    Q.      You didn't have any banking

3    relationship with them?

4    A.      Not that I recall, no.

5    Q.      Had you ever heard of Beneficial

6    before you received a check in the mail?

7    A.      I believe -- I recognize HSBC.

8    Q.      Okay.

9            And so the record is clear,

10   Exhibit McNally 2 says on the top left corner

11   of the check "Beneficial member HSBC"?

12   A.      Group.

13   Q.      Group.

14           MR. BIANCO:  I think that's a

15           trademark between the two words.

16           MR. CURTIS JOHNSON:  I think so.

17   Q.      So is it your understanding that

18   Beneficial and HSBC are related companies or

19   entities?

20   A.      Yes.

21   Q.      Did you have any relationship

22   with HSBC before receiving anything from

23   Beneficial?

24   A.      No.

25   Q.      If you look at Exhibit McNally 3,

68

                    LeeAnn McNally

1              marked for identification.)

3        Q.      Okay.

4                Showing you what's been marked as

5   McNally 4, it appears to be a letter from

6   Forster & Garbus dated December 19, 2011.   It

7   doesn't have a Bates stamp on it.

8                Do you recognize this document?

9        A.      No.

10       Q.      Who is this letter addressed to?

11       A.      Me.

12       Q.      What is the address listed?

13       A.      151 Hilary Street, Oakdale.

14       Q.      What is the date of the letter?

15       A.      December 19, 2011.

16       Q.      Did you live at 151 Hilary Street

17   on December 19, 2011?

18       A.      No.

19       Q.      Did you have mail forwarded from

20   151 Hilary Street to your current address on

21   December 19, 2011?

22               MR. BIANCO:  Objection to the

23          form of the question.

24               You can answer.

25       A.      All I remember is changing my

76

                    LeeAnn McNally

1                   MR. BIANCO:  Objection to the

2          form of the question.

3          Q.      -- at 151 Hilary Street?

4          A.      I don't doubt it.

5          Q.      Do you have an understanding of

6  why your parents wouldn't have forwarded

7  something that they received similar to or

8  exactly the same as McNally Exhibit 4 to you?

9                   MR. BIANCO:  Objection to the

10         form of the question.

11         A.      I don't know.  Like I said, I

12 don't have a very good relationship with my

13 parents.  I don't speak to them much.  They

14 think of me as an -- I am a disappointment to

15 them, so I don't really speak to them.  I

16 called my father out of desperation, and that

17 was it.

18         Q.      I'm going to show you what's been

19 marked McNally 5 (handing).

20         A.      (Witness reviewing.)

21         Q.      Take a second to flip through all

22 three pages of McNally 5, which are Bates

23 stamped Agoado-F&G-000003 through 000005.

24                  Do you recognize this document?

77

LeeAnn McNally

1

2          A.      It looks familiar, but I can't

3    say I completely recognize it.

4          Q.      In what way does it look

5    familiar?

6          A.      The first page just looks

7    familiar to me.

8          Q.      You may have seen it before?

9          A.      I cannot emphasize any more than

10   that, but yeah, it's possible.

11         Q.      Do you have any memory of seeing

12   this document before?

13         A.      Maybe a few years ago.

14         Q.      Would a few years ago be 2012?

15         A.      Possibly.

16         Q.      This document is dated February

17   6, 2012; would it have been sometime around

18   the time the document was dated?

19         A.      I suppose.

20         Q.      Okay.

21                 Had you seen this document

22   February 6th or approximately in February or

23   March of 2012, would you have had an

24   understanding of what it was?

