# Exhibit M-L

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x
DAVID AGOADO, LEEANN MCNALLY,
CRAIG MOORE, CHRIS PIERRE, THOMAS
SHARKEY, MADGE SHIPMAN, and DOREEN
VAZQUEZ individually and on
behalf of all others similarly situated,
                    Plaintiffs,
          -against-
MIDLAND FUNDING, LLC, MIDLAND
FUNDING, LLC. doing business in
New York as MIDLAND FUNDING OF
DELAWARE, LLC, and MIDLAND
CREDIT MANAGEMENT, INC.,
                    Defendants.
----------------------------------------x

                         5036 Jericho Turnpike
                         Commack, New York

                         July 14, 2015
                         10:53 a.m.


          Examination Before Trial of the

Plaintiff, CRAIG MOORE, pursuant to

Order, before CINDY A. AFANADOR, a Notary

Public of the State of New York.




          CINDY AFANADOR COURT REPORTING, INC.
                    516-491-2694
               www.cindycourtreporting.com

12

                          Craig Moore

1

2        A.      A few times.

3        Q.      Okay.

4                Do you remember when the first

5    time you met with him was?

6        A.      The first time I met with him was

7    probably a few -- maybe last year I want to

8    say.

9        Q.      Okay.

10               Before we go any further, do you

11   have any questions of me or your attorney you

12   wish to put on the record?

13       A.      No.

14       Q.      Okay.

15               Could you please tell me your

16   name and your current address?

17       A.      My name is Craig Moore.   My

18   current address is 25 Crater Lake Drive in

19   Coram, New York 11727.

20       Q.      How long have you lived at that

21   address?

22       A.      I've lived at that address since

23   2006.

24       Q.      And does anybody live with you at

25   that address?

29

1                    Craig Moore

2        Q.      Is that correct, and it's signed

3   by both Alan Finkel and yourself, Mr. Moore?

4        A.      Yes.

5        Q.      That's your signature?

6        A.      Yes.

7        Q.      Okay.

8                So let's take a look at this for

9   a few minutes.

10               By the way, when you first

11  received -- let's step back.

12               Going back to number 2, when you

13  first got that letter --

14       A.      Number 2?

15       Q.      Yes.

16       A.      (Witness reviewing.)

17       Q.      -- what did you think that was

18  about?

19       A.      I don't know what it was about.

20       Q.      Had you heard of Midland Funding

21  at that time?

22       A.      No.

23       Q.      Now, the third paragraph, it says

24  that Midland and/or their attorneys' actions

25  may have been in violation of federal and

1                    Craig Moore
2    state law; do you see that?
3         A.    Yes.
4         Q.    Did you have any idea what that
5    meant?
6         A.    Yes.
7         Q.    What did that mean?
8         A.    That they were in violation of
9    federal and state law.  That they broke the
10   law somehow.
11        Q.    Did you have any idea what that
12   might -- how that might have happened?
13        A.    No.
14        Q.    Okay.
15              And at that time you never heard
16   of Midland Funding Corp.?
17        A.    No.
18        Q.    Let's turn to number 3.
19        A.    (Witness complying.)
20        Q.    After you got that letter and you
21   contacted Mr. Finkel -- I'm sorry.
22        A.    Got this letter (indicating)?
23        Q.    Number 2, you contacted
24   Mr. Finkel?
25        A.    Yes.

77

1                    Craig Moore

2    Drive, Coram, New York 11727.

3                    MR. FRANK:  Off the record.

4                    (Discussion held off the record.)

5                    (Moore Exhibit 5, Document bearing

6           Bates stamp P&P #213 through #220, marked

7           for identification.)

8           Q.       Mr. Moore, I am going to show you

9    what's been marked as Moore 5 and ask you to

10   take a look at it (handing)?

11          A.       (Witness reviewing.)

12                   Okay.

13          Q.       And have you seen this document

14   before?

15          A.       Yes.

16          Q.       And for the record, this is a

17   Summons and Complaint in foreclosure filed by

18   Wells Fargo Bank against yourself and your

19   wife and several other individuals regarding

20   the property at 25 Crater Lake Drive; is that

21   correct?

22          A.       Yes.

23          Q.       Do you recall when you received

24   this originally -- step back.

25                   Did you get this -- you see that

78

1                    Craig Moore
2    it's dated, the summons.  On the first page it
3    says it was filed on 6/12/12; do you see that?
4         A.    Yes.
5         Q.    And it looks like the second --
6    take a look at page 2, please?
7         A.    (Witness reviewing.)
8         Q.    And that's dated June 25, 2012
9    and it says, "Notice:  You are in danger of
10   losing your home."
11             Do you see that?
12        A.    Yes.
13        Q.    Do you recall receiving this
14   around that time, June 25, 2012?
15        A.    I don't remember.
16        Q.    Do you recall receiving this?
17        A.    Yes.
18        Q.    Back around that time?
19        A.    I don't remember.  I know I
20   received this letter, but I don't remember
21   what date I received it.
22        Q.    Is it fair to say that you
23   received it in 2012, sometime in the summer of
24   2012?
25        A.    I guess.

79

1                    Craig Moore

2        Q.      Okay.

3                Did you file an answer to this

4    complaint?

5        A.      No.

6        Q.      Did you see an attorney about

7    this complaint?

8        A.      No.

9        Q.      Okay.

10               But you did get a copy of this

11   complaint at the time when the foreclosure

12   action was filed?

13       A.      I know I got a copy of this

14   complaint, yes.

15       Q.      And what did you do when -- after

16   you got a copy of the complaint?

17       A.      I dealt with my mortgage company.

18       Q.      And who was your mortgage

19   company; do you recall?

20       A.      It was Option One at the time.

21       Q.      Just because I am going to ask

22   you about this, looking at page 2, you see the

23   third -- the fourth underlined group of words,

24   it says -- you see where it says, "Sending a

25   payment to your mortgage company will not stop

80

                          Craig Moore

1                         Craig Moore

2      this foreclosure action"?

3             A.       Yeah, I see that.

4             Q.       You see right below it it's in

5      all capital letters, "You must respond by

6      serving a copy of the answer on the attorney

7      for the plaintiff (mortgage company) and

8      filing the answer with the Court."

9                      Do you see that?

10            A.       Yes.

11            Q.       And did you file an answer with

12     the Court or with the attorney for the

13     plaintiff?

14            A.       No.

15            Q.       Do you have any idea why the

16     County of Suffolk Office of Community

17     Development got a copy of the complaint?

18            A.       Say it again.

19            Q.       Do you have any understanding of

20     why, and it looks like at the bottom of page 2

21     it says to and it says Craig N. Moore; do you

22     see that?

23            A.       Yes.

24            Q.       Below that it says Candice A.

25     Moore?

84

                    Craig Moore

1    into a mortgage modification plan or you were

2    discussing mortgage modification prior to

3    getting this complaint?

4         A.    I believe, yeah, a little bit

5    after getting this complaint.

6         Q.    After the complaint?

7         A.    Yeah.

8         Q.    That was the resolution of this

9    complaint?

10        A.    Yes.

11        Q.    You entered into a mortgage

12   modification?

13        A.    We were -- yeah, modification.  I

14   think.  I'm not sure.

15        Q.    Well, you are still living at

16   25 Crater Lake Drive?

17        A.    Yes.

18        Q.    You worked out something at that

19   time?

20        A.    Yes.

21        Q.    And to your knowledge, was this

22   complaint dismissed at some point?

23        A.    No.  I don't think so, because

24   the company sold, as far as what I know.

85

1                    Craig Moore

2        Q.      So you don't know what happened

3   to this complaint?

