# Exhibit M-M

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------------x

STEVEN ITALIANO, JUNE GIOIA, SUSAN
WHITE, DOREEN VAZQUEZ, and
CHRIS PIERRE, individually and on
behalf of all others similarly situated,
                       Plaintiffs,
                -against-
MIDLAND FUNDING, LLC, MIDLAND
FUNDING, LLC. doing business in
New York as MIDLAND FUNDING OF
DELAWARE, LLC, and MIDLAND
CREDIT MANAGEMENT, INC.,
                       Defendants.
--------------------------------------x

                       5036 Jericho Turnpike
                       Commack, New York

                       May 18, 2015
                       10:26 a.m.


        Examination Before Trial of the

Plaintiff, CHRISTOPHER PIERRE, s/h/a

CHRIS PIERRE, pursuant to Order, before

CINDY A. AFANADOR, a Notary Public of the

State of New York.




            CINDY AFANADOR COURT REPORTING, INC.
                       516-491-2694
                   www.cindycourtreporting.com

24

1                    Christopher Pierre

2         A.      In 2010 was I supporting my

3    parents?

4         Q.      Yes, either one or both, if they

5    were alive?

6         A.      My mom was alive in 2010, but I

7    was not supporting her.  I mean, what do you

8    mean by supporting her?  Was she living with

9    me?

10        Q.      No, monetarily.

11        A.      No.

12        Q.      Was your father alive then?

13        A.      Not in 2010.

14        Q.      Okay.

15                You give me the general basis of

16   your claims against my client in this lawsuit?

17                MR. BIANCO:  Objection to the

18           form of the question.

19                You can answer.

20        A.      Rubin & Rothman?

21        Q.      Correct.

22        A.      You want to know what my

23   objection is to them?

24        Q.      I want to know the basis of your

25   claims against my client in this lawsuit, as

25

1                    Christopher Pierre
2    you understand it.
3         A.      It's my understanding that they
4    did not have enough evidence at the time to
5    bring forth that judgment against me.
6         Q.      When you say "enough evidence,"
7    what do you mean by that?
8              MR. BIANCO:  Objection to the
9         form of the question.
10        A.      Well, I was -- a letter was sent
11   to me saying that I owed them money, but I
12   wasn't entirely sure that the amount was
13   right.  I wasn't entirely sure that there was
14   enough evidence.  I know I had a credit card,
15   but now that it was with Rubin & Rothman, I
16   wasn't entirely sure that, you know, the
17   numbers that they had were correct and things
18   like that too, but...
19        Q.      Are you reading off something as
20   you answer that?
21        A.      No.
22        Q.      Okay.
23        A.      I couldn't even see it there
24   without my glasses on.
25              MR. BIANCO:  Just so you know

1                    Christopher Pierre

2    didn't want it to go to judgment, that was my

3    big fear.

4           Q.     When you say "it," was this a

5    Chase credit card?

6           A.     Yes, I think -- yeah, it was a

7    Chase credit card.

8           Q.     And you used that credit card?

9           A.     Yes, I did use it.

10          Q.     Did you default on payments on

11   that credit card?

12                 MR. BIANCO:  Objection to the

13          form of the question.

14          A.     I don't recall.

15          Q.     Did there come a time when Chase

16   advised you that use of that credit card was

17   terminated?

18          A.     I don't recall.  I just know that

19   they sent me, Rubin & Rothman, saying that

20   they assumed the -- that debt, so that's when

21   I realized that, obviously, this is going to

22   be something that they are going to be looking

23   for me to come to them for.

24          Q.     Did you tell them that they had

25   the wrong person?

31

Christopher Pierre

1          A.     No.

2          Q.     Do you believe that you owed a
debt?

3          A.     I believe I owed a debt.  I just
don't know if that was the right amount.

7          Q.     And do you recall what amount
they were trying to collect?

9          A.     They told me approximately
$7,000.

11         Q.     Okay.

12                Did that number sound wrong to
you?

14         A.     I didn't know.  I just -- I
hadn't used the card in quite some time.  I
didn't know what fees may have been attributed
to it.  I didn't know if they were continually
charging me interest on it.  I didn't know if
there were late fees.  I don't know.

20         Q.     Have you had credit cards other
than that Chase card?

22         A.     Had I ever had?

23         Q.     Right.

24         A.     Yes.

25         Q.     Are there late fees on those

34

1                    Christopher Pierre

2         Q.      No, no, that -- the first time

3    you spoke to them, why did you call them?

4                    MR. BIANCO:   Objection to the

5         form of the question.

6                    Can you qualify them?

7                    MR. ARLEO:   Rubin & Rothman.

8         A.      Why did I call them?  They sent

9    me a letter in the mail saying I owed that

10   amount of money.

11        Q.      So you called them in response to

12   a letter?

13        A.      Yes.

14        Q.      Not in response to a lawsuit that

15   Rubin & Rothman had filed?

16        A.      No.

17        Q.      Okay.

18                   MR. ARLEO:   Can I have this

19        marked as RR 1, please?

20                   (RRP Exhibit 1, Document Bates

21        stamped R&R 000003, marked for

22        identification.)

23        Q.      Can you take a look at that and

24   let me know when you are finished reading

25   that, please?

38

                    Christopher Pierre

1

2     Q.      Okay.

3             Did you ever use that credit card

4     to pay any bills from that business?

5     A.      No.

6     Q.      Did that business -- did you

7     incur bills with that business?

8     A.      I'm sure I did.

9     Q.      And the years that you had that

10    business, if you can recall?

11    A.      If I had to recall, I believe it

12    was 2011 to '14.

13    Q.      Okay.

14            So you started the business in

15    2011?

16    A.      To the best of my knowledge,

17    yeah.

18    Q.      Would you say that it's safe to

19    conclude that the time you had started that

20    business, you no longer had that Chase credit

21    card to use?

22    A.      I would say I did not have the

23    card available to me, yeah.

24    Q.      Okay.

25            So you get a letter from Rubin &

39

Christopher Pierre

1  Rothman, you call them up and when did they

2  reference a judgment?

3

4         MR. BIANCO:   Objection to the

5     form of the question.

6     Q.      If you can recall.

7         MR. BIANCO:   You can answer.

8     A.      When I originally called them,

9  like I had said earlier, we agreed -- I had

10 told her that my wife had lost her job and

11 that I was willing to pay them a specific

12 monthly amount.

13         She had asked what, to the best

14 of my ability, I thought I can afford to pay.

15 And I had suggested $100, which I was told

16 would be sufficient and we would -- it would

17 be temporary.  I had paid the $100 a month

18 until I was served with an order to go to

19 court and I was confused.

20    Q.      Okay --

21    A.      And I said, I don't understand

22 why we are going to court if I'm paying you

23 and agreed to pay you the $100 a month.

24    Q.      Why don't we hold off on that

25 court document until we -- there are missing

40

Christopher Pierre

2 pages.

3      A.      Okay.

4           MR. ARLEO:   Can we have this

5      marked as RRP 2.

6           (Exhibit RRP 2, Document Bates

7      stamped R&R 000036, marked for

8      identification.)

9      Q.      Mr. Pierre, can you take a look

10 at what's been marked as RRP 2, please?

11     A.      (Witness reviewing.)

12          Okay.

13     Q.      And do you know, have you ever

14 seen that document before?

15     A.      Yes, I do remember getting some

16 type of a document from -- not from Midland,

17 though.  I don't remember this from Midland.

18 The only thing that really I can remember is

19 my direct dealings with Rubin & Rothman.   I

20 don't remember anything as far as what --

21 Midland Funding.

22     Q.      Did you ever speak to Midland

23 Funding prior to the time you spoke to Rubin &

24 Rothman?

25          MR. BIANCO:   Objection to the

41

1                    Christopher Pierre

2          form of the question.

3                    You can answer.

4          A.        I don't remember.  I have no

5    knowledge of remembering them.  All my

6    rememberings in regards to this is through

7    Rubin & Rothman.

8          Q.        Okay.

9                    And again, the document is RRP 2.

10   It's an agreement between Midland Funding and

11   you, whereby you would pay $100 a month

12   towards the balance of $6,997.74, and that's

13   dated 12/15/2010.  Do you remember if you

14   signed this document?

15         A.        This is from Midland not from

16   Rubin & Rothman.

17         Q.        Well, I believe this is from

18   Rubin & Rothman and it references that

19   creditor is Midland Funding.  The first letter

20   you got from Rubin & Rothman is dated December

21   8, 2010 and this is --

22         A.        Right.

23         Q.        -- dated December 15th?

24         A.        December 15th.

25         Q.        So --

1              Christopher Pierre

2   Midland Funding and, you know, everything --

3         Q.      You see the bottom, it says,

4   "Rubin & Rothman, LLC, attorneys for

5   creditor"?

6         A.      Yes, but they are also not on the

7   top part letterhead and all my dealings I

8   remember dealing with just that, not

9   necessarily coming from other than that

10  letterhead.

11        Q.      Okay, but in that agreement,

12  RRP 2, the $100, was that the terms that you

13  wanted to --

14        A.      With Rubin & Rothman, yes.

15        Q.      Right, okay.

16               Now, when you said they didn't

17  have evidence, what specific evidence do you

18  believe they needed in order to come and

19  collect this debt from you in a proper manner?

20               MR. BIANCO:  Objection.

21               Interpose a privilege objection.

22  DI               If you have an independent

23        understanding of what evidence is

24        required from Rubin & Rothman or from

25        Midland to file a lawsuit or collect a

44

Christopher Pierre

1
2      debt, that's fine.  If your
3      understanding comes from me or Alan, I
4      instruct you not to answer.
5          A.      Yes, I will not answer that.
6          Q.      So you learned allegedly, that
7   there wasn't any evidence, from your
8   attorneys?
9              MR. BIANCO:  Yes or no answer.
10         You can answer that question.
11         A.      Everything I learned regarding
12  that was through discussions with my attorney.
13         Q.      Have you alleged that allegation
14  in your complaint?
15             MR. BIANCO:  Objection to the
16         form of the question.
17             What allegation?
18             MR. ARLEO:  You know what, we are
19         going to have to get a ruling on this,
20         because you are not letting him answer
21         questions concerning his second amended
22         class action complaint, because you are
23         claiming it's attorney/client privilege
24         and I respectfully disagree with you.
25             He is a proposed class

48

1              Christopher Pierre
2              MR. BIANCO:  Objection to the
3        form of the question.
4              You can respond.
5        A.     The laws?
6        Q.     The laws my client violated
7   pursuant to your complaint?
8              MR. BIANCO:  Objection to the
9        form of the question.
10              You can answer, if you know.
11        A.     No, not specifically.  I just --
12   I have an understanding that there was not
13   enough evidence at the time, but I also have
14   other things that really made me feel as
15   though that I was completely wronged.  And to
16   be honest with you, the things that happened
17   in that regard I feel were far worse than
18   what, you know, this other portion of the...
19        Q.     So let's take this into two
20   boxes.  The first box is the allegation that
21   my client didn't have enough evidence to file
22   this lawsuit?
23        A.     Yes, that bothered me.
24        Q.     That's the basis of this class
25   action complaint?

49

Christopher Pierre

2    A.    Yes.

3    Q.    Okay.

4          Yet, there's other things that

5    happened to you that were more egregious to

6    you?

7    A.    Well, from a personal level, I

8    felt as though that I was taken advantage of

9    and wronged and in response to the fact that I

10   wasn't entirely sure they had enough evidence

11   with the time, coupled with the fact that

12   their -- the way they went about pursuing it,

13   actually made the whole situation so far

14   worse.

15   Q.    Okay.

16         So when you say the way they went

17   to pursue it, are you talking about all the

18   telephone conversations you had with them?

19         MR. BIANCO:  Objection to the

20         form of the question.

21         You can answer.

22   A.    Yes.

23   Q.    And those telephone conversations

24   are separate than any letter that they may

25   have sent you?

71

```
1                   Christopher Pierre
2    documents to support that?
3                   MR. BIANCO:  Objection to the
4         form of the question.
5                   You can answer.
6         A.        It's because they didn't provide
7    any -- I'm assuming that's what the number is.
8         Q.        Okay.
9                   When you first got that letter,
10   did you ask for any proof?
11        A.        I don't recall.
12        Q.        So you are not saying you didn't
13   owe money, you just didn't know the amount
14   that you owed?
15                  MR. BIANCO:  Objection to form.
16        A.        That's correct.
17                  MR. BIANCO:  You can answer.
18        Q.        When you made the credit card
19   payments, did you ever note any information in
20   the memos of the checks, if you can recall?
21                  MR. BIANCO:  Objection to the
22        form of the question.
23                  You can answer.
24        A.        I would assume that I put the
25   account number for the Chase.
```

1            Christopher Pierre

2       A.      So what happened was I was paying

3   the $100 a month, and when I was served that a

4   judgment was going to be levied against me and

5   I had to go to court, I called them up and

6   said, I am very confused.  I had been paying

7   the $100 a month and I don't understand why it

8   got to this, when you said if I continue to

9   pay the $100 a month it wouldn't get to this.

10           And Storm informed me that just

11  like it said there, you have a temporary

12  agreement in place with us for $100 a month.

13  There is no need to attend the district court,

14  as a matter of fact, I am not going, just

15  disregard the paper to go to court.  Just

16  continue to pay your $100 a month.

17           So I did.  And then I got notice

18  in the mail that it was a judgment against me.

