# Exhibit M-N

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x

DAVID AGOADO, LEEANN MCNALLY,
CRAIG MOORE, CHRIS PIERRE, THOMAS
SHARKEY, MADGE SHIPMAN, and DOREEN
VAZQUEZ individually and on
behalf of all others similarly situated,
                Plaintiffs,
         -against-
MIDLAND FUNDING, LLC, MIDLAND
FUNDING, LLC. doing business in
New York as MIDLAND FUNDING OF
DELAWARE, LLC, and MIDLAND
CREDIT MANAGEMENT, INC.,
                Defendants.

----------------------------------------x

                   5036 Jericho Turnpike
                   Commack, New York

                   July 13, 2015
                   10:28 a.m.

      Examination Before Trial of the

Plaintiff, THOMAS SHARKEY, pursuant to

Order, before CINDY A. AFANADOR, a Notary

Public of the State of New York.

      CINDY AFANADOR COURT REPORTING, INC.
              516-491-2694
           www.cindycourtreporting.com

6

```
 1                    Thomas Sharkey
 2  T H O M A S    S H A R K E Y, called as a witness,
 3  having been duly sworn by a Notary Public, was
 4  examined and testified as follows:
 5
 6              THE COURT REPORTER:  Please state
 7          your full name for the record.
 8              THE WITNESS:  Thomas Sharkey.
 9              THE COURT REPORTER:  What is your
10          address?
11              THE WITNESS:  606 Birch Hollow
12          Drive, Shirley, New York 11967.
13  EXAMINATION BY
14  MR. CURTIS JOHNSON:
15          Q.    Hello.  My name is Curtis
16  Johnson.  I am an associate with Davidson
17  Fink.  I am representing the law firm Forster
18  & Garbus in connection with this lawsuit, your
19  lawsuit against it and a number of other
20  defendants.
21              MR. CURTIS JOHNSON:  Do counsel
22          on the phone want to state their
23          appearances?
24              MR. ARLEO:  Sure.  Robert Arleo,
25          counsel for Rubin & Rothman.
```

17

                        Thomas Sharkey

1

2      two years.

3                        I left Jildor, was the New York

4      manager for Sacha London for two years and I

5      have been back at Jildor Shoes ever since.

6            Q.      Is it fair to say you have worked

7      in retail your entire life?

8            A.      Yes.

9            Q.      You testified earlier that you

10     live at 606 Birch Hollow Drive, Shirley,

11     New York; when did you move there?

12           A.      I moved there almost six years

13     ago.  December 13th will be six years that I

14     moved there.

15           Q.      So that would be 2009?

16           A.      Um-hum.

17                   THE COURT REPORTER:  Yes?

18                   THE WITNESS:  Yes.

19           Q.      Where did you live before 606

20     Birch Hollow Drive?

21           A.      28 Criss, C-R-I-S-S, Street, Lake

22     Ronkonkoma, New York.

23           Q.      How long did you live at 28 Criss

24     Street?

25           A.      13 years.

18

                    Thomas Sharkey

1

2        Q.      So I'm doing math really quick in

3   my head.

4                1996 to 2009?

5        A.      Correct.

6        Q.      Is that right?

7        A.      Because I moved there back into

8   that house after my divorce.

9        Q.      Who do you currently live with,

10   if anyone?

11        A.      Myself.

12        Q.      You mentioned you had a divorce;

13   are you currently married?

14        A.      No.

15        Q.      When were you married?

16        A.      August 14, 1976.

17        Q.      And you were divorced in '96?

18        A.      Yes.

19        Q.      What was your spouse's name?

20        A.      Lynn.

21        Q.      Last name?

22        A.      Maiden name?

23        Q.      Or current last name?

24        A.      Sharkey, S-H-A-R-K-E-Y.

25        Q.      What was her maiden name?

1                    Thomas Sharkey

2        A.     Lavelle, L-A-V-E-L-L-E.

3        Q.     Do you have any children?

4        A.     Yes.

5        Q.     How many?

6        A.     One.

7        Q.     Son or daughter?

8        A.     Son.

9        Q.     How old is your son?

10       A.     27.

11       Q.     He doesn't live with you, right?

12       A.     No.

13       Q.     Is he financially dependent on

14   you?

15       A.     Somewhat.

16       Q.     Do you claim him on your taxes as

17   a dependant?

18       A.     No, I don't.

19       Q.     How is he financially dependent

20   on you?

21       A.     I help him financially.

22       Q.     Okay.

23              If you had to estimate an amount

24   you give him on an annual basis, what would

25   that be?

25

1              Thomas Sharkey

2              What banks have you done banking

3    with in your lifetime?

4         A.    As far as savings and checking

5    accounts?

6         Q.    Sure.

7         A.    Chase.

8         Q.    Have you used any other banks?

9         A.    As far as back as I can remember,

10   it's been Chase.

11        Q.    Okay.

12             Have you had credit cards in your

13   lifetime?

14        A.    I have.

15        Q.    Do you know what banks issued the

16   credit cards?

17        A.    Well, I know Bank of America.

18   I'm trying to remember.

19             Quite frankly, over the years, I

20   have not had that many credit cards.

21        Q.    Okay.

22             What is not that many?

23        A.    Over the years, maybe four.

24        Q.    Okay.

25             You said one of them was Bank of

26

                        Thomas Sharkey

 1
 2   America?

 3        A.      One of them was Bank of America,

 4   yes.

 5        Q.      Did you have one with Chase?

 6        A.      I have a Chase debit credit card.

 7        Q.      Okay.

 8                Do you have any store credit

 9   cards?

10        A.      Kohl's.

11        Q.      Have you ever had any other store

12   credit cards?

13        A.      I believe Macy's.

14        Q.      Have you ever borrowed from a

15   bank to buy a car?

16        A.      Yes.

17        Q.      What banks?

18        A.      Capital One and currently

19   G.M. Financial.

20        Q.      Do you remember when you got your

21   original mortgage on your house at 606 Birch

22   Hollow Drive; do you remember what bank you

23   got that from?

24        A.      I don't have a mortgage at 606

25   Birch Hollow Drive.

36

                    Thomas Sharkey

1

2        A.        Correct.

3        Q.        And if you make payments to the

4    bank after you've borrowed on the card, it

5    restores your ability to use the card again,

6    right?

7        A.        Correct.

8        Q.        Okay.

9                  Was it your practice with your

10   Bank of America card to make purchases on a

11   card and then make payments on the card and

12   make additional purchases on the card?

13                 MR. FRANK:  Objection to the form

14         of the question.

15                 Compound question.

16       Q.        Do you understand what I mean by

17   that?

18       A.        No.

19       Q.        Okay.

20                 When you got your Bank of America

21   card, did you -- you used the card, right?

22       A.        Yes.

23       Q.        When you used the card, did you

24   use it all the way up to the credit limit?

25                 MR. FRANK:  Objection to the form

32

                         Thomas Sharkey

1

2    to make those payments?

3                    MR. FRANK:   Objection to the form

4         of the question.

5                    What happened when --

6         Q.        What actions did your lender take

7    when you failed to make payments on your

8    mortgage for 28 Criss Street?

9         A.        They tried to work things out

10   with me.

11        Q.        Okay.

12                   Did you ever fail to make

13   payments on the Bank of America credit card?

14        A.        Yes.

15        Q.        And did you miss one payment or

16   multiple payments on your Bank of America

17   credit card?

18        A.        Multiple.

19        Q.        And did there come a time when

20   Bank of America cut off your line of credit?

21        A.        Yes.

22        Q.        Okay.

23                   Did they take any other actions

24   against you to try to collect?

25        A.        I don't remember the specifics,

1                    Thomas Sharkey

2    it was a long time ago.

3          Q.      Okay.

4                  Do you remember when it was?

5          A.      I would think it was around 2007

6    or '8, maybe.

7          Q.      Did you eventually pay off the

8    debt you owed to Bank of America?

9          A.      Not directly to Bank of America,

10   no.

11         Q.      Okay.

12                 Who did you pay that debt off to?

13         A.      I paid it off to Midland Funding.

14                 MR. FRANK:  Objection to the form

15         of the question.

16                 MR. CURTIS JOHNSON:  All right.

17         Q.      Have you ever failed to pay

18   taxes?

19         A.      No.

20         Q.      Do you generally understand when

21   loans are not repaid, do you understand what

22   actions creditors might take against you?

23         A.      Yes.

24         Q.      What actions might they take?

25         A.      They can try to work with you.

39

Thomas Sharkey

1

2    Q.    Do you remember what your
3    interest rate was?
4    A.    No.
5    Q.    Do you remember how frequently
6    you were required to make payments on the
7    card?
8    A.    I believe monthly.
9    Q.    Okay.
10         There came a time when you
11   stopped making payments on the card, right?
12   A.    Yes.
13   Q.    Why did you stop making payments?
14   A.    Because financially, things were
15   upside down in my world and I had a -- to
16   prioritize what I could pay at that point.
17   Q.    Okay.
18         What did Bank of America do, if
19   anything, in response to your stopping making
20   payments?
21   A.    This was a long time ago.
22   Q.    Okay.
23   A.    So I am going to answer your
24   questions the best of my ability, okay.
25         I remember speaking to someone at

40

Thomas Sharkey

Bank of America.  My house was upside down, it was under water, if you understand what I am explaining to you.

My house had been refinanced and it was upside down.  I had a lot of things going on in my life and I believe I spoke to someone from Bank of America and I told them what was going on, that I was being forced to sell my house in a short sale.  It was a very old house, the heating system was going, so many things going on at that point in my life that I was under water.

So I explained that I do take care of my responsibilities, I do take care of my debts and she was a very nice woman, I can't remember her name, because like I said, it was a long time ago.

I said, look, until I get onto my feet, I would like to pay you $50 a month. She said well, I will speak to my supervisor and get back to you.

She got back to me and said, I am so sorry, Mr. Sharkey, we cannot accept $50 a month.  We are going to give you one more

1                    Thomas Sharkey

2    chance, can you please pay this debt and give

3    us more than $50.  I said the most I can give

4    you right now, and it was the most I can give.

5    I mean you have to prioritize how you are

6    going to live and keep a roof over your head

7    and how you are going to eat.

8                    I said no, 50 is the most I can

9    give you at this point in time.  She got back

10   in touch with me and said, I'm sorry,

11   Mr. Sharkey, we are going to have to write

12   this off as a bad debt.

13                   I said well, I'm sorry that you

14   have to do that, but there is nothing I can

15   do, my hands are tied.  I know it's going to

16   affect my credit score, but that's my credit

17   score, that's my consequences.  And I said, I

18   am very sorry, so if you have to write it off

19   as a bad debt, write it off as a bad debt and

20   I thought that was the end of it.

21        Q.      Okay.

22                   What is your understanding of

23   what happens when a bank writes something off

24   as a bad debt?

25        A.      My understanding is that they

43

                     Thomas Sharkey

1

2    Q.    Have you ever heard the term bad

3    debt in connection with your job at Jildor

4    Shoes?

5    A.    My debt?

6    Q.    No, have you ever heard the term

7    bad debt in connection with your

8    responsibilities at Jildor Shoes?

9    A.    No.

10   Q.    Have you ever taken a finance

11   class?

12   A.    No.

13   Q.    Have you ever taken an economics

14   class?

15   A.    No.

16   Q.    So you testified it was your

17   understanding that when Bank of America told

18   you that they were treating your debt as a bad

19   debt, that it would affect your credit score,

20   but you wouldn't have to repay the loan; is

21   that right?

22   A.    Right.

23   MR. FRANK:  Objection.

24   Mischaracterizes the witness'

25   testimony.

44

Thomas Sharkey

1    Q.    You can answer.

2    A.    Repeat the question, please.

    (Record read.)