25                 MR. BIANCO:  Objection to the

86

```
1                 LeeAnn McNally

2    with it in 2012?

3                 MR. BIANCO:  Objection to the

4         form of the question.

5                 You can answer.

6         A.      I don't even know how to answer

7    it.  I would have tried to do something.  I

8    couldn't pay $6,000.  I don't have that kind

9    of money, never did, and never will.  So I

10   don't know what I would have done.

11        Q.      Would you have contacted

12   Forster & Garbus?

13                MR. BIANCO:  Objection to the

14        form of the question.

15                You can answer.

16        A.      Possibly.

17                (McNally Exhibit 6, Document

18        bearing Bates stamp Agoado-F&G 000006,

19        marked for identification.)

20        Q.      Showing you what's been marked as

21   Exhibit McNally 6 (handing).

22        A.      (Witness reviewing.)

23        Q.      It bears Bates stamp Agoado-F&G

24   000006, although it's difficult to read.  It's

25   covered up by other writing.  Can you make
```

87

1                    LeeAnn McNally

2    that out in the bottom?

3         A.      Um-hum.

4         Q.      Okay.

5                 Do you recognize the document?

6         A.      No.

7         Q.      Do you have any understanding

8    what this document is?

9         A.      No.

10        Q.      You see at the top it says,

11   "Affidavit of Service"?

12        A.      Yes.

13        Q.      After the caption it says,

14   "Thomas Steidel being duly sworn deposes and

15   says:  Deponent is not a party herein, is over

16   18 years of age and resides in New York State.

17   On March 3, 2012 at 12:57 p.m. at 151 Hilary

18   Street, Oakdale, New York, the deponent served

19   the within summons and complaint with Index

20   BAC 051240/12, and date purchased, February

21   21, 2012 endorsed thereon, LeeAnn DeRosa

22   defendant therein named."

23                 Skipping down to number 3, says

24   "By delivering a true copy of each to Dennis

25   DeRosa-father a person of suitable age and

88

LeeAnn McNally

1    discretion.   Said recipient" and there is an

2    "X" mark for "dwelling/house (usual place of

3    abode) within the state."

4              Do you see that?

5    A.    Yes.

6    Q.    Do you have any reason to believe

7    your summons and formal complaint weren't

8    served on Dennis DeRosa as stated in this

9    document?

10   A.    I have no idea.   I am not my dad.

11   Q.    If you look down where it says

12   number 7, says "A description of defendant or

13   other person served or spoken to on behalf of

14   the defendant is as follows:   Sex, male; color

15   of skin, white; color of hair, gray; age, 51

16   to 65 years; height, 5'4 to 5'8; weight, 131

17   to 160 pounds; other features, balding."

18             Does that description describe

19   your father's appearance?

20   A.    Yes.

21             (McNally Exhibit 7, Document

22             entitled Work Order Number 153972, marked

23             for identification.)

24   Q.    Showing you what's been marked as

91

                        LeeAnn McNally

1

2       that long.

3       A.      (Witness reviewing.)

4       Q.      Let me know when you are

5  finished.

6       A.      I am good.

7               Oh, wait, another page.

8               (Witness reviewing.)

9               Okay.

10      Q.      Have you ever seen that document

11  before today?

12      A.      No.

13      Q.      Having read through the document,

14  did anything immediately jump out to you as

15  untrue?

16              MR. BIANCO:  Objection to the

17       form of the question.

18              You can answer.

19      A.      No.

20      Q.      Look back at what's been marked

21  as paragraph 1.

22      A.      (Witness reviewing.)

23      Q.      Read it over real quick again so

24  it's fresh in your mind.

25      A.      Okay.

92

1                    LeeAnn McNally

2        Q.      Do you have any reason to doubt

3   the truthfulness of that paragraph?

4                MR. BIANCO:  Objection to the

5        form of the question.

6                You can answer.

7        A.      No.

8        Q.      Do you have any reason to doubt

9   that anything in that paragraph is inaccurate

10  or false?

11               MR. BIANCO:  Objection to the

12       form of the question.

13       A.      No.

14       Q.      Look at paragraph 2.

15       A.      (Witness reviewing.)

16       Q.      Do the same thing, just get it in

17  your head.

18       A.      (Witness reviewing.)

19               Okay.

20       Q.      Do you have any reason to doubt

21  the veracity of statements in paragraph 2?

22       A.      No.

23       Q.      Nothing in paragraph 2 strikes

24  you as untrue?