4        A.      No, I don't know what happened to

5   it.  I know it's still filed.

6        Q.      But is it open or you don't know

7   if it's open or closed?

8        A.      I don't know how open and closed

9   it is.  No, I don't know that.

10       Q.      Did you ever feel it might be

11  wise to check?

12       A.      No.

13       Q.      You said you got your credit

14  report recently?

15       A.      Not recently, but like three

16  years ago, I believe so, if I am correct.

17  '08.

18       Q.      Well, that's more than two years

19  ago.

20       A.      2010, 2011, maybe, somewhere

21  around there.  I know it's a little bit after

22  my mother passed I got it.  I believe so.

23       Q.      That would be 2013?

24       A.      Um-hum.

25       Q.      That's --

Craig Moore

1
2          It states -- looking at the first
3   paragraph, do you understand what the first
4   paragraph means?  Do you have an understanding
5   of what that means?
6          A.      Today, yes.  Reading it right
7   now, yes.
8          Q.      I don't want to put words in your
9   mouth.  I am going to ask you if you can
10  interpret it for us, what it's telling you?
11         A.      It says something GE whoever
12  that maybe has been purchased by Midland
13  Funding of Delaware and has placed, you know,
14  a law firm to collect for collections.
15         Q.      And it says your account with GE
16  Money Bank, right?
17         A.      Yes, states my account, yeah.
18                 (Moore Exhibit 10, Document bearing
19         Bates stamp P&P #7 through P&P #9, marked
20         for identification.)
21         Q.      I am going to show you what's
22  been marked as Moore 10 (handing).
23         A.      (Witness reviewing.)
24         Q.      I ask you to take a look at that.
25         A.      (Witness reviewing.)

104

1                    Craig Moore
2         Q.      Have you seen this document
3    before?
4         A.      No, I didn't see this document
5    before.
6         Q.      For the record, this is a
7    summons, page 1, and the second and third
8    pages are a complaint.
9                    It's Midland Funding, LLC d/b/a
10   in New York as Midland Funding of Delaware,
11   LLC, against Craig Moore.  It's dated 6/27/11.
12   And you notice that underneath -- you
13   understand what the caption is, because we've
14   talked about caption before?
15        A.      The top?
16        Q.      Right.  Okay.
17                    And you see right below the
18   caption it says defendant's residence address?
19        A.      Um-hum.
20        Q.      Is that your address?
21        A.      Under defendant's residence
22   address, yes, sir, 25 Crater Lake Drive,
23   Coram, New York 11727.
24        Q.      And it's your testimony, as you
25   sit here today, that you have never seen this

Craig Moore

1
2   complaint before?

3        A.     I have never seen this complaint.

4        Q.     Has your attorney shown you this

5   complaint; is that possible?

6               Let me ask a different way.

7               Has your attorney shown you this

8   complaint?

9        A.     I can't remember if he showed it

10   to me.

11       Q.     Okay.

12              And it's your testimony you never

13   saw -- if he did show it to you, that would

14   have been the first time you had seen it, you

15   hadn't seen it prior to that?

16       A.     Yeah, if he did show it to me

17   that was probably my first time seeing it, but

18   I never seen this before.

19       Q.     Okay.

20              (Moore Exhibit 11, Document bearing

21         Bates stamp P&P #163, marked for

22         identification.)

23       Q.     I am going to show you what's

24   marked as Moore 11 (handing).

25       A.     (Witness reviewing.)

107

                          Craig Moore

1

2          A.      A chef has to be in -- I am in

3    sometimes 6 o'clock in the morning.  All

4    depending what's going on that day.

5          Q.      Was it the same with Smokey

6    Bones?

7          A.      Yes, even earlier.  Truck days,

8    5:30; inventory days, 5:00.

9          Q.      I'm going to ask you to take a

10   look at the fourth paragraph where it starts

11   out pursuant to C.P.L.R.?

12         A.      Yes.  Okay.

13         Q.      And it says on 8/6/2011, service

14   was completed by depositing a true copy of

15   each document to the above address; do you see

16   that?

17         A.      Um-hum.

18         Q.      And I'm going to ask you to go up

19   to the second paragraph and it says -- what is

20   the address where this -- where the process

21   server states that this complaint was served?

22         A.      Saying that it's 7/25 at

23   4:36 p.m.

24         Q.      Not paragraph above.

25         A.      It was served on 8/5 at 9:50 a.m.

108

1                          Craig Moore

2          Q.       Right.   It says --

3          A.       Summons and Complaint on

4    Craig Moore, 25 Crater Lake Drive in the

5    matter indicated below.

6          Q.       25 Crater Lake Drive, that's your

7    address, correct?

8          A.       Yes, sir.

9          Q.       And it says on the next

10   paragraph, it says "Affixing to the door."

11   According to what I am reading, and you tell

12   me if I am right or wrong, looks like on

13   July 25th and July 27th, someone went to the

14   house and then on August 5, it was affixed to

15   the door; that's my understanding?

16         A.       Um-hum.

17         Q.       Do you agree with that?  Is that

18   what it appears to you?

19         A.       That's what I am reading on this

20   affidavit, yes.

21         Q.       And, as you sit here today, under

22   oath, your testimony is that a copy of the

23   summons and complaint was never affixed to

24   your door?

25         A.       No, sir.

109

Craig Moore

1  Q.      And it says here in the last

2  paragraph, it says it was mailed -- a copy of

3  this, of the Summons and Complaint was mailed

4  to you on August 6, 2011?

5  A.      I don't know if it was.  I never

6  received anything.

7  Q.      Okay.

8  So your testimony today is you

9  didn't receive it on that occasion either, but

10  that is your address?

11  A.      Yes, sir.

12  Q.      Okay.

13  A.      I don't remember if I did.

14  Q.      Is it possible that you did?

15  A.      I don't know.

16  Q.      All right.

17  So just so we are clear, you

18  don't recall, but it's possible or you are

19  sure you never got it?

20  A.      I never got it.  Something like

21  that I think I would remember or if I would

22  see it on my door.  I don't remember.  It's

23  four years.  To be honest with you, I don't

24  know.

110

1                    Craig Moore

2                 (Moore Exhibit 12, Document bearing

3        Bates stamp P&P #17 through P&P #20,

4        marked for identification.)

5        Q.      I am going to show you what we

6   marked as Moore 12 (handing).

7        A.      (Witness reviewing.)

8        Q.      I ask you to take a look at it.

9        A.      (Witness reviewing.)

10       Q.      It's four pages.

11       A.      (Witness reviewing.)

12       Q.      Have you had a chance to review

13   it?

14       A.      Yes.

15       Q.      And Mr. Moore, just so we are

16   clear, a lot of documents I've shown you up

17   until now, including this one, this is an --

18   this is not signed.  There is a name on it.

19   Did you see there is a name on it, but it's

20   not a signed copy?

21       A.      (Witness reviewing.)

22       Q.      You see there is no signature on

23   it?

24       A.      Um-hum.

25       Q.      Most of the documents I've shown

112

1                    Craig Moore

2              MR. WILLIAMSON:   That's fine.

3         Q.     Are we on --

4         A.     Yes, I gotcha.

5         Q.     That's how you have been

6    answering your questions up until now?

7         A.     Yes.

8         Q.     Fair enough.

9              Have you seen this document

10   before, this is a letter dated August 25, 2011

11   and it's addressed to you; is that correct,

12   sir?

13        A.     Yes.

14        Q.     And that's your address on top of

15   the letter?

16        A.     Yes, 25 Crater Lake Drive.

17        Q.     This is a letter from Pressler

18   and Pressler?