19  I was thoroughly confused how this happened.

20  They levied a judgment against me, so I sort

21  of lost faith in Storm, because I got the

22  impression she did that purposely.

23           So I went straight to district

24  court and said, I'm very confused.  I spoke to

25  the clerk behind the desk, how did this get to

79

Christopher Pierre

1   this?  And she said you were supposed to be in

2   court.  And I said well, I spoke to the person

3   and she said I didn't have to be here, that's

4   why I didn't come, I could have come that day.

5   She goes, it happens all the time and they

6   threw me some papers out.  She said you have

7   to fill this out.

8   And if I am not mistaken, I think

9   that was something, an Order to Show Cause

10  was -- and I had to fill out that paperwork

11  and send it back in.  So I was very confused

12  and I felt as though I was lied to and taken

13  advantage of when she specifically told me not

14  to go.

15  Q.     Now, you filled out the Order to

16  Show Cause, to your knowledge, did they vacate

17  the judgment?

18  A.     To the best of my -- it was

19  interesting.  I believe they vacated the

20  judgment and Storm didn't call me back.

21  Somebody else from Rubin & Rothman called me

22  back.  I don't remember who it was.  Said

23  Storm was not assigned to the case anymore.

24  That may have been, and I can't

Christopher Pierre

1
2    say for certain, but it may have been Shari
3    and she said we are actually going to take
4    $2,000 off.  So we are going to take your 6985
5    or whatever was due at that point, we are
6    going to reduce it to $5,000, and as long as
7    you pay the $100 a month, we won't take you
8    back to court.
9            So I was very confused, to be
10   honest with you.  I don't know who to trust
11   there anymore, because I thought in speaking
12   with Storm I had a pretty good rapport with
13   her and now speaking to somebody else and her
14   being removed from my case, I didn't feel very
15   confident that I was going to be given the
16   right information, so I just continued the
17   $100 a month.
18       Q.    Did that next person you spoke
19   to, did she apologize to you for what
20   happened?
21       A.    No.  I was very angry about it
22   and I said, I don't understand how it got to
23   this.  You know I am paying you and yet, you
24   are still bringing a judgment against me.  I
25   don't know.  And she never apologized or he.

92

Christopher Pierre

1    understanding that it's your knowledge.

2         A.    To my knowledge, that based on

3    what my case was, that this was -- has been an

4    ongoing thing with Rubin & Rothman and Midland

5    and they've been doing this to I'm told a lot

6    of people.  And based on what I've gone

7    through, I would like to see it end.  I would

8    like to see them actually not have the

9    opportunity to do this to anybody else,

10   truthfully.

11        Q.    When you say "do this," do you

12   mean what happened with you when they told you

13   you didn't have to go?

14        A.    Well, definitely that.

15   Definitely that, but in the case too where

16   they were actually quite possibly bringing a

17   lot of these class action or these judgments

18   to people who maybe not necessarily didn't

19   deserve to.

20        Q.    Because they were the wrong

21   person?

22        A.    I don't know.

23        Q.    But in your case, were you the

24   wrong person?

Christopher Pierre

1

2     A.      I was the right person, I just

3  don't know if, you know, they said all the

4  evidence necessary to get to a point where it

5  should have been a judgment.

6     Q.      Okay.

7            Do you know who the members of

8  your class are?

9            MR. BIANCO:  Objection to the

10        form of the question.

11           You can answer.

12    A.      No.

13    Q.      Do you know where they are

14 located?

15    A.      No.

16    Q.      Would you agree to settle your

17 claims presently in this lawsuit?

18    A.      Agree to settle it?

19    Q.      Yes.

20    A.      I haven't thought -- well,

21 possibly.  I don't know.  I would have to

22 speak to my attorney about it.  I don't know.

23    Q.      Were you ever terminated from a

24 job?

25           MR. BIANCO:  Objection to the

96

1               Christopher Pierre

2                    Toyota, as a matter of fact.  I

3      was involved with a Toyota -- it was a class

4      action suit against Toyota.

5           Q.    You were a member of the class?

6           A.    Yeah.  I got nothing.  I should

7      have.

8           Q.    Have you ever been promised any

9      money in this case?

10          A.    No.

11                MR. ARLEO:  Ben, can we take a

12          two-minute break so I can speak to

13          Mr. Schwartz?

14                MR. BIANCO:  Sure.

15                (Recess taken.)

16     BY MR. ARLEO:

17          Q.    Mr. Pierre, I think we were

18     talking about when you went to court and filed

19     the Order to Show Cause, correct?

20          A.    Yes.

21          Q.    How did you learn a judgment was

22     entered against you?

23          A.    I believe it came in the mail.

24          Q.    Okay.

25          A.    Yeah.

                    Christopher Pierre

1
2       Q.      Did they garnish your wages
3  pursuant to the judgment?
4       A.      No.
5       Q.      Did they attach your bank
6  accounts?
7       A.      No.
8       Q.      Okay.
9               Did they -- did Rubin & Rothman
10 attempt to enforce that judgment in any way
11 whatsoever?
12      A.      After the -- after I got that?
13      Q.      At any time.
14      A.      I don't know.
15      Q.      Okay.
16              But at any time since you first
17 learned that Rubin & Rothman was handling this
18 claim up until today, they've never garnished
19 your wages?
20      A.      No.
21      Q.      Or attached to any bank account?
22      A.      No.  What happened is that
23 occasionally, I -- I don't get a statement
24 from them.  So I have to call up and find out
25 what my balance is.  As a matter of fact, I

108

Christopher Pierre

1

2      A.      That she was suing?

3      Q.      Yes.

4      A.      Not to my knowledge.

5      Q.      Do you know if she ever sued a

6  creditor?

7              MR. BIANCO:   Objection to the

8          form of the question.

9              You can answer.

10     A.      I don't know.

11     Q.      But for as long as you were

12 married, you are not aware that she sued a

13 credit card company?

14     A.      Correct, yeah.  Definitely.

15     Q.      And you haven't filed bankruptcy?

16     A.      No.

17     Q.      Now, I want to make sure, you

18 live at 25 Audubon Avenue in Holbrook,

19 New York, how long have you lived there?

20     A.      Since October of 2000.

21     Q.      Have you ever resided at another

22 address from October of 2000 until the

23 present?

24     A.      No.

25     Q.      Okay.

1                    Christopher Pierre

2     are prepared to discuss all relevant facts and

3     circumstances regarding your allegations in

4     the second amended complaint; do you see that

5     in there?

6              A.     Yes, I do.

7              Q.     Are you prepared to do that?

8              A.     I am.

9              Q.     Very good.

10                    You can put that aside.

11                    I have no need for that.

12                    I'm going to show you we are

13    going to mark MCMP 2.

14                    (MCMP Exhibit 2, Document Bates

15          stamped MCM-0007, marked for

16          identification.)

17             Q.     I am handing the deponent,

18    Mr. Pierre, a copy of MCMP 2, which I will

19    represent is a letter from Midland Credit

20    Management dated September 26, 2010 to

21    Mr. Pierre; do you have that in front of you?

22             A.     I do.

23             Q.     Okay.

24                    Is that your -- in the address

25    section, is that your name, Chris Pierre?

112

                    Christopher Pierre

1

2          A.       Yes.

3          Q.       Underneath it it says, "25

4    Audubon Avenue, Holbrook, New York

5    11741-2307"; do you see that?

6          A.       I do.

7          Q.       Is that your mailing address?

8          A.       It is.

9          Q.       And you resided -- in September

10   26, 2010, you resided at that address,

11   correct?

12         A.       In September 26th of 2010?

13         Q.       Correct.

14         A.       Yes.

15         Q.       When -- do you receive mail at

16   any other address?

17         A.       For a while I did, but it

18   wasn't -- it was through the company I owned.

19         Q.       Okay.

20                  But as far as any mail that would

21   be addressed to you personally and not your

22   company, would that mail go to your residence?

23         A.       Yes.

24         Q.       Who opens the mail at your house,

25   if something comes in your name, Chris Pierre,

1                Christopher Pierre

2    does your wife open it, do you?

3         A.      Both of us, actually.

4         Q.      Okay.

5                I wanted you to take a look at

6    this letter, because it identifies in the top,

7    there is a box and at the top -- the box says

8    MCM account number; do you see that?

9         A.      I do.

10         Q.      And it identifies the original

11   creditor.  Could you tell me who that original

12   creditor is?

13         A.      It states Chase Bank USA NA.

14         Q.      And it provides a current

15   balance; do you see that?

16         A.      Yes, I do.

17         Q.      What is the balance?

18         A.      It states $6,982.82.

19         Q.      Now, we go down the letter, it

20   says -- beneath the box says, "Notice of New

21   Ownership and Prelegal Review.  Dear Chris

22   Pierre."

23                The next paragraph, tell me when

24   you've read that.

25         A.      (Witness reviewing.)

114

1                    Christopher Pierre

2                 Okay.

3          Q.        It says in this paragraph, I want

4      to make sure I read it accurately.  "Midland

5      Funding, LLC recently purchased your Chase

6      Bank USA NA account and Midland Credit

7      Management, a debt collection company, is the

8      servicer of this obligation."

9                 Did I read that correctly?

10         A.        You did.

11         Q.        Let me ask you:  What do you

12     think that means?

13              MR. BIANCO:  Objection to the

14          form of the question.

15              You can answer.

16         A.        I'm assuming that you took over

17     the account or the balance from Chase.

18         Q.        Let me make sure we are clear.

19     You are saying that this letter states that

20     Midland Funding purchased -- bought your Chase

21     Bank USA debt and that Midland Credit

22     Management is collecting on it?

23              MR. BIANCO:  Objection to the

24          form of the question.

25         A.        I'm not sure.  I'm just assuming

116

1                Christopher Pierre

2    number, please?

3         A.     7220.

4         Q.     Now, it also has the previous

5    balance, which is in the top right box; says,

6    "previous balance"; do you see that?

7         A.     I do.

8         Q.     And is that number, $6,980.53?

9         A.     It is.

10        Q.     Now, I'm going to ask you:  Do

11   you have any recollection of receiving this

12   Midland Credit Management letter of September

13   26, 2010?

14        A.     I do not.

15        Q.     Okay.

16               When you get letters in the mail

17   from collectors, those kind of things, do you

18   keep those, do you have a file?

19               MR. BIANCO:  Objection to the

20        form of the question.

21               You can answer.

22        A.     Not really.  I mean the ones

23   that -- let's see.

24               Do I keep them?

25               If I'm currently paying them, if

117

Christopher Pierre

1   a balance is not being deducted from it, then

2   no, not necessarily.  I will say I paid that

3   already, it was sent in already, I took care

4   of that one.

5       Q.     But during this time when this

6   letter would have been sent, you were already

7   being sued on several other debts that you

8   didn't pay from -- I think the two that we

9   referenced occurred prior to September 26,

10  2010, correct?

11      A.     I don't know.  Does that fall in

12  those lines when you got that?

13      Q.     I'm trying to figure out.

14         If I were to ask you to go back

15  and look through any documents you have, you

16  wouldn't be able to find this letter?

17      A.     No.

18      Q.     Do you have any reason to believe

19  this letter was not sent to you?

20      A.     Any reason?

21      Q.     Yes.

22      A.     No, I don't have any reason to

23  believe it wasn't sent.

24      Q.     You might have gotten it, you

118

                    Christopher Pierre

1   might not have?

2       A.      Correct.

3       Q.      Now, I want you to turn to MCM --

4   well, it's marked at the bottom MCM 0008 of

5   MCMP 2, it's the second page.

6       A.      Okay.

7       Q.      I know, it's small.

8               Now, it says -- I'm going down

9   one, two -- it's below the box, one, two --

10  it's the second paragraph beginning with

11  "Unless."  I am going to read it to you.

12              "Unless you notify MCM within 30

13  days after receiving this notice that you

14  dispute the validity of the debt or any

15  portion thereof, MCM will assume this debt to

16  be valid."

17              Do you see that?  Did I read that

18  correctly?

19      A.      You did.

20      Q.      I'm going to read the next

21  paragraph.

22              "If you notify MCM in writing

23  within 30 days after receiving this notice

24  that the debt or any portion thereof is

1                    Christopher Pierre

2       Q.      Okay.

3               So I'm going to represent to you

4  that what's been marked MCMP 3 is part of a

5  bill of sale, but it says bill of sale of a

6  Chase Bank USA, identified as the seller of

7  the purchase of accounts to Midland Funding,

8  LLC.  When you look through that -- and do you

9  see anything there that you disagree with?

10              MR. BIANCO:  Objection to the

11       form of the question.

12       A.      Are you asking me?

13       Q.      I will ask a better question.

14              Do you understand what the first

15  paragraph says?

16       A.      That you purchased the account

17  from Chase Bank.

18       Q.      Okay.

19              And when we say the account, are

20  we talking about your account?

21       A.      No, the credit card account.  The

22  balance, right?

23       Q.      Okay.

24              I want to understand.

25              So this document is part of the

127

                    Christopher Pierre

1    documents that show that Midland Funding

2    purchased your credit card account, your Chase

3    Bank account from Chase Bank; is that accurate

4    or not?

5              MR. BIANCO:  Objection to the

6         form of the question.