3    A.    Correct.

4    Q.    Did there come a time after Bank of America told you they were treating your loan as a bad debt that you learned that they had not, in fact, decided not to collect on your debt?

    MR. FRANK:  Objection to the form of the question.

    Double negative.

    Q.    Do you understand the question?

    A.    No.

    Q.    So Bank of America decided to treat your debt as a bad debt; is that right, is that your understanding?

    A.    Yes.

    Q.    After they decided to treat your debt as a bad debt and they told that to you, right?

    A.    Yes.

    Q.    After they told you that, did there come a time when either Bank of America

45

                          Thomas Sharkey

1    or some other entity tried to collect on that

2    debt?

3          A.      Yes.

4          Q.      Okay.

5                  Do you know when that was?

6          A.      I don't know the date when that

7    was.

8          Q.      Okay.

9          A.      But I know that it was --

10         Q.      Who was the entity that tried to

11   collect on your debt?

12         A.      Midland Funding.

13         Q.      How did you find out that Midland

14   Funding was trying to collect on your debt?

15         A.      I believe I received some kind of

16   correspondence.

17         Q.      Okay.

18                 Did you get that at 28 Criss

19   Street or 606 Birch Hollow Drive?

20                 MR. FRANK:  Objection to the form

21         of the question.

22         Q.      If you remember?

23                 MR. FRANK:  Assumes it was at one

24         of those locations.

46

Thomas Sharkey

1    A.    It was one, I don't remember.

2    Q.    Okay.

3          So you got correspondence from

4    Midland Funding; what did you do when you

5    received correspondence from Midland?

6    A.    I am trying to remember.  I

7    really -- it was such a long time ago, I don't

8    really remember.  All I remember was that I

9    really did think that the whole thing was done

10   with Bank of America, so I didn't really

11   understand it.

12   Q.    Okay.

13         So you got correspondence and you

14   thought you didn't have to pay the debt; is

15   that right?

16   A.    Yeah, I thought it was written

17   off as a bad debt.

18   Q.    Did you take any steps to

19   investigate why Midland was contacting you?

20   A.    No, I just thought it was someone

21   trying to collect money on something that was

22   already taken care of that was done, so I

23   just -- basically, I disregarded that.

24   Q.    Okay.

47

1                    Thomas Sharkey

2              Did you ever receive any phone

3  calls from Midland Funding?

4         A.     I don't recall Midland Funding.

5         Q.     Okay.

6              Did you ever call Midland Funding

7  yourself?

8         A.     Not to my best recollection, no.

9         Q.     Did you ever write Midland

10 Funding any letters?

11        A.     Not that I remember, no.

12        Q.     Did you ever e-mail Midland

13 Funding?

14        A.     No.

15        Q.     Do you use e-mail?

16        A.     Occasionally.

17        Q.     Okay.

18              Did you keep any copies of the

19 correspondence you received from Midland

20 Funding?

21        A.     No.

22        Q.     Have you ever heard of Forster &

23 Garbus?

24        A.     Yes.

25        Q.     When did you first hear of

48

                    Thomas Sharkey

Forster & Garbus?

     A.     I would say approximately three
years ago.

     Q.     How did you first hear of
Forster & Garbus?

     A.     I received a letter in the mail.

     Q.     Three years ago you were living
at 606 Birch Hollow Drive; is that right?

     A.     Three years ago, yes.

     Q.     So is it likely you received that
correspondence in the mail at 606 Birch Hollow
Drive?

     A.     From Forster & Garbus?

     Q.     From Forster & Garbus.

     A.     Yes.

     Q.     Do you remember what the
correspondence said?

     A.     No.

     Q.     Did you receive more than one
piece of correspondence from Forster & Garbus?

     A.     I don't remember.

     Q.     Did you ever receive any phone
calls from Forster & Garbus?

     A.     Yes.

49

Thomas Sharkey

1    Q.    Do you know how many?

2    A.    Many.

3    Q.    Do you know when you received
4    your first phone call from Forster & Garbus?

5    A.    I'm trying to think.

6          It was about three years ago.

7    Q.    So around the time that you got
8    the correspondence?

9    A.    Right.

10   Q.    Do you remember what those phone
11   calls were about?

12   A.    Yes.

13   Q.    What were they about?

14   A.    They -- there was a gentleman on
15   the line, who was not much of a gentleman, who
16   was telling me that Midland Funding has
17   retained them as attorneys because my debt
18   from Bank of America was sold to Midland
19   Funding, and that they were representing
20   Midland Funding and they were trying to
21   collect the money from me.  And then I tried
22   to explain to them to my knowledge it was
23   written off as a bad debt and that that was
24   the pass.  I am trying to get my life

Thomas Sharkey

together. It did affect my credit score, I'm sorry, and that was that.

Q. Okay.

A. And there was continuing harassing phone calls at my place of business.

Q. Did you ever call Forster & Garbus yourself?

A. Yes.

Q. Why did you call them?

A. Because they were being relentless in calling me, so I called them.

Q. Okay.

And what did you discuss when you called them?

A. I basically discussed what I am discussing with you right now, that I was going through a very bad situation in my life, that I thought that it was written off as a bad debt and I didn't really understand what was going on and I was told that I need to pay this money back. And I said I can pay you $50 a month, that's all I can pay. And they said that's not acceptable, we'll do whatever we have to do to get our money.

51

Thomas Sharkey

1    Q.      Okay.

2            Did you understand what they

3    meant when they said do anything they have to

4    do?

5    A.      I just took it for what he said,

6    we'll do whatever we have to do to get our

7    money.

8    Q.      Okay.

9            Did you understand one of those

10   things that Forster & Garbus may do would be

11   to sue you?

12   A.      I thought that was possible.

13   Q.      Okay.

14           Did you ever, in your

15   conversations with Forster & Garbus, ask them

16   to provide you with any supporting

17   documentation to prove that they were allowed

18   to collect the debt?

19   A.      No.

20   Q.      Why not?

21   A.      Because I didn't think I really

22   owed that debt.  I thought it was written off.

23   I really didn't want to give much attention to

24   it.  I had too many other things to give my

1                    Thomas Sharkey

2    attention to at that point in my life.

3         Q.     So Forster & Garbus called to

4    collect a debt that you didn't believe you

5    owed; is that right?

6         A.     Correct.

7         Q.     And you didn't ask them to prove

8    that you owed the debt?

9         A.     No, I didn't.  I told them it was

10   written off as a bad debt.  I told them I

11   offered to give $50 a month and I told -- I

12   was told that's not acceptable, we are sorry

13   for what you are going through, we are writing

14   you off as a bad debt.  And I believed that

15   was the end of it.

16                 I didn't want to give any more of

17   my energy to this.  I figured it was over,

18   done with, let me get on with my life and what

19   I need to do in my life.

20        Q.     Did there come a time when your

21   understanding of your obligation to repay the

22   debt changed?

23        A.     Repeat the question.

24               MR. FRANK:  Objection to the form

25       of the question.

57

Thomas Sharkey

1  different mortgage lender and you are
2  obligated to pay the new mortgage lender,
3  right?
4
5      A.    Yes.
6      Q.    You testified that you now
7  understand that a credit card lender may
8  transfer obligation that you owe to that
9  lender to another lender, right?
10     A.    Yes.
11     Q.    Okay.
12           When you were discussing your
13  debt, your Bank of America debt with Forster &
14  Garbus, did you have an understanding then
15  that Bank of America may have transferred your
16  obligation to Midland Funding?
17     A.    It was my understanding that they
18  sold the debt to Midland Funding.
19     Q.    Okay.
20           And --
21     A.    For the amount, I had no idea
22  what amount, so I don't know.
23     Q.    You understood that that is what
24  occurred?
25     A.    At that point I understood that

58

1                    Thomas Sharkey

2    that's what occurred.

3         Q.     Okay.

4                Did you have any reason to doubt

5    at that time that the sale of your debt from

6    Bank of America to Midland Funding was

7    legitimate?

8                MR. FRANK:  Objection to the form

9         of the question; reason to doubt.

10        A.     I don't understand the question.

11        Q.     Okay.

12               When you learned that your Bank

13   of America debt was sold to Midland Funding,

14   you learned that from getting a letter in the

15   mail from Midland Funding, right?

16        A.     Yes.

17        Q.     Okay.

18               When you got that letter in the

19   mail from Midland Funding, did you have any

20   reason to believe that the sale of your debt

21   from Bank of America to Midland Funding wasn't

22   legitimate?

23        A.     I didn't know if it was

24   legitimate or not.  I didn't know how much it

25   was for.  I don't know.

Thomas Sharkey

1
2      If you were to glance at it, if
3  you had noticed a listed purchase that you
4  didn't actually make, would you have done
5  something about that?  What would you have
6  done?
7          A.      I would have disputed it.
8          Q.      Did you ever dispute any
9  purchases with Bank of America?
10         A.      Not to my recollection.
11         Q.      Okay.
12                 So you understood when you were
13  contacted by Midland Funding or Midland Credit
14  Management, I am going to use Midland
15  generically, there are two different
16  companies.
17         A.      Yes.
18         Q.      When you were contacted by
19  Midland, did you have any reason to believe
20  that Bank of America didn't sell your debt to
21  Midland?
22         A.      I didn't know what to believe at
23  the time.
24         Q.      Okay.
25                 Did you take any steps to

62

Thomas Sharkey

2  investigate whether, in fact, Bank of America
3  sold your debt to Midland?

4          A.      No.

5          Q.      No, okay.

6                  Again, when you were contacted by
7  Forster & Garbus on behalf of Midland to
8  collect the debt that had been transferred to
9  Midland, did you take any steps to investigate
10 whether either Forster & Garbus -- well, did
11 you take any steps to determine whether
12 Forster & Garbus was authorized to direct that
13 debt on behalf of Midland?

14         A.      No.

15         Q.      Did you take any steps when you
16 were contacted by Forster & Garbus about the
17 Midland debt that was originally your Bank of
18 America credit card, to determine whether
19 Midland was authorized to collect that debt at
20 that point?

21         A.      No.

22         Q.      Okay.

23                 Why not?

24         A.      I don't know.

25         Q.      It was your testimony earlier,

71

Thomas Sharkey

1  Q.     Did either of them tell you you
2  were obligated to pay the debt to
3  Forster & Garbus?
4  A.     No.  I don't remember, no.
5  Q.     Did you discuss what bad debt
6  meant with either Michael or Joseph?
7  A.     It was a long time ago.  I really
8  don't remember.  I just asked them to speak on
9  my behalf.  I thought that they would
10 understand a little bit better than I would
11 understand.  And like I said, I was going
12 through a lot of anxiety at the time, so I
13 figured they might be able to explain this to
14 me or to come upon some type of agreement with
15 this gentleman from Forster & Garbus.
16 Q.     What sort of agreement did you
17 hope they would come to?
18 A.     That maybe they could come across
19 a type of settlement.
20 Q.     When you say "settlement," what
21 sort -- what do you mean by settlement?
22 A.     First of all, I didn't receive an
23 itemized account of what I owed.
24 Q.     Okay.

72

Thomas Sharkey

1    A.    So first of all, I would have

2  liked to have seen an itemized account of

3  everything that I owed and see, because of the

4  circumstances, if you understand how some

5  credit cards work, they will say, all right,

6  if you owe this money, pay us this amount and

7  we will call it settled.

8    Q.    When you say settlement, you mean

9  you were hoping to pay an amount less than you

10 owed?

11   A.    A percentage like you would do on

12 some credit cards, if you follow what I am

13 saying.

14   Q.    Okay.

15         Now, you said you were hoping to

16 receive an itemized statement; did you ever

17 ask Forster & Garbus for an itemized

18 statement?