25       A.      Nope.

93

1                    LeeAnn McNally

2        Q.      Look at paragraph 3, which starts

3   on page -- only on page 1, I'm sorry.

4        A.      Okay.

5                (Witness reviewing.)

6        Q.      One sentence.

7        A.      (Witness reviewing.)

8        Q.      Do you have any reason to believe

9   paragraph 3 is untrue?

10               MR. BIANCO:  Objection to the

11          form of the question.

12       A.      I may have doubted the amount,

13   but that's it.

14       Q.      But you knew that you owed some

15   balance?

16       A.      Yes.

17       Q.      Okay.

18               And you knew that balance was

19   somewhere -- well, let me ask you that.

20               What did you think the balance

21   was?

22               MR. BIANCO:  Objection to the

23          form of the question.

24       A.      I don't know.  I didn't think it

25   was that high.

94

1                    LeeAnn McNally

2        Q.      Did you think it was around

3    6,000?

4                 MR. BIANCO:  Objection to the

5         form of the question.

6                 You can answer.

7        A.      No.

8        Q.      Did you think it was around

9    5,000?

10                MR. BIANCO:  Objection to the

11        form of the question.

12                You can answer.

13       A.      No, I thought it was less.

14       Q.      Less than five thousand?

15       A.      Yes.

16       Q.      More than 4,500?

17                MR. BIANCO:  Objection to the

18        form of the question.

19       A.      I thought maybe it was around

20    four.

21       Q.      Okay.

22                Did you receive account

23    statements in the mail from Beneficial in

24    connection with your loan from Beneficial?

25       A.      I don't recall.

96

                          LeeAnn McNally

1

2   I never attempted to pay.

3        Q.      Okay.

4        A.      That's my only objection.

5        Q.      So look at paragraph 4, please.

6        A.      (Witness reviewing.)

7                Um-hum.

8        Q.      Paragraph 4 alleges "Defendant

9   opened an account with Beneficial on

10  August 1st, 2006."

11               Do you have any reason to doubt

12  the veracity of that allegation?

13       A.      No.

14       Q.      And after Subsection 2 of

15  paragraph 4, says, "The last payment posted on

16  the account was May 31, 2009."

17               Do you have any reason to doubt

18  the veracity of that allegation?

19       A.      No.

20       Q.      So you think you probably made

21  your last payment on that account sometime

22  around May 31, 2009?

23       A.      It's possible.

24       Q.      And then it says, "The account

25  was charged off on January 21, 2010."

97

```
 1                    LeeAnn McNally
 2              Do you see that?
 3         A.    Yes.
 4         Q.    Any reason to doubt that?
 5              MR. BIANCO:  Objection to the
 6         form of the question.
 7              You can answer.
 8         A.    No.
 9         Q.    In fact, this affidavit of facts
10    alleges you did make payments on your
11    Beneficial loan, doesn't it?
12         A.    It does.
13         Q.    Does that correspond with your
14    memory of your loan for Beneficial?
15         A.    Yes.  I know I made payments.
16         Q.    Okay.
17              Paragraph 5, take a quick look at
18    that.
19         A.    Okay.
20              (Witness reviewing.)
21              Okay.
22         Q.    Do you have any reason to doubt
23    the veracity of the allegations in paragraph
24    5?
25              MR. BIANCO:  Objection to the
```

98

                    LeeAnn McNally

1

2          form of the question.

3                    You can answer.

4          A.        Could you repeat the question?

5          Q.        Do you have any reason to doubt

6   the veracity of that statement in paragraph 5?

7                    MR. BIANCO:   Objection to the

8          form of the question.

9          A.        No.

10         Q.        Take a quick look at paragraph 6.

11         A.        (Witness reviewing.)

12         Q.        Do you have any reason to doubt

13   the veracity of the statement in paragraph 6?

14         A.        No.

15         Q.        Okay.

16                   (McNally Exhibit 9, Document

17         bearing Bates stamp Agoado-F&G-000007,

18         marked for identification.)