19        A.     Yes.

20        Q.     Okay.

21             And you see the first sentence in

22   the letter, it says, "Enclosed please find a

23   copy of the summons and complaint filed with

24   District Court of the County of Suffolk, First

25   District, Ronkonkoma."

1                    Craig Moore

2          A.      Yes.

3          Q.      As you sit here today, you state

4    you've never received this letter?

5          A.      No.

6          Q.      But this is your address?

7          A.      Yes, that's my address.  I don't

8    remember receiving this letter, to be honest

9    with you.  I don't remember it.  I don't think

10   I ever did.  I don't remember it.

11         Q.      The letter encloses the summons

12   and complaint, the same one as I showed you

13   previously, correct?

14         A.      Yes.

15         Q.      As you sit here today, you don't

16   recall that you ever received this?

17         A.      No, I don't recall receiving

18   this.

19         Q.      I will ask again, is it possible

20   that you received it and you just don't

21   remember?

22         A.      I don't know.

23         Q.      Okay.

24                 The summons, which is the same

25   summons that I showed you earlier, look at

114

Craig Moore

page 2, 6/27/11 with your address on it.

     A.    The second page with my address on it?

     Q.    Yes.

     A.    Yes, that's my address.

     Q.    And this is a copy of what I showed you earlier, the summons and complaint?

     A.    Yes, this is a copy of what you just showed me.

     Q.    Okay.

     (Moore Exhibit 13, Document bearing Bates stamp P&P #16, marked for identification.)

     Q.    I show you what's marked as Moore 13 (handing).

     A.    (Witness reviewing.)

     Q.    That's a letter dated August 25, 2011.

     A.    (Witness reviewing.)

     Q.    I ask for you to look this over and tell me if you recall seeing this letter before?

     A.    I don't recall.

     Q.    And who's the letter addressed

115

1                    Craig Moore

2     to?

3          A.      Craig Moore.

4          Q.      And that's you, sir?

5          A.      Yes.

6          Q.      And that's at your address, 25

7     Crater Lake Drive?

8          A.      Yes.

9          Q.      Okay.

10                 And this was the address you were

11    living at in 2011?

12         A.      Yes.

13         Q.      Do you have any reason to doubt

14    that this letter was sent to you on that date?

15                 MR. FRANK:  Objection, form.

16         A.      I don't know.  I don't remember.

17         Q.      I understand that you don't

18    remember -- you are saying you don't remember

19    seeing it?

20         A.      Yes.

21         Q.      But I am asking, do you have any

22    reason to doubt that it was, in fact, sent?

23         A.      I don't know.  I don't know if it

24    was sent or not to me, if I didn't receive it.

25    I don't know if it was sent.  I don't remember

116

Craig Moore

1  seeing it.  Did I have to sign for it?  I

2  don't know.

3  

4      Q.    Well, if you would have had to

5  sign for it, do you normally -- if you get

6  certified mail, if you get a note from the

7  post office that you have certified mail, do

8  you normally go and pick it up?

9      A.    Yes.

10     Q.    You do?

11     A.    Yeah.

12     Q.    Okay.

13         Have there been occasions that

14  you recall where you got a notice that you got

15  certified mail and you didn't go and pick it

16  up?

17     A.    I remember -- I mean there's

18  times, yeah, that I didn't go and pick it up.

19  My wife may have gone to pick it up.

20     Q.    But somebody would go and pick it

21  up?

22     A.    Yeah.

23     Q.    That's what you meant?

24         MR. WILLIAMSON:  You can call it

25         when you want a break.  I will keep

117

Craig Moore

1    going until you stop me.

2                 MR. FINKEL:  Go another 15

3    minutes.

4                 MR. WILLIAMSON:  That's fine.

5                 (Moore Exhibit 14, Document bearing

6    Bates stamp P&P #21, marked for

7    identification.)

8         Q.    I am showing you what I marked as

9    Moore 14 (handing).

10        A.    (Witness reviewing.)

11        Q.    I ask you to take a look at it,

12   please --

13        A.    (Witness reviewing.)

14        Q.    -- and read it.

15              I mean it's not too long.

16              This is a letter dated 8 --

17   9/7/11.

18              MR. FRANK:  Off the record.

19              (Discussion held off the record.)

20   BY MR. WILLIAMSON:

21        Q.    You have read it?

22        A.    Yes.

23        Q.    I am just going to point your

24   attention -- this letter is addressed to you,

118

                          Craig Moore

1
2    sir?
3          A.      Yes, it is.
4          Q.      And you were living at 25 Crater
5    Lake Drive on September 7, 2011?
6          A.      Um-hum.
7          Q.      You have to say yes or no.
8          A.      Yes.
9          Q.      And you see in the re line, it
10   has a re line and it mentions a district
11   court?
12         A.      Yes.
13         Q.      And you see the first sentence of
14   the letter?
15         A.      Um-hum.
16         Q.      You have been served with a
17   summons and complaint in the above-referenced
18   matter and you have failed to contest it.
19         A.      Um-hum.
20         Q.      Have you seen this letter before?
21         A.      No.
22         Q.      Do you have any reason to doubt
23   that the letter was sent to you on the date
24   listed?
25                 MR. FRANK:  Objection to the form

119

1                    Craig Moore

2         of the question.

3         A.      I don't know.  I don't remember

4    seeing this letter.

5         Q.      As you sit here today, if I gave

6    you this letter, what -- would you have any

7    kind of reaction to it?

8                    MR. FRANK:  Objection to the form

9         of the question.

10        A.      If -- if -- yeah.  Can you

11   rephrase that a little bit?

12        Q.      Sure.

13                  If you received a letter at home

14   this week --

15        A.      Today?

16        Q.      Today, yesterday, tomorrow, what

17   would you do with it?

18                  MR. FRANK:  Objection.

19                  Calls for speculation.

20        Q.      If anything?

21        A.      I don't know.  I don't know what

22   I would do.  I would wonder who the hell is

23   Midland Funding without knowing it today.

24        Q.      Okay.

25        A.      Or with the case, yeah, I would

126

                         Craig Moore
1   this document before?
2
3        A.      No.
4        Q.      Okay.
5                Did you have a JCPenney account?
6        A.      Yes.
7        Q.      Charge account?
8        A.      Yes, I believe so.
9        Q.      What happened to that account;
10  did you pay it off and close it?
11       A.      I received -- I don't know.  I
12  never paid -- I don't think I paid it off.  I
13  know I owed them.  I don't know exactly how
14  much.
15       Q.      Do you know if GE Money Bank was
16  the bank behind that account?
17       A.      No.  I don't know anything.  I
18  just know -- I know JCPenney, but that's about
19  it.
20       Q.      Do you remember how much money
21  you owed them on it when you stopped paying?
22       A.      No.  I owed them some money.  I
23  don't know exactly how much.
24       Q.      Could it have been a couple of
25  thousand?

Craig Moore

1

2     A.     I'm not sure exactly how much it

3  was.

4     Q.     If -- is it possible that it was

5  a couple of thousand dollars or you think it

6  was less?

7     A.     No, should have been less,

8  'cause -- I mean my account -- I don't

9  remember, to be honest with you.  I know I

10  owed them money, but not that much.  I don't

11  think I owed them that much.

12     Q.     Do you know what happened to that

13  account, besides you say you owed the money,

14  did they try to collect it from you?

15     A.     They sent me a few bills a couple

16  of times.  I got a couple of statements from

17  them, but that was it.

18     Q.     You didn't do anything about it?

19     A.     No, at the time, no, I hadn't.

20     Q.     When you were doing -- when the

21  foreclosure action was filed, and you were

22  reorganizing -- doing your mortgage, did they

23  ask you for a list of all your outstanding

24  debts?