7              You can answer.

8         A.    I'm assuming that's what it is.

9         Q.    Okay.

10             Now, the only other question I

11   have for this is -- this is the last

12   paragraph, okay, it says "With respect to

13   account information for the accounts listed in

14   the final data file, seller represents and

15   warrants to purchaser that (i) the account

16   information is complete and accurate.  (ii)

17   the account information constitutes seller's

18   own business records and accurately reflects

19   in all material respects the information in

20   seller's database.  (iii) the account

21   information was kept in the regular course of

22   business.  (iv) the account information was

23   made at or near the time, by or from

24   information transmitted by a person with

128

Christopher Pierre

1  knowledge of the data entered into and

2  maintained in the seller's database; and (v)

3  it is the regular practice of seller's

4  business to maintain and compile such data."

5              I want you read that.

6              What do you think that means?

7              MR. BIANCO:  Objection to the

8       form of the question.

9              You can answer.

10      A.     I'm assuming that before Chase

11  sold you the account that they are stating

12  that all the information it pertains to it is

13  true and up to date.

14      Q.     Okay.

15             I want you to turn to it, it's

16  MCM 0004 in MCMP 3.

17      A.     Okay.

18      Q.     Now, at the top of this form it

19  says field and field data; do you see that?

20      A.     I do.

21      Q.     And you will see that last name

22  there identifies Pierre and the first name

23  identifies Chris, correct?

24      A.     Correct.

128

```
 1                Christopher Pierre
 2   knowledge of the data entered into and
 3   maintained in the seller's database; and (v)
 4   it is the regular practice of seller's
 5   business to maintain and compile such data."
 6                I want you read that.
 7                What do you think that means?
 8                MR. BIANCO:  Objection to the
 9        form of the question.
10                You can answer.
11        A.     I'm assuming that before Chase
12   sold you the account that they are stating
13   that all the information it pertains to it is
14   true and up to date.
15        Q.     Okay.
16                I want you to turn to it, it's
17   MCM 0004 in MCMP 3.
18        A.     Okay.
19        Q.     Now, at the top of this form it
20   says field and field data; do you see that?
21        A.     I do.
22        Q.     And you will see that last name
23   there identifies Pierre and the first name
24   identifies Chris, correct?
25        A.     Correct.
```

1                Christopher Pierre

2        Q.      Okay.

3                Then it has an account number;

4    could you read the last -- it's redacted, but

5    there are four digits; can you read that?

6        A.      The last four are 7220.

7        Q.      Now, do you remember looking at

8    MCMP 2, the letter from Midland Credit

9    Management?  Keep that page open.  I want you

10   to take that page, go to the third page of the

11   letter and I think you testified earlier that

12   there was a redacted account number there; do

13   you see that?

14       A.      I do.

15       Q.      Is that the same last four digits

16   as in the field data on MCMP 3?

17       A.      It is.

18       Q.      It is, okay.

19                Now, also, it shows the sale

20   amount, which was -- can you read that number?

21       A.      $6,980.53.

22       Q.      What do you think that

23   represents, if you know?

24       A.      Apparently, that's the amount

25   that's owed on that account.

130

Christopher Pierre

1   Q.      Okay.

2          And then it says contract date

3   and it looks like it's October 30, 2005; do

4   you see that?

5   A.      I do.

6   Q.      Do you think that's a -- that's

7   the time you opened the credit card with

8   Chase, if you know?

9   A.      I have no idea.

10  Q.      And then you have your address.

11  It says address one, that's the 25 Audubon

12  Avenue address in Holbrook, New York, ZIP code

13  11741-2307; is that accurate?

14  A.      That is.

15  Q.      There is also a home phone

16  number.  I will give you the last four digits,

17  1184; is that your current -- last four digits

18  of your current home phone number?

19  A.      No.

20  Q.      Was that your home phone number

21  in 2010?

22  A.      I don't know for sure.

23  Q.      At some point did you have that

24  phone number?

131

Christopher Pierre

2    A.    Yes.

3    Q.    When did you stop using that

4    phone number?

5    A.    I don't know when I switched from

6    Optimum Online to Verizon.

7    Q.    Now, there is also a work phone

8    number that ends in 4933; do you see that?

9    A.    Yes.

10   Q.    Is that a work number for Peak

11   Baseball?

12   A.    No.

13   Q.    What is that number; does it have

14   any meaning to you at all?

15   A.    Yes, that's my cell number.

16   Q.    Okay.

17         Did Peak Baseball have its own

18   phone number?

19   A.    Yes, at one time it did.  It was

20   a Google number, though.  It would ring to

21   that number and then ring to my phone.

22   Q.    If I went on the Internet and I

23   typed in Peak Baseball now on Google, it would

24   show me your cell phone number?

25   A.    No, it would show you it as being

132

1          Christopher Pierre

2  closed.

3          Q.     Well, okay.  But if I pulled it

4  up, let's say I pulled up a Web site -- I will

5  tell you this, I did pull up the Web site and

6  it did provide that number as a contact with

7  your name.

8          A.     Okay.

9          Q.     Is that the number that would

10  have been on the Web site when it was

11  functioning?

12          A.     It was functioning, it was the

13  Google number and then it automatically rang

14  to my cell phone.

15          Q.     Okay.

16                 Now, then we see underneath the

17  work phone says SSN, social security number;

18  do you see that?

19          A.     Yes.

20          Q.     It says 1720?

21          A.     I see that.

22          Q.     Is that the last four digits of

23  your social security number?

24          A.     It is.

25          Q.     Then we have -- we know that's

137

1              Christopher Pierre

2    Funding.

3         Q.      Okay.

4                 And then I'm looking at this,

5    now, this affidavit of sale of the account by

6    original creditor.  I'm going to ask you,

7    generally, what do you think that tells us?

8                 MR. BIANCO:  Objection to the

9         form of the question.

10                You can answer.

11        A.      One more time.

12        Q.      This affidavit of sale of the

13   account by original creditor, what do you

14   think that tells us about Chase and Midland

15   Funding?

16                MR. BIANCO:  Same objection.

17                You can answer.

18        A.      Affidavit of sale, I'm assuming

19   this is an affidavit again stating that the

20   sale of that credit apparently is being

21   transferred to Midland Funding.

22        Q.      Okay.

23                Now, and that's fine.

24                We are done with that fun

25   document.

1                    Christopher Pierre

2                    As we sit here today, do you have

3    any facts at all that support the position

4    that Midland didn't purchase the debt, your

5    debt from Chase?

6                    MR. BIANCO:  Objection to the

7              extent were you asking him personally?

8                    MR. SCHWARTZ:  Personally I'm

9              asking him.  You could think what you

10             want.  I am worried about him.  He's the

11             important one, no offense.

12                   MR. BIANCO:  Absolutely.

13                   MR. ARLEO:  Worry about him too.

14        Q.      Do you have any facts, anything

15   at all that would show that notwithstanding

16   these documents we've looked at, okay, do you

17   have anything from your side to say hey,

18   Midland Funding didn't buy your Chase account?

19                   MR. BIANCO:  Objection to the

20             form of the question.

21                   You can answer.

22        A.      No, I have no proof that would

23   state that you didn't buy it, no.

24        Q.      Okay.

25                   Here we go.

Christopher Pierre

1               Now we are going to get to some

2    fun.  I doubt it.  It's not even fun for us.

3               I'm handing you --

4               MR. SCHWARTZ:  MCMP 4.

5               (MCMP Exhibit 4, Document Bates

6        stamped MCM-0010 through MCM-0045, marked

7        for identification.)

8      Q.    I'm handing Mr. Pierre a copy of

9    what's been marked MCMP 4, which is Bates

10   stamped MCM 0010 all the way through MCM 0045.

11              I want you to take a look at

12   that.

13      A.    (Witness reviewing.)

14              Is this something that was just

15   recently run?  This looks like there is a lot

16   of credit card stuff on here.  I don't know.

17   You want me to read through all of them?

18           MR. BIANCO:  You want him to read

19        the whole thing?

20      Q.    I am not going to have any

21   questions about the boilerplate language.  I'm

22   more concerned about getting some information

23   regarding these statements.

24           MR. BIANCO:  Okay.  I mean I say

1               Christopher Pierre

2       that only because it's 30 some-odd

3       pages.  If you want him to sit here --

4       Q.      It wasn't originally run -- by

5   the way, this was produced in our document

6   responses, that's why it has the stamps on the

7   bottom.  It was produced to your attorney, I

8   don't know, at some point.

9               I want you to take a look.  We'll

10  go to the first one.  It says statement.  Let

11  me ask you this:  Do you know what this

12  form -- what it is; do you know what this is?

13              MR. BIANCO:  Just the first page?

14              MR. SCHWARTZ:  Just the first

15      page.

16              MR. BIANCO:  No objection.

17      A.      No, it seems a lot of the same,

18  buy.com.  No, I don't know what that is.

19      Q.      Well, it says at the top corner

20  that it's a statement for account number and

21  then it's redacted and then it says 7220; do

22  you see that?

23      A.      Yes.

24      Q.      And would you agree that that

25  7220 is the same last four digits that was

141

1                 Christopher Pierre

2   referenced in the Chase documents, the bill of

3   sale, as well as Midland Credit Management

4   letter to you?

5        A.     Yes.

6        Q.     So I want to make sure we are

7   talking about the same account; you understand

8   where we are going?

9        A.     I do.

10        Q.     And the words buy.com in that

11   box, does that refresh your recollection as to

12   this particular credit card?

13               MR. BIANCO:  Just for clarity,

14           you are representing the redacted

15           portions are exactly the same in all the

16           documents?

17               MR. SCHWARTZ:  Sure.  Sure, they

18           are.  Yes, I am making that

19           representation.

20               MR. BIANCO:  Okay.

21        A.     Are you asking me if that

22   amount -- this is the credit card, buy.com is

23   what we are talking about is --

24        Q.     What I'm asking you is, it

25   identifies buy.com, which may be the brand of

142

Christopher Pierre

1  the Chase credit card, I don't know, I'm

2  asking you; does that ring a bell, buy.com?

3      A.    It rings a bell.  I don't know if

4  I had a credit card with buy.com, but the name

5  buy.com rings a bell.

6      Q.    What is buy.com?

7      A.    If I am not mistaken, it's an

8  online Web site you can buy stuff on.

9      Q.    Okay, I didn't know.

10         In any event, now, I want you to

11  take a look at the address box and I will

12  represent to you that this is a copy of a

13  statement that came from Chase Bank USA and I

14  want to just go to the -- where the address

15  box is; do you see that?

16      A.    For Cardmember Service?

17      Q.    No, the mailing address box,

18  which would say -- it says -- does it say

19  Mr. Chris Pierre?

20      A.    It does.

21      Q.    And it has your address, correct?

22      A.    Correct.

23      Q.    Okay, then the other box, does

24  say Cardmember Service, P.O. Box 15153,

143

Christopher Pierre

1  Wilmington, Delaware 19866-5153.  Let me ask
2  you this:  Where it says Cardmember Service,
3  do you know whose address that is?
4
5       A.      No.
6       Q.      But the mailing address is your
7  address?
8       A.      It is.
9       Q.      Okay.
10              The account number, the last 7220
11 is the Chase account -- was your Chase account
12 number; is that correct, the last four digits?
13      A.      That was my -- I don't know if
14 it's my present Chase account, but it must
15 have been the one back then.
16      Q.      The credit card account?
17      A.      Oh, the credit card account, that
18 I don't know.
19      Q.      Okay.
20              Well, we've gone through -- if
21 you look through the other exhibits, you will
22 see --
23      A.      Yes, based on the other exhibits
24 where it was brought to my attention, that
25 number matches the same number on all those

1              Christopher Pierre

2    other exhibits, correct.

3         Q.     Now, it says the payment due

4    date -- it says a new balance provides

5    $6,161.52; do you see that?

6         A.     I do.

7         Q.     And it provides a payment due

8    date of August 28, 2007; is that correct?

9         A.     August.

10        Q.     Is that 28th?

11        A.     28th of '07, yes.

12        Q.     Okay.

13               And now, as we sit here today,

14   and it reflects, by the way, that on July

15   18th, there was a payment of $257; do you see

16   that in the transaction section?

17        A.     I do.

18        Q.     Do you have any recollection of a

19   payment of $257, I guess preceding August 26,

20   2007?

21        A.     I do not.

22        Q.     Do you recall receiving

23   statements that looked like this from Chase?

24        A.     I do not.

25        Q.     Let's go to MCM 0012 of Exhibit

145

1           Christopher Pierre

2    MCMP 4.

3           A.     (Witness reviewing.)

4                  Okay.

5           Q.     Again, we see the statement for

6    account number 7220.  Would you agree with me

7    that that is the same -- that's the credit

8    card, last four digits of the credit card from

9    Chase that Midland Funding was collecting on?

10          A.     Correct.

11          Q.     And it shows a new balance of

12   $6,101.89?

13          A.     Yes.

14          Q.     And it gives a payment date of

15   September 28, 2007?

16          A.     Yes.

17          Q.     So that would be the next monthly

18   statement?

19          A.     Yes.

20          Q.     Okay.

21                 Again, it's addressed to

22   Mr. Chris Pierre at 25 Audubon Avenue,

23   Holbrook, New York, correct?

24          A.     Correct.

25          Q.     And here it reflects a payment --

146

Christopher Pierre

1  in the transaction section it reflects a

2  payment of August 22nd of $255; do you see

3  that?

4        A.      I do see that, but where does it

5  show the date I made that?

6        Q.      Transaction date at the

7  beginning, you see where it says August 8 --

8  I'm sorry, 0822?

9        A.      Yes.

10       Q.      Again, we've asked for your

11  checking accounts, your checks of -- showing

12  payments, so obviously when you ask for that,

13  if any of these payments show up, we usually

14  need to see those checks.