19   A.    I don't think so, no.

20   Q.    Why not?

21   A.    I don't know.

22   Q.    Do you remember how many calls

23 you had between you personally and Forster &

24 Garbus?

Thomas Sharkey

1

2      MR. CURTIS JOHNSON:  He

3   understands it now.  He learned it at

4   some point.  I wanted to find out when

5   he learned that particular fact.

6      MR. FRANK:  Also objection to the

7   form of the question; served a summons

8   from whom.

9      MR. CURTIS JOHNSON:  We haven't

10  gotten there yet.  That's not the point.

11  He understands at this point he was

12  served with a summons, right?  Okay.

13      MR. FRANK:  He also testified --

14  he testified he was served with a

15  summons for divorce, so from whom is

16  relevant to the question.

17      Q.    Do you understand that, sitting

18  here today, that you were served with a

19  summons by Midland Funding who was represented

20  by Forster & Garbus?

21      A.    No, I didn't realize it was a

22  summons.

23      Q.    You didn't realize it was a

24  summons?

25      A.    I did not realize it was a

89

Thomas Sharkey

1    summons.

2         Q.    Did there come a time when you

3    learned it was a summons?

4              MR. FRANK:  Again, objection as

5         to what "it" is.

6         Q.    There was something you were

7    served with; is that right?

8         A.    I --

9              MR. FRANK:  Objection.

10             Something he was served with,

11        when?

12        Q.    You can answer my question.

13             MR. FRANK:  If you understand his

14        question, you can answer.

15        A.    Repeat the question.

16             (Record read.)

17        A.    I was not served personally.  I

18   received a piece of paper from someone who

19   lived in the same house as me.  I did not

20   realize that it was a summons.

21        Q.    Okay.

22             So this piece of paper you

23   received from someone living in the same house

24   as you that you didn't realize was a summons,

90

Thomas Sharkey

1  do you now realize it was a summons?

2       A.      I was told -- I was told it was a

3  summons way after the fact.  I didn't realize

4  it.

5       Q.      When is way after the fact?

6       A.      After the fact when -- after the

7  fact that I needed to start making payments

8  and there was a judgment against me.  I didn't

9  even realize I had a summons to go to court.

10      Q.      Okay.

11              Who told you you had a summons to

12 go to court?

13      A.      I found out once I got the

14 judgment against me.  I didn't even realize I

15 had a summons to go to court.

16      Q.      Okay.

17              You said that you were handed a

18 piece of paper that you now understand to be a

19 summons by someone that lived with you; who

20 was that person?

21      A.      That person was my cousin's

22 husband.

23      Q.      What was his name?

24      A.      Michael McGuigan,

91

                    Thomas Sharkey

1

2    M-C-G-U-I-G-A-N.

3          Q.     When were you handed that piece

4    of paper by Mr. McGuigan?

5          A.     That was probably the summer of

6    2012.

7          Q.     Do you know how Mr. McGuigan got

8    that piece of paper?

9          A.     He -- as far as I know, he was

10   sitting in the garage, outside the garage, the

11   garage door was open.  I was at work, and

12   somebody just said -- asked if I lived there

13   and he said yes.  And they said give this to

14   him and he handed it to me.

15         Q.     Did he give it -- I will back up.

16                Do you know how long after he

17   received it that he gave it to you?

18         A.     I don't know.

19         Q.     Do you think it was a matter of

20   hours?

21         A.     No.

22         Q.     Days?

23         A.     I have no idea.  I don't

24   remember.

25         Q.     Okay.

93

                    Thomas Sharkey

Lorraine?

        A.      Yes.

        Q.      When did Mr. McGuigan pass?

        A.      He passed on November 24th.

        Q.      Of this past year?

        A.      Um-hum.

        Q.      So at some point you were handed
a piece of paper by Mr. McGuigan who said that
someone gave it to him personally; is that
right?

        A.      Correct.

        Q.      You now understand that piece of
paper was a summons?

        A.      I did not know that at the time.

        Q.      Okay.

                Did you read the piece of paper
that he handed you?

        A.      I looked at it briefly and all I
saw on the bottom of it was, and this is what
I remember about this piece of paper is it
said this is an attempt to collect a debt, so
I thought it was a bill.  Like, you know, a
debt collector's bill, and I thought it was
garbage and I threw it out.

98

1                    Thomas Sharkey

2    don't know.  I'm not sure.

3           Q.     Okay.

4                  You mentioned that at some point

5    you learned that there was a judgment against

6    you; is that right?

7           A.     Yes.

8           Q.     How did you learn there was a

9    judgment against you?

10          A.     I believe that somebody from

11   Forster & Garbus called me and told me that

12   there is a judgment against me.

13          Q.     What was your understanding of

14   how they obtained that judgment against you?

15          A.     They sent it to me that I failed

16   to appear in court and I said to him, I said,

17   I never received anything that told me to go

18   to some court at some date and some time, I

19   never received anything like that, ever.

20                 And he says no.  I said no, I

21   wasn't.  I was never given a piece of paper

22   saying Mr. Sharkey, you must appear at this

23   court on this day, at this time, ever, and

24   then without me knowing that I could represent

25   myself at a time and a date at a court, a

102

Thomas Sharkey

1  you learned that Forster & Garbus had a
2  
3  judgment against you?
4          A.      No.
5          Q.      Why not?
6          A.      I just figured that they had it,
7  they had it, and I had to pay it, and I had to
8  pay it.  And that was that.
9          Q.      Did you contact any court when
10 you learned that Forster & Garbus had a
11 judgment against you?
12         A.      No.
13         Q.      Why not?
14         A.      I just saw that they had the
15 judgment at that point and figured -- they
16 said they were going to contact my employer
17 and I didn't want them to contact my employer,
18 so I just went ahead and paid the money.
19         Q.      Do you remember when Forster &
20 Garbus told you they had a judgment against
21 you?
22         A.      I don't know exactly.  I know it
23 was at the end of the summer and I think that
24 was the end of the summer of 2012, I believe.
25              MR. CURTIS JOHNSON:  I am going

1                    Thomas Sharkey

2          to get into exhibits now.  Do you want

3          to take a break before we get into

4          exhibits?

5                    MR. FRANK:  Are you okay?

6                    THE WITNESS:  I am fine.

7                    MR. CURTIS JOHNSON:  Okay, we can

8          keep going.

9          Q.     If you look back at what's been

10    marked as Exhibit Sharkey 1 sitting in front

11    of you?

12         A.     Yes.

13         Q.     It has withdrawn --

14                    MR. CURTIS JOHNSON:  This is 2.

15                    (Sharkey Exhibit 2, Document

16         bearing Bates stamp Agoado-F&G-000191

17         through 000192, marked for

18         identification.)

19         Q.     I am showing you what's been

20    marked as Exhibit Sharkey 2.  It's a document

21    bearing Bates number Agoado-F&G-000191 through

22    192.

23                    When I say Bates number, it's

24    that number at the bottom right-hand corner of

25    the page.

Thomas Sharkey

1

2          I will tell you those numbers

3  have been added in connection with this

4  litigation to keep control of what documents

5  we are talking about, it's a control number.

6          A.     Yes.

7          Q.     Do you recognize this document?

8          A.     (Witness reviewing.)

9          Do I remember it or do I

10 recognize it?

11         Q.     Do you recognize it?

12         A.     Yeah, I can recognize that it's a

13 charge statement.

14         Q.     Who's it a charge statement from?

15         A.     This is from Bank of America.

16         Q.     And whose account is this for?

17         A.     It says prepared for Thomas J.

18 Sharkey.

19         Q.     Do you see an account number on

20 the top left corner of the page?

21         A.     I do.

22         Q.     Do you recognize that account

23 number?

24         A.     No.

25         Q.     Do you remember what your Bank of

105

                        Thomas Sharkey

1

2    America credit card account number was?

3         A.      No.

4         Q.      Do you see on the top of the page

5    says April 2009 statement?

6         A.      Yes.

7         Q.      Did you think this is possibly

8    the April 2009 statement from Bank of America

9    to you in connection with the Bank of America

10   credit card that you had?

11        A.      That's what it says on this

12   statement.  I don't know the validity of it or

13   not.  I don't see anything itemized.  I don't

14   know what the charges are.  I see you have a

15   statement in front of me for $6,000.

16        Q.      It says credit line $6,000?

17        A.      I see credit line $6,000, yes.

18        Q.      What does it say the balance due

19   is?

20        A.      New balance total?  Is that what

21   you are asking me?

22        Q.      I am asking you what -- if you

23   look at this whole document, what amount does

24   this document say the balance due is?

25        A.      6959.54.

106

Thomas Sharkey

1    Q.    $6,959.54?

2    A.    Correct.

3    Q.    What is the minimum payment due?

4    A.    2,053.

5    Q.    If you look at the bottom of the page, who's this document addressed to?

6    A.    Tom Sharkey.

7    Q.    What is the address?

8    A.    28 Criss Street, Ronkonkoma, New York.

9    Q.    Is that the address you were living at in April of 2009?

10   A.    Lake Ronkonkoma, yes.

11   Q.    Do you have any reason to believe you didn't receive this statement from Bank of America?

12          MR. FRANK:  Objection to the form of the question.

13   Q.    You can answer.

14          MR. FRANK:  Presumes the statement was sent from Bank of America to the witness.

15   A.    I presume it was.  I don't remember.  I don't know.

108

Thomas Sharkey

2      Did I read that right?

3  A.      You read it right.

4  Q.      Okay.

5      Do you remember receiving any

6  statements from Bank of America with language

7  similar to that?

8  A.      No.

9  Q.      Do you have any reason to believe

10  you didn't receive statements from Bank of

11  America?

12  A.      I really don't remember.  I

13  really don't.

14  Q.      Okay.

15      You testified earlier that there

16  came a time when you stopped making payments

17  on your Bank of America card, right?

18  A.      I believe so, yeah.

19  Q.      Do you remember looking at this

20  document?  Does that refresh your recollection

21  as to when you may have stopped making

22  payments?

23  A.      This was further the time when I

24  was going to go into foreclosure on my home

25  and was forced to sell my house in a short

109

1                    Thomas Sharkey

2    sale.

3          Q.      So sometime around April 2009 you

4    weren't making payments on your Bank of

5    America credit card, right?

6          A.      As far as I can remember.

7          Q.      Okay.

8          A.      But I did offer to make $50 a

9    month payments, I do remember that.

10         Q.      Okay.

11                 So in April 2009, it was your

12   understanding that you had an obligation to

13   pay back Bank of America, right?

14         A.      I didn't know the exact amount.

15   I don't know if this was the exact amount.  I

16   really wasn't scrutinizing all my credit card

17   bills at that point as I was going through so

18   many other things.  I mean there could have

19   been purchases put onto this card not to my

20   knowledge.  Not saying that it was or it

21   wasn't, but I am saying, to my recollection,

22   for what I was going through, I did not look

23   through the statements to see if this was the

24   correct amount.

25         Q.      Okay.

113

1                    Thomas Sharkey

2    honestly don't.

3         Q.      Okay.

4                 If you look at the second page of

5    this statement?

6         A.      (Witness complying.)

7         Q.      Look at the top of the page, the

8    second box down says customer statement of

9    disputed item; you see that?

10        A.      Yes.

11        Q.      Read what's in that box real

12   quick to yourself.

13        A.      (Witness reviewing.)

14        Q.      And then read everything from

15   there down to where it says grace period.

16        A.      (Witness complying.)

17        Q.      Let me know when you've looked at

18   it.

19        A.      I did.

20        Q.      What is your understanding of

21   that section of this document?

22        A.      My understanding is if you have a

23   dispute, you should get in contact with them

24   and let them know if you have a dispute.