19         Q.        Showing you what's been marked as

20   McNally Exhibit 9, bears Bates stamp

21   Agoado-F&G-000007.

22                   Do you recognize this document?

23         A.        No.

24         Q.        This document is a letter, right?

25         A.        Yes.

99

1                    LeeAnn McNally

2        Q.      Who is it addressed to?

3        A.      LeeAnn DeRosa.

4        Q.      That's you?

5        A.      Yes.

6        Q.      What is the address of the

7   letter?

8        A.      151 Hilary Street, Oakdale,

9   New York.

10       Q.      That's the address you grew up

11  at, right?

12       A.      Yes.

13       Q.      And address your parents still

14  live at?

15       A.      Yes.

16       Q.      Do you have any reason to doubt

17  that this letter made its way to 151 Hilary

18  Street in or around May 23, 2012?

19               MR. BIANCO:  Objection to the

20       form of the question.

21               You can answer.

22       A.      No.

23       Q.      If your parents had received this

24  letter, would they have given a copy of it to

25  you?

1                     LeeAnn McNally

2                     MR. BIANCO:  Objection to the

3          form of the question.

4          A.     I would like to think they would.

5          Q.     Do you remember them giving you a

6     copy of this letter?

7          A.     This letter does not look

8     familiar to me.

9          Q.     The first line of the letter

10    after it says Dear LeeAnn DeRosa, it says, "A

11    judgment has been sent to court for entry in

12    the above matter."

13                 Do you remember being notified by

14    Forster & Garbus that a judgment had been sent

15    for entry --

16                 MR. BIANCO:  Objection to the

17         form of the question.

18         Q.     -- in a case against you?

19                 MR. BIANCO:  Objection to the

20         form of the question.

21                 You can answer.

22         A.     No.

23         Q.     Had you received this letter,

24    what would you have done in reaction to it?

25                 MR. BIANCO:  Objection to the

101

                    LeeAnn McNally

1

2        form of the question.

3        A.      I would have contacted the

4   office, contacted Forster & Garbus.

5        Q.      Okay.

6               Do you remember contacting

7   Forster & Garbus in response to this letter or

8   a letter like it?

9        A.      I don't remember.

10       Q.      Does that mean you didn't do it

11  or does that mean you just don't remember if

12  you did it or not?

13       A.      I really don't remember if I did

14  it or not.

15       Q.      Okay.

16              THE WITNESS:  Can I get a water?

17              MR. BIANCO:  Sure.  Take a break.

18              (Recess taken.)

19              (McNally Exhibit 10, Document

20          bearing Bates stamp Agoado-F&G 000008

21          through 000011, marked for

22          identification.)

23       Q.      Showing you what's been marked as

24  McNally Exhibit 10.  It has Bates stamp

25  Agoado-F&G 000008 through 000011.

102

1                    LeeAnn McNally

2              Look through all four pages

3    before I ask you my next question, please.

4         A.      (Witness reviewing.)

5         Q.      You can look through for now.   I

6    am not going to quiz you on it quite yet.

7         A.      (Witness reviewing.)

8         Q.      Let me know when you are ready.

9         A.      (Witness reviewing.)

10              Yep.

11        Q.      Do you recognize this document or

12   those documents?

13        A.      Not really.

14        Q.      First two pages labeled 08, Bates

15   stamp 08 and 09 appear to be similar except

16   for 08 has a signature from clerk of the

17   district court and a Bates stamp of June 27,

18   2012; do you see that?

19        A.      Yes.

20        Q.      I will represent to you that this

21   is a transcript of your judgment.   Is your

22   name on this document?

23        A.      Yes.

24        Q.      Do you have an understanding of

25   what it is?

1              LeeAnn McNally

2              MR. BIANCO:  Objection to the

3       form of the question.

4              What is?

5              MR. CURTIS JOHNSON:  What the

6       first two pages are?

7              MR. BIANCO:  Okay.

8              You can answer.

9       A.      Not really.

10      Q.      Okay.

11              Turn to the letter that starts on

12      the third page that I provided you.