25     A.     No.

128

1                    Craig Moore

2        Q.      Okay.

3                I would like you to look and

4    direct your attention to the first paragraph.

5        A.      (Witness reviewing.)

6                Okay.

7        Q.      Do you have any reason to doubt

8    that Paula Hansen was employed as a legal

9    specialist at Midland Credit Management?

10       A.      Based on this statement right

11   here right now?

12       Q.      Right.

13               Do you have any basis to

14   challenge that statement?

15       A.      No.  I don't know.

16       Q.      Do you have any basis to

17   challenge that she has access to pertinent

18   account records?

19               MR. FRANK:  I am going to object

20          on the basis of privilege.  Any

21          information that your attorneys may have

22          furnished you in anticipation of

23          litigation is attorney work product, so

24          if you are able to answer the question

25          without divulging any attorney/client

Craig Moore

1

2    work product, please do so.

3              MR. WILLIAMSON:   Okay.

4    Q.        So let me rephrase, because I am

5    not going to argue with your counsel.

6              I want to to emphasize, I am asking

7    do you have any knowledge, that you know, not

8    what your attorney told you?  I don't want to

9    know what your attorney told you.  So when I

10   ask you do you have any knowledge, do you have

11   any reason, you independently, irrespective --

12   I don't care what he told you.  I don't want

13   to know what he told you or Mr. Finkel told

14   you or anybody else told you.  I want to know

15   what you know on your own.

16             So do you have any basis, and

17   that's what I mean when I say do you have any

18   basis, that's what I am getting at, to

19   challenge the accuracy that Paula Hansen had

20   access to pertinent account records for

21   Midland Credit Management?

22   A.        I don't even know who she is.  I

23   don't know.  Based off of what I am reading

24   right now, no.

25   Q.        You have no basis to challenge

130

1                    Craig Moore

2    that statement?

3         A.     No.

4         Q.     Okay.

5                Do you have any basis to

6    challenge that she has personal knowledge of

7    the account records maintained on plaintiff's,

8    that being Midland's, behalf?

9                MR. FRANK:  Again objection on

10          the basis of privilege.

11               MR. WILLIAMSON:  Again, all these

12          questions -- I think we set the ground

13          rules.

14        Q.     All the questions I am asking

15   about this document, your knowledge, not what

16   he told you or somebody else told you.

17        A.     No.

18        Q.     One of your attorneys told you?

19        A.     No.

20        Q.     So no, you have no basis to

21   challenge?

22        A.     No.

23               MR. FRANK:  Just for the record,

24          not just what we told him, but also, you

25          know, any communications that we gave to

131

                        Craig Moore

1
2      him that might be implicated in our
3      attorney work product are relevant to
4      this litigation.
5              MR. WILLIAMSON:  If you testified
6      you fed him information, okay.
7              MR. FRANK:  Of course we did the
8      investigation, of course we gave him
9      information.
10         Q.     Do you have any basis to
11  challenge the fact that the GE Money account
12  number 6008894762841387 was assigned to
13  Midland Credit Management?
14         A.     Besides what my attorneys told
15  me, no.
16         Q.     And do you have any basis to
17  challenge the statement made by Paula Hansen
18  in this affidavit, "I have access to and have
19  reviewed the records pertaining to the
20  account"?
21         A.     No.
22         Q.     Okay.
23              Now let's look at paragraph 2.
24         A.     (Witness reviewing.)
25         Q.     Do you have any basis to

140

Craig Moore

1    A.    No.

2    Q.    Okay.

3          Then goes on.  The next sentence

4    goes "The relevant financial information

5    concerning the account includes the

6    following," and we go to the next page.

7    A.    (Witness reviewing.)

8    Q.    It says, "The account shows that

9    the defendant(s)owed a just and true balance

10   of $504.03 as of 2011, 5/15.  Do you have any

11   basis to dispute that that is what the account

12   showed?

13   A.    No.

14   Q.    Okay.

15         Do you have any basis to dispute

16   the rest of that sentence?  Just read it and

17   tell me if you do.

18   A.    (Witness reviewing.)

19         No.

20   Q.    No?  The answer is no, you have

21   no basis to dispute that statement?

22   A.    No.

23   Q.    Okay.

24         When you had credit cards, and I

171

1           Craig Moore

2           I will give it a stab.

3           MR. FRANK: Let me explain, his

4       understanding of what actual damages are

5       or aren't if that understanding is a

6       function of his attorneys telling him.

7           MR. WILLIAMSON: Fine. I am

8       going to define it for him. You can

9       disagree if you choose.

10          Q.    I understand actual damages to be

11  out-of-pocket costs that you incurred.

12              Have you suffered any

13  out-of-pocket actual costs in regards to any

14  of your allegations that are in the complaint?

15          A.    No.

16          Q.    So you have paid no monies to

17  anybody as a result of anything that's

18  contained in any of the allegations contained

19  within the complaint?

20          A.    No.

21          Q.    In your mind, in your mind, have

22  you suffered any other, and I am asking in

23  your mind, have you suffered any other damages

24  that you could tell me about? In your mind.

25  I am not asking what your attorneys told you.

172

1                    Craig Moore
2    I am not asking about statutory damages.  What
3    do you think you've suffered, if anything?
4         A.    Suffered a lot.
5         Q.    What have you suffered?
6         A.    Harassment.
7         Q.    From who?
8         A.    From -- I was getting repeated
9    phone calls, that's all I remember at the
10   time.  We were getting phone calls and it was
11   like all the time, day and night.  And they
12   were leaving messages, 'cause we weren't home,
13   you know, and I constantly was getting phone
14   calls, constantly.
15             And I feel that, you know, I
16   wasn't shown proof, because I didn't even know
17   anything.  I spoke to my attorney what Midland
18   was, what the case was about and my question
19   was, I'm thinking it was a Verizon bill that I
20   owed and it came out to be something more than
21   that, you know.  And it's -- I mean I felt
22   like I was taken advantage of, personally.
23        Q.    How so?
24        A.    Because they are saying I owed
25   them something but no one showed me anything

176

                              Craig Moore

1
2    Pressler is?

3         A.    As of today I know who they were.

4         Q.    Today?

5         A.    Yes.

6         Q.    Before today?

7         A.    I mean through my attorneys I

8    find out who they were.

9         Q.    They told you who they were?

10        A.    Yes.

11        Q.    You didn't know about them

12   before?

13        A.    Yes.

14        Q.    Without your attorneys, okay.

15              Have you ever had any of your

16   bank accounts restrained by anybody?

17        A.    I don't understand what you mean.

18        Q.    Okay.

19        A.    Like a hold put on my accounts?

20        Q.    Yes.

21        A.    Not that I can remember.

22        Q.    Okay.

23              Has anybody ever garnished your

24   wages?