15       A.      Okay.

16       Q.      There was a $255 payment on that

17  one.  Then we can go forward.  I want to go,

18  hopefully sooner than later, MCM 0014 of

19  Exhibit MCMP 4.

20       A.      (Witness reviewing.)  Okay.

21       Q.      Again, it's a statement for the

22  same account 7220, correct?

23       A.      Correct.

24       Q.      And it's also addressed to you

147

Christopher Pierre

1   and -- is that correct?

2       A.    It is.

3       Q.    And the balance is now $5,034.92;

4   is that right?  Is that what that is or six?

5       A.    I show the balance at that time

6   of --

7       Q.    I'm sorry, yeah, it's $6.034.92.

8       A.    Yes.

9       Q.    And that -- this is the next

10  monthly statement, correct?

11      A.    That is in September.

12      Q.    Well, this one is now payment due

13  date of October 26, 2007?

14      A.    Yes, it is.

15      Q.    And here it's showing another

16  payment September 18th of $255; does it show

17  that?

18      A.    It shows a payment on 9/18 for

19  255.

20      Q.    It says that it was payment by

21  electronic check; do you see where it says

22  that in the transaction description?

23      A.    Yes.

24      Q.    As we sit here today, do you

                    Christopher Pierre

1  recall making any -- I mean do you recall

2  having any conversations with Chase way back

3  when you had difficulty paying this, where you

4  were making some kind of minimum payment; does

5  this bring back anything at the time period?

6       A.     I don't recall.

7       Q.     But it shows that you were

8  making -- there was an electronic payment,

9  correct?

10      A.     Can I assume that was a payment

11 online?

12      Q.     You can assume whatever you want.

13 If you are not sure, then say I don't know.

14      A.     I'm not sure.  Electronic payment

15 is there.

16      Q.     Okay.

17             So these payments would have been

18 made electronically when you said earlier -- I

19 believe you testified you wrote checks?

20      A.     I believe when I did I wrote

21 checks, yes.

22      Q.     Could your wife have made these

23 payments in 2007?

24      A.     As far as a check or online, what

                    Christopher Pierre

1

2  are you asking?

3       Q.    Let me ask you this, I will step

4  back.

5            For example, in MCM 0014, this

6  particular statement shows a payment on

7  September 18, 2007, correct?

8       A.    Yes.

9       Q.    Okay.

10           And I'm trying to figure out

11 whoever -- whether it would have been you that

12 made that payment of $255 or whether it could

13 have been your spouse or someone else?

14      A.    It was, I'm assuming now, either

15 one of us.  Couldn't have been anybody but me

16 or her.

17      Q.    Okay.

18           MR. ARLEO:  Can we take five

19      minutes?

20           MR. BIANCO:  We've been going for

21      an hour.

22           MR. SCHWARTZ:  Sure.  Sure.

23           (Recess taken.)

24 BY MR. SCHWARTZ:

25      Q.    So we are looking at I guess it's

150

Christopher Pierre

1  MCM 0016 Bates stamped MCMP 4.  Let me know
2  when you are there.
3       A.     I'm there.
4       Q.     Now we have -- the next -- I
5  believe this is the next monthly statement for
6  account number 7220; do you see that?
7       A.     I do.
8       Q.     It's now November 28, 2007; is
9  that correct?
10      A.     As a due date, yes.
11      Q.     As a payment due date.  I am
12 sorry, that would be the next monthly
13 statement from Chase?
14      A.     Correct.
15      Q.     Concerning the debt?
16      A.     Um-hum.
17      Q.     Is that a yes?
18      A.     Yes.
19      Q.     Again, it shows another payment
20 again, $256 on October 17th, a payment by
21 electronic check; do you see that?
22      A.     I do.
23      Q.     You have no recollection of that
24 payment either?

1                    Christopher Pierre

2          A.      I do not.

3          Q.      Zip on ahead.

4                  Gets slightly more interesting in

5    a little bit, but I have to go through this in

6    sequence.

7                  Next one is MCM 0018, tell me,

8    when you are there, of MCMP 4.

9          A.      I am there.

10         Q.      All right.

11                 It says statement for account

12   number 7220; do you agree?

13         A.      I do.

14         Q.      And this is addressed to you at

15   your address?

16         A.      It is.

17         Q.      Okay.

18                 And this one shows a payment due

19   date of December 28, 2007; do you agree with

20   that?

21         A.      Yes, I do.

22         Q.      And it reflects a payment in the

23   transaction section on November 17, 2007 of

24   $300 via electronic check; do you agree?

25         A.      November 17, 300, yes.

152

Christopher Pierre

Q.      Do you have any recollection of making that payment?

A.      I do not.

Q.      Do you have any idea why the payment went up on this payment as opposed to 256 on the prior payments?

A.      I have no idea.

Q.      Now we go to MCM 0020.

A.      I'm there.

Q.      Again, it's a statement for account number 7220; will you agree with that?

A.      I do.

Q.      It shows a payment due date of January 28, 2008.

A.      It does.

Q.      Okay.

Again, it's addressed to Chris Pierre at your address, correct?

A.      It is.

Q.      And in the transaction section, it shows a December 17th payment by electronic check of $200?

A.      It does.

Q.      Do you have any recollection of

153

                    Christopher Pierre

1    making a payment on December 17th of 2007 of

2    $200 to Chase?

3         A.      I do not.

4         Q.      Let's go to MCM 0022.

5         A.      Okay.  I am there.

6         Q.      Again, this is another statement

7    for account number 7220, correct?

8         A.      It is.

9         Q.      And this one has a payment date

10   of February 28, 2008, correct, payment due

11   date?

12        A.      Payment due date, yes.

13        Q.      It's addressed to Chris Pierre at

14   25 Audubon Avenue, correct?

15        A.      Yes, but it doesn't say past due

16   amount.

17        Q.      Well, it says past due -- oh,

18   past due amount 0.00, correct?

19                It's important.

20        A.      Yes.

21        Q.      Okay.

22        A.      Which is weird, because they were

23   saying the last one I was late; past due

24   amount of 240.  I only paid 200 so how is it

154

1                    Christopher Pierre

2    on --

3         Q.      Okay.  Helping me out here.

4         A.      How is it on that particular

5    invoice I don't have a past due amount?

6         Q.      Well, I don't have an answer for

7    you, but what else is interesting, and again,

8    do you have an answer, it says say past due

9    amount zero dollars.  I want to look at the

10   transactions.

11        A.      Okay.

12        Q.      Here it reflects a payment on

13   January 19, 2008 of $485?

14        A.      Okay.

15        Q.      Do you have any recollection of

16   making that electronic payment?

17        A.      I do not.

18        Q.      Then you see some purchases.

19              Do you see the next transaction,

20   it identifies Target -- first of all, are you

21   familiar with Medford, New York?

22        A.      I am.

23        Q.      Is that -- and there is a

24   Target -- let me ask you this:  January 27th,

25   does that date have any meaning?  In other

155

Christopher Pierre

1        Christopher Pierre
2   words, is it a birthday, anniversary, anything
3   like that?
4        A.        January 27th, no, not to my
5   knowledge.
6        Q.        Okay.
7                  And -- but that -- okay.  So you
8   see that there was a transaction with Target
9   for $178.52 on January 27th of 2008?
10       A.        Correct.
11       Q.        And then there's one on January
12  31st with -- looks like sephora.com for
13  $53.74?
14       A.        I see that as well.
15       Q.        Now, again, does that January
16  31st have any significance as far as your
17  wife's birthday or anything like that?
18       A.        Nope.
19       Q.        Okay.
20                 Do you recall making any
21  purchases at Sephora or Sephora online?
22       A.        I do not.
23       Q.        Okay.
24                 Does your wife make purchases
25  from Sephora in the period -- at any time?

156

Christopher Pierre

1   A.      Not recently, no.  I don't know
2
3   if back then if she did.
4       Q.      Okay.
5           Now we go to the next statement,
6   which is MCM 0024 on MCMP 4.  Again, it's a
7   statement for an account number 7220 and it's
8   the next monthly statement with a payment due
9   date of March 28, 2008 and the past due
10  balance of zero, correct?
11      A.      Correct.
12      Q.      Okay.
13          And there is only, I'm sorry,
14  there is -- in the transactions it identifies
15  an over-limit fee on February 4th; do you see
16  that?
17              I do.
18      Q.      Above it there is a late fee?
19      A.      I do.
20      Q.      Then there is a payment, March
21  1st, 2008 of $200, correct?
22      A.      Of March 1st?
23      Q.      Yeah.
24      A.      Yes.
25      Q.      You have no recollection of

157

Christopher Pierre

1   making that $200 payment?

2       A.      I do not.

3       Q.      I figure if I ask enough, maybe I
4   will get lucky.

5               The next one is MCM 0026 of
6   MCMP 4.

7       A.      I'm there.

8       Q.      Okay.

9               Statement is for account number
10  7220.  Now, this is the next monthly statement
11  saying payment due date of April 28, 2008 with
12  a past due amount of zero, correct?

13      A.      Yep.

14      Q.      It's requiring a minimum payment
15  of $200?

16      A.      Okay, I see that.

17      Q.      Then we look down and we look
18  down at the transactions and it shows a
19  returned payment on March 1st of $200; do you
20  see that?

21      A.      I do.

22      Q.      Do you have any recollection of
23  receiving a returned payment from Chase?

24      A.      I do not.

158

Christopher Pierre

1

2      Q.      Do you recall any conversations

3  with Chase about their billing practices?   In

4  other words, their billing you for things you

5  didn't buy or identity theft or anything like

6  that?

7      A.      I do not.

8      Q.      Then there was a payment on March

9  5th of $200; do you see that?

10     A.      I do.

11     Q.      And then you see a payment on

12  March 28th of $426.63 by electronic payment;

13  do you see that?

14     A.      I do.

15     Q.      Do you have any recollection of

16  the $626 --

17     A.      And 63 cents?

18     Q.      Yes.

19     A.      No, I do not.

20     Q.      You don't have any recollection.

21             Okay.

22             Then we have MCM 0028 of

23  Exhibit MCMP 4.  Let me know when you are

24  there.

25     A.      I'm there.

159

1                    Christopher Pierre
2          Q.      All right.
3                  Statement for account number
4     7220; is that correct?
5          A.      It is.
6          Q.      And this is the next monthly
7     statement, which is May 28, 2008, correct?
8          A.      Correct.
9          Q.      Okay.
10                 And this time it has a monthly
11    past due balance of $200, correct?
12         A.      It does.
13         Q.      And it's addressed to you?
14         A.      It is.
15         Q.      And this one shows a Hess charge,
16    April 2 of 2008 of $41.70 in Holbrook,
17    New York?
18         A.      I do see that.
19         Q.      Do you use that -- at that time
20    did you use that Hess gas station?
21         A.      I don't know.  I may have.
22         Q.      If you don't know, you don't
23    know.
24                 Let's go to MCM 30.  Let me know
25    when you are there, that's of MCMP 4.

160

1                    Christopher Pierre

2        A.      I'm there.

3        Q.      Statement for account number

4   7220?

5        A.      It is.

6        Q.      It's the next monthly statement

7   with a payment due date of June 28, 2008 and

8   has a past due balance of $232, correct?

9        A.      It does.

10       Q.      And here the transaction reflects

11  a payment of $200 on May 11, 2008, correct?

12       A.      It shows a payment of, yes, $200,

13  correct.

14       Q.      Sure.

15               MCM 0032 --

16       A.      I'm there.

17       Q.      -- on MCMP 4.  It shows a

18  statement for account number ending in 7220,

19  correct?

20       A.      It does.

21       Q.      This is the next statement,

22  payment due date of July 28, 2008 with a past

23  due balance of $168?

24       A.      It does.

25       Q.      And here it's -- again, when you

161

Christopher Pierre

1  go down to the transaction section, it shows

2  on June 27th, there was a payment of $300.  On

3  that same day there was -- I'm sorry, on July

4  2 -- no, June 27th, the same day, the $300 is

5  returned.  There is a return fee payment and

6  then it's resubmitted $300; do you see that on

7  July 2?

8  A.    I do.

9  Q.    Do you have any recollection of

10  events that caused that payment, return

11  payment and payment being submitted to Chase?

12  A.    I do not.

13  Q.    MCM 34.

14  A.    I am there.

15  Q.    This is MCMP 4.  And again, it's

16  a statement from Chase for account number 7220

17  with a payment due date of August 28, 2008 and

18  now, the past due amount is $401, correct?

19  A.    It is.

20  Q.    And here there is -- there are no

21  transactions, just a late fee and over-limit

22  fee?

23  A.    Correct.

24  Q.    So at this point there are no

25

162

Christopher Pierre

1  payments being made by you?

2              MR. BIANCO:  Objection to the

3        form of the question.

4              You can answer.

5        A.      It seems that way, yes.

6        Q.      Because all the prior ones had

7  payments of 200 or 100 or 400 or some-odd

8  number, but this is the first one where it

9  doesn't seem to reflect any payments, correct?

10       A.      Correct.

11       Q.      Turn to the next one, MCM 36 on

12  MCMP 4.  This statement, now the balance is up

13  to $6,106.26 with a payment due date of

14  9/28/08, correct?

15       A.      Correct.

16       Q.      And the past due balance of 641?

17       A.      Correct.

18       Q.      And again, there's no payments

19  listed in the transaction?