25        Q.      Did you ever get in contact with

                    Thomas Sharkey
2  Bank of America to dispute any amount?
3       A.     I did not.
4       Q.     Okay.
5              Put that one aside.
6              MR. FRANK:  Off the record a
7       second?
8              MR. CURTIS JOHNSON:  Sure.
9              (Discussion held off the record.)
10             (Sharkey Exhibit 3, Document
11      bearing Bates stamp Agoado-F&G-000193
12      through 000194, marked for
13      identification.)
14 BY MR. CURTIS JOHNSON:
15      Q.     Showing you what's been marked as
16 Exhibit Sharkey 3, bearing Bates stamp
17 Agoado-F&G-000193 to 194; do you recognize
18 this document?
19      A.     Strange.
20             I really -- when is the date on
21 this?  May of 2009?  Payments and credits
22 6959 -- I don't remember this.
23      Q.     Okay.
24             You don't remember receiving
25 this?

128

Thomas Sharkey

1  if I really needed to appear, they would send

2  me an additional document telling me when to

3  appear and I never received one.

4

5       Q.     Look at the statement I just read

6  to you, the fifth line down, it says, "By

7  serving an answer to the annexed complaint

8  upon plaintiff's attorney at the address

9  stated below"; do you see that?

10      A.     Um-hum.

11      Q.     What is your understanding of by

12 serving an answer to the annexed complaint

13 upon the plaintiff's attorney?

14      A.     I don't know how they wanted me

15 to answer.  Like I said, I thought they would

16 send me a piece of paper saying appear at this

17 time and date, and I never received anything.

18      Q.     You see the next paragraph, down

19 where it says, "Upon your failure to answer,

20 judgment will be taken against you for the

21 relief demanded in the complaint, together

22 with disbursements of this action."

23      A.     Um-hum.

24      Q.     What is your understanding of

25 that paragraph?

1          Thomas Sharkey

2     A.     I thought that it was just a way

3 to get them for me to speak with them

4 voluntarily because it does not give me a time

5 or a date to appear.

6     Q.     Okay.

7          You see right below that where it

8 says, "Forster & Garbus, LLP, attorneys for

9 plaintiff"?

10     A.     I do.

11     Q.     It has an address and phone

12 number?

13     A.     I do.

14     Q.     Then your understanding was this

15 document was asking you to contact Forster &

16 Garbus, right?

17     A.     Yes.

18     Q.     Did you, in fact, contact

19 Forster & Garbus upon receipt of the document?

20     A.     I did not.

21     Q.     You see where it says original

22 creditor, Bank of America or "ORIG CRED:   Bank

23 of America"?

24     A.     Yes.

25     Q.     You testified earlier that you

132

1                    Thomas Sharkey

2    in a million years.

3          Q.      Below that line, it says, "Note,

4    the law provides that:"

5                  Then there are three different --

6    there is an A, B and C, three options, right?

7          A.      Um-hum.

8          Q.      It says, "If this summons is

9    served by its delivery to you, or (for a

10   corporation) an agent authorized to receive

11   service, personally within the County of

12   Suffolk, you must answer within 20 days after

13   such service, or (B) if this summons is served

14   otherwise than as designated in Subdivision

15   (A) above, you are allowed 30 days to answer

16   after the proof of service is filed with the

17   clerk of this court."

18                 Do you see that?

19         A.      I see -- I see it.

20         Q.      What is your understanding of A

21   and B together?

22                 MR. FRANK:  Objection to the form

23        of the question.

24                 What is the question?

25                 MR. CURTIS JOHNSON:  What is his

133

1              Thomas Sharkey
2        understanding of this language right
3        here?
4        A.     I was never issued a summons by a
5   process server.
6        Q.     Okay.
7        A.     It's hearsay to say if I even
8   received anything, but I don't know when he
9   received it and when he gave it to me, this
10  letter, but your question is what?
11       Q.     What is your understanding of the
12  language in A and B on this document?
13              MR. FRANK:  You are asking --
14              MR. CURTIS JOHNSON:  What is his
15       understanding of those words?
16       A.     It says that you must answer
17  within 20 days after such service, but I don't
18  even know if the service in which this was
19  served was done correctly or legally.  I don't
20  have any kind of dates.  I did not see any
21  process server personally.
22              To me, this was a bogus way for
23  someone to try to strong-arm me and collect a
24  debt and make me think this was a legal
25  document, which some bill collectors do this.

134

Thomas Sharkey

1          They send you something in the
2  mail that looks like it's a legal document and
3  it looks like you are being summoned to court
4  and they don't put a time or date and that's
5  the way they get you to come and collect your
6  debt.  And to me this seemed like a bogus way
7  of going about getting it, rather than say
8  Thomas Sharkey, appear at this court on this
9  time and date.  So to me this was bogus.
10       Q.     When you received this document,
11  did you show it to anybody?
12       A.     I showed it to Michael McGuigan.
13       Q.     Did you talk to Michael McGuigan
14  about it?
15       A.     Yeah.  He said this is bogus, get
16  rid of it.
17       Q.     What did Michael McGuigan do for
18  a living?
19       A.     He worked for Long Island Rail
20  Road.
21       Q.     What did he do for Long Island
22  Rail Road?
23       A.     I'm not sure exactly what he did.
24       Q.     Was he an attorney?

142

Thomas Sharkey

1   of the question.

2          That isn't what it says.  It says

3   a credit card or line of credit or

4   promissory note/loan.

5          MR. CURTIS JOHNSON:  Okay.

6          MR. FRANK:  Those are

7   disjunctives.

8     Q.     Let's look at what it actually

9   says.  It says, "On information and belief,

10  defendant, in person or through an agent, made

11  credit card purchases or took money advances

12  under a credit card or line of credit account

13  or promissory note/loan, which a copy was

14  furnished to defendant."

15         Do you see that?

16    A.     Yes, I do.

17    Q.     Did you, in fact, make purchases

18  on a Bank of America card?

19    A.     I'm sure I made some purchases on

20  a Bank of America card.  I didn't receive any

21  kind of promissory note or loans.

22    Q.     But you received one of the

23  three, one of those, right; you had a credit

24  card and you made purchases, right?

148

Thomas Sharkey

1    Q.    Okay.

2          How old was Mike McGuigan in --

3    A.    When he passed?

4    Q.    No, in 2012.

5    A.    He was -- I believe he was 61.

6    Q.    So he wasn't a minor, right?

7    A.    He was not a minor.

8    Q.    In 2012, was Mr. McGuigan at all mentally impaired?

9    A.    He had some issues.

10    Q.    What were his issues?

11    A.    He had personal issues, which I will not go into.

12    Q.    Do you contest that he was a person of suitable age and discretion?

13    A.    I would.

14    Q.    On what basis?

15    A.    I am not going to get into his personal life.  Let him rest in peace.

16    Q.    Why do you think he is not a person of suitable age and discretion?

17    A.    I said I would rather not discuss his personal problems.  Let him rest in peace.

18    Q.    Off the record a second.

149

1          Thomas Sharkey

2          (Discussion held off the record.)

3          MR. FRANK:  Okay.  The witness is

4    acknowledging that they -- he received a

5    piece of paper that was a summons.  I

6    think he already answered that question

7    yes, if I remember.

8          MR. CURTIS JOHNSON:  I want to

9    confirm that he doesn't contest that he

10   was served with the summons and

11   complaint that I showed him today, which

12   I don't think he has answered.

13         MR. FRANK:  That's fine.

14         THE WITNESS:  Fine.

15   A.    Fine.

16   Q.    Do you admit that you were served

17   with the summons and complaint that is Sharkey

18   Exhibit 4?

19   A.    Yes.

20   Q.    Do you admit that you were served

21   on or around February 25, 2012?

22   A.    Around there.

23   Q.    Okay.

24         (Sharkey Exhibit 6, Document

25   bearing Bates stamped Agoado-F&G-000098

152

1                    Thomas Sharkey
2          information that did not come from any
3          discussion with an attorney, then you
4          may answer using that understanding.
5          A.    So repeat the question.
6                I'm sorry.
7          Q.    Sure.
8                Having read through paragraph
9     1 --
10         A.    Right.
11         Q.    -- other than things that you
12    were told by your attorney about paragraph 1,
13    do you have any reason to doubt the veracity
14    of the statements in paragraph 1?
15               MR. FRANK:  Objection as to time.
16               Does he have any reason right
17         now?
18               MR. CURTIS JOHNSON:  Right now.
19         A.    I have no opinion either way,
20    because I have never seen this document
21    before, to my knowledge, so I -- it can't say
22    anything.  I can't agree with it or disagree
23    with it.  I don't have an opinion, really.
24         Q.    Okay.
25               Paragraph 2, just take a quick

153

1                    Thomas Sharkey
2    look through that.
3         A.      (Witness reviewing.)
4                 Okay.
5         Q.      What is your understanding of
6    what's been stated in paragraph 2?
7         A.      So Midland Funding would like to
8    make some money off an account that they
9    bought, a bad account that they bought off of
10   Bank of America.  That's how they make their
11   money.  So the plaintiff is saying that she
12   had access, review the electronic records and
13   she is authorized to make this affidavit,
14   which they need for Bank of America on the
15   plaintiff's behalf.
16        Q.      Okay.
17                Other than what you have been
18   told by your attorney in connection --
19        A.      They didn't tell me this.  This
20   is what I am saying.
21        Q.      I am asking a very specific
22   question so he doesn't have to object.
23                Other than what you have been
24   told by your attorney in connection with this
25   case, do you have any independent basis to

154

                    Thomas Sharkey

1
2    doubt the veracity of the statements in
3    paragraph 2?
4         A.    I think this is what they need to
5    do in order to do the kind of business that
6    they do to buy off bad debts and to make money
7    off of it.  This is the legal steps that they
8    need to take in order to collect their monies.
9    This is what they need to do legally.
10        Q.    Okay.
11              Do you have any reason to doubt
12   that they actually did what they needed to do?
13        A.    Sure, I have no proof that they
14   did or didn't.
15        Q.    Other than this sworn statement
16   right here stating the facts, right?
17        A.    You know what, it doesn't mean
18   anything to me.
19        Q.    Okay.
20              Now go down to paragraph 3.
21        A.    Um-hum.
22        Q.    Again, just read through it
23   really quickly.
24        A.    Um-hum.
25              (Witness reviewing.)

155

1                    Thomas Sharkey

2        Q.      What is paragraph 3 talking

3   about?

4        A.      It's talking about what the

5   defendant owed at the approximate time when

6   they bought the bad account.

7        Q.      I think you are looking at

8   paragraph 4, right?

9        A.      I'm sorry.

10               MR. FRANK:  Flip back.

11               This is paragraph 3 (indicating).

12               THE WITNESS:  Okay.

13       A.      (Witness reviewing.)

14               So she's familiar -- she's

15   trained, the records are kept in the regular

16   course of business, of course is what she

17   needs to say.  It was in the regular course of

18   business for a person with knowledge of the

19   act or event recorded to make the record or

20   data compilation with a person of knowledge to

21   transmit information there to be included in

22   such records.  In the regular course of

23   business, the record or compilation is made at

24   or near the time of the act or event, the

25   relevant financial information concerning the

156

                    Thomas Sharkey

1

2    accounts includes the following.

3         Q.    Okay.

4               Now --

5         A.    So --

6         Q.    Looking at paragraph 3, other

7    than maybe what you have been told by your

8    attorneys in connection with this case, do you

9    have any independent reason to doubt the truth

10   of the statements in paragraph 3?

11        A.    (Witness shaking head.)

12        Q.    I saw you shake your head, but

13   the reporter can't write that down.

14        A.    (Witness reviewing.)

15              I don't doubt or believe.  I mean

16   it's a written paragraph in a legal document

17   that needs to be written this way, I

18   understand.

19        Q.    Okay.

20              But you don't have any reason to

21   think it's not true?