13      A.      (Witness reviewing.)

14      Q.      It's a letter dated May 31, 2012

15      from Forster & Garbus and that's addressed to

16      you, right?

17      A.      Yeah.

18      Q.      Do you recognize this letter?

19      A.      No.

20      Q.      In the first line after it says,

21      "Dear LeeAnn DeRosa" it says, "A judgment has

22      been duly entered in court against you."

23              Do you see that?"

24      A.      Yes.

25      Q.      Had you received this letter -- I

104

                    LeeAnn McNally

1       know you -- do you recall the letter?  Let me

2       ask you this:  Do you recall receiving the

3       letter?

4            A.     No.

5            Q.     Okay.

6                   Had you received this letter,

7       would you have understood that a judgment had

8       been entered against you after reading that

9       line?

10           A.     Yes.

11           Q.     Okay.

12                  What would you have done when you

13      learned there was a judgment entered against

14      you?

15                  MR. BIANCO:  Objection to the

16           form of the question.

17           A.     I honestly don't know what I

18      would have done.

19           Q.     You see the next sentence in that

20      letter says, "The judgment bears interest of 9

21      percent per year until fully paid."

22                  Did you see that?

23           A.     I do.

24           Q.     Do you have an understanding of

1                    LeeAnn McNally

2    how interest works?

3          A.     I do.

4          Q.     Okay.

5                 You understand that the amount of

6    the judgment, which was $7,216.41, the

7    interest would run on that judgment?

8          A.     Yes.

9          Q.     Okay.

10                Go back to the first page real

11   quick.

12         A.     (Witness complying.)

13         Q.     You see the line says, "Amount

14   awarded $6,661.60"?

15         A.     Yes.

16         Q.     Below it there is an interest

17   amount from December 18, 2011 of $267.74?

18         A.     Um-hum.

19         Q.     What is your understanding of

20   that interest amount?

21         A.     I guess it was the interest that

22   had accrued from the time they got my debt.

23         Q.     Okay.

24                Then it says, "Total damages

25   $6,929.34."

106

                    LeeAnn McNally

1                    I am not good at math, so I am

2        going to give you a calculator.  I don't

3        expect anyone to be good at math, that's why

4        we became lawyers, right (handing)?

5                    You can add up $6,661.60 and

6        267.74.

7        A.      (Witness calculating.)

8        Q.      I don't think the decimal worked

9        right when you did that.

10       A.      Oh.

11       Q.      Try again.

12       A.      It's different.  All right.  Hold

13       on.  These new fancy phones, I don't know.

14                   MR. BIANCO:  6,661.6, plus

15       267.74.

16       A.      (Witness calculating.)

17       Q.      Okay.

18                   What do you get?

19       A.      $6,929.34.

20       Q.      Okay.

21                   That's the same number as the

22       total damages, right?

23       A.      Yes.

24       Q.      Then it lists cost by statute

1                     LeeAnn McNally

2    filing fee, sheriff's fee, service fee,

3    transcript filing fee and there are amounts

4    next to those; $50, $140, $56.07, $25 and

5    $16; do you see that?

6         A.    Yes.

7         Q.    Now, I can ask you to add all

8    those up or I can represent to you that those

9    add up to $287.07; does that sound right now,

10   287.07 totaled up?

11        A.    Yeah.

12        Q.    Okay.

13              And if you add the 287.07 to the

14   $6,929.34, it equals $7,216.41; does that

15   sound right?

16        A.    Sounds right.

17        Q.    Okay.

18              So do you understand how the

19   amount awarded in the judgment plus the costs

20   and interest came to be $7,216.41?

21              MR. BIANCO:  Objection to the

22         form of the question.

23              You can answer.

24        A.    Yes.

25        Q.    Okay.

108

                          LeeAnn McNally

1                         LeeAnn McNally

2              You can give me my phone back.

3         A.        (Handing.)

4                   (McNally Exhibit 11, Document

5         bearing Bates stamp Agoado-F&G-000012,

6         marked for identification.)