25        A.    I've had my wages garnished.

Craig Moore

1
2  credit card or something else, some other kind
3  of account?
4        A.      No, I don't know.
5        Q.      Okay.
6                Now, in your own words, if I
7  asked you this, I apologize.  I am asking it.
8  What is this case about?  What is your
9  understanding of what this case is about?  And
10 this case -- when I say "this case," I mean --
11       A.      This case?
12       Q.      David Agoado versus Midland
13 Funding.
14       A.      Based off what I -- my attorneys
15 told me and from what we see is that I was
16 charged an amount --
17       Q.      All right.  Stop.  Time out for a
18 second.
19                I don't want you to tell me what
20 your attorneys told you.
21       A.      So just what I know?
22       Q.      Yes, what do you know?
23       A.      Well, that I was charged "X"
24 amount of dollars, which I knew nothing about
25 and somehow someone was able to put --

183

Craig Moore

1  Pressler and Pressler put a judgment against
2  me, which I knew nothing about.
3   
4      Q.      Right.
5      A.      And I am owed this debt, which I
6  know nothing about, and it's nothing I can do
7  about it.  I have to pay the debt, I'm
8  assuming.
9      Q.      Have you paid the debt?
10     A.      No, I haven't paid the debt, but
11  they are saying I owe them, and I know nothing
12  about it, and that we were taken advantage of,
13  because I should have been let know that I had
14  to be in court and told about these things so
15  I can be able to challenge this.
16     Q.      So you think the 20-some odd
17  letters that went to you at your address
18  wasn't enough?
19          MR. FRANK:  Objection.
20          The witness is testifying there
21      is no evidence on the record that any
22      letters were sent to his address other
23      than counsel's testimony that they were.
24     Q.      You have seen the letters that
25  were addressed to you?

184

1                      Craig Moore

2          A.      Yes.

3          Q.      And you have no basis to dispute

4   that they were sent, correct?

5          A.      Yes, I have no basis.

6          Q.      Despite all of that evidence to

7   the contrary, you are saying that nobody ever

8   told you that this was going on until

9   Mr. Finkel contacted you?

10              MR. FRANK:  Objection.

11              There is no evidence that the

12         letters were sent on the record.  You

13         call that evidence?

14              MR. WILLIAMSON:  No, that's his

15         story.  That's good.

16              MR. FRANK:  Have you produced

17         some other evidence that we are not

18         aware of?  Are you in possession of

19         evidence that these letters --

20              MR. WILLIAMSON:  Are you talking

21         about the videographer who was hiding in

22         the bushes when his mail was delivered,

23         that guy?  I am getting him.  He is

24         coming.

25              MR. FRANK:  Not about the letters

                         Craig Moore

 1        privilege.  Please divulge only your

 2        understandings that were not a direct

 3        function of your attorney's

 4        communications and what your attorneys

 5        told you about this complex federal

 6        action.

 7   A.        Yes.

 8   Q.        Okay.

 9             You said you knew nothing -- you

10   owed a debt, you admit you owe a debt to

11   JCPenney, correct?

12   A.        I know I owed.  Yes, I owe some

13   credit.  I don't know how much it was.

14   Q.        That hasn't been paid?

15   A.        As far as I know, I don't think

16   so, unless somebody paid it for me.

17   Q.        You didn't pay it?

18   A.        Yeah.

19   Q.        Okay.

20        MR. WILLIAMSON:  We've been going

21        for over an hour.

22        MR. FRANK:  You want to take a

23        break?

24        MR. WILLIAMSON:  Yeah, I think

188

                           Craig Moore

1

2          that's a good idea.

3                    (Moore Exhibit 26, Document bearing

4          Bates stamp P&P #235 through #236, marked

5          for identification.)

6          Q.      I am going to show you what we

7    marked as Moore 26 (handing).

8          A.      (Witness reviewing.)

9          Q.      I ask you if you have seen this

10   document before?

11                   And, for the record, this appears

12   to me to be a credit card statement from a

13   JCPenney credit card, Mr. Moore, would you

14   agree with me?

15         A.      Yes.

16         Q.      Okay.

17         A.      I don't remember this exact

18   statement, but yeah, I mean it is JCPenney,

19   that is my name.

20         Q.      And you see where it says

21   under -- you see summary of account activity?

22         A.      Yes.

23         Q.      And it says previous balance

24   504.03?

25         A.      Um-hum.

Craig Moore

1

2      Q.      Does that sound about right to

3  you?

4              MR. FRANK:  Objection to the form

5      of the question; about right.

6      Q.      Does that sound like the balance

7  that was outstanding on your account; does

8  that sound about right?

9      A.      Something about that, yeah.  I

10  don't remember the exact amount, but I know

11  it's something like that, yes.

12     Q.      Okay.

13             And did you pay this -- actually,

14  you said that you didn't -- you still owe

15  money to JCPenney?

16     A.      I thought I do, yeah.  I didn't

17  know how much it was.

18     Q.      Okay.

19             Does this refresh your

20  recollection as to how much it might have

21  been?

22     A.      Could have been something around

23  that, but I'm not sure.  That's something

24  around where it is.

25     Q.      So that seems it's in the

190

Craig Moore

1    ballpark?

2    A.    Similar, yeah.

3    Q.    Okay.

4    I want you to turn to the second

5    page.

6    A.    (Witness complying.)

7    Q.    And I note that this is small,

8    you know, it's reduced, the Xerox?

9    A.    Um-hum.

10   Q.    It's hard to read.

11   A.    Okay.

12   Q.    But you are younger than I am and

13   I am going to guess your eyes are better than

14   mine.  And if you look, there is, underneath

15   the black bar, there's a couple of paragraphs,

16   then there is like a little box where it says

17   bankruptcy notice.

18   A.    Card benefits subject to change?

19   That part?  Are you saying underneath that?

20   Q.    No.  Wait a second, because I

21   can't see that.

22   MR. FRANK:  This little box

23   (indicating)?

24   MR. MATTHEW JOHNSON:  Yes.

191

1                          Craig Moore

2          A.      Yes, this.  Okay.  I got it.  I

3    see it now.

4          Q.      And it's really -- I need a

5    magnifying glass, to be honest, to find it

6    with the way it's copied.

7                  Did you see where it says the

8    third line in that box "Your account is owned

9    and serviced by GE Money Bank"?

10         A.      Complete terms and conditions,

11   yes, I see it.

12         Q.      Where are you looking, just point

13   out?

14         A.      I just read it, right after.  I

15   finished reading it.

16         Q.      Okay.  I see.  Because I had

17   trouble seeing that.  All right.

18                 Does this refresh your

19   recollection about the connection between

20   GE Money Bank and JCPenney?

21         A.      No.

22         Q.      That there is a connection, and

23   does this refresh your recollection that there

24   is a connection between GE Money Bank and the

25   JCPenney account?

Craig Moore

1

2          MR. FRANK:  Objection.  The

3     witness didn't testify that he didn't

4     remember.  He testified that he hadn't

5     heard of GE Money Bank in association

6     with JCPenney account.

7          MR. WILLIAMSON:  Fair enough.

8     Q.     Does this now refresh your

9  recollection that there's a connection between

10  GE Money and JCPenney?

11     A.     It doesn't refresh it.  Now I

12  know that it is.  I know GE Money is connected

13  with JCPenney.

14     Q.     Now, okay.

15          And did you receive statements on

16  a regular basis when the account was opened?

17     A.     Yes.

18     Q.     Do you recall when you opened the

19  account?

20     A.     No.

21     Q.     This looks like the date of this

22  account statement closing date is 6/7/2010;

23  does that sound correct?

24     A.     That it was closed?

25     Q.     Yes.

202

1                    Craig Moore

2              MR. WILLIAMSON:  You know, we can

3         do this for another two hours.  I don't

4         particularly care to.

5         Q.    What did Pressler do to you?

6              MR. FRANK:  Again, repeating for

7         the fifth time.

8              MR. WILLIAMSON:  He answered

9         about other people.  I am asking him

10        about him.

11        Q.    What did they do to you?  Give me

12   an answer, we will move on.

13        A.    I feel like they put a judgment

14   against me without me knowing about it and I

15   have no clue what was going on and they didn't

16   send me any verification on it.

17        Q.    They didn't send you any

18   verification letter?

19        A.    That I owed them or anything.  I

20   didn't know where it came from.  I didn't know

21   who they were.

22        Q.    Did you ask them for a

23   verification letter?