20       A.      Correct.

21       Q.      But it does say the charge

22  privileges -- I'm right above where it says --

23  below Visa account summary, it shows "The

24  charge privileges on your credit card account

163

Christopher Pierre

1   have been revoked.  You no longer have the

2   ability to use your credit card account for

3   purchases.  We can help get back on track."

4          Then there is a phone number; do

5   you see that?

6          A.     I do.

7          Q.     So at that time, that point, now

8   there Dan -- based on these Chase records, you

9   haven't made a payment and now they've

10  terminated the credit card privileges, you

11  can't charge on it, correct?

12         A.     Yes.

13         Q.     Okay.

14         Now we go MCM 0038 in MCMP 4.

15         Now we have a statement for

16  account number ending in 7220 from Chase,

17  payment due date.  Now we have a new balance

18  of $6,332.56 with a payment due date of

19  October 28, 2008; is that correct?

20         A.     Yes.

21         Q.     Again, this one is addressed to

22  Chris Pierre, it's your address, correct?

23         A.     Correct.

24         Q.     And now here it says under the --

164

Christopher Pierre

1   and there are no transactions.  Now they are

2   just assessing late fees and over-limit fees?

3       A.     Correct.

4       Q.     Here it says, "You haven't made

5   the required payments and your credit card

6   account is 90 days past due.  As a result,

7   your credit bureau may be updated with a

8   negative rating.  Please send your payment

9   immediately or call."

10          And there is an 800 number; do

11  you see that?

12      A.     I do.

13      Q.     So once again, now the payments

14  aren't coming in and now they are advising you

15  you are 90 days late?

16      A.     Correct.

17      Q.     All right.  Move along here.

18          MCM 0040.

19          Again, this is another statement.

20  This is the next statement for account number,

21  Chase account number 7220, reflecting the

22  balance of $6,526.80 with a payment due on

23  November 28th, 2008, correct?

24      A.     Correct.

165

1                    Christopher Pierre

2          Q.      It's addressed to you?

3          A.      It is.

4          Q.      And this one it says, "It's not

5    too" below the Visa account summary, it says

6    "It's not too late to resolve the outstanding

7    balance on your credit card account.  We have

8    a variety of payment options that might be

9    right for you."

10                 Then they provide a phone number,

11   correct?

12         A.      It does.

13         Q.      And there is no payment there.

14                 Now they are just giving you a

15   late fee?

16         A.      Right.

17         Q.      MCM 42, MCMP 4.

18                 Again, here is the next statement

19   for account number 7220; do you see that?

20         A.      I do.

21         Q.      Okay.

22                 It shows a new balance of

23   $6,728.79 with a payment due date of December

24   28, 2008, correct?

25         A.      Correct.

166

Christopher Pierre

1

2      Q.      Okay.

3              Here it says in the comments

4  below the Visa account summary, it says "You

5  haven't made the required payments on your

6  credit card and your credit card account is

7  150 days' past due.  You can still turn things

8  around.  Call us today."

9              And so that's the first part of

10  it; is that correct?

11      A.      That is correct.

12      Q.      Okay.

13              And then it also -- "Your APR and

14  your promotional rate have expired as a result

15  of your late payment on your account."

16              That's the second comment,

17  correct?

18      A.      Correct.

19      Q.      Now, do you have any recollection

20  of having any, up to this point, of having any

21  kind of conversation with Chase regarding your

22  inability to pay the credit card debt?

23      A.      I don't have any recollection.

24      Q.      Okay.

25              Do you know if you did or didn't?

167

1                    Christopher Pierre

2          A.     I don't have any recollection of

3     whether I did or I didn't.

4          Q.     Okay.

5                 So you might have but you might

6     not have?

7          A.     Possibly, yeah.

8          Q.     Okay.

9                 Now we get to the -- I think this

10    is the last one.  It should be.  The last

11    statement, okay.  Now, this is the last Chase

12    statement for account number 7220, showing a

13    balance of $6,941.53 with a payment due date

14    of January 28, 2009, correct?

15         A.     Correct.

16         Q.     It's addressed to Chris Pierre,

17    25 Audubon Avenue, Holbrook, New York,

18    correct?

19         A.     Correct.

20         Q.     And here it says in the comments

21    below the Visa account summary, "The

22    outstanding balance on your credit card is

23    scheduled to be written off as bad debt

24    shortly."

25                We'll stop there.

Christopher Pierre

1

2           What is your understanding of

3  what that means?

4           A.     I have no understanding what that

5  means.

6           Q.     So you don't know what it means

7  to have a debt written off as a bad debt?

8           A.     No.

9           Q.     And it does indicate that "Your

10  credit bureau will be updated with a negative

11  rating that could last for up to seven years."

12           Do you see that?

13           A.     That I see.

14           Q.     Are you aware when you went

15  back -- when you looked at your credit report,

16  was there derogatory information from Chase on

17  your report, not just -- not the judgment, was

18  there derogatory information on the report

19  from Chase?

20           MR. BIANCO:  Objection to the

21       form of the question.

22           You can answer.

23           A.     I don't recall.

24           MR. SCHWARTZ:  This is 5.

25           (MCMP Exhibit 5, Document Bates

171

1          Christopher Pierre

2          (Continued in non-confidential

3      portion of transcript.)

4  BY MR. SCHWARTZ:

5      Q.    It shows a balance on the right

6  side of $6,980.53; do you see that?

7      A.    I see that.

8      Q.    Now, we also see the home phone

9  number and the business number and I believe

10  we've talked about, that was your former home

11  number ending in 1184 before you switched over

12  your carrier?

13      A.    Yes.

14      Q.    And that business number ending

15  in 4933 is actually your cell phone number?

16      A.    It is.

17      Q.    Okay.

18          MR. SCHWARTZ:  This is 6.

19          (MCMP Exhibit 6, Document Bates

20      stamped MCM-0047 through MCM-0057, marked

21      for identification.)

22      Q.    I'm handing Mr. Pierre a copy of

23  what's been marked MCM 5, which is a Chase

24  credit card cardmember agreement (handing).

25      A.    (Witness reviewing.)

Christopher Pierre

1

2      Q.      You will see behind it there are

3  what the industry calls envelope stuffers.

4      A.      (Witness reviewing.)

5      Q.      Okay.

6              First of all, have you seen this

7  document; do you recall if you have ever seen

8  this document?

9      A.      Is this the document I signed

10  when I opened the account?

11      Q.      Well, that would be the question,

12  but the first question is a very basic one:

13  Have you seen this document prior to today?

14      A.      I don't recall.

15      Q.      Do you recall if this was the

16  agreement that you received when you opened up

17  your Chase credit card account?

18      A.      I'm not going to be able to

19  recall that.

20      Q.      Okay.

21      A.      I know it's not signed by me.

22      Q.      Are you aware if there is -- I am

23  sorry.  Go ahead.  Look through it.

24              Are you aware if there has ever

25  been a credit card agreement signed by a

174

Christopher Pierre

1    A.    I would assume it certifies that

2  I am the person purchasing whatever it is that

3  I am purchasing.

4    Q.    Okay.

5          So it's your understanding that

6  when you have -- when you get a credit card

7  agreement from a credit card company, you are

8  bounding when you sign it?

9    A.    Yeah.

10    Q.    Well, this agreement doesn't have

11  a signature section.  I'm asking you, and I

12  may have already asked this, I want to make

13  sure we are clear on the testimony, you don't

14  recall receiving a copy of this?

15    A.    I don't recall.

16    Q.    When the credit card came to you

17  from Chase, do you recall if there was -- do

18  you even recall receiving the credit card?

19    A.    No.

20    Q.    All right.

21          I have no further questions with

22  that one.

23          MR. SCHWARTZ:  7.

24          (MCMP Exhibit 7, Document Bates

177

Christopher Pierre

As we are sitting here today looking at the records, statements, bill of sale, do you dispute -- do you have any basis to dispute that Midland Funding was not the -- was not the lawful owner -- was not the owner -- let me step back a second.

Sir, do you have any facts that would show that Midland Funding was not the owner of your debt that you originally owed to Chase?

A.    Do I have anything to dispute that, I have nothing to dispute it, no.

Q.    Well, I want to make sure, because earlier when you were asked this sort of big question, why are you suing Rubin & Rothman at the very beginning of the case and you said because they did something wrong, I believe?

A.    Yeah.

Q.    I'm going to ask the same question.

Why are you suing Midland Funding?

MR. BIANCO:   Objection to the

179

1                    Christopher Pierre

2  Rothman filed a lawsuit against you, correct?

3       A.      Yeah.

4       Q.      And they filed that lawsuit on

5  behalf of Midland Funding as the owner of the

6  debt, correct?

7       A.      I would agree, yes.

8       Q.      And your position is for some

9  reason that they filed -- they should not have

10 filed that lawsuit, correct?

11      A.      Correct.

12      Q.      Yes.

13              MR. BIANCO:  Objection to the

14          form of the question.

15              You can answer in your own words.

16      A.      As I said before, I assumed they

17 did not have enough evidence at the time to

18 actually do it.  I'm not disputing that I had

19 the card, but I wasn't entirely assured that

20 all of the information was properly there, the

21 late fees and all that other stuff that went

22 along with it.  So I really don't -- they

23 never mailed me anything saying, as you can

24 see from you guys, look, this is what we have.

25      Q.      Sure.

185

Christopher Pierre

1  Q.      I didn't understand that last
2

3 part.

4          You are saying what obligation is
5 right that you owed?  I'm not sure what you
6 just said.

7          A.      I have an obligation.  It was my
8 card.  I don't know for sure if that was the
9 exact amount that was necessary and I don't
10 think they did anything to help me in that
11 regard.  Most of our conversations were pretty
12 much or all of our conversations were on the
13 telephone and my primary concern at that point
14 was to avoid bringing it to a judgment.

15         Q.      Sure.

16         A.      If I paid the $100 a month, in my
17 mind this was going to go away when I paid it
18 off.

19         Q.      Okay.

20                 What I'm asking you is:  If you
21 were unsure of the amount, you had a recourse
22 in that letter right there, to get it
23 confirmed, okay?

24         A.      I didn't trust that they would do
25 the right thing, I really didn't.

186

1                    Christopher Pierre

2         Q.        But that was your choice,

3    correct?

4         A.        That was my choice and that's

5    pretty much -- yeah.

6                   (MCMP Exhibit 9, Document Bates

7             stamped PI-CP-0001 through PI-CP-0019

8             marked for identification.)

9         Q.        I'm handing over to the deponent,

10   Mr. Pierre, MCMP 9, which were documents I

11   believe produced by you, correct?

12        A.        I don't know.  I haven't read it.

13        Q.        By your attorney, that's fine.

14                  And the question I have is:  If

15   you could turn at the bottom it says PI-CP-19?

16        A.        What page?

17        Q.        PI-CP-19.  So you are at one, go

18   to 19.  I think it's probably the next to

19   last --

20        A.        (Witness complying.)

21        Q.        The last page, very last page.

22        A.        I am on it.

23        Q.        Now, earlier you were talking

24   about a settlement stipulation?

25        A.        Correct.

202

Christopher Pierre

1    concrete facts.

2    Q.    So do you think that -- never

3    mind.  Never mind.

4           Okay.

5           I've looked at this in your --

6    when you filed your motion to rule to show

7    cause to open the default judgment, there was

8    a letter that was attached, correct; there was

9    a letter you wrote to the judge, an

10   attachment.  I believe it's in the package of

11   stuff you produced.

12          MR. BIANCO:  9.

13          MR. SCHWARTZ:  MCMP 9.

14   Q.    If you could read the last

15   paragraph out loud, please?  Read it for the

16   record.

17   A.    This paragraph states "As our

18   family starts to repay all of our outstanding

19   debts and judgments, we are diligently trying

20   to repay our creditors.  We ask the court

21   consider your request for an Order to Show

22   Cause and have the ability to negotiate a fair

23   settlement agreement and repayment plan with

24   Rubin & Rothman and I agree to appear at any

203

```
 1                  Christopher Pierre
 2    and all proceedings in this matter."
 3          Q.      Okay.
 4          A.      I forgot you were typing.
 5          Q.      You wrote that, right?
 6          A.      I did.
 7          Q.      You typed that up?
 8          A.      I typed it up.
 9          Q.      Did anybody assist you in writing
10    that?
11          A.      No.
12          Q.      Would you agree if you owe a debt
13    you should pay it?
14                  MR. BIANCO:  Objection to the
15          form of the question.
16                  You can answer.
17          A.      Yes.
18          Q.      It seems to me that paragraph
19    talks about -- a bit about the fact you have
20    an obligation to pay a bill you owe?
21          A.      I believe I was doing so too.
22          Q.      Would you agree that the credit
23    card debt that you incurred with Chase, would
24    you believe that you owed that, now you've
25    paid it off, but prior to paying it off that
```

204

                    Christopher Pierre
1    you owed that to Midland Funding?
2         A.     That entire amount, 69 and
3    change, whatever, I can't say for certain I
4    owed that amount.  I know I owed them money,
5    but I don't know if it was that amount.
6         Q.     You don't have any reason to say
7    I didn't owe that amount, you don't know?
8         A.     I have no proof.
9         Q.     Okay.
10             And you've never requested proof?
11        A.     No, because I was fearful that I
12   was going to be having a judgment applied
13   against me, so the easiest way for me to do it
14   was pay the $100 and make it go away.
15        Q.     So even if Midland Funding sent
16   you a letter more than, I don't know, a year
17   before the lawsuit was filed, it was properly
18   addressed to your residence, that afforded you
19   the opportunity to investigate a year before
20   the suit was filed.  I am not saying -- we
21   don't know, you don't remember.  If Midland
22   comes to the plate and says I sent this
23   letter, this letter advised him if he has any
24   questions this is how he disputes it, a year

1          Christopher Pierre

2    before the suit was filed and you didn't do

3    it, who should bear the burden of that?