22        A.    It can be true, it cannot be

23   true.  It's something -- it's -- there are

24   steps of protocol that need to be taken in

25   order to -- for this process to be taken.  I

157

Thomas Sharkey

1  am an intelligent man.  I understand what this
2  is all about.
3
4      Q.     Okay.
5             But I guess what I am trying to
6  get at is, do you have any, other than what
7  you have been told by your attorneys, do you
8  have any personal reason to think the
9  statements made in paragraph 3 aren't true?
10     A.     I don't know if they are true or
11 false.  I don't know this person.  This is the
12 first time I am reading this.  Either way, if
13 it's true or false, I have no clue if it's
14 true or false.
15     Q.     Okay.
16            Paragraph 4?
17     A.     (Witness reviewing.)
18     Q.     "The account shows the defendant
19 owed a balance of $6,959.54 as of May 29,
20 2011."
21            Do you see that?
22     A.     I do.
23     Q.     What is your understanding of
24 paragraph 4?
25     A.     That's what they are saying that

158

Thomas Sharkey

1    I owe.

2        Q.      Okay.

3        A.      I don't have any kind of

4    documentation saying, and this is over four

5    years ago.  I don't know how they arrived at

6    that number.  And I understand that that is

7    what they believe I owed at that point.

8        Q.      But did you have any reason to

9    think you didn't owe that amount?

10       A.      Yeah, I could have, I could not

11   have.  I don't know.

12       Q.      Okay.

13               Paragraph 5, again, take a quick

14   look at it.

15       A.      (Witness reviewing.)

16       Q.      What is your understanding of

17   paragraph 5?

18       A.      That I failed to make some of the

19   payments pursuant to the agreement of the

20   credit card.

21       Q.      And was that true?

22       A.      At times, yes.

23       Q.      Paragraph 6.

24       A.      (Witness reviewing.)

159

1                    Thomas Sharkey

2          Q.      Take a quick look.

3          A.      (Witness reviewing.)

4          Q.      It's saying "(1) opened the

5    account almost ten years ago and the last

6    payment posted to the account was close to six

7    years ago, and it was charged off about six

8    years ago."

9                  Did you have any reason to doubt

10   the truth of the statements in paragraph 6,

11   other than what you've been told by your

12   attorneys?

13         A.      I don't remember.  I can't tell

14   you exactly if -- this is what it says.  This

15   is what it says.  It was a long time ago.

16         Q.      Okay.

17                 Paragraph 7, take a quick look at

18   that one.

19         A.      (Witness reviewing.)

20         Q.      What is paragraph 7 saying?

21         A.      Saying that they retained

22   attorneys to collect the delinquent debt.

23         Q.      Is it also saying you failed to

24   make full payment on the debt?

25         A.      Yes.

160

Thomas Sharkey

2    Q.    And that demand was made on you
for the debt?

A.    Yes.

Q.    Do you have any reason to doubt
the allegation in paragraph 7?

A.    Just say the question again,
please.

Q.    Do you have any reason to doubt
the allegations that are found in paragraph 7?

MR. FRANK:  Objection to the form
of the question.

Q.    Other than what you have been
told by your attorneys?

A.    Like I said, I am reading this
for the first time, so I really don't have an
opinion either way on it.

Q.    Okay.

Do you have any reason to think
that Midland or its agents, Forster & Garbus,
didn't make demand on you for a balance in
connection with your Bank of America credit
card?

MR. FRANK:  Objection,
privileged.

161

1                    Thomas Sharkey
2              MR. CURTIS JOHNSON:  I think he's
3         already testified that he received
4         letters asking him to pay his Bank of
5         America credit card.  I am just asking
6         him to confirm the context in -- in the
7         context of this document that that's his
8         recollection.
9              I don't think that's privileged.
10             MR. FRANK:  If you are able to
11        testify, you can answer the question,
12        without reflecting attorney/client
13        communications, please do.
14        A.    I am really sorry.  Just repeat
15   the question, because I am confused right now.
16        Q.    Sure, I will clarify it.
17             You testified earlier that you
18   remember receiving at least one letter from
19   Midland asking you to pay a debt on your Bank
20   of America credit card, right?
21        A.    I remember one, yes.
22        Q.    And do you have any reason to
23   doubt that that letter -- you received that
24   letter more than 30 days before this affidavit
25   was executed?

162

                    Thomas Sharkey

 1

 2      A.     I don't remember this affidavit

 3   at all.

 4      Q.     Okay.

 5             But if you look at the date of

 6   the affidavit, it's on the third page, May 15,

 7   2012; do you see that?

 8      A.     Um-hum.

 9      Q.     Do you have any reason to doubt

10   that at least 30 days before May 15, 2012, you

11   received a letter from Midland Funding asking

12   you to pay your obligation on your Bank of

13   America credit card?

14      A.     I don't remember that.  I

15   received a letter from them a long time ago,

16   not anywhere in --

17      Q.     Was it at least 30 days before

18   May 15, 2012 that you received the letter?

19      A.     From Midland Funding, it was way

20   before that.

21      Q.     Okay.

22      A.     Way, way.  I hadn't heard from

23   them for ages until I heard from Forster &

24   Garbus.

25      Q.     Okay.

163

Thomas Sharkey

1    And we've already talked about
2
3    this, but when you were asked to pay Midland
4    Funding you didn't pay Midland Funding, right,
5    immediately?

6        A.    No, I didn't.

7        Q.    Upon being asked -- okay.

8              Look at paragraph 8.

9        A.    (Witness reviewing.)

10             Yeah, this is executed for the
11   purpose of enabling the plaintiff to obtain a
12   default judgment against the defendant herein
13   or for the Defendant's failure to answer or
14   otherwise defend.  As I said before, I didn't
15   realize there was a time or date for me to go
16   and defend myself.

17       Q.    Okay.

18             You didn't consult an attorney to
19   find out if there was a time or date?

20       A.    No, I did not.  There was no time
21   or date.

22       Q.    And paragraph 9.

23       A.    (Witness reviewing.)

24       Q.    Take a quick look at that.

25       A.    I do not recall receiving any

166

1                    Thomas Sharkey

2          Q.      Do you remember receiving any

3     correspondence from Forster & Garbus?

4          A.      I do.

5          Q.      Okay.

6          A.      Vaguely.

7          Q.      Do you remember receiving

8     correspondence informing you that a judgment

9     had been entered against you?

10         A.      I think I do, yes.

11         Q.      Okay.

12                 You just don't remember if this

13    is the exact correspondence?

14         A.      I don't remember if this was the

15    piece of correspondence or not, but I do

16    remember, it was, yeah, a judgment was

17    rendered against me, which I was taken aback

18    with, because I really didn't know that there

19    was really even a court date and I didn't know

20    whether they got their decision made and a

21    court date, because I was never given a court

22    date.

23         Q.      What did you do when you received

24    the letter from Forster & Garbus saying a

25    judgment had been entered against you?

171

                    Thomas Sharkey

1    it.

3        Q.     Okay.

4               Are you seeking to recover from

5    Forster & Garbus for the way you feel you were

6    treated by Forster & Garbus?

7               MR. FRANK:  Objection,

8          privileged.

9               If you are able to speak about

10         the nature of your recovery and theory

11         of the case without divulging

12         attorney/client communication about the

13         strategy of the case, then please do.

14              But anything about the intentions

15         of the lawsuit that is a function of

16         attorney/client communications is

17         privileged.

18       A.     Yeah, I would rather not discuss

19   that.

20       Q.     Okay.

21              Other than what you've been told

22   by your attorneys, why are you suing Forster &

23   Garbus?

24       A.     Why am I suing Forster & Garbus,

25   because I don't think that they went about

172

1                     Thomas Sharkey

2     collecting this debt properly.  I think it was

3     very -- done very unprofessionally.

4                 I don't think it was done in a

5     clear-cut manner that an average individual

6     would realize that they need to show up in

7     court when they get a piece of paper in the

8     mail with no date and no time.  I think they

9     used tactics to scare people.  I just think

10    the whole thing was unprofessional.  I think

11    it was handled totally incorrectly and that's

12    why I'm here.

13          Q.     Okay.

14                 Why are you suing Midland

15    Funding?

16                 MR. FRANK:  Objection.

17          Q.     Other than what you may have been

18    told by your attorneys?

19                 MR. FRANK:  Well, that doesn't

20           solve the problems.

21                 Any communications at all that

22           lead to your belief as to why you are

23           suing Midland Funding, at this time if

24           that belief is formulated as a result of

25           your attorney/client communications,

173

1                    Thomas Sharkey

2         then it's privileged.

3         A.      Yeah, it is.  No, it's going to

4    be privileged.

5         Q.      Okay.

6                 Other than communications you

7    have had with your attorney, you have no

8    independent reason for suing Midland Funding,

9    right?

10        A.      Right.

11                (Sharkey Exhibit 8, Document

12        bearing Bates stamp Agoado-F&G-000109,

13        marked for identification.)

14        Q.      Showing you what's been marked as

15   Exhibit Sharkey 8 (handing).

16        A.      (Witness reviewing.)

17        Q.      It has Bates stamp

18   Agoado-F&G-000109.  Appears to be a letter

19   from Forster & Garbus to you at 606 Birch

20   Hollow Drive, dated June 13, 2012.

21                Do you recognize this document?

22        A.      Let me read it.

23                (Witness reviewing.)

24                This was a letter that was done

25   after the judgment was already made, correct?

Thomas Sharkey

1  
2  I'm not sure.

3            MR. FRANK:  Let him ask the

4       questions.

5       A.     I don't understand.

6       Q.     Okay.

7              My question, first question I

8  asked you is do you recognize this document?

9       A.     Possibly.  I don't 100 percent

10 remember it.

11      Q.     Do you have any reason to believe

12 you didn't receive this document?

13      A.     I'm sorry?

14      Q.     Do you have any reason to believe

15 you did not receive this document?

16             MR. FRANK:  Objection to the form

17      of the question.

18      A.     I don't know.

19      Q.     The address on the document is

20 your address, right?

21      A.     That's correct.

22      Q.     It was your address in 2012?

23      A.     Yes.

24      Q.     And you have never had trouble

25 getting mail at that address, right?

175

                    Thomas Sharkey

1

2          A.      No.

3          Q.      So if this document was mailed to

4    you, you would have received it?

5          A.      I believe I probably would have.

6    I don't know.  I can't --

7          Q.      All right.  Take a look at

8    everything after Dear Mr. Sharkey.

9          A.      Okay.

10         Q.      That couple of paragraphs that

11   follow that, what is your understanding of

12   what this letter is telling you?

13         A.      (Witness reviewing.)

14                 First of all, they are looking

15   for assets to satisfy the judgment.  They

16   might send it to the sheriff's department.

17   And I can contact the office to arrange to pay

18   said judgment, and that's when I believe I

19   spoke to -- I may have received this letter,

20   because I think that may have been when I

21   talked to Mr. Rizzo and that's when he told me

22   that if I came up with a large amount of money

23   within 30 days, he could do a little bit

24   better or something like that and I don't care

25   who you have to get it from, get it from your

176

                        Thomas Sharkey
1
2   brother, your brother-in-law, anyone in your
3   family.  I think it was after this letter, I
4   believe is when that happened.  I am not sure.
5         Q.     Okay.
6                Again, you didn't consult an
7   attorney around the time you received this
8   letter about this letter, right?
9         A.     No.
10        Q.     Did you talk to anyone else about
11  the letter at the time you received it?
12        A.     I might have spoke to my cousin's
13  husband about it.  I don't remember.
14        Q.     Your cousin's husband is Joe
15  Cobis?
16        A.     No, Michael McGuigan who's
17  passed.
18        Q.     Oh, okay.
19               You don't remember talking to
20  Mr. McGuigan, or do you, about this letter?
21        A.     I really -- I honestly -- I don't
22  remember.  I'm sure I mentioned it to him.
23        Q.     Do you remember talking to
24  Mr. McGuigan about there being a judgment
25  against you in general?