7         Q.        Showing you what's been marked

8    McNally Exhibit 11 (handing).

9         A.        (Witness reviewing.)

10        Q.        It has Bates stamp

11   Agoado-F&G-000012.

12                  Do you recognize this document?

13        A.        No.

14        Q.        Again, it's a letter, it's

15   addressed to you, right?

16        A.        Yes.

17        Q.        The address on it is 151 Hilary

18   Street, which is your parents' address?

19        A.        Yes.

20        Q.        The date on the letter is

21   June 13, 2012, right?

22        A.        Yes.

23        Q.        Does this timing of June 2012,

24   does that refresh your recollection as to

25   whether you found out your bank account was

109

                    LeeAnn McNally

1
2    frozen in 2012 or '13?

3         A.    Yes.

4         Q.    What is your recollection now?

5         A.    Must have been 2012.

6         Q.    Okay.

7               This letter went to your parents'

8    address like you said on June 13, 2012?

9         A.    Yes.

10        Q.    You said you called your father

11   sometime in June 2012 to talk about the fact

12   there is a judgment against you, right?

13        A.    Yes.

14        Q.    When you called your father, did

15   he mention that he received a letter similar

16   to this?

17        A.    No.

18        Q.    Did he mention he received any

19   letters from Forster & Garbus?

20        A.    No.

21        Q.    Why do you suppose that is?

22              MR. BIANCO:   Objection to the

23        form of the question.

24              You can answer.

25        A.    I have no idea.

133

LeeAnn McNally

1   was like in bringing it all up again is very

2   painful to me.  So really just feel like if

3   something wasn't done properly, then maybe

4   somebody should just stop doing that.

5           It's got nothing to do with

6   money.  It's got to do with the way things are

7   done and that's all, and the way I was

8   treated.  I am not some greedy person.  I am

9   not a greedy person at all.  I just didn't

10  like the way I was treated.  And that is all I

11  have to say about it.

12      Q.      Okay.

13          What did you think that Forster &

14  Garbus did wrong?

15          MR. BIANCO:  Objection.

16          Again, just again from your own

17      understanding is perfectly fine.

18      A.      I just -- I don't remember these

19  letters.  I just -- I don't understand why I

20  got -- I mean -- what they did, like freezing

21  my account and just like all of it was just --

22  it just seemed like it happened all at once.

23          And maybe I don't know anything

24  now, you know, 'cause I am not a lawyer or

134

                    LeeAnn McNally

1

2    anything like that, but I felt wronged.  Maybe

3    they didn't do anything wrong, maybe -- I'm

4    sorry.

5                   But it was a scary thing that

6    happened to me.  That's all.  And I felt

7    wronged, because I didn't feel like it was

8    right for them to freeze my account and I

9    didn't feel like it was right -- I don't even

10   know half the stuff that was done.  I didn't

11   know my dad was served, I had no idea.  I mean

12   I don't know what else to say except that.

13   My marriage almost ended.  It was a very hard

14   time, so I guess I just felt like it was just

15   wrong.

16        Q.     Do you understand that this case

17   was brought as a putative class action?

18                   MR. BIANCO:  Objection to the

19        form of the question.

20        A.     Does that mean more than me and

21   these other people?

22        Q.     That's what I am asking.  Do you

23   understand that you are seeking to have this

24   case certified as a class action?

25        A.     Yeah, 'cause there is more than

142

                              LeeAnn McNally

1        form of the question.

2        A.      You know what, I would like to

3   say yes, but it sure does take an awful long

4   time and I still see things being done that

5   aren't right.

6        Q.      Can you articulate the basis of

7   your claims against Forster & Garbus?

8               MR. BIANCO:  Objection to the

9        form of the question.

10              You can answer in your own words.

11       A.      I am not -- I feel like I've

12  already said how I feel about this whole

13  thing.  My problem is just the way it went

14  about.  I don't know how else to say it.  I

15  just -- I can't articulate what I want to say.