24              MR. FRANK:  Objection.

25              Asked and answered.

213

1                    Craig Moore

2          A.     No, I don't recall.  I think he

3     was referred to me.

4          Q.     By a friend or by --

5          A.     By someone that was -- we worked

6     together.  She was a realtor.  It was referred

7     to me by a realtor.

8          Q.     You asked her, can you help me

9     out and get an attorney?

10         A.     Yeah.

11         Q.     Okay.

12                Let's turn to page 12.

13         A.     (Witness complying.)

14         Q.     You see in that the last sentence

15    in that paragraph?

16         A.     Which paragraph?

17         Q.     38.

18                I'm sorry.

19         A.     Okay.

20         Q.     I didn't say it.  My fault.

21                Last sentence "Midland usually

22    has no right to obtain or even request any of

23    the underlying documentation of the original

24    alleged consumer debt that it purchases."

25                Do you have any information, any

214

1                    Craig Moore
2   factual information to support that?
3                    MR. FRANK:  Objection on the
4        basis of privilege.
5        Q.     Again, I am asking what you know
6   independent of what your attorney told you.
7   If that's the only way you know is through
8   your attorney, then just say I know through my
9   attorney so it's protected.
10       A.     I know through my attorney, it's
11  protected.
12       Q.     You have no independent knowledge
13  other than your attorney?
14       A.     Yes, I have no independent
15  knowledge other than my attorney.
16       Q.     Do you know, and I am going to
17  ask for your opinion now, based on your
18  knowledge and what you discussed, whose
19  responsibility is it to file an answer to a
20  complaint, as a general principle?
21                   MR FRANK:  Objection.
22                   Calls for legal analysis.
23       A.     An attorney.
24       Q.     An attorney for a defendant?
25       A.     Yes.

216

1                    Craig Moore

2          think so.

3               MR. FRANK:  I think this is now

4          the fifth time you've asked him how he

5          was harassed.

6               MR. WILLIAMSON:  I asked how he

7          was damaged.  This is different.  This

8          is very specific, I think.  Maybe it

9          isn't.

10         Q.    If you already told me what I

11    thought, then that's the answer.

12         A.    I already told you what I

13    thought.

14         Q.    When I asked you -- so we are

15    clear, when I asked you how you had been

16    damaged, that was the answer and that would

17    encompass this?

18               MR. FRANK:  No.  You asked him

19         several times already if he was harassed

20         and how he was harassed.  This is

21         becoming so repetitive.

22               MR. WILLIAMSON:  I thought I

23         asked how he was damaged or what they

24         did wrong.

25               MR. FRANK:  Do you want to

217

Craig Moore

1    briefly answer, in your own words, how
2    you felt you were harassed again?
3        A.    Constant phone calls.  That's all
4    I remember.  It was so long ago.  To be honest
5    with you, I remember being I was getting a lot
6    of phone calls and it was at night, during the
7    day, when I got home, I remember that.  They
8    left messages.
9        Q.    Who's they?
10       A.    I don't know who it was from.
11       Q.    Okay.
12             And this may be a foolish
13   question, but you didn't keep any notes of any
14   of that?
15       A.    No, we didn't.
16       Q.    Okay.
17             And I know I asked this, so -- I
18   asked this question before, but I am going to
19   ask it real quick, it's just a yes or no, then
20   we can move on.
21             You had no contact with Pressler
22   and Pressler, that's what you testified to
23   earlier?
24       A.    Yes.

222

1                    Craig Moore

2              And you deny that.

3              So you do have evidence showing

4    that Pressler and Pressler lacked a reasonable

5    basis to file a suit?

6         A.    What was your question again, I'm

7    sorry?

8         Q.    Well, here you deny -- you are

9    asked to admit that you have no evidence

10   showing that Pressler and Pressler lacked a

11   reasonable basis to file the suit, and you

12   deny that, so that means you do have evidence?

13        A.    No, I don't have evidence.

14        Q.    So then you really should -- this

15   should be an admission, not a denial, number

16   28, correct?

17        A.    Yes.

18        Q.    Okay.

19              Let's look at Number 29.

20        A.    (Witness reviewing.)

21        Q.    "Admit that you have no evidence

22   that Midland furnished false information

23   concerning your GE Money Bank account to any

24   credit reporting agency."

25              Again, you deny that.

223

```
 1                    Craig Moore
 2              Do you have evidence that Midland
 3    furnished false information concerning your GE
 4    account?
 5         A.      Well, they never sent me a
 6    statement.
 7         Q.      Do you have any evidence that
 8    they furnished false information?
 9         A.      No, I don't have any evidence
10    based off of what my attorney showed me, no,
11    only what they showed me.
12         Q.      That should be an admission, not
13    a denial; am I correct?
14         A.      Yes.
15         Q.      Let's look at Number 32.
16         A.      (Witness reviewing.)
17              Says here you asked to admit --
18    "Admit that you have no evidence supporting
19    your assertion that Midland Funding could not
20    demonstrate the existence of a debt when
21    lawsuits are filed on its behalf to collect
22    debts in New York State courts."
23              And you deny that.  So you do
24    have evidence?
25              MR. FRANK:  Objection.
```

226

                        Craig Moore

1         about what actual damages are.

2                   So maybe you didn't understand

3         when you answered this.

4                   I am asking you now actual

5         damages, meaning out-of-pocket expenses, that

6         money came out of your pocket, do you admit

7         that you have incurred no actual damages

8         attributable to the conduct of Midland?

9         A.      Yes.

10        Q.      So that needs to be changed to

11        admit, not a deny, and the same thing goes for

12        36, where it says "Admit that you have

13        incurred no tangible damages attributable to

14        the conduct of Midland."

15                  MR FRANK:  Objection.  I'm not

16              sure I understand what the word tangible

17              damages is.

18        Q.      How can you deny it?  Do you know

19        what tangible damages are?

20        A.      Anything outside of --

21        Q.      If you can describe -- I would

22        say tangible means something you can describe.

23        Can you describe any damages other than what

24        we talked about?

227

                          Craig Moore

1

2        A.       No.

3        Q.       Okay.

4                 Next documents.

5                 (Moore Exhibit 28, Document

6        entitled Responses and Objections to

7        Midland Funding, LLC's First Set of

8        Interrogatories Directed to Plaintiff

9        Craig Moore, marked for identification.)

10       Q.       I show you what we marked as

11   Exhibit 28 (handing).

12       A.       (Witness reviewing.)

13       Q.       It's Responses and Objections to

14   Midland Funding, LLC's First Set of

15   Interrogatories Directed to Plaintiff Craig

16   Moore.

17                I ask you to take a look at that.

18       A.       (Witness reviewing.)

19       Q.       I ask if you have seen this

20   document before?

21       A.       Yes.

22       Q.       And did you provide the factual

23   basis for the statements in it?

24       A.       Yes.

25       Q.       And you certified the truth of

1                    Craig Moore

2        Q.      Okay.

3                Do you recall if you ever

4    disputed any charges on the JCPenney account?

5        A.      I don't recall it, but I remember

6    when they first called me I disputed it, but I

7    don't remember what it was over.

8        Q.      Do you remember whatever it was

9    was resolved?

10       A.      I don't know if it was resolved.

11   It was so long ago.

12       Q.      It wasn't --

13       A.      Yeah, I remember they were

14   calling.  I remember JCPenney calling me a few

15   times, but I don't remember.

16       Q.      Okay.

17               Getting close to done.  Just bear

18   with me.