4              MR. BIANCO:  Objection to the

5         form of the question.

6         A.    I don't know.

7         Q.    You don't think you should?

8              MR. BIANCO:  Objection to the

9         form of the question.

10             You can answer.

11        A.    Again, I agree that I had debt

12   incurred on this card and I agreed to make

13   restitution on it and I thought I was doing

14   that by paying the $100 a month.  My question

15   was that I wasn't entirely sure that the

16   number that they came to was the exact number

17   and I thought they held all the cards so I did

18   everything in my power to make sure it doesn't

19   go to judgment by paying the $100.

20        Q.    Again, and that's fine.  I am not

21   attacking you on that.  I'm just saying you

22   never questioned it, for whatever your

23   reasons, you never questioned it, you never

24   said, hey, Midland Funding, show me how much I

25   owe, verify my debt, you never did that,

206

Christopher Pierre

1   right?

2                   MR. BIANCO:  Objection to the

3           form of the question.

4         A.    I never.

5         Q.    I am pointing to a Rubin &

6   Rothman -- RRP 4, by the way, when I said

7   that, but I could be talking about MCMP 2 as

8   well, which was the letter from Midland

9   Funding.

10                  MR. BIANCO:  Same objection.

11                  You can answer.

12        A.    My answer is that I didn't and I

13  just was hoping that it didn't go to judgment,

14  so I just paid it.

15        Q.    Okay.

16                  Now --

17        A.    But if we take it to this, today

18  the way we look at it and all the things that

19  led up to it, where numbers were being changed

20  and numbers were being reerased and this is

21  the new number and stuff like that, that was

22  from the beginning.

23        Q.    I don't mean to interrupt.  I am

24  not following that logic.

209

                    Christopher Pierre

1
2   know on what basis you are suing Midland
3   Funding in this class action lawsuit and I
4   will preface that by saying, do you know under
5   what law?
6          A.      No.
7          Q.      Do you know what the Fair Debt
8   Collections Practices Act is?
9          A.      No.
10         Q.      Do you know what the New York
11  General Business Law is of Section 349, to be
12  exact?
13         A.      I can't say honestly, no.  I
14  don't know.
15         Q.      Do you have any facts that show
16  that Midland Funding engaged in any action
17  independent of Rubin & Rothman against you?
18                 MR. BIANCO:  Objection, only to
19           the extent that you should answer for
20           yourself.
21                 MR. SCHWARTZ:  I don't want to
22           hear --
23         A.      Rephrase that.
24         Q.      Okay.
25                 It seems to me that during the

Christopher Pierre

1
2    course of this deposition, you have been
3    talking about Rubin & Rothman's conduct about
4    giving you -- reducing the demand to $5,000 or
5    making phone calls, what have you, we
6    understand that.
7         A.       Correct.
8         Q.       Independent of Rubin & Rothman's
9    conduct that you are claiming, beyond that,
10   what did Midland Funding do to you?
11              MR. BIANCO:  You can answer for
12          yourself.
13        A.       Like I said before, I mean I have
14   been repeating that same issue where I believe
15   they didn't have, you know, enough evidence at
16   the time.  But remember, I don't remember
17   speaking to Midland.  Most of my conversations
18   was through, you know, Rubin & Rothman.  So if
19   they had conversation with me or if they told
20   me, I don't recall them, you know, over the
21   phone telling me, you know, here are your
22   options.  Everything is through Rubin &
23   Rothman.
24        Q.       Well, except for the original
25   letter that Midland Funding sent that you are

220

1              Christopher Pierre

2       A.      I am also a layman.  Now you are

3  going to have to understand that, you know,

4  you guys are lawyers, you guys have a

5  different understanding on what sounds right

6  than we do.

7       Q.      And you are right, and I am not

8  asking you that.  What I am asking you for, if

9  something in a complaint says they buy these

10  debts but they don't have any proof and I am

11  sitting here with a handful of statements that

12  they are saying is not preserved, I am calling

13  question to that.

14       A.      Okay.

15       Q.      But okay.

16              That with respect to your

17  account, would you say that Midland acquired

18  your debt, okay, that included documents from

19  the original creditor and I am referring to

20  MCMP 4?

21              MR. BIANCO:  Objection to the

22       form of the question.

23              You can answer.

24       A.      Yes.

25       Q.      Now, paragraph 7, it's the second

1          Christopher Pierre

2   here.

3          The conclusion that's being drawn

4   in this particular version of the class

5   complaint is that it says Midland knows it

6   cannot actually demonstrate the existence of a

7   debt.  In other words, that when this lawsuit

8   was filed, Midland with respect to your debt,

9   couldn't prove the existence of your debt.

10  Even though you don't contest the existence,

11  do you believe that's an accurate statement

12  when it comes to your account?

13       A.    I guess so.  I don't know.

14       Q.    You think it is accurate or it

15  isn't?  Let me make sure we understand.

16       A.    You are saying that Midland

17  doesn't actually have any proof that I have

18  this debt?

19       Q.    No, I am not saying anything.

20  You are saying.  Your attorneys are saying.

21  It's saying -- I want to understand this.  I

22  want to make sure I understand what you are

23  saying.

24          It says, "Second, even though

25  Midland knows it cannot actually demonstrate

223

Christopher Pierre

1  the existence of a debt, Midland engages in a
2  pattern and practice of fraudulently filing
3  lawsuits."
4
5          Let's stop there.
6          I'm saying -- let's break it down
7  to your particular set of circumstances.
8          Do you believe that Midland knows
9  it cannot demonstrate the existence of your
10 debt?
11     A.    No.  I believe based on your
12 documentation you are showing me evidence that
13 I had debt.
14     Q.    Okay.
15          Now, the next part of this is
16 "Midland engages in a pattern and practice of
17 fraudulently filing lawsuits without
18 evidentiary support in the New York State
19 courts."
20          Do you see that?
21     A.    Yes.
22     Q.    I am not asking you for the world
23 at large, I am asking for you; is that true?
24 In other words, is that true?
25     A.    That they engage in a pattern and

227

Christopher Pierre

1        A.     Sounds to me like I was the only

2 one.

3        Q.     Okay.

4             We'll figure that out, I am sure.

5             Are you aware if Midland Funding

6 has furnished any information on your credit

7 reports pertaining to this debt?

8        A.     I have no idea.

9        Q.     I'm pretty sure they aren't, by

10 the way.  When you said about a year ago you

11 went on your credit report and you saw a

12 judgment there with respect to this debt, you

13 didn't see any kind of reference to Midland

14 Funding, were there any other -- was there any

15 other bad information on that credit report?

16        A.     There was other information, I

17 just don't remember what they were.  The

18 reason why this one sticks out is because,

19 like I said all along, I didn't anticipate it

20 being there.  I assumed once I -- and it was

21 on for quite some time even afterwards, and to

22 this day I don't know if it's off.

23        Q.     Okay.

24             MR. SCHWARTZ:  Let's go to the

236

                    Christopher Pierre

1

2    correct, that's in the possession of Midland;

3    would you agree with me?

4         A.      Yes.

5         Q.      The account statements, we went

6    through those; would you agree with me?

7         A.      We did.

8         Q.      Okay.

9                 The customer service records, and

10   I believe we showed you a screen print from

11   Chase with the customer service information,

12   which was Exhibit MCMP 5, so we showed you

13   that as well, right?

14        A.      You did.

15        Q.      And then, obviously, the last

16   thing would be the customer dispute records,

17   but you didn't dispute it, right?

18        A.      Correct.

19        Q.      So every one of the things in

20   that paragraph that says, "Midland did not

21   purchase or obtain," we have kind of gone

22   through during this deposition; would you

23   agree with me?

24                MR. BIANCO:  Objection to the

25        form of the question.

237

1                Christopher Pierre

2                You can answer.

3      A.       Yes.

4      Q.       Would you agree with me that

5   statement is incorrect with respect to your

6   account?

7                MR. BIANCO:  Objection to the

8         form of the question.

9                You can answer.

10     A.       No, it's not incorrect.  You

11  showed me all those.

12     Q.       Okay.

13               Let's clarify.

14               It says, "Midland does not

15  purchase," that's the claim, "or obtain the

16  documents showing."  What they are saying is

17  Midland doesn't have, doesn't purchase or

18  obtain the credit contract, the account

19  statements, the customer service records or

20  the customer dispute record, okay.  And I am

21  asking you, do you think that statement is --

22  is that right or wrong with respect to your --

23               MR. BIANCO:  Objection to the

24         form of the question.

25               You can answer for yourself.

238

                    Christopher Pierre

1
2       A.      I believe that's accurate.

3       Q.      Okay.

4               Let's go back then.

5               We'll use this as a -- I would

6   like you to take a look at MCMP 6.  Take a

7   look at that.

8       A.      (Witness reviewing.)

9               MCM --

10      Q.      P 6.

11      A.      Okay.

12              What was that, about seven hours

13  ago?

14      Q.      Feels like it, doesn't it?

15  That's it, the cardmember agreement, right

16  there.

17      A.      Okay.

18      Q.      I want you to take a look at that

19  and kind of cross-check that, because I want

20  to get to the answer on this one.  It says --

21  again, it says, "Midland doesn't purchase or

22  obtain," I guess the real concern is "obtain

23  documents showing the indebtedness between the

24  original creditor and the debter such as the

25  credit contract and amendments thereto."

239

1                    Christopher Pierre
2                    Is that a credit contract with
3        the amendments thereto?
4                    MR. BIANCO:  Objection to the
5            form of the question.
6                    You can answer.
7            A.      This is a cardmember agreement.
8        Again, I don't know if it was mine, but this
9        is a cardmember agreement, yes.
10           Q.      There are amendments attached to
11       it, correct?
12           A.      There is.
13           Q.      Let's look at the next one,
14       MCMP 4.
15           A.      (Witness reviewing.)
16           Q.      Now, you are looking at those.
17       I'm asking you, did I produce -- did we take a
18       look at the account statements in your name
19       for the Chase account?
20           A.      We did.
21           Q.      So we have that checked off.
22                   In paragraph 36, customer service
23       records, was that MCMP 5?  Take a look at
24       MCMP 5.
25           A.      (Witness reviewing.)

240

Christopher Pierre

1     Q.      And that is -- MCMP 5 is the --
2  is a customer service record for Chase.
3  That's a Chase screen print for your account,
4  okay, that we represented; do you see where it
5  says Chase?

6     A.      I do, account, yep.

7     Q.      Now, we've seen that and, of
8  course, there was no dispute.  So, obviously,
9  there is no such record as a customer dispute
10 record, because you didn't dispute it.  So we
11 will go over this step by step for this
12 sentence, because it's important as to your
13 account.

14        So would you agree that Midland,
15 with respect to your account, obtained
16 documents showing an indebtedness between the
17 regular creditor and you, including, and I
18 will put it this way, a credit card contract
19 and amendments, account statements and
20 customer service records for your account;
21 would you agree that Midland had those
22 documents and produced them?

23        MR. BIANCO:  Objection to the
24     form of the question.

241

1        Christopher Pierre

2              You can answer.

3    A.      Yes.

4    Q.      So now let's step back.   That

5  sentence, do you believe that sentence is

6  accurate with respect to your account, that it

7  didn't do it?

8    A.        In the sense that, like I said,

9  I -- you showed me a credit contract, not

10  necessarily my credit contract, that's the

11  only thing from that sentence I would not

12  agree with.

13    Q.      Okay.

14              So but the account statements,

15  customer service we all agree?

16    A.      Yes.

17    Q.      That would be inaccurate then?

18    A.      Yes.

19    Q.      Paragraph 50 -- well, I don't

20  care about that either.   We know it didn't

21  happen.

22              Let's go to -- oh, okay.

23              Paragraph 53; do you see where it

24  says, "Many of these affidavits"?

25    A.      I do.

243

1              Christopher Pierre

2      stamped R&R 000012 through R&R 000019,

3      marked for identification.)

4      Q.     I'm handing you what's -- it was

5  in Rubin & Rothman's production, R&R 12

6  through 19.

7              I want you to take a look at that

8  (handing).

9      A.     (Witness reviewing.)

10     Q.     Do you know what that is?

11             I will ask you a better question,

12  if you want.  Is that the collection action

13  that was filed against you in State Court to

14  recover on the Midland Funding debt by Rubin &

15  Rothman?

16             MR. BIANCO:  Objection to the

17      form of the question.

18             You can answer.

19     A.     Yes.

20     Q.     I want you to turn to the last

21  page.  This will be easy.  What does it say at

22  the top of that?

23     A.     Certificate of Conformity.

24     Q.     So you see that's a Certificate

25  of Conformity and it's signed -- and I think

244

Christopher Pierre

1  it might be notarized, I'm not sure?

2            MR. BIANCO:  It's not notarized.

3      Q.      But it is signed and it's signed

4  by Jill Brown, Attorney at Law; do you see

5  that?