188

                        Thomas Sharkey

1
2        Q.      Did you ever tell the sheriff's
3    office I don't think I owe this debt?
4        A.      No.
5        Q.      Did you ever tell Forster &
6    Garbus I don't think I owe this debt?
7        A.      No, I thought that was it, I had
8    to pay it.
9        Q.      Okay.
10               So Forster & Garbus never
11   actually ended up garnishing your wages,
12   right?
13       A.      If I didn't voluntarily pay the
14   sheriff's department $500 a month, then they
15   were going to go to my employer, which would
16   have been a huge embarrassment to me.  So I'm
17   sure at one point I must have contacted the
18   sheriff's department and said I will pay
19   voluntarily the $500 a month until I pay it
20   off.  And I know the -- at the end I paid a
21   big lump sum and received a letter back from
22   the sheriff's department saying this is paid
23   in full.
24       Q.      Okay.
25               (Sharkey Exhibit 10, Document

1                    Thomas Sharkey

2    document right now.

3                    You are currently suing Midland

4    Funding and Forster & Garbus, right?

5         A.    Yes.

6         Q.    You are represented by Frank &

7    Bianco, right?

8         A.    Yes.

9         Q.    Do you know how many complaints

10   have been filed in this case?

11        A.    I'm sorry?

12        Q.    Do you know how many complaints

13   have been filed in this particular case?

14        A.    No.

15        Q.    Do you know how many complaints

16   you have been a party to in this case?

17        A.    No.

18        Q.    Was this litigation pending when

19   you joined as a party?

20        A.    I don't know.

21        Q.    How did you learn of the

22   existence of litigation against Forster &

23   Garbus and Midland Funding?

24        A.    Through Mr. Finkel.

25        Q.    How did you come to join this

1                    Thomas Sharkey

2                    Before receiving a letter from

3    Mr. Finkel, did you have any intention to sue

4    Forster & Garbus or Midland Funding?

5         A.     I wish I could.  You know, I

6    had -- I hadn't actually decided to do that.

7         Q.     Do you understand that there's

8    more than one law firm representing the

9    plaintiffs in this case?

10        A.     I don't know.

11        Q.     Okay.

12                The attorney sitting directly to

13   your right, do you know what his name is?

14        A.     Um-hum.

15        Q.     What is his name?

16        A.     Greg.

17        Q.     Okay.

18                And do you know if Greg, whose

19   last name is Frank, do you know if Mr. Frank

20   works with Mr. Finkel at the same law firm?

21        A.     I don't believe so.  I don't

22   know.

23        Q.     So you know there's at least two

24   law firms representing the plaintiffs in this

25   case, right?

217

Thomas Sharkey

1  as whether or not someone served you

2  with a complaint for the Bank of America

3  suit, which is the language of the

4  interrogatory.

5          MR. CURTIS JOHNSON:  Off the

6  record a second.

7          (Discussion held off the record.)

8  BY MR. CURTIS JOHNSON:

9      Q.      If you look at Interrogatory

10  Number 10, it says, "Describe all actions you

11  took in response to being served with a

12  complaint for the Bank of America suit."

13          And your response to

14  Interrogatory 10 says, "Plaintiff incorporates

15  by reference his response made with respect to

16  Interrogatory Number 9 above.  Plaintiff

17  objects to this interrogatory to the extent

18  it assumes that plaintiff admits that he was

19  served with the complaint for the Bank of

20  America suit."

21          With those objections in mind, it

22  also says, "Subject to and without waiving his

23  general and specific objections, plaintiff

24  states as follows:  Plaintiff took no action,

218

Thomas Sharkey

1   as plaintiff was not aware as to what to do in

2   response to the filing of the Bank of America

3

4   suit."

5           Now, recognizing the fact that

6   you don't admit you were served, your response

7   seems to indicate that you were served, right?

8           MR. FRANK:  I am going to object

9       to that form.

10          It specifically says plaintiff

11      objects to this interrogatory to the

12      extent it assumes that plaintiff admits

13      that he was served with the complaint

14      for the Bank of America suit.

15   A.      That's correct.

16          MR. FRANK:  You are asking if

17      that sentence means that he does assume

18      it?  I don't understand the objection.

19   A.      It's assuming that I admitted

20   that I was served with the complaint and I

21   never admitted that.

22   Q.      Okay.

23          Except for today you did.

24   A.      I didn't know what it was.  I am

25   telling you as of today.

219

                    Thomas Sharkey

1

2          Q.      Okay.

3          A.      I didn't take any action, because

4    I was not aware of what to do in response of

5    that, and that's exactly what I said.

6          Q.      Right, but you clearly, if that's

7    your response to this interrogatory, you

8    didn't take action because you didn't know

9    what to do in response; you had to know there

10   was something you needed to respond to, right?

11         A.      I didn't know that I had to

12   respond to it.

13                 MR. FRANK:  Objection to the form

14         of the question.

15         A.      I didn't know I had to respond to

16   it, because I didn't take it as a real

17   summons.  I didn't think this was a real

18   summons.  If you look back to the number

19   before that, I didn't know that this was a

20   real summons.  People go all different

21   creative ways to try to collect money from

22   people.  I thought this was maybe a really

23   shady and creative way of trying to get money

24   from somebody.  I did not take this as an

25   actual summons.  So thinking that, this does

220

Thomas Sharkey

1  make sense.

2       Q.    You can put that aside.

3            Do you understand this case is

4  brought as a putative class action?

5       A.    I'm not sure exactly what that

6  means.

7       Q.    Okay.

8            Do you understand that this case

9  is brought with the hope that at some point it

10 will be certified as a class action by the

11 plaintiffs?

12            MR. FRANK:  I am going to object

13       as to privilege.

14            Any conversations that you may

15       have had about the procedure components

16       of this lawsuit with counsel are

17       protected by a privilege.

18            If you, as a layperson, had an

19       independent understanding of the Federal

20       Court class action process, then please

21       answer using that understanding.

22       A.    I don't have any understanding of

23 that whatsoever.

24       Q.    Okay.

221

Thomas Sharkey

Do you have an understanding of what a class action is?

A.     Not really.

MR. FRANK:  Objection again on the basis of privilege.  I sense we are heading in the direction of, you know, procedure, legal procedure.  And so I am going to blanket object to any legal procedure questions that involve counsel.

MR. CURTIS JOHNSON:  Okay.  I will make a general blanket exception in my questions.

Q.     The questions I am going to ask you for the foreseeable future about class actions, I am not asking you to tell me what your counsel told you.  I am asking for your independent understanding.

A.     Okay.

MR. FRANK:  Only if you have an independent understanding.

A.     Okay.  I get it.  I get it.

Q.     Do you know what a class action is?

223

Thomas Sharkey

1
2        MR. FRANK:  Objection to the form
3    of the question; meant to be.
4        MR. CURTIS JOHNSON:  I am trying
5    to get around the word putative, because
6    he doesn't understand what putative --
7    he certainly doesn't understand that,
8    but -- all right.
9    Q.    Please look back at Exhibit 1.
10   A.    Exhibit 1?
11   Q.    Exhibit 1.
12   A.    (Witness reviewing.)
13         Okay.
14   Q.    You see on the top of Exhibit 1
15   on the right side where it says Second Amended
16   Class Action Complaint?
17   A.    Yes.
18   Q.    Do you understand what the term
19   class action means in connection with this
20   document?
21   A.    I'm not sure.  I don't mean to
22   sound ignorant.
23   Q.    I understand.
24   A.    I don't know.
25   Q.    Please look at the caption where

227

Thomas Sharkey

2   Q.    You don't have an understanding
3 what it means to be a named plaintiff?

4   A.    No, I don't.

5   Q.    Okay.

6   A.    Like I said, I'm sorry, I don't
7 mean to sound ignorant, but this is not my
8 forte.

9   Q.    No, it's fine.

10        Have you ever heard of the term
11 class representative, other than what you've
12 been told by counsel?

13        MR. FRANK:  Object on the basis
14        of privilege.

15        The plaintiff has every right to
16        rely on counsel for any understanding of
17        legal terms such as class
18        representative.  If the witness has an
19        independent lay understanding of the
20        term class representative before his
21        privileged communications with counsel,
22        please give that understanding.

23   A.    Okay.

24        I'm really confused here.  What
25 is the question now?

1                    Thomas Sharkey
2        Q.      Sure.
3                With your counsel's objection
4    that he just stated, I am going to have the
5    reporter read back the question.
6                (Record read.)
7        A.      No, I have never heard it.
8        Q.      Other than what you've been told
9    by counsel, do you have an understanding of
10   your responsibilities as a named plaintiff in
11   this case?
12               MR. FRANK:  Object to the entire
13          line of questioning.  I question -- the
14          witness is allowed to rely on counsel in
15          the prosecution of litigation, so I
16          question the relevance of the witness'
17          precounsel communication understanding
18          of these terms.
19               MR. CURTIS JOHNSON:  Fine.
20               I also believe that class
21          representatives have to understand their
22          role as class representatives and if you
23          are going to object on privilege grounds
24          on every single question of his
25          understanding of his role, then I have

235

                    Thomas Sharkey

1

2        Q.      Do you know what, other than what

3   you've been told by counsel, do you know what

4   laws or common law principles you allege

5   Forster & Garbus violated?

6                MR. FRANK:  Again, object.  This

7           is turning into a memory test about the

8           complaint.  If you want to ask him

9           questions about the complaint, it's

10          sitting right in front of him.  If you

11          want this to be a memory test, I don't

12          know what we will get out of it.

13       Q.      You can answer my question.

14       A.      The question is?

15       Q.      Other than what you've been told

16  by your lawyers, do you know what common law

17  principles or statutes you allege that

18  Forster & Garbus violated?

19       A.      I don't know.

20       Q.      Okay.

21               You can look back at Exhibit 1.

22       A.      (Witness complying.)

23       Q.      It's a long document.  So I am

24  going to give you a few minutes to read

25  through it.

236

Thomas Sharkey

1              I will represent that attached to

2  Exhibit 1 -- I'm sorry, attached to Exhibit 1

3  are two exhibits, A and B, and I am not going

4  to ask you any questions about Exhibit A and

5  B, but you can still look through, if you

6  like.

7        A.     (Witness reviewing.)

8        Q.     I am not going to ask you about

9  those exhibits.

10        A.     Okay.

11        Q.     Have you seen that document

12  before today?

13        A.     Have I seen this document before

14  today, no.

15        Q.     Did you assist in the preparation

16  of that complaint?

17        A.     Of this document?

18        Q.     Yes.

19        A.     Did I assist in this document?

20        Q.     Did you assist your attorney's in

21  the preparation of that document?

22        A.     I mean I discussed what happened

23  to me with my attorney obviously, but I didn't

24  help them prepare this document.

237

Thomas Sharkey

Q.    And they didn't ask you to review
it before they filed it, did they?

A.    No.

Q.    Did they go over the contents of
it with you before it was filed?

MR. FRANK:  Object again.  You
are firing out the questions so fast,
you are answering so fast, I can't get
in there.

Q.    I'm not asking the content.  I am
just asking if they took place.

MR. FRANK:  I am trying to
remember which of the last three
questions were asked.

(Record read.)

MR. FRANK:  Object as to form.
Temporally what that means, the
contents of the document?

Q.    You can answer.

A.    Did they go over -- this is the
first time I am reading it.  Everything that
is listed in here I can see is being true and
I discussed a lot of the things that are in
this document with my attorneys.

250

Thomas Sharkey

1    allegations in the complaint without

2    divulging privilege, attorney/client

3    communications, please do so.

4    A.    Okay.

5          Repeat the question.

6    Q.    Other than what you've been told

7    by your attorneys, what statements by

8    Forster & Garbus do you allege were deceptive?

9    A.    I don't think there was any basis

10   for a lot of things that Forster & Garbus said

11   to me, because I don't think they have

12   anything to back it up and that's my personal

13   opinion.