16  I don't...

17       Q.      Do you know how many causes of

18  action you've brought against Forster &

19  Garbus?

20              MR. BIANCO:  Objection to the

21       form of the question.

22       A.      I do not.

23       Q.      Do you know the laws under which

24  those causes of action were brought?

143

1                    LeeAnn McNally

2          A.      I do not.

3          Q.      Have you ever heard of the

4   General Business Law Section 349?

5          A.      No.

6          Q.      Okay.

7                   You have heard of the Fair Debt

8   Collection Practices Act, right?

9          A.      Yes.

10         Q.      Do you understand you have a

11  claim under the Fair Debt Collection Practices

12  Act?

13         A.      If you say I do.

14         Q.      Have you ever heard of Judiciary

15  Law Section 487?

16         A.      No.

17         Q.      Do you understand you have a

18  claim against Forster & Garbus for unjust

19  enrichment?

20                 MR. BIANCO:  Objection to the

21          form of the question.

22                 You can answer.

23         A.      Unjust enrichment?  I -- no, I

24  don't know.  I don't know.

25         Q.      Do you know what unjust

190

                        LeeAnn McNally

1

2       Q.      Okay.

3               I would like to move to McNally

4   2, which is the actual check.

5       A.      Okay.

6       Q.      If we look at page 2 of this

7   document, up near the top, there is a phone

8   number.  It appears to be 631-492-7741?

9       A.      Yes.

10      Q.      Is that your phone number or was

11  that your phone number?

12      A.      That was my cell phone number,

13  yes.

14      Q.      Was it your cell phone number in

15  August of 2006?

16      A.      Yes.

17      Q.      And we earlier discussed the

18  partially redacted number that ends in 5196;

19  would you agree that was -- that would be your

20  checking account number at the time?

21      A.      Yes.  I didn't really realize it

22  until hearing it out loud, because I used to

23  say it to myself when I had to pull out

24  deposit slips, but yes, yes, that's my

25  checking account.

227

1                    LeeAnn McNally

2          A.       I changed my address.

3          Q.       How did you change your address?

4          A.       I went to the post office.

5          Q.       Did you notify the New York

6   Department of Motor Vehicles that you changed

7   your address?

8          A.       Yes.

9                    MR. BIANCO:  Objection to the

10          form of the question.

11                   THE WITNESS:  Sorry.

12                   MR. BIANCO:  She asked and

13          answered that again.

14          Q.       Did you notify any creditors when

15   you changed your address?

16          A.       I changed my address, I felt like

17   that should have covered it.  I didn't know I

18   had to call everybody and tell them my address

19   changed.

20          Q.       If you look at the third page of

21   this document --

22                   MR. BIANCO:  Did you get all of

23          that, Cindy?

24                   THE COURT REPORTER:  Yes.

25          Q.       So there is -- under Transaction,

235

1              LeeAnn McNally

2              Have you reviewed your credit

3    report in the past three years?

4        A.      No, I have not.

5        Q.      Do you know if this Beneficial

6    account was reported to your credit history?

7        A.      I do not know.

8              (McNally Exhibit 21, Bates

9         Agoado-F&G-000015 through 000020, marked

10        for identification.)

11       Q.      Handing you what's been marked as

12   McNally 21 (handing).

13       A.      (Witness reviewing.)

14       Q.      I will represent to you that

15   these records are from Midland Credit

16   Management called Claims Notes; do you see

17   under name and address on page 1, it lists

18   your name and your Oakdale address?

19       A.      Yes.

20       Q.      Does it properly identify your

21   social security number?

22       A.      Yes.

23       Q.      If you turn to page 4 of 6, there

24   is a listing for June 18, 2012?

25       A.      (Witness reviewing.)

1          LeeAnn McNally

2          MR. BIANCO:  Objection to the

3      form of the question.

4          You can answer for yourself as a

5      layperson.

6      A.    I guess it says that if

7  defendants have insufficient evidence of the

8  existence of the consumer's debt -- I'm kind

9  of a little confused about it.  Basically, the

10 defendants have insufficient evidence of the

11 existence of the consumer debt excluded from

12 the class or officers and directors of

13 defendants at all relative -- relevant times.