19               Look at 21.

20       A.      (Witness reviewing.)

21       Q.      Please.

22       A.      Um-hum.

23       Q.      Interrogatory 21.

24               It says "Describe all facts that

25   support" your contention "your allegation that

237

                    Craig Moore
1   Pressler and Pressler filed suit against you

2   without having conducted a reasonable

3   investigation as to the facts they were

4   alleging as alleged in paragraph 9 of your

5   complaint."

6            Do you have any facts other than

7   what your attorneys told you?

8        A.    Besides the phone calls and the

9   constant harassment.

10       Q.    To support this -- I want you to

11  read the question.

12       A.    No.

13       Q.    You have no facts, okay.

14            Let's look at Number 24.

15       A.    (Witness reviewing.)

16       Q.    One, two, three, four, five, six,

17  seven.  I see seven lawsuits that were filed

18  against you?

19       A.    Um-hum.

20       Q.    Do you know what happened with

21  all these lawsuits?  I will ask in the first

22  one, Advantage Assets, was the judgment

23  entered on that case?

24       A.    I am not sure.

251

Craig Moore

1  are not the right guy, you are the Craig Moore

2  that owed the money?

3

4       A.      Yes.

5       Q.      Okay.

6               How should Midland and Pressler

7  and Pressler, how should they have notified

8  you that there was a lawsuit going on; what do

9  you think they should have done that they

10 didn't do?

11              MR. FRANK:  Objection.

12              Calls for speculation.

13      Q.      They did something wrong.  I am

14 asking, what do you think they should have

15 done to notify you?

16      A.      I think they should have tried to

17 contact me.

18      Q.      Okay.

19              And you don't think they tried to

20 contact you, as you sit here today?

21      A.      No, I don't think so.  To me, I

22 don't think so because I never received those

23 letters and no one called me and a judgment

24 was placed upon me.

25      Q.      No one called you?

252

                              Craig Moore

1            A.      I know I did get phone calls, not

2    from them per se.  I think they should have

3    personally reached out to me or make an

4    attempt to come to my house even 10:00 or

5    9 o'clock at night, I don't know.

6            Q.      They should have come to your

7    house personally?

8            A.      I guess so.

9            Q.      No, then we'd be sitting for a

10   real lawsuit.

11                   MR. WILLIAMSON:  Take two

12           minutes.  Let me talk to Mr. Johnson,

13           but I think I may be done.

14   EXAMINATION BY

15   MR. MATTHEW JOHNSON:

16           Q.      Okay, Mr. Moore, I am Matthew

17   Johnson.  I am an attorney at Marshall,

18   Dennehey, Warner, Coleman & Goggin, and I'm

19   defending Midland Funding, LLC and Midland

20   Credit Management, Inc. in this case.

21                   As we talked before, you've been

22   sworn in.  You are under oath.  So when I ask

23   questions, please give me honest answers.  And

24   if I do say anything you don't understand or

255

                         Craig Moore

1

2    A.      (Witness nodding.)

3    Q.      What year is that car?

4    A.      2001 Isuzu Rodeo.

5    Q.      And what is your current home

6    telephone number?

7    A.      (631)828-5160.

8    Q.      And have you had that number

9    since you moved into your current residence?

10   A.      Yes.

11           (Moore Exhibit 30, Document bearing

12           Bates stamp MCM-0356, marked for

13           identification.)

14   Q.      So I am going to hand you what's

15   been marked Moore 30 (handing).

16   A.      (Witness reviewing.)

17           Yes.

18   Q.      And as you can see, this document

19   has been stamped Duplicate across the top.  I

20   will represent to you that is not an original

21   part of the document.

22           As you can see on the bottom

23   left, it's also been Bates stamped MCM-0356.

24   Also not part of the original document.

25           What this document appears to be

256

Craig Moore

1   is a JCPenney account statement dated

2   November 10, 2009.

3          Have you seen this document

4   before?

5          A.     I don't remember it.  I'm

6   assuming I did.

7          Q.     And do you see the name and

8   address to which it was addressed, bottom

9   left?

10         A.     Yes.

11         Q.     Is that your name and address?

12         A.     Yes, sir.

13         Q.     You can see the account number is

14   partially redacted; what are the last four

15   digits of that account number?

16         A.     1367.

17         Q.     And I apologize for the quality

18   of the copy.  Could that possibly be 1387 as

19   well?

20         A.     It's possible, but it looks like

21   a six.

22         Q.     Okay.

23              And let's see.

24              You testified that you did

Craig Moore

1       Penneys' accounts or just one Penneys' charge

2       account?

3              A.      I only had one.

4              Q.      So that might be an accurate date

5       that you opened the Penneys account that's at

6       issue?

7              A.      Yes, sir.

8              Q.      Now we've got something that says

9       RMS last PMT, which says October 20, 2009.

10      Right below that it says last PMT AMT says 30;

11      do you see that?

12             A.      Um-hum.  Yes.

13             Q.      And we looked at Moore 30, which

14      was that Penneys statement we just reviewed,

15      which reflected a payment on October 20, 2009?

16             A.      Yes.

17             Q.      Do you think that might be the

18      same payment identified here in this document,

19      Moore 32?

20             A.      I assume it is.

21             Q.      And if you look at the bottom

22      line, there is some print on there.  I will

23      read that.

24                      "Data printed by Midland Credit

263

1                    Craig Moore

2    Management, Inc. from electronic records

3    provided by General Electric Capital

4    Corporation, GE Money Bank Retailer Credit

5    Services, Inc., pursuant to the bill of

6    sale/assignment of accounts transferred on or

7    about June 30, 2010 in connection with the

8    sale of accounts from General Electric Capital

9    Corporation, GE Money Bank Retailer Credit

10   Services, Inc., to Midland Funding, LLC."

11              Did I read that accurately?

12        A.    Yes.

13        Q.    And what would your understanding

14   of that paragraph be, if any?

15        A.    They are selling the account.

16        Q.    And who is selling?

17        A.    Transferring it to GE Capital to

18   Retail Services of Midland Funding, LLC.

19        Q.    Okay.

20              Set that one aside.

21              (Moore Exhibit 33, Document bearing

22        Bates stamp MCM-0361 through MCM-0362,

23        marked for identification.)

24        Q.    (Handing.)

25              Just handed you what's been

278

1                    Craig Moore

2         Q.      And a few lines down it says SSN

3    and there is a partially redacted number and

4    four digits; do you see that?

5         A.      Yes.

6         Q.      Are those the last four digits of

7    your social security number?

8         A.      Yes.

9         Q.      Okay.

10                I don't have anything further on

11   that.

12                Just looking back at 36 for a

13   second.

14                It does state on the first page,

15   it says charge-off balance, $504.03; do you

16   see that?

17        A.      Yes, sir.

18        Q.      Do you have any reason to believe

19   that that might not be an accurate number of

20   the balance that was owed at the time Penneys

21   closed your account?

22                MR. FRANK:  Objection to the form

23        of the question.

24                You may answer.

25        A.      No.

279

1                    Craig Moore

2         Q.     Okay.

3                Okay.

4                That's all I really have to do

5    with that one.

6                So we looked at -- with

7    Mr. Williamson you discussed several other

8    lawsuits that you had been a party to and

9    those were all filed in Suffolk County; is

10   that correct?

11        A.     Suffolk, yes.

12        Q.     Suffolk.

13               And 2011, you were living in

14   Suffolk County?

15        A.     Yes, sir.

16        Q.     So if somebody were to bring suit

17   against you, that would be the county you live

18   in?

19        A.     Yes.

20        Q.     Now, we talked earlier, you had

21   said you believe you received calls from

22   Midland, but you didn't speak with them when

23   they called; is that accurate?