6      A.      I do.

7      Q.      With respect to your -- with

8  respect to the lawsuit filed against you,

9  would you agree with me that a Certificate of

10  Conformity was attached to the complaint?

11      A.      Yes.

12      Q.      Thank you.

13            So you are not one of these many

14  in paragraph 53 of the amended complaint?

15      A.      No, 'cause I got this.

16      Q.      All right.

17            Turn to the paragraph specific to

18  you.

19            Mr. Pierre, I think it's page --

20  paragraph 88.  It's page 30 of MCMP 12.

21      A.      (Witness reviewing.)

22      Q.      Above that it says, "Christopher

23  Pierre," that is you, correct?

24      A.      That is me.

25

245

Christopher Pierre

1    Q.      So now we look down.  I want you
2  to pay your attention to, okay, where it says,
3  "Although."  So it's "Although defendants
4  assert," you see that part of it, paragraph
5  88?

6    A.      Yeah, how many sentences down?

7    Q.      It's line, one, two, three, four,
8  five, six.

9    A.      I have it.

10   Q.      "Although defendants assert that
11 the purported debt was assigned to Midland by
12 Chase Bank, upon information and belief,
13 Midland does not possess and has never
14 possessed, nor ever seen any documentary
15 evidence supporting any of the purported debts
16 assigned to Midland by Chase Bank."

17         What do you think that means?

18         MR. BIANCO:  Objection to the
19       form of the question.

20         You can answer for yourself.

21   A.      If I am reading it properly, that
22 you guys, Midland, does not possess or seen
23 any documentary evidence supporting any of the
24 perpetrated debts assigned to Midland by Chase

246

1                    Christopher Pierre
2       Bank, so...
3            Q.      With respect to your account, I
4       think that's a pretty good analysis, too, with
5       respect to your account, is that true or not?
6                    MR. BIANCO:  Objection to the
7               extent that this document has a date on
8               it, so...
9                    MR. SCHWARTZ:  Okay.
10                   MR. BIANCO:  I want to be very
11              clear that we are not -- again, I don't
12              want to answer for him.  Let's be very
13              clear.
14           Q.      "On or about January 5, 2011,"
15      that's what the paragraph begins, that Midland
16      represented by defendant Rubin & Rothman
17      commenced an action against you in the Fourth
18      District Court of Suffolk County seeking
19      $6,980.53 plus interest and costs, okay?
20           A.      Okay.
21           Q.      From that date, okay, then it
22      says, "Upon information and belief, Midland,
23      nor Rubin & Rothman made a reasonable effort
24      to verify Mr. Pierre's purported debt before
25      harassing him or before filing suit."

247

```
 1                    Christopher Pierre
 2              Do you see that?  Do you see that
 3    sentence right there?
 4         A.     I do see that.
 5         Q.     Let me ask you -- let's stop
 6    there and ask a question there.
 7              It says that "Upon information
 8    and belief, neither Midland" -- let's worry
 9    about Midland.  "Upon information and belief,
10    Midland did not make a reasonable effort to
11    verify your debt."
12              Would you believe that's -- I'm
13    trying to understand that statement, that you
14    believe that Midland didn't verify it prior to
15    filing of a lawsuit, correct?
16              MR. BIANCO:  Objection to the
17         form of the question.
18              You can answer for yourself.
19         A.     I agree.
20         Q.     Okay.
21              Do you know what verified means,
22    just a common term, not a legal term?
23         A.     Yeah, to make sure it's right.
24         Q.     Now, did anybody -- you never
25    disputed the debt, you never said I don't owe
```

248

Christopher Pierre

1  

2 this debt, I'm not sure of the amount, you

3 never told Midland that, did you?

4        A.     I don't recall telling Midland.

5        Q.     You never told --

6        A.     Rubin & Rothman, yes.

7        Q.     January 5, 2011, when the lawsuit

8 was filed, prior to that, you had

9 conversations with Rubin & Rothman, correct?

10        A.     Prior to, yes, prior to the

11 lawsuit being filed I did, yes.

12        Q.     During any of those previous

13 conversations, did you ever say to Rubin &

14 Rothman I don't owe this debt, it's not my

15 debt, it's too much, any dispute?  Make it

16 very general:  Did you ever dispute the debt?

17        A.     No.

18        Q.     Okay.

19              We'll leave it at that.

20              Let's go back to "Although."

21              "Although defendants assert that

22 the purported debt was assigned to Midland by

23 Chase Bank," okay, you say, "Upon information

24 and belief, Midland does possess documentary

25 evidence supporting that the account was, in

249

1              Christopher Pierre
2    fact, assigned to Midland by Chase Bank."
3              Do you see that?
4         A.    I do.
5         Q.    Now, we've looked at a lot of
6    documents.  Do you think that's an accurate
7    statement with respect to your account?
8              MR. BIANCO:  Objection.  Again,
9         statement has a date on it.
10              MR. SCHWARTZ:  As of January 5,
11         2011.
12         Q.    Do you think that as of January
13    5, 2011 Midland did not have the bill of sale
14    that we looked at earlier, which was MCMP 3?
15              MR. BIANCO:  Objection to the
16         form of the question.
17              You can answer, if you know.
18         A.    I don't know.  I am assuming they
19    did.  I don't know for sure.
20         Q.    Okay.
21              And the credit card agreement
22    that you are not sure is your agreement, do
23    you have any facts that show that prior to
24    January 5, 2011, Midland did not have a copy
25    of that agreement from Chase?

1              Christopher Pierre

2              MR. BIANCO:  Objection to the

3       form of the question.

4              You can answer.

5       A.     No, I'm assuming they had.

6       Q.     We can go through this with the

7  affidavit of sale, which was MCM -- it was in

8  the -- I don't care.  We can put it in real

9  fast.  Rubin & Rothman 45.  It was probably --

10 well, let's mark this.  It will be easier,

11 MCMP 14.

12              (MCMP Exhibit 14, Document Bates

13       stamped R&R 000045, marked for

14       identification.)

15       Q.     Let me hand you MCMP 14, which is

16 the affidavit of sale.  I'm pretty sure it was

17 part of the bill of sale stuff we produced,

18 but there you go.  Take a look at that.

19 Again, does that affidavit of sale, from an

20 employee of Chase, where she says on or about

21 September 21, 2010 Chase sold the account to

22 Midland Funding, right?

23       A.     Correct.

24       Q.     So we are talking about as of on

25 or about January 5, 2011 that Midland didn't

251

Christopher Pierre

1   possess any documents, any documentary

2   evidence supporting any of the purported debts

3   assigned to Midland by Chase Bank -- here is

4   what I'm going to ask you:  You've seen all

5   these documents.  With respect to your

6   account, assuming that Midland had these

7   before January 5, 2011, they would have

8   documents that would show that the account was

9   purchased -- was sold -- was sold by Chase to

10  Midland Funding, correct?

11       A.      Right.

12       Q.      And that Midland Funding was the

13  owner of the debt that they were trying to sue

14  you on?

15       A.      Yes.

16       Q.      Okay.

17              So if, in fact, Midland had these

18  records before January 5, 2011, that statement

19  wouldn't be accurate, although, with respect

20  to your account, not to the world at large,

21  just to you?

22              MR. BIANCO:  Objection to the

23         form of the question.

24              You can answer.

252

                    Christopher Pierre

1

2       Q.      It wouldn't be accurate, would

3    it?

4       A.      No.

5       Q.      It wouldn't be accurate?

6       A.      It wouldn't be accurate.

7       Q.      Very good.  Thank you.

8               Now, it says -- in fact, the next

9    one, "Midland is incapable of ever proving the

10   existence of a debt or debt agreement as

11   Midland avoided collecting any of the

12   documentary evidence of the purported debt,

13   ranging from Mr. Pierre's credit card

14   application to the alleged credit card

15   purchases that compromised (sic) the purported

16   debt."

17              We agree that we haven't seen the

18   credit card agreement, right?

19      A.      Correct.

20      Q.      The application, I'm sorry, not

21   the agreement, the application.

22      A.      Or the agreements.

23      Q.      We'll disagree, because we

24   produced the cardmember agreement that Chase

25   says is the agreement that binds.

254

Christopher Pierre

2    I hope I didn't make that typo.  Thank

3       you for correcting it.

4       Q.      So that right there is -- other

5   than the credit card application, we've gone

6   over some documents that establish that the

7   bill of sale, the statements, the records from

8   Chase, the records from Midland and all the

9   data that shows this transfer, other than the

10  credit card application, would you agree that

11  we have provided you with statements regarding

12  the credit card purchases for your accounts?

13          MR. BIANCO:  Objection to the

14      form of the question.

15          You can answer.

16  A.      Yes, you did.

17  Q.      And then the last part, "Midland

18  simply alleges that the Chase Bank debt is

19  legitimate, simply because Chase Bank

20  apparently told them so upon assignment."

21          Do you see that sentence?

22  A.      Yes.

23  Q.      Now, is that accurate?  Is that

24  an accurate statement?

25          MR. BIANCO:  Objection to the

1              Christopher Pierre

2        form of the question.

3              With respect to his account?

4              MR. SCHWARTZ:  Well, it's only

5        about Christopher Pierre, so yeah.

6        Q.       Is that true at this point?

7        A.       In the terms that the actual

8    amount of debt, but, yes, I believe that it's

9    legitimate and you, Chase Bank, knew about

10   that upon the assignment.

11        Q.       Let me just make sure we are

12   clear.  I don't want to trip you up.  I am

13   trying to get to the bottom of it.

14              That -- Chase Bank said that your

15   debt is a legitimate debt, okay, I don't think

16   there is going to be any debate about that.

17              Midland has documents showing

18   that your debt is legitimate, correct?

19              MR. BIANCO:  Objection to the

20        form of the question.

21              You can answer.

22        A.       Yes.

23        Q.       Assume that we had these

24   documents before January 5, 2011, would that

25   statement be accurate?

257

Christopher Pierre

2  Is that an accurate statement?

3  MR. BIANCO:  Objection to the

4  form of the question.

5  You can answer.

6  A.  Yes.

7  Q.  Again, I have to go back a little

8  bit.

9  Because Midland is assuming they

10  had these documents before January 5, 2011.

11  They have a whole lot of documents; they have

12  the statements, they have the agreement, the

13  cardmember agreement, which Chase says applies

14  to your account, may not, they say it does;

15  the Chase internal records, the Midland

16  records, the bill of sale, and the assignment

17  and all that information, including the data,

18  the electronic data from Chase, which had your

19  social security number and all that stuff we

20  looked at earlier, all those documents,

21  assuming that they were in the possession of

22  Midland, were available for Midland January 5,

23  2011; would you say that Midland simply said

24  well, Chase told us so, so it must be

25  legitimate or did they have documentary

258

1              Christopher Pierre

2    evidence?

3              MR. BIANCO:   Objection to the

4         form of the question.

5         A.     They had documentary evidence.

6         Q.     Thank you.

7              When you said here -- now this is

8    paragraph 89, and this is the last paragraph

9    that covers you particularly; you see that?

10        A.     I do.

11        Q.     Okay.

12             Now, actually, you know what, I

13   don't think I have a question there.  I don't

14   have a question.

15             I'm going to jump down.  Here it

16   is.

17             MR. BIANCO:   Can we take a break?

18             MR. SCHWARTZ:   Take a quick break

19        and then I am hopefully going to wrap

20        up.

21             (Recess taken.)

22   BY MR. SCHWARTZ:

23        Q.     Sir, I want you to turn to page

24   35 of MCMP 12, the second amended complaint.

25   It's the unjust enrichment section; do you see

259

Christopher Pierre

1  that?

2

3      A.    I do.

4      Q.    Now, here it says that plaintiff

5  well, "Plaintiff and members of the class"

6  paragraph 110, "Plaintiffs," meaning including

7  you "and members of the class have paid

8  substantial amounts to Midland in the form of

9  wage garnishments and attachments from default

10 judgments as well as settlements obtained

11 through the use of the fraudulent, deceptive

12 or misleading affidavits and affirmations

13 against plaintiffs and members of the class as

14 described above."

15            Do you see that?

16     A.    I do.

17     Q.    We talked about this before; your

18 wages weren't garnished?

19     A.    They were not.

20     Q.    There was no attachment, in other

21 words, property wasn't attached or anything

22 like that, correct?

23     A.    Not to my knowledge there wasn't.

24     Q.    No, okay.

25            Now, as well as settlements

260

```
 1              Christopher Pierre
 2    obtained through the use of fraudulent,
 3    deceptive or misleading affidavits or
 4    affirmations against you.
 5              Are you aware of any fraudulent,
 6    deceptive or misleading affidavits in
 7    connection with the suit, the collection
 8    action filed against you or for any other
 9    purpose?
10              MR. BIANCO:  Objection to the
11         form of the question.
12              You can answer for yourself.
13         A.        Fraudulent affidavits, to my
14    knowledge, no.
15         Q.        So let me ask you.  Here we are
16    alleging -- let me try to be simple here, as
17    simple as possible.
18              Do you believe that Midland
19    Funding or Midland Credit Management was
20    unjustly enriched with respect to your debt?
21              MR. BIANCO:  Objection to the
22         form of the question, to the extent that
23         that is a legal term.
24         Q.        Do you know what unjust
25    enrichment means in lay terms?
```

                    Christopher Pierre

1

2          Q.     I want to make sure we have a

3     clean record, okay?

4          A.     Right.

5          Q.     What you are saying is you admit

6     at the time the lawsuit was filed against you

7     by Rubin & Rothman, Midland Funding owned your

8     debt?