14   Q.    How did you arrive at the

15   personal opinion that Forster & Garbus didn't

16   have anything to back it up?

17   A.    Because they never provided me

18   with anything except for the fact that Midland

19   Funding bought a debt which I didn't even know

20   what the exact amount was and they were coming

21   after me for it.

22   Q.    But again, you never asked

23   Forster & Garbus to provide you anything, did

24   you?

251

Thomas Sharkey

1     MR. FRANK:  Objection.

2     Asked and answered.

3   A.     Repeat the question.

4          Did I ever ask Forster &

5   Garbus --

6          Q.     To provide you any support for

7   their claim that you owed debt?

8          A.     No, I didn't.

9          Q.     Okay.

10         Other than what you've been told

11  by your attorneys, how did you believe you

12  have been damaged by Forster & Garbus'

13  actions?

14         A.     I think I said that in my last

15  three answers before, but I will reiterate it

16  one more time.

17         Q.     Okay.

18         A.     I think it was very shady the way

19  that they served me because to me it did not

20  seem like they were serving me the proper way

21  that someone should be served with telling me

22  where and a time to appear and a date to

23  appear.

24         I think they would go any way

Thomas Sharkey

1  they could in order to make their money on

2  this whole deal, especially this Mr. Rizzo,

3  because to ask me to ask my family for $4,000

4  and then pay $200 a month, I am sure he wanted

5  his little cut in on the deal.  And calling me

6  at work constantly and harassing me, I just

7  think that the main reason for his position is

8  to make money for himself off of other

9  people's misfortune.

10        Q.      Do you have any evidence that you

11  paid any amount to Forster & Garbus or Midland

12  Funding that you did not, in fact, owe?

13        A.      I paid the sheriff's department.

14        Q.      Okay.

15                Do you have any evidence that you

16  paid the sheriff's department any money that

17  you did not, in fact, owe?

18        A.      I don't have evidence either way.

19  All I know is that, as far as I was concerned,

20  there was no more debts and I wasn't paying

21  $500 a month, plus more at the end, close to

22  $8,000 I wound up paying, which I am sure

23  Mr. Rizzo got a nice little chunk of change

24  from.

253

Thomas Sharkey

1   Q.      Do you allege that you were
2   emotionally damaged by Forster & Garbus'
3   activities?
4               MR. FRANK:  Objection to the form
5       of the question.
6               When you reference your
7       allegations, this implicates our legal
8       theories.
9               Please answer the question if you
10      can based on your layman's understanding
11      of the question.
12   Q.      You can answer.
13   A.      If you mean was I stressed out by
14  them, very much so.
15   Q.      Okay.
16              Did you seek treatment in
17  connection with the stress caused by Forster &
18  Garbus?
19   A.      No.
20   Q.      What false statements do you
21  believe independent of what you may have been
22  told by your attorneys that Forster & Garbus
23  made to the State Court in connection with
24  your litigation involving Midland Funding and

263

Thomas Sharkey

1    Midland nor Forster & Garbus made a regional

2    effort to verify Mr. Sharkey's purported debt

3    before harassing him and filing suit."

4         Then it says, "Although

5    defendants assert the purported debt was

6    purchased from Bank of America, upon

7    information and belief, Midland Funding does

8    not possess and has never possessed (nor ever

9    seen) any documentary evidence supporting any

10   of the purported debt presumably purchased

11   from Bank of America."

12        Right?

13        A.    Right.

14        Q.    Again, if you look at Exhibit 2,

15   isn't Exhibit 2 a document, a documentary

16   evidence that supports the fact that you had a

17   debt with Bank of America?

18             MR. FRANK:  Objection on the

19        basis of privilege.

20             Documentary evidence is a legal

21        term, and any conversations that you may

22        have had with your counsel regarding the

23        nature of evidence, what evidence is,

24        what evidence is available in this case

264

Thomas Sharkey

1   is privileged.

2          If you have any independent

3   understanding, please use it to answer

4   the question.

5          A.     Okay, this is an April of 2009

6   statement.  We have no way of knowing if there

7   was a computer error six years ago from Bank

8   of America for 6767.

9          Does Midland Funding have any

10  evidence to back this number here, 6767.20 up?

11  Do they have any evidence of that from Bank of

12  America that they can produce?

13         Q.     So your allegation is you are --

14  sitting here today, is that Midland Funding

15  has no proof that you owed a debt to Bank of

16  America, they just don't have the proof that

17  you would like to see; is that correct?

18         A.     You know what, my store --

19         MR. FRANK:  Objection.

20         You would like to see is a little

21  contentious.  Maybe we could phrase it

22  as a little bit less aggressive?

23         MR. CURTIS JOHNSON:  Okay.

24         A.     Repeat your question, please.

265

Thomas Sharkey

1    Q.    Sure.

2    Isn't it true, sitting here

3 today, that your allegation is not that

4 Midland Funding did not have any documentary

5 evidence of your debt, but rather that they

6 didn't have the documentation that you would

7 expect them to have when they to tried to

8 collect your debt?

9    MR. FRANK:  Objection to the form

10    of the question, as to whether we have

11    documentary evidence.

12    Q.    You can answer.

13    A.    You have one piece of paper right

14 here, okay.  In my store, we have printed out

15 mistakenly balances for some of my customers,

16 okay.  Mistakes happen.  This is from 2009, a

17 mistake could have happened.

18    This cannot be the right number.

19 So what I am saying to you is, they don't have

20 enough, okay.  Anyone can print out a paper.

21 I can print out a paper, one of my customers,

22 Mr. Schwartz, owes me $67,000, when they owe

23 me $678.  You want to go back and show me

24 proof, show me proof.  Do they have it?  I

CINDY AFANADOR COURT REPORTING, INC.
1-877-DEPO-YOU

273

                    Thomas Sharkey

2    plaintiffs involved in this litigation?

3         A.     No.

4         Q.     I would like to refer back to

5    Exhibit 2, which is this Bank of America

6    statement?

7         A.     (Witness reviewing.)

8                Okay.

9         Q.     So we have talked about the fact

10   that this document says new balance total

11   $6,959.54; is that correct?

12        A.     Yes.

13        Q.     Do you have any facts that you

14   would say disprove that that is the number

15   that you owed at the time this statement was

16   issued?

17        A.     Quite frankly, from 2009, I don't

18   have any kind of evidence or facts.

19        Q.     After looking at this document,

20   do you see what interest rate it says, annual

21   percentage rate for this billing period; do

22   you see an interest rate provided?  It's about

23   halfway down the page.

24        A.     Oh.

25               (Witness reviewing.)

284

1              Thomas Sharkey

2      not to answer.

3              MR. MATTHEW JOHNSON:  We do

4      reserve the right to reopen this topic.

5              MR. FRANK:  Please, by all means,

6      get us the bill of sale and assignment

7      of loans so we can talk about it.  It's

8      a document in your office.

9      Q.      Moving on to something different.

10             (Sharkey Exhibit 16, Document

11     bearing Bates stamp MCM-0667, marked for

12     identification.)

13     Q.      Handing you what's been marked

14  Sharkey 16.  Take a minute to review it,

15  please (handing).

16     A.      (Witness reviewing.)

17             Okay.

18     Q.      Have you had a chance to look at

19  it?

20     A.      Yes.

21     Q.      So this states primary name,

22  Thomas J. Sharkey, is that yourself?

23     A.      Yes.

24     Q.      And address, 606 Birch Hollow

25  Drive; as we discussed, that's your address?

285

Thomas Sharkey

1  

2   A.      Yes.

3   Q.      The last four of your social, are

4   those accurate?

5   A.      Yes.

6   Q.      The two phone numbers listed,

7   were they ever your number?

8   A.      They are no longer my number.

9   Q.      But those are numbers you

10  recognize as one time being yours?

11  A.      They look familiar.  I have had a

12  new number for a long, long time.

13  Q.      And the next line is sale amount,

14  $6,959.54.  And do you remember seeing that

15  number earlier today in the other exhibits

16  we've looked at?

17  A.      I saw that on the exhibits.  I

18  don't necessarily agree with the amount.

19  Q.      Okay.

20  Do you have any facts that would

21  cause you to disagree with that amount?

22  A.      I do not.  That's many years ago.

23  I do not have any documents.

24  Q.      And if you look at it, it says,

25  original account number, the last four digits

286

Thomas Sharkey

1   are 1898?
2
3       A.    I could not tell you.
4       Q.    It's the third line down, says,
5   original account number?
6       A.    Right.  I don't remember the
7   account number.
8       Q.    Okay.
9             Then if you look at Sharkey, I
10  believe it's 2 --
11      A.    I'm sorry.
12      Q.    If you look at Sharkey Exhibit 2?
13      A.    (Witness reviewing.)
14      Q.    We looked at that earlier.  It
15  had a string of numbers.
16      A.    I got it.  Yes, okay.
17      Q.    Do you see the last four digits
18  in that string of numbers towards there?
19      A.    On the bottom, 1898?
20      Q.    Does that match original account
21  number from Exhibit 16?
22      A.    Yeah, 1898.  Yes.
23      Q.    As long as you are looking at 2,
24  does that have the same balance total as the
25  sale amount in Exhibit 16?

287

                    Thomas Sharkey

1

2          A.       (Witness reviewing.)

3                   Let me see.

4                   It does.

5          Q.       If you look down -- back to 16,

6    Exhibit 16, you see birthday, it has a year

7    1957; is that the year of your birth?

8          A.       Yes.

9          Q.       If you look at the bottom, I will

10   read across the bottom in print says, "Data

11   provided (sic) by Midland Credit Management

12   from electronic records" --

13         A.       It's printed.

14         Q.       "Data printed by Midland Credit

15   Management Inc., from electronic records

16   provided by FIA Card Services, NA, pursuant to

17   the bill of sale/assignment of accounts dated

18   March 28, 2011 in connection with the sale of

19   accounts from FIA Card Services, NA to Midland

20   Funding, LLC."

21                  Did I read that accurately?

22         A.       Yes.

23         Q.       What is your understanding of the

24   meaning of that paragraph?

25         A.       Saying that they sold my debt

289

Thomas Sharkey

Q.    So did you, in fact, pay that $6,959.54 to FIA Card Services or Bank of America?

A.    Whether I did or didn't, it has a credit symbol right here and tells me I owe nothing.  Payment due, zero.

Q.    And does it say that you paid it or does it say charge-off adjustment?

A.    It doesn't say.  It just says payment due, zero, and says credit.

Q.    Do you believe that was money -- the debt disappeared?

MR. FRANK:  Objection to the form of the question, disappeared.

A.    I can only tell you what I see in black and white here.  I see a credit for 6,959.54 and past due amount, zero and payment due, zero.  That's all I can tell.

Q.    What do you think happened to that debt?

A.    I think that Bank of America wrote it off as a bad debt.

Q.    Do you think --

A.    Go ahead.

290

1           Thomas Sharkey

2      Q.    Go ahead, sorry.

3      A.    And then they tried to sell a bad

4 debt that they had already written off to

5 Midland Funding.

6      Q.    Do you think Bank of America has

7 a right to sell a debt that they have written

8 off as a bad debt?

9      A.    I do not.

10      Q.    Do you think that it's wrong for

11 Bank of America to sell a debt that they have

12 written off as a bad debt?

13      A.    Absolutely, especially when I

14 suffered consequences already with my credit

15 score and when I tried to make payment

16 arrangements with them, absolutely.

17      Q.    Why do you think it's wrong for

18 them to sell a bad debt to somebody else?