14 I'm -- I am a little unsure.  Little unsure

15 about it.

16     Q.    Okay.

17          Do you believe -- first of all,

18 would you agree that suit was filed against

19 you on behalf of Midland Funding seeking to

20 collect the Beneficial debt?

21     A.    Yes.

22     Q.    Having reviewed the records that

23 we have today, do you believe that Midland

24 Funding possessed documentation of that debt?

25          MR. BIANCO:  Objection to the

252

LeeAnn McNally

2    form of the question.

3            You can answer.

4    A.    Yes.

5    Q.    Do you believe that suit was

6    brought against you with insufficient evidence

7    of the debt, as a layperson, not as an

8    attorney?

9    A.    I believe they had evidence of a

10   debt, yes, but I don't know.  No, just, yes.

11   Q.    Yes, you do believe they had

12   insufficient --

13   A.    I don't believe they had

14   insufficient evidence, because I said that I

15   owed the money.  I don't say -- I never said I

16   didn't owe money, never said that.

17   Q.    Flipping ahead to page 24,

18   paragraph 74.

19   A.    (Witness complying.)

20   Q.    Second sentence states, "Upon

21   information and belief, neither Midland

22   Funding nor Forster & Garbus, LLP made a

23   reasonable effort to verify McNally's

24   purported debt before harassing her or filing

25   suit."

255

                          LeeAnn McNally
1    Beneficial, the check and the other things.  I
2    mean I don't know where any of that stuff is,
3    I don't know where it came from, I don't know
4    what it is, I don't know where it was before,
5    so I will say that that signed check is
6    certainly mine.
7
8            Q.     Speaking as to Midland Credit
9    Management, did you believe they used any
10   unfair or unconscionable means to collect a
11   debt from you, the Beneficial debt?
12               MR. BIANCO:  Objection to the
13           form of the question.
14           A.     I have no idea.  I am not
15   familiar with the debt laws and I don't really
16   know what was -- I know some of the things
17   that were done to me, not necessarily by
18   Midland but by others, were wrong, like
19   threatening to throw me in jail, I don't know.
20   You know, when you owe money and everyone is
21   calling, you don't know what is right and
22   what's wrong.  You just try to make the best
23   of it.
24           Q.     Well, if you can, just the
25   Beneficial account and Midland Credit

256

1               LeeAnn McNally

2     Management's dealings with you, did you ever

3     have any contact with Midland Credit

4     Management?

5               MR. BIANCO:  Objection to the

6          form of the question.

7               You can answer.

8          A.     I really don't remember.  I mean

9     it was a really long time ago, and like I

10    said, it wasn't the only people asking me for

11    money.

12         Q.     Do you have any basis to assert

13    that Midland Funding did not properly purchase

14    your debt?

15               MR. BIANCO:  Objection to the

16          form of the question.

17         A.     I would have no idea.  I really

18    don't.

19               MR. MATTHEW JOHNSON:  That's all

20          I have.

21               MR. CURTIS JOHNSON:  I might have

22          rebuttal to your questions too.

23               MR. BIANCO:  I think it's proper

24          for me to go first.  You can finish up

25          with not only your rebuttal --

284

C E R T I F I C A T E

STATE OF NEW YORK        )

                         ) ss.:

COUNTY OF SUFFOLK        )


        I, CINDY A. AFANADOR, a Notary

Public within and for the State of New

York, do hereby certify:

        That LEEANN MCNALLY, the witness

whose deposition is hereinbefore set

forth, was duly sworn by me and that such

deposition is a true record of the

testimony given by such witness.

        I further certify that I am not

related to any of the parties to this

action by blood or marriage; and that I

am in no way interested in the outcome

of this matter.

        IN WITNESS WHEREOF, I have

hereunto set my hand this 14th day of

July, 2015.

        ____*Cindy A. Afanador*_____

        CINDY A. AFANADOR