24        A.     Um, I mean I can't remember

25   speak -- I remember calling them.  I remember

280

                    Craig Moore

1

2   my wife spoke to somebody.  She said they were

3   from some company and that I had called them,

4   'cause I thought it was involving a dispute

5   over a phone charge.

6        Q.      And it turned out to be about the

7   JCPenney account?

8        A.      I don't know if it was.  They

9   never disclosed to me what it was.  They just

10  said I owed them and they told me how much I

11  owed them and I was disputing that I didn't

12  owe them and I told them to send me something

13  in reference to it and I never received

14  anything.

15       Q.      Do you know about when that was?

16       A.      No.  Actually, I don't remember.

17       Q.      Let's look at the second amended

18  complaint, which is 8.

19       A.      (Witness reviewing.)

20               Okay.

21       Q.      Yes.

22               If you look at page 2 of this

23  document, the first paragraph starts out

24  "Midland is a consumer debt collector.

25  Midland's business model is predicated upon

282

Craig Moore

1    Q.      And we've looked at a couple of

2  JCPenney account statements that Midland

3  produced from its records?

4              MR. FRANK:  Objection to the form

5        of the question.

6              We looked at some documents that

7        said the name JCPenney on them.  No

8        witness has testified these are account

9        statements.

10             MR. WILLIAMSON:  But he could.

11             MR. MATTHEW JOHNSON:  Let's see.

12             MR. WILLIAMSON:  He identified

13       them as account statements.  He did.

14       Your witness, he looked at it and said,

15       yeah, it's an account statements.

16             MR. FRANK:  Said it looked like

17       an account statement.

18             MR. WILLIAMSON:  Okay.

19   Q.      Let's look at Moore 30.  Do you

20  have that Moore 30 document in that pile

21  there?

22             While you are at it, if you see

23  Moore 26 as well?

24   A.      (Witness reviewing.)

283

Craig Moore

1

2          Okay.

3          Okay, 30.

4     Q.   And 26?

5     A.   Got it.  Sorry.

6     Q.   Sure.

7          So when you had your JCPenney

8     account, did you ever receive any account

9     statements?

10    A.   Yeah, I received JCPenney account

11    statements.

12    Q.   And looking at the document

13    marked Moore 26 and Moore 30, do these appear

14    to be JCPenney account statements on your

15    account?

16    A.   They appear to be.  30 does

17    appear to be an account, yeah.

18    Q.   And how about Moore 26, does that

19    look like an account statement to you?

20    A.   This looks like an account

21    statement, but I have never received this.

22    Q.   Does it look like account

23    statements that you did receive from JCPenney?

24    A.   No, 'cause it says no balance.

25    Q.   But does the form of the document

1                     Craig Moore

2        A.      I'm not sure.

3                MR. FRANK:  Objection on the

4        basis of privilege.

5                He is not sure.  He is not sure.

6        Q.      Okay.

7                If you flip up to paragraph 7,

8    which is on page 4 of Moore 8.

9        A.      (Witness reviewing.)

10               Page 7?

11       Q.      Paragraph 7 on page 4.

12       A.      Got it.

13       Q.      So this starts "Second, even

14   though Midland knows it cannot actually

15   demonstrate the existence of a debt, Midland

16   engages in a pattern and practice of

17   fraudulently filing lawsuits without

18   evidentiary support in New York courts."

19               Having looked at what appear to

20   be JCPenney account statements provided by

21   Midland on your account, do you believe that

22   Midland can demonstrate the existence of a

23   debt and, in particular, your JCPenney debt?

24       A.      I'm assuming so.  I'm not sure.

25       Q.      If you think they could not

286

                              Craig Moore

1

2    demonstrate it, what would cause you to

3    believe they could not demonstrate the

4    existence of this JCPenney account?

5              MR. FRANK:  Objection to the form

6         of the question, as to what demonstrate

7         is and whether the existence means mere

8         existence or actual number of the debt?

9         Q.    You can answer.

10        A.    I don't know if they can or not.

11   If they can, they have to show it to me, I'm

12   assuming.

13        Q.    If they were to produce those two

14   exhibits, Moore 30 and 26 that we're talking

15   about as possibly being JCPenney account

16   statements, would you say that that

17   constitutes proof of the -- of your JCPenney

18   account?

19              MR. FRANK:  Objection.

20              Calls for speculation.

21        A.    I would like to see more.  I mean

22   could they produce the actual charges of what

23   I charged?  Could they produce that to me of

24   what I purchased?

25        Q.    I am asking, if they produce

287

Craig Moore

Moore 26 and Moore 30 that we were just

talking about, would you say that demonstrates

evidence of the existence of this debt, this

JCPenney debt?

A.      I'm assuming so.

Q.      Okay.

A.      Yes, I am assuming so.

Q.      While you were living at the 25

Crater Lake Drive address, have you received

letters from other debt collectors not

Midland?

A.      Yes.

Q.      What do you generally do with

those letters?

A.      I open them.

Q.      Do you ever contact the debt

collectors that sent you the letter?

A.      Depending on who they were.

Q.      Have you ever disputed a debt

with a debt collector?

A.      Yes.

Q.      And have you ever received

verification of a debt from a debt collector?

A.      Yes.

291

```
                        Craig Moore
 1
 2    lacked in terms of evidence to bring suit to
 3    collect this JCPenney debt?
 4         A.      I am not sure what they lacked.
 5               MR. FRANK:  Objection.
 6               This isn't a memory test.  It
 7          says what they lacked later on in the
 8          complaint.
 9               MR. FINKEL:  Okay, I have to go
10          in the next room.
11               MR. FRANK:  Off the record.
12               (Discussion held off the record.)
13               (Recess taken.)
14    BY MR. MATTHEW JOHNSON:
15         Q.      So one of the claims in this
16    complaint is that -- well, as it applies to
17    you, your JCPenney GE Money Bank debt was not
18    properly assigned to Midland Funding, maybe
19    that Midland Funding didn't purchase it
20    properly.  Do you have any reason to believe
21    that Midland Funding didn't properly purchase
22    your GE Money JCPenney account?
23         A.      No.
24         Q.      We did see -- we talked earlier
25    about the other lawsuits that you have been
```

293

Craig Moore

1
2          A.      No.
3          Q.      Do you believe that you paid any
4   money to Midland Funding, Midland Credit
5   Management or even Pressler and Pressler that
6   you should not have paid on this JCPenney
7   account?
8          A.      No.
9          Q.      Okay.
10          Do you believe any of the money
11  you did pay on your JCPenney account at any
12  point should be refunded to you?
13          A.      No.
14                  MR. MATTHEW JOHNSON:  I just need
15              to reserve the right to recall the
16              witness if I need to in connection with
17              the bill of sale matter and possibly in
18              follow-up to any follow-up you might
19              have with your own plaintiff, but that's
20              all the questions I have right now.
21  EXAMINATION BY
22  MR. FRANK:
23          Q.      Mr. Moore, thank you so much for
24  being so patient.  I know it's been a very
25  long day.  We are nearing the end of it.

340

C E R T I F I C A T E

STATE OF NEW YORK          )

                           ) ss.:

COUNTY OF SUFFOLK          )


          I, CINDY A. AFANADOR, a Notary
Public within and for the State of New
York, do hereby certify:

          That CRAIG MOORE, the witness whose
deposition is hereinbefore set forth, was
duly sworn by me and that such deposition
is a true record of the testimony given by
such witness.

          I further certify that I am not
related to any of the parties to this
action by blood or marriage; and that I
am in no way interested in the outcome
of this matter.

          IN WITNESS WHEREOF, I have
hereunto set my hand this 2nd day of
August, 2015.

          _____*Cindy A. Afanador*_____

          CINDY A. AFANADOR