9                 MR. BIANCO:  Objection to the

10           form of the question.

11                He qualified that with based on

12           what he's seen today.

13         Q.     Based on what you've seen today?

14                MR. BIANCO:  You can answer.

15                MR. SCHWARTZ:  I am not trying to

16           get money from you.

17         A.     When it was originally sent to me

18     or asked me, I wasn't sure.

19         Q.     I said that I am not accusing.  I

20     am trying to clean the record up as we are

21     today.

22                MR. BIANCO:  Ask the clean

23           question.  I will let it go.

24                MR. SCHWARTZ:  Sure.

25         Q.     Sir, as we sit here today,

269

Christopher Pierre

1  through the course of this deposition, Request

2  for Admission Number 3, it requests that you

3  admit that at the time that judgment was

4  entered against you in the Chase Bank suit

5  brought by Rubin & Rothman, at that time

6  Midland Funding owned your account; do you

7  admit that?

8       A.    Yes.

9       Q.    Let's jump up to Request for

10 Admission Number 11.  It's page 8 of MCMP 15.

11           By the way, this kind

12 of dovetails request number 11.  Request for

13 Admission Number 12 -- no, you affirmed that.

14 You know what, never mind.  That relied on

15 prior answers.

16           Let's go to request 21.

17      A.    (Witness reviewing.)

18      Q.    It's on page 13.

19      A.    Yep.

20      Q.    Now, Request for Admission Number

21 21 says, "Admit you received the Summons and

22 Complaint for the Chase Bank suit attached to

23 these requests as Exhibit A."  That was --

24           MR. SCHWARTZ:  Do you have a copy

1           Christopher Pierre

2       of the original request?

3           MR. JOHNSON:  Yes.

4       Q.      I want to show you the document

5   that we are relying upon here.

6           We don't need to mark this,

7   actually.  Here, I want you to take a look at

8   that.  If we need to mark it -- that was the

9   Exhibit A.

10          MR. BIANCO:  So the record is

11      clear, we are showing Exhibit A to

12      Midland's Request to Admit to Plaintiff

13      Pierre?

14          MR. SCHWARTZ:  Right.  Correct.

15          MR. BIANCO:  I am placing

16   Exhibit A before Chris.

17      Q.      Take a look at that.

18      A.      (Witness reviewing.)

19          Yes, this is what --

20      Q.      Well, let me clarify.

21          It says in your response,

22   "Plaintiff states that after reasonable

23   inquiry, information known or readily

24   available to plaintiff is not sufficient to

25   enable plaintiff to admit or deny this

271

Christopher Pierre

1    request, as he does not recall whether he

2    received the Summons and Complaint for the

3    Chase Bank suit attached to these requests as

4    Exhibit A."

5              That was the response and what I

6    just need is a little bit of clarity.

7              Do you recall receiving that

8    Summons and Complaint?

9              MR. BIANCO:  Objection to the

10        form of the question.

11             You can answer.

12    A.        Yes.

13    Q.        And do you recall how you

14    received that?

15             MR. BIANCO:  Objection to the

16        form of the question.

17    Q.        In other words, did you receive

18    it in the mail, did you receive it by somebody

19    came up to you, a process server, and said

20    here you go?

21    A.        I was served by somebody.  I'm

22    not sure what was served.

23    Q.        Okay, but --

24    A.        Somebody served me some paper.

272

                    Christopher Pierre

1

2      Q.      A person came up and handed you

3  stuff?

4      A.      They knocked on my door.

5      Q.      Okay.

6              So then you admit that you

7  received the Summons and Complaint from Chase

8  Bank attached to the request as Exhibit A?

9      A.      Yes.

10     Q.      If you want to take a look at

11  Exhibit A in conjunction with Request for

12  Admission Number 22 --

13     A.      (Witness reviewing.)

14     Q.      "Admit that summons instructed

15  you must answer within 20 days after service

16  of the Summons and Complaint."

17              And here you didn't deny it and I

18  don't know why.

19     A.      Maybe it's because it was all

20  caps.

21     Q.      Sir, do you agree that that

22  Summons and Complaint in little Section A at

23  the bottom instructs you must answer within 20

24  days after service of the Summons and

25  Complaint?

275

1              Christopher Pierre

2    that?

3              MR. BIANCO:  Objection to the

4         fact I am going to stand by the

5         response, but Chris can answer for

6         himself.  After being here today, he can

7         answer for himself.

8              MR. SCHWARTZ:  At some point it

9         has to be answered.

10             MR. BIANCO:  My answer is it's

11        still premature.  If you want to ask

12        Chris today, I am not going to stop him

13        from answering.

14        Q.     Do you admit that you have no

15   evidence, that you personally have no evidence

16   that Rubin & Rothman lacked a reasonable basis

17   to file the lawsuit on behalf of Midland

18   Funding to recover on your Chase Bank account?

19             MR. BIANCO:  Objection to the

20        form of the question.

21             You can answer for yourself

22        whether you have --

23        A.     Do I have evidence, me

24   personally?

25        Q.     Yes.

276

Christopher Pierre

1

2    A.    I have no evidence, no, not me.

3          MR. BIANCO:  So we are clear, the

4    reason why I believe these are denied is

5    you specifically defined as including

6    not only yourself, me, Alan, other

7    investigators.  I want to be totally

8    clear.  I am not playing games.

9          MR. SCHWARTZ:  I understand that

10   that is probably the reason for this.

11   Now I have to distinguish it a little

12   bit.

13         MR. BIANCO:  Fair enough.

14   Q.    Request for Admission Number 28,

15   says, "Admit that you have no evidence that

16   Midland Funding furnished false information

17   concerning your Chase Bank account to any

18   credit reporting agency."

19         Now, do you see that?

20   A.    I do.

21   Q.    Do you have any evidence -- do

22   you have any facts that Midland Funding

23   furnished information concerning your Chase

24   Bank account to any credit reporting agency?

25         MR. BIANCO:  Objection to the

277

1                    Christopher Pierre
2          form of the question.
3                    You can answer for yourself.
4          Q.      I am not talking about false
5    information, I am just talking about
6    information, period.
7                    MR. BIANCO:   Same objection.   You
8          can answer for yourself.
9          A.      To what extent, that actually a
10   negative credit report was actually sent?
11         Q.      That's what I'm asking you.
12                   Do you have any understanding
13   that Midland Funding put bad information on
14   your credit report?
15         A.      Okay.   No, I don't have any -- I
16   have no evidence.
17         Q.      Okay.
18                   And so by extension then, you
19   have no information that Midland Funding put
20   false information, not only bad, but false
21   information on your credit report; would that
22   be accurate?
23         A.      Again, I will go back to that
24   same argument about the actual amount.
25         Q.      Okay.

279

1                    Christopher Pierre
2          A.      (Witness reviewing.)
3          Q.      That's what we are asking, but
4    I'm going to ask you a question.
5                    I'm going to ask you a question
6    that doesn't involve analysis of 1692e of the
7    Fair Debt Collections Practices Act, okay.
8                    Do you have any facts, you
9    personally or understanding, as to any false
10   information that Midland conveyed to you?
11                   MR. BIANCO:  Objection to the
12         form of the question.
13                   You can answer for yourself.
14         A.      No, I have no facts.
15         Q.      That Midland Funding engaged in
16   any misleading conduct with respect to you?
17                   MR. BIANCO:  Same objection.
18                   You can answer.
19         A.      Other than hiring the people from
20   Rubin & Rothman, no.
21         Q.      And again, that was Midland
22   Credit Management not Midland Funding,
23   correct?
24         A.      Yes.
25         Q.      In other words, to the best of

280

Christopher Pierre

1

2   your knowledge, Midland Credit Management was

3   the people that hired Rubin & Rothman,

4   correct?

5        A.      Correct.

6        Q.      Is that your understanding?

7        A.      Yes.

8        Q.      Still don't understand this, but

9   Request for Admission Number 30 says, "Admit

10  that" -- you will see here, I am going to read

11  it.

12            "Admit that you have no evidence

13  supporting your assertion that MF," Midland

14  Funding "cannot actually demonstrate the

15  existence of a debt when lawsuits were filed

16  on its behalf to collect those debts in New

17  York State courts as you alleged in paragraph

18  7 of the amended complaint."

19            I am going to make that easier.

20            I am going to say, do you admit

21  that Midland Funding had documents in its

22  possession at any time that demonstrated the

23  existence of your debts?

24            MR. BIANCO:  Objection to the

25      form of the question.

283

                    Christopher Pierre

1    Bank USA NA creditor, sold a pool of

2    charged-off accounts (the accounts) by a

3    purchase and sale agreement and a bill of sale

4    to Midland Funding, LLC (debt buyer) as part

5    of the sale of the accounts, electronic

6    records and other records were transferred on

7    individual accounts to the debt buyer."

8              And the debt buyer is Midland

9    Funding; you would agree with me?

10        A.    Yes.

11        Q.    So here we have a Chase person, a

12   CSD strategy analyst lead at Chase Bank

13   stating that on September 21, 2010, Chase sold

14   a portfolio of debts and accounts to Midland

15   Funding and that in part of that sale, the

16   electronic records and other records on

17   individual accounts, meaning your account,

18   were provided to Midland Funding; would you

19   agree with me that's what that says?

20             MR. BIANCO:  Objection to the

21        form of the question.

22        A.    Yes, I would agree.

23        Q.    Let's go back to the request for

24   admission.  When you said you believed, it was

290

1                    Christopher Pierre
2    that's how I feel.
3         Q.     Did you suffer any out-of-pocket
4    expenses as a result of the collective conduct
5    that Rubin & Rothman, Midland Funding, Midland
6    Credit Management -- you don't have to parse
7    it out, did you incur any out-of-pocket loss,
8    money-wise?
9                    MR. BIANCO:   Objection to the
10            form of the question.
11        A.     I know I had to go file the
12   paperwork.  I had to drive out to I guess
13   Riverhead that was.
14        Q.     So would you say that in that
15   sense your out-of-pocket damages would be
16   what?  To be honest, I don't know where
17   Riverhead is from where you are, but let's
18   assume that you are talking about 10 bucks, 50
19   bucks, 20 bucks; do you know?
20        A.     It's not much; how's that?
21        Q.     Did the entry of the judgment
22   against you on behalf of Midland Funding, did
23   that result in you seeking any kind of medical
24   treatment, psychiatric treatment or anything
25   like that?

303

Christopher Pierre

1  allegation that Midland Funding usually has no

2  right to obtain or even request any of the

3  underlying documentation of the original

4  alleged consumer debt that it purchases."

5       And that was paragraph 38 of the

6  complaint; do you see interrogatory 13?

7       A.    Yes, I do see that.

8       Q.    Now, you can look at the

9  complaint, but I will ask you that we do know

10  we looked at MCMP 14, which was the affidavit

11  of the seller, right there?

12      A.    Yep.

13      Q.    We talked about that.  So do you

14  have any facts that would suggest that Midland

15  usually had no right to obtain or to request

16  the underlying documentation from the original

17  alleged consumer debt that it purchased?

18            MR. BIANCO:  Objection to the

19       form of the question.

20            You can answer.

21      Q.    I am talking about with Chase.  I

22  am not talking about the world at large.  I am

23  talking about your account.

24      A.    No.

304

1                   Christopher Pierre

2       Q.      Okay.

3               So you wouldn't have any facts to

4   support that argument?

5       A.      No, I wouldn't.

6       Q.      Going back to MCMP 16,

7   Interrogatory 17, it's on page 12.

8       A.      (Witness reviewing.)

9       Q.      We went through that.  Never

10  mind.

11              Good.

12              Look at Interrogatory Number 24

13  on page 14.

14      A.      (Witness reviewing.)

15      Q.      It says here "Identify all actual

16  damages that you claim to have incurred as a

17  result of the conduct of Midland Credit

18  Management and any facts substantiating your

19  claims for actual damages as alleged in the

20  prayer for relief."

21              Do you see that interrogatory?

22      A.      Yes, I do.

23      Q.      You responded that "We exceeded

24  the" -- well, you made several legal

25  objections, which I am sure your attorneys did

312

Christopher Pierre

1

2   BY MR. SCHWARTZ:

3         Q.      Don't run from that statement.

4                 We talked earlier -- we had shown

5   you a copy of -- real quickly, have a moment

6   off the record.

7                 (Discussion held off the record.)

8   BY MR. SCHWARTZ:

9         Q.      It was Bates stamped marked

10  MCM 0004 in MCMP 3; do you see that?

11        A.      I do.

12        Q.      We went over this.  This was the

13  field data and field stuff at the top?

14        A.      Yes, I see this.

15        Q.      It identified the particulars for

16  Chris Pierre, the account, the sales, numbers,

17  phone numbers and all that stuff, right?

18                MR. BIANCO:  What page?

19        Q.      MCM 0004, the field data.

20        A.      Okay, yes.

21        Q.      That one, right.

22                Could you read the bottom out

23  loud, very bottom of the page, data printed?

24        A.      "Data printed by Midland Credit

25  Management Inc., from electronic records

313

1                    Christopher Pierre

2    provided by Chase Bank USA NA, pursuant to the

3    bill of sale/assignment of accounts dated

4    9/21/2010 in connection with the sale of

5    accounts from Chase Bank USA NA to Midland

6    Funding LLC."

7                    MR. SCHWARTZ:  I don't have any

8         further questions.

9                    Thank you.

10                   (Time noted:  4:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25