19      A.    Because this was between me and

20 Bank of America.  I tried to make arrangements

21 with them.  I -- when I was able to do it

22 before misfortune came upon me, I paid my

23 debts.  I paid my consequences with my credit

24 score.  I tried to manage arrangements with

25 them.  So I don't think they had any right.  I

1                    Thomas Sharkey

2                    (Sharkey Exhibit 19, Document

3           bearing Bates stamp MCM-0601 through

4           MCM-0603, marked for identification.)

5           Q.       Handing you what's been marked

6     Sharkey 19.  If you can take a minute to look

7     at that (handing).

8           A.       (Witness reviewing.)

9           Q.       Are you ready?

10          A.       Okay.

11          Q.       So this is a letter.  Heading

12    says MCM, dated March 31, 2011.

13                   Is this letter addressed

14    correctly to you?

15          A.       Yes.

16          Q.       That was your residence on

17    March 31, 2011?

18          A.       Yes.

19          Q.       Do you remember receiving this

20    letter?

21          A.       It's possible.  I don't remember

22    this exact letter.  It's possible.

23          Q.       And earlier I believe you

24    testified that you received a letter from

25    Midland; is that accurate?

309

Thomas Sharkey

2  addressed to MCM and not the previous owner."

3              Is that accurate?

4      A.     You read that properly, yes.

5      Q.     The next paragraph states "Unless

6  you notify MCM within 30 days after receiving

7  this notice that you dispute the validity of

8  the debt or any portion thereof, MCM will

9  assume this debt to be valid."

10             Is that correct?

11     A.     You read it correctly.

12     Q.     Did you notify MCM of any

13 disputes of the validity of the debt?

14     A.     No.

15     Q.     Under the terms of that

16 paragraph, what do you believe MCM would do if

17 you did not dispute the debt?

18     A.     I didn't know.  I really did not

19 know.

20     Q.     The next paragraph "If you notify

21 MCM in writing within 30 days after receiving

22 this notice that the debt or any portion

23 thereof is disputed, MCM will obtain

24 verification of the debt or a copy of a

25 judgment (if there is a judgment) and MCM will

310

1                    Thomas Sharkey

2     mail you a copy of such verification or

3     judgment."

4                    Is that accurate?

5          A.       You read it correctly, yes.

6          Q.       Is verification of a debt what

7     you wanted?

8                    MR. FRANK:  Objection to the form

9          of the question.

10                   When?

11         Q.       As we sit here today, you seem to

12    be upset that the debt wasn't properly

13    validated to you; is that accurate?

14                   MR. FRANK:  Objection to the form

15         of the question.

16                   Characterizes the witness' mental

17         state.

18         Q.       You can answer.

19         A.       As far as I was concerned, this

20    whole matter was taken care of and from the

21    piece of paper that we looked at today, it

22    indeed said balance due, zero.

23         Q.       So when you got this letter, did

24    you consider that debt invalid, the Bank of

25    America debt?

311

Thomas Sharkey

A.      Yes.

Q.      And did you take any steps to request validation of the debt as outlined on page 2 of this letter to you?

A.      No.

Q.      Why not?

A.      Because as far as I was concerned, I had been through enough.  I had dealt with Bank of America.  It was taken care of and they were selling it to another party after it has a zero balance and I didn't want to respond to it.

Q.      Did you realize that this letter was saying that they were threatening to take legal action against you if you didn't pay this debt that they said you owed?

A.      Um-hum.

Q.      So you knew by ignoring this letter you were risking having legal action brought against you?

A.      I really honestly did not think they would do that.  Again, I really did not think they would do anything.

Q.      Why did you think they wouldn't

315

                    Thomas Sharkey

1

2          Q.      But you never did contact Midland

3    Credit Management or Midland Funding about

4    that?

5          A.      No.

6                  Why did they resurface years

7    after?   I mean...

8                  MR. FRANK:   Let him...

9                  (Sharkey Exhibit 20, Document

10               bearing Bates stamp MCM-672 and ending in

11               MCM-685, marked for identification.)

12         Q.      So I am handing you what's been

13   marked Sharkey 20 (handing).

14         A.      (Witness reviewing.)

15         Q.      This is a document starting at

16   MCM-672 and ending in MCM-685.   Just take a

17   second and flip through it.   You don't have to

18   read everything.

19                 I will ask you some questions

20   about the first two pages.   If you look at

21   page 1 of Sharkey 20, it's titled Customer

22   Additional Data.   I will represent to you that

23   this is data from Midland Credit Management

24   internal system that is provided in discovery

25   to your counsel.

318

1                    Thomas Sharkey

2         Q.        SSN?

3         A.        Yeah, okay.  Go ahead.

4         Q.        Those are your social?

5         A.        Yes.

6         Q.        If we go up ahead two pages to

7    page marked MCM-675?

8         A.        (Witness complying.)

9         Q.        Page is entitled Bureau Reports

10   by Reporting Date?

11        A.        Um-hum.

12        Q.        Do you remember during this time

13   period, this runs from May 18, 2011 through

14   May 28, 2014, did you ever happen to review

15   your credit history?

16        A.        What dates?

17        Q.        May 18, 2011 through May 28,

18   2014.

19        A.        I may have when I went for a car

20   loan.

21        Q.        Do you remember ever seeing this?

22        A.        This piece of paper?

23        Q.        No.  No.  Do you remember ever

24   seeing this Bank of America account on your

25   credit history either as Bank of America

1                  Thomas Sharkey

2    account or a Midland Funding account?

3         A.     No.

4         Q.     You can set that aside.

5         A.     (Witness complying.)

6         Q.     You mentioned earlier that you

7    were injured in a car accident in the '90s,

8    the late '90s?

9         A.     Yes.

10        Q.     Just generally, what sort of

11   injuries were they?

12        A.     It was my back.

13        Q.     You stated earlier, I believe,

14   you received collection letters on other

15   debts, specifically medical debts, correct?

16        A.     Yes.

17        Q.     On those other debts, you paid

18   those debts when you got collection letters?

19        A.     On the medical debts, yeah.

20        Q.     Did you ever consider appealing

21   the judgment that Midland Funding obtained

22   against you?

23        A.     Did I ever consider appealing it?

24        Q.     Yes.

25        A.     No.

1              Thomas Sharkey

2              MR. FRANK:  Off the record.

3              (Discussion held off the record.)

4    BY MR. MATTHEW JOHNSON:

5         Q.      So we just passed around

6    Sharkey 21.

7              If you pull up to Request for

8    Admission Number 29, which is on page 15?

9         A.      (Witness complying.)

10        Q.      So this says "Admit that you have

11   no evidence that Midland furnished false

12   information concerning your Bank of America

13   account to any credit reporting agency."

14              And your response, "Plaintiff

15   objects to this request on the ground that

16   plaintiff has not had sufficient opportunity

17   to complete its investigation and discovery.

18   Subject to and without waiving his general and

19   specific objections, plaintiff states as

20   follows:  Deny."

21              Is that accurate?  Did I read

22   that accurately?

23        A.      Yes.

24        Q.      And what evidence do you have

25   that Midland furnished false information

324

Thomas Sharkey

1   concerning your Bank of America account to any

2   credit reporting agency?

4       A.      I don't have any physical

5   evidence.

6       Q.      Do you have any other kind of

7   evidence?

8       A.      No.

9       Q.      If we look at 31?

10      A.      (Witness reviewing.)

11      Q.      States "Admit that you have no

12  evidence showing that Midland violated

13  Section" -- I'm sorry.  I will wait for you.

14      A.      Oh.

15      Q.      "Admit that you have no evidence

16  showing that Midland violated Section 1692e of

17  the Fair Debt Collection Practices Act as

18  alleged in paragraph 102 of your amended

19  complaint."

20              I will just tell you that 1692e

21  that's referred to here, that bars the making

22  of false or misleading representations in

23  connection with the collection of a debt.

24      A.      Um-hum.

25      Q.      Now, as far as Midland Funding or

343

1            Thomas Sharkey

2    yes, I do.

3         Q.     Having seen the terms and

4    conditions of your account and the updated

5    terms and conditions of your account and the

6    two letters from Bank of America, statements

7    regarding your account that Midland produced,

8    do you believe that Midland lacks sufficient

9    basis to bring a lawsuit to collect your debt?

10            MR. FRANK:  Objection to the form

11        of the question.

12            Assumes that the document showed

13        to the witness was related to his

14        account.

15            You may answer.

16   A.     The question again?

17            (Record read.)

18   A.     Yes, I do believe.

19        Q.     Why do you believe Midland lacks

20   sufficient basis?

21        A.     I keep repeating the same thing

22   over and over and over again.  I paid -- I

23   dealt with Bank of America.  I offered to make

24   payment arrangements with them.  I waited for

25   an answer from a supervisor, the supervisor

344

Thomas Sharkey

1   said they cannot accept that.  I was going

2   through a lot of things in my life and that's

3   what I could afford to give.

4

5            I had to prioritize the things I

6   need in my life, so therefore, I offered to

7   make a certain amount of a payment.  They said

8   let me call my supervisor, call you back.

9   That's what they told me, we are writing this

10  off as a bad debt.

11           I said, what does that mean, and

12  they said that means that we are writing it

13  off.  And they said we are not instituting any

14  kind of legal action against you, but it is

15  definitely going to affect your credit score.

16  They did not say that they were going to sell

17  it to another company.

18       Q.     So do you think when they turned

19  down the offer of $50 a month they would

20  accept an offer of zero dollars a month and

21  say --

22              MR. FRANK:  Objection.

23              Calls for speculation.

24       Q.     Do you think it's reasonable to

25  believe that when they turned down -- is it

345

Thomas Sharkey

1  correct to say they turned down your offer of

2  $50 a month?

3

4        A.      They did turn it down, yes.

5        Q.      Do you think that instead of $50

6  a month they are offering zero dollars a

7  month?

8               MR. FRANK:  Objection.

9        A.    No.

10               MR. FRANK:  It's a contentious

11        question.

12               Also, it has a time assumption

13        that these events occurred all at the

14        same time.

15               You can answer.

16        A.     I offered what I could pay at the

17  time.  And what you are saying to me, do you

18  think that they would accept zero dollars a

19  month, is really not a good question at all,

20  because I wouldn't offer someone zero dollars

21  a month.  I was offering them what I could

22  afford.  I had to take care of myself, my son.

23  I had a lot of things going on in my life,

24  that's it.

25        Q.      Does the fact that they turned

1                    Thomas Sharkey

2    down $50 a month imply to you that they felt

3    you still owed a debt?

4                    MR. FRANK:  At the time that they

5          turned down the offer?

6                    MR. MATTHEW JOHNSON:  Yes.

7          A.     At the time they turned down the

8    offer, I still owed them the debt.  I tried to

9    make some type of arrangement with them.

10         Q.     Do you know what the difference

11   between Midland Funding, LLC and Midland

12   Credit Management, Inc. is?

13         A.     I don't.

14         Q.     When you received the collection

15   letter from Midland, actually, from Midland

16   Credit Management that we discussed, did you

17   show that to anybody else?

18         A.     Not that I recall.

19         Q.     Would you have read it carefully;

20   do you know if you did?

21         A.     I don't remember.

22         Q.     Have you ever requested that a

23   debt collector provide validation of a debt?

24         A.     No.

25         Q.     Going forward to paragraph 78,

411

C E R T I F I C A T E

STATE OF NEW YORK          )

                          ) ss.:

COUNTY OF SUFFOLK          )


          I, CINDY A. AFANADOR, a Notary

Public within and for the State of New

York, do hereby certify:

          That THOMAS SHARKEY, the witness

whose deposition is hereinbefore set

forth, was duly sworn by me and that such

deposition is a true record of the

testimony given by such witness.

          I further certify that I am not

related to any of the parties to this

action by blood or marriage; and that I

am in no way interested in the outcome

of this matter.

          IN WITNESS WHEREOF, I have

hereunto set my hand this 29th day of

July, 2015.

                    ____*Cindy A. Afanador*_____

                    CINDY A. AFANADOR