**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID AGOADO, LEEANN MCNALLY, CRAIG MOORE, CHRIS PIERRE, THOMAS SHARKEY AND DOREEN VAZQUEZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MIDLAND FUNDING, LLC, MIDLAND FUNDING, LLC DBA IN NEW YORK AS MIDLAND FUNDING OF DELAWARE, LLC, MIDLAND CREDIT MANAGEMENT, INC., RUBIN & ROTHMAN, LLC, FORSTER & GARBUS LLP, COHEN & SLAMOWITZ, LLP and PRESSLER & PRESSLER LLP, <br><br> Defendants. | **Civil Action No.** <br> **2:14-cv-00018 (WFK)(ST)** |

### DEFENDANTS MIDLAND FUNDING, LLC AND MIDLAND CREDIT MANAGEMENT, INC.'S RESPONSE TO PLAINTIFFS' LOCAL CIVIL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS

#### Introduction

A.     Midland objects to Plaintiffs' use of argumentative headers to introduce various subsections of their Rule 56.1 statement. None of the headers are followed by citation to evidence as required by Local Rule 56.1(d) and therefore are improper.

B.     Midland objects to Plaintiffs' characterization of every debt at issue as an "alleged debt" as Plaintiffs provide no citation to evidence to support the assertion. As set forth below, Midland has provided documentary evidence as to the existence of each such debt.

C.     Midland objects to Plaintiffs' citations to documents without providing a citation to the corresponding documents anywhere in evidence.

**Defendants' Collection Action Against Plaintiffs**

*Plaintiff Agoado (Chase Account)*

1.      On January 23, 2012, C&S[1] filed a lawsuit in Suffolk County District Court against Mr. Agoado as to the alleged Chase account, with MF named as plaintiff. (Frank Decl. Ex. 1-A (select court documents from Agoado-Chase state-court collection action) at S&S290–292 (summons and complaint, stating causes of action for breach of contract and account stated)).

> **Response:**      Admit with the exception of Plaintiffs' characterization of Agoado's Chase account as "alleged," as the evidence has established its existence. Johnson Decl. Ex. M-J (excerpts from David Agoado Dep.) at 10:15-11:7, 20-25; 14:15-16; 150:25-151:4; Murphy-Agoado Ex. H (Chase credit card statements for Agoado account).

2.      On July 25, 2012, C&S filed a default judgment application in the suit as to Plaintiff Agoado's alleged Chase account. (Frank Decl. Ex. 1-A at S&S119–128 (default judgment application)).

> **Response:**      Admit but for characterizing Agoado's Chase account as "alleged." *See* Response to ¶ 1.

3.      The MCM-issued affidavit included in this default judgment application for Plaintiff Agoado's alleged Chase account states, at Paragraph 9:

> It is in the ordinary course of business for plaintiff or its agents to send a validation letter to defendant(s) in accordance with the Fair Debt Collection Practices Act (15 USC § 1692g) setting forth the amount of the debt, identifying

---

[1] "Defendants" collectively refers to: Midland Funding, LLC d/b/a as Midland Funding of Delaware, LLC ("MF") and Midland Credit Management, Inc. ("MCM") (together, "Midland" or "Midland Defendants"); and Cohen & Slamowitz, LLP ("C&S"); Forster & Garbus LLP ("F&G"); Pressler & Pressler LLP ("P&P"); and Rubin & Rothman, LLC ("R&R") (together, "Attorney Defendants").

plaintiff as the creditor to whom the debt is owed, and notifying defendant(s) that, in accordance with the FDCPA, unless defendant(s) disputes the validity of the debt, or any portion of it, the debt will be assumed valid.

(Frank Decl. Ex. 1-A at S&126) (emphasis added).

**Response:**     Admit but for characterizing Agoado's Chase account as "alleged." *See* Response to ¶ 1.

4.     The default judgment against Mr. Agoado as to his alleged Chase account was docketed by the clerk for the First District Court of Suffolk County on August 28, 2012. With interest and costs included, the judgment amount as entered was $8,830.94. (Frank Decl. Ex. A-1 at S&S130 (transcript of judgment)).

**Response:**     Admit but for the characterization of Agoado's Chase account as "alleged." *See* Response to ¶ 1.

*Plaintiff Agoado (Household Account)*

5.     On January 23, 2012, C&S filed a lawsuit in Suffolk County District Court against Mr. Agoado as to the alleged Household account, with MF named as plaintiff. (Frank Decl. Ex. 1-B (select court documents from Agoado-Household state-court collection action) at S&S313–315 (summons and complaint, stating causes of action for breach of contract and account stated)).

**Response:**     Admit but for the characterization of Agoado's Household account as "alleged." Agoado admitted that either he or his former wife opened the Household account under his name. *See* Johnson Decl. Ex. M-J at 68:17-69:22; 70:7-14; 70:21-71:12; Johnson Decl. Ex. M-J(b) at C&S102-106.

6.     On July 24, 2012, C&S filed a default judgment application in the suit as to Plaintiff Agoado's alleged Household account. (Frank Decl. Ex. 1-B at S&S108–117 (default judgment

application)).

   **Response:**  Admit but for the characterization of Agoado's Household account as "alleged." Agoado admitted that either he or his former wife opened the Household account under his name. *See* Response to ¶ 5.

  7.  The MCM-issued affidavit included in this default judgment application for Plaintiff Agoado's alleged Household account states, at Paragraph 8:

   It is in the ordinary course of business for plaintiff or its agents to send a validation letter to defendant(s) in accordance with the Fair Debt Collection Practices Act (15 USC § 1692g) setting forth the amount of the debt, identifying plaintiff as the creditor to whom the debt is owed, and notifying defendant(s) that, in accordance with the FDCPA, unless defendant(s) disputes the validity of the debt, or any portion of it, the debt <u>will be assumed valid</u>.

   (Frank Decl. Ex. 1-B at S&S115) (emphasis added).

   **Response:**  Admit but for the characterization of Agoado's Household account as "alleged." *See* Response to ¶ 5.

   **Response:**

  8.  The default judgment against Mr. Agoado as to his alleged Household account was docketed by the clerk for the First District Court of Suffolk County on August 28, 2012. With interest and costs included, the judgment amount as entered was $12,508.15. (Frank Decl. Ex. 1-B at S&S13 (transcript of judgment)).

   **Response:**  Admitted in part. The citation to Frank Decl. Ex. 1-B at S&S13, which is incorrect. The actual citation should be to Frank Decl. Ex. 1-B at S&S131. Further, Midland denies the characterization of Agoado's Household account as "alleged." *See*

4

Response to ¶ 5.

**Response:**

*Plaintiff McNally*

9.     On February 6, 2012, F&G filed a lawsuit in Suffolk County District Court against Ms. McNally, with MF named as plaintiff. (Frank Decl. Ex. 1-C (select court documents from McNally state-court collection action) at F&G 002–003 (summons and complaint, stating causes of action for breach of contract and account stated)).

**Response:**     Admit. Further responding, Plaintiff McNally went by the name "Leeann Derosa" at the time. *See id.*

10.     On May 22, 2012, F&G filed a default judgment application in the suit as to Plaintiff McNally's alleged account. (Frank Decl. Ex. 1-C at F&G 006–013 (default judgment application)).

**Response:**     Admit that on or about May 22, 2021, F&G filed a default judgment application in the suit as to Plaintiff McNally's account. Midland denies that McNally's account was an "alleged" account, as McNally admitted that she borrowed $5,000 from Beneficial, funded by HSBC Bank USA, N.A., and failed to repay the loan. Johnson Decl. Ex. M-k (excerpts from McNally Dep.) at 29:4-7; 32:2-4; 55:22-57:23; 63:9-20; 190:3-25; Confidential Murphy-McNally Ex. D (Acceptance of credit in form of $5,000 check payable to McNally); Murphy-McNally Ex. C (sample copy of offer of credit and governing terms that Beneficial provided to McNally).

11.     The MCM-issued affidavit included in this default judgment application for Plaintiff McNally's alleged account states, at Paragraph 9:

It is in the ordinary course of business for plaintiff or its agents to send a

5

validation letter to defendant(s) in accordance with the Fair Debt Collection Practices Act (15 USC § 1692g) setting forth the amount of the debt, identifying plaintiff as the creditor to whom the debt is owed, and notifying defendant(s) that, in accordance with the FDCPA, unless defendant(s) disputes the validity of the debt, or any portion of it, the debt will be assumed valid.

(Frank Decl. Ex. 1-C at F&G 008) (emphasis added).

**Response:**     Admit but for the characterization of McNally's account as "alleged," as its existence was established by Midland. *See* Response to ¶ 10.

12.     The default judgment against Ms. McNally was docketed by the clerk for the Second District Court of Suffolk County on May 29, 2012. With interest and costs included, the judgment amount as entered was $7,216.41. (Frank Decl. Ex. 1-C at F&G 016 (transcript of judgment)).

**Response:**     Admitted in part; denied in part. Midland admits that the default judgment against Ms. McNally was docketed by the clerk for the Second District Court of Suffolk County in the amount of $7,216.41. Midland denies that this took place on May 29, 2012, as the judgment is dated June 27, 2012. Frank Decl. Ex. 1-C at F&G016.

13.     A satisfaction as to this judgment was submitted in Suffolk County Supreme Court on July 26, 2012, and filed by the Suffolk County Clerk on September 4, 2012, for Plaintiff McNally's alleged account. (Frank Decl. Ex. 1-C at F&G 022 (satisfaction)).

**Response:**     Admit but for Plaintiffs' characterization of the debt as "alleged." *See* Response to ¶ 10.

*Plaintiff Sharkey*

14.     On February 6, 2012, F&G filed a lawsuit in Suffolk County District Court against

Mr. Sharkey, with MF named as plaintiff. (Frank Decl. Ex. 1-D (select court documents from Sharkey state-court collection action) at F&G 077–078 (summons and complaint, stating causes of action for breach of contract and account stated)).

> **Response:**    Admitted in part. Midland admits all facts of this paragraph but for the date F&G filed suit, which F&G77 indicates was February 14, 2012. *See* F&G77.

15.    On May 22, 2012, F&G filed a default judgment application in the suit as to Plaintiff Sharkey's alleged account. (Frank Decl. Ex. 1-D at F&G 081–088 (default judgment application)).

> **Response:**    Midland admits all facts of this paragraph but denies Plaintiffs' characterization of the account as "alleged." Sharkey admitted that he had a Bank of America credit card, that he used the credit card and that he failed to make all required payments on the card. Johnson Decl. Ex. M-N (excerpts from Sharkey Dep.) at 25:12-26:5; 32:12-21; 36:20-22; 142:18-22. Sharkey's basis for not paying the debt was his belief that creditors cannot sell accounts in default once they are written off as bad debt. Johnson Decl. Ex. M-N at 289:20-290:9.

16.    The MCM-issued affidavit included in this default judgment application for Plaintiff Sharkey's alleged account states, at Paragraph 9:

> It is in the ordinary course of business for plaintiff or its agents to send a validation letter to defendant(s) in accordance with the Fair Debt Collection Practices Act (15 USC § 1692g) setting forth the amount of the debt, identifying plaintiff as the creditor to whom the debt is owed, and notifying defendant(s) that, in accordance with the FDCPA, unless defendant(s) disputes the validity of the debt, or any portion of it, the debt <u>will be assumed valid</u>.

(Frank Decl. Ex. 1-D at F&G 083) (emphasis added).

**Response:**    Admit but for Plaintiffs' characterization of Sharkey's debt as "alleged." *See* Response to ¶ 15.

17.    The default judgment against Mr. Sharkey was docketed by the clerk for the Second District Court of Suffolk County on May 29, 2012. With interest and costs included, the judgment amount as entered was $7,856.92. (Frank Decl. Ex. 1-D at F&G 091 (transcript of judgment)).

**Response:**    Admit.

18.    On June 20, 2012, F&G began the process of garnishing Mr. Sharkey's wages. (Frank Decl. Ex. 1-D at F&G 096 (income execution notice for employer)).

**Response:**    Admit.

19.    On September 12, 2012, F&G notified the Sheriff of Suffolk County of a payment arrangement with Mr. Sharkey, for $4,000 initially, and $200 monthly thereafter. (Frank Decl. Ex. 1-D at F&G 098 (notice of payment arrangement)).

**Response:**    Admit in part. Midland denies that the $200 monthly payments were to continue indefinitely. The $200 monthly payments were to cease upon satisfaction of the debt. *See* Frank Decl. Ex. 1-D at F&G 98.

20.    A satisfaction as to the judgment against Mr. Sharkey was submitted in Suffolk County Supreme Court on April 1, 2014, and filed by the Suffolk County Clerk on April 17, 2014. (Frank Decl. Ex. 1-D at F&G 100 (satisfaction)).

**Response:**    Admit.

*Plaintiff Vazquez*

21.    On or about February 2, 2011, R&R filed suit against Ms. Vazquez in Suffolk County District Court, with MF named as plaintiff. (Frank Decl. Ex. 1-E (select court documents

from Vazquez state-court collection action) at R&R #102–#103 (summons and complaint, stating causes of action for breach of contract and account stated)).

> **Response:**  Admit.

22.    The complaint filed by R&R against Ms. Vazquez on Midland's behalf identified Chase as MF's "assignor" with respect to the alleged debt in question. (Frank Decl. Ex. 1-E at R&R #103).

> **Response:**  Midland admits all facts of this paragraph but denies Plaintiffs' characterization of the account as "alleged." Ms. Vazquez admitted that she had possessed a credit card issued by Chase Bank USA, N.A., that she used the card and that she owed the debt that R&R sued her to collect. Johnson Decl. Ex. M-O (excerpts from Vazquez's deposition) at 30:24-31:14; 38:18-24; 40:25-41:7; 42:7-17.

23.    On or about June 7, 2011, R&R filed a default judgment application in the suit as to Plaintiff Vazquez's alleged account. (Frank Decl. Ex. 1-E at R&R #118–#122 (default judgment application)).

> **Response:**  Admit but for Plaintiffs' characterization of the debt as "alleged." *See* Response to ¶ 22.

24.    The MCM-issued affidavit included in this default judgment application referenced only Chase with respect to the source of the account, and did not identify any prior owner(s). (Frank Decl. Ex. 1-E at R&R #119–#121 (affidavit for default judgment application))

> **Response:**  Denied. The MCM-issued affidavit references both Chase and stated that the "action is based upon a revolving credit agreement entered into between [Vazquez] and the original credit grantor." Frank Decl. Ex. 1-E at R&R119-20 (at ¶¶ 1 & 4).

25.    The default judgment against Ms. Vazquez was rendered and docketed by the clerk

for the Fourth District Court of Suffolk County on June 17, 2011. With interest and costs included, the judgment amount as entered was $11,131.48. (Frank Decl. Ex. 1-E at R&R 130 (transcript of judgment)).

> **Response:**    Admit.

26.    On June 17, 2011, R&R commenced the garnishment process against Ms. Vazquez. (Frank Decl. Ex. I-4 at R&R #134–#139 (income execution documents for employer)).

> **Response:**    Admitted as to the facts; denied as to the citation. The correct citation is Frank Decl. Ex. 1-E at R&R 134-139.

27.    Ms. Vazquez had paid Midland at least $5,945.84.00 in connection with the alleged debt in question by December 2013, shortly after Plaintiffs' class action lawsuit was commenced. (Frank Decl. Ex. 3-B at MCM-0087–0088 (Midland payment history for Vazquez)).

> **Response:**    Admit but for Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 22.

## Discovery Shows Defendants Fraudulently Procured Judgments On Unprovable Debt

### *Midland's Sellers Disclaimed Accuracy Of The Data Provided At Purchase*

28.    During discovery in this litigation, Defendants produced documents in response to Plaintiffs' demands for documents demonstrating how MF purchased alleged debts. When Midland acquired debt, the entities from which it purchased could not provide an analysis of the original allegedly unpaid charge, the fees, the interest, etc. for each alleged debt, and instead simply provided a dollar amount for the account balance as a data item in a spreadsheet, meanwhile disclaiming the accuracy of that amount. The July 30, 2010 purchase agreement for Plaintiff Vazquez's alleged account states that "'Current Balance' means the approximate unpaid balance, expressed in United States Dollars, owed on each Account as of the date of charge-off . . .'" (Frank

Decl. Ex. 2-A at Part 1.7, (MCM-1017)) (emphasis added).

**Response:**      Denied. Plaintiffs improperly attempt to generalize regarding what they imply are the terms applicable to each and every account that MF purchases when, in fact, Plaintiffs provide only a portion of the facts concerning MF's purchase of a portfolio of accounts that included Plaintiff Vazquez's account.

As to the Vazquez account, reference to Midland's Murphy-Vazquez Ex. A (filed under seal) at MCM 1018-19, §1.10(j), omitted from Pl's Ex. 2-A, provides that "To the best of Seller's knowledge the information provided by Seller and/or its agents related to the Accounts including, without limitation, the information set forth in the Account Schedule, offering memorandum or related document(s) provided to Purchaser in connection with its due diligence concerning the transactions contemplated by this Agreement, if any to the best of Sellers knowledge is complete and accurate. Further, the Account information contained in the Account Schedule provided by Seller to purchaser constitutes Seller's own business records that pertain to such Accounts and accurately reflects in all material respects the information in Seller's database. The Account information in the Account Schedule was kept in the regular course of Seller's business. The Account information in the Account Schedule was made or compiled at or near the time by, or from information transmitted by, a person with knowledge of the data entered into and maintained or caused the data to be entered into and maintained, in Seller's database. It is the regular practice of Seller's business to maintain and compile such data."

Midland's Murphy-Vazquez Ex. A at MCM 1021 (at 3.1(b)) provides that the Seller is the sole and absolute owner of, and has good and marketable title to, each of the Accounts.

Murphy-Vazquez Ex. A at Section 3.1(d), titled "Accuracy of Information," provides: To its best belief and knowledge, the information provided by Seller and/or its agents related to the Accounts including, without limitation, the information set forth in the Account Schedule and the seller survey, offering memorandum or related document(s) provided to Purchaser in connection with its due diligence concerning each of the transactions contemplated by this Agreement is complete and accurate.

Murphy-Vazquez Ex. A at Section 3.1(g), titled "No Material Omissions," provides that "Seller has not omitted any material information in its actual knowledge related to the Accounts that would adversely affect Purchaser's ability to collect on the Accounts in the normal course of business.

Midland's Murphy-Vazquez Ex. A at MCM-1023 at § 4.4(b) provides that the Seller will provide all bills of sale historically associated with the Accounts purchaser is purchasing.

*Midland's Secondary Debt Is Defective Due To Broken Chain Of Title*

29.     During discovery in this litigation, Defendants produced documents in response to Plaintiffs' demands for proof of, inter alia, MF's ownership of the alleged debts that were the subject of the underlying state-court collection actions. As to Plaintiff Vazquez, the documents produced show Midland was not the first debt buyer to own Plaintiff Vazquez's alleged account. According to the document that Midland produced as the purchase agreement for Plaintiff Vazquez's alleged account, dated July 30, 2010, the entity that sold this to MF was not an original lender, but a fellow debt buyer, which could be either SquareTwo Financial Corporation, or one of two purported SquareTwo subsidiaries, CACH, LLC or CACV of Colorado, LLC. (Frank Decl. Ex. 2-A (excerpts from Vazquez purchase agreement) at MCM-1017 (agreement's introductory

paragraph)).

**Response:** Denied. Plaintiffs again improperly implies that Vazquez's account is typical of the Plaintiffs' accounts in general to assert that Midland was not the first owner of not only Vazquez's account but others. MF, however, purchased each account at issue other than Vazquez's account directly from the original creditor, as shown by the following evidence:

(1) MF purchased Plaintiff Agoado's HSBC/Household account from original creditor HSBC Consumer Lending (USA). Murphy-Agoado Ex. A (purchase agreement including bill of sale between MF and HSBC Consumer Lending (USA) Inc. and its affiliates and their subsidiaries under which MF purchased Agoado's Household Finance Corporation III account); Murphy-Agoado Ex. D at S&S102 (Personal Credit Line Account Agreement between Agoado and Household Finance Corporation III giving rise to Agoado's Household debt purchased by MF);

(2) MF purchased Agoado's Chase Bank USA, N.A. account from Chase Bank USA, N.A. Murphy-Agoado Ex. F (purchase agreement including bill of sale between MF and Chase Bank USA, N.A. under which MF purchased Agoado's Chase Bank account); Murphy-Agoado Ex. H at S&S042-81 (multiple statements from Chase to Agoado concerning the Chase account purchased by MF).

(3) MF purchased McNally's Beneficial account from original creditor HSBC Consumer Lending (USA), which sold it on behalf of Beneficial Company LLC. Murphy-McNally Ex. A (purchase agreement including bill of sale between MF and HSBC Consumer Lending (USA) on behalf of Beneficial Company LLC under which MF purchased McNally's Beneficial account); Murphy-McNally Ex. C (reflecting fact that account MF purchased was a Beneficial loan issued to McNally);

(4) MF purchased Moore's JC Penney-branded card issued by GE Money Bank from GE Money Bank. Murphy-Moore Ex. A (purchase agreement including bill of sale between MF, GE Money Bank, Retailer Credit Services Inc. and General Electric Capital Corporation under which MF purchased Moore's JC Penney-branded card issued by GE Money Bank); Murphy-Moore Ex. B (Data page reflecting that Moore's JC Penney-branded card issued by GE Money Bank was among those purchased by MF);

(5) MF purchased Pierre's Buy.com branded Chase Bank account from Chase Bank USA, N.A. Murphy-Pierre Ex. A (purchase agreement including bill of sale between MF and Chase Bank USA, N.A. under which MF purchased Pierre's Buy.com-branded Chase Bank account); Murphy-Pierre Ex. C at MCM-10 to 45 (multiple account statements issued to Pierre on his Buy.com-branded Chase Bank account purchased by MF);

(6) MF purchased Sharkey's Bank of America card from FIA Card Services, N.A., a wholly-owned subsidiary of Bank of America. Murphy-Sharkey Ex. A (purchase agreement between MF and FIA Card Services, N.A., a wholly owned subsidiary of Bank of America Corporation, under which MF purchased Sharkey's Bank of America account); Murphy-Sharkey Ex. B (data produced by FIA Card Services, N.A. regarding Sharkey's account pursuant to the Bill of Sale); Murphy-Sharkey Ex. C (copy of statement issued to Sharkey on his Bank of America account purchased by MF);

(7) MF purchased Plaintiff Vazquez's account from SquareTwo Financial Corporation, which had purchased it from Chase Bank USA, N.A. Murphy-Vazquez Ex. A (purchase agreement including bill of sale between MF and SquareTwo Financial Corporation, acting on behalf of itself and its wholly-owned subsidiaries, CACV of Colorado, LLC and CACH, LLC, under which MF purchased Vazquez's Chase Bank account); SquareTwo provided relevant

information about Ms. Vazquez's account including the date it was opened, the date of charge off and the exact balance due (Murphy-Vazquez Ex. B); an account statement for the account from Chase (Murphy-Vazquez Ex. C); the terms and conditions governing her account (Muprhy-Vazquez Ex. D).

The agreement with SquareTwo Financial Corporation provides that SquareTwo was providing account information including SquareTwo's own records as well as those of SquareTwo's predecessor in interest that SquareTwo "relied upon and incorporated in to its business records, pertaining to such Accounts and accurately reflects in all material respects the information in Seller's database. The Account information in the Account Schedule was kept in the regular course of Seller's business and, upon information and belief, the business of Seller's Predecessor. The Account information in the Account Schedule was made or compiled at or near the time by, or from information transmitted by, a person with knowledge of the data entered into and maintained or caused the data to be entered into and maintained, in Seller's database. It is the regular practice of Seller's business and, upon information and belief, the business of Seller's Predecessor to maintain and compile such data." Murphy-Vazquez Ex. A at MCM-1022 at § 3.1(m).

30.     The July 30, 2010 purchase agreement for Plaintiff Vazquez's alleged account states that "'Current Balance' means the approximate unpaid balance, expressed in United States Dollars, owed on each Account as of the date of charge-off . . .'" (Frank Decl. Ex. 2-A at Part 1.7, (MCM-1017)) (emphasis added).

      **Response:**     Admitted in part and denied in part. Midland admits that the quoted section does so state, but Plaintiff omits reference to other sections of the agreement that provide that all information provided by the seller was accurate to the best of seller's

knowledge and obtained from seller's business records. Midland incorporates its response to ¶ 28, which sets forth those terms, herein by reference.

31.     Midland's internal records as to this alleged account reflect that it was originated by Washington Mutual ("WaMu"), then assigned to Chase, although Midland has furnished no assignments from WaMu to any other entity or from Chase to any other entity. (Frank Decl. Ex. 2-B (Midland data sheet for Vazquez account) at MCM-0068).

> **Response:**     Admitted. Further responding, it is a matter of public record that JPMorgan Chase Bank purchased the banking operations of Washington Mutual ("WaMu") after WaMu failed in 2008. *See* www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/wamu.html (last accessed December 28, 2021); *see also* "JPMorgan Chase Acquires Banking Operations of Washington Mutual," Sept. 25, 2008 at www.fdic.gov/news/press-releases/2008/pr08085.html (last accessed December 28, 2021).

32.     Midland's internal records state that electronic data concerning Ms. Vazquez's alleged Chase account were "provided by SquareTwo Financial Corporation, CACV of Colorado, LLC and CACH, LLC" in connection with a "transfer[] on or about 10/27/2010 in connection with the sale of accounts from provided by SquareTwo Financial Corporation, CACV of Colorado, LLC and CACH, LLC to Midland Funding LLC"—but the records do not identify which of these three entities was the purported assignor of the alleged account. (Frank Decl. Ex. 2-B at MCM-0068).

> **Response:**     Denied. The "Account Purchase Agreement" provides that MF purchased Vazquez's account from SquareTwo Financial Corporation, acting on behalf of itself and its wholly-owned subsidiaries CACV of Colorado, LLC and CACH, LLC (collectively referred to a "Seller") and that "Seller" owned the accounts that were sold,

including that of Ms. Vazquez. Murphy-Vazquez Ex. A at MCM-1017. The document titled "Closing Statement/Invoice" confirms that MF purchased Ms. Vazquez's account from SquareTwo Financial. Murphy-Vazquez Ex. A. at MCM-1050. Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 22.

> **Response:**

33.     Midland's internal records concerning Ms. Vazquez's alleged Chase account also state that, with respect to "Chain Of Title(s)," there is "No Information available." (Frank Decl. Ex. 2¬B at MCM-0083).

> **Response:**     Admitted in part, denied in part. Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 22. Further responding, Murphy-Vazquez Ex. A is the Bill of Sale under which Vazquez's account was transferred to MF. *See* Murphy-Vazquez Ex. A. The Bill of Sale provides, *inter alia*, that SquareTwo was providing account information including SquareTwo's own records as well as those of SquareTwo's predecessor in interest and that SquareTwo "relied upon and incorporated in to its business records, pertaining to such Accounts and accurately reflects in all material respects the information in Seller's database. The Account information in the Account Schedule was kept in the regular course of Seller's business and, upon information and belief, the business of Seller's Predecessor. The Account information in the Account Schedule was made or compiled at or near the time by, or from information transmitted by, a person with knowledge of the data entered into and maintained or caused the data to be entered into and maintained, in Seller's database. It is the regular practice of Seller's business and, upon information and belief, the business of Seller's Predecessor to maintain and compile such data." Midland's Murphy-Vazquez Ex. A at MCM-1022 at § 3.1(m).

34.     Midland has produced documents labeled "ASSIGNMENT AND BILL OF SALE" and showing a date of October 27, 2010, that variously identify SquareTwo Financial Corporation, CACV of Colorado, LLC and CACH, LLC as entities which have assigned portfolios accounts to MF—but none of these documents identifies which of those three entities (if any) assigned Ms. Vazquez's alleged Chase account to MF. (Frank Decl. Ex. 2-B (purported assignment documents for Vazquez account) at MCM-0062–0067).

    **Response:**     Denied. The "Account Purchase Agreement" provides that MF purchased Vazquez's account from SquareTwo Financial Corporation, acting on behalf of itself and its wholly-owned subsidiaries CACV of Colorado, LLC and CACH, LLC (collectively referred to a "Seller") and that "Seller" owned the accounts that were sold, including that of Ms. Vazquez. Murphy-Vazquez Ex. A at MCM-1017. The document titled "Closing Statement/Invoice" confirms that MF purchased Ms. Vazquez's account from SquareTwo Financial. Murphy-Vazquez Ex. A. at MCM-1050. Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 22.


*Midland Told The Attorney Defendants There Was No Account-Level Documentation*

35.     Midland and the Attorney Defendants use the You've Got Claims program ("YGC") to allow their respective computer systems to interface concerning debt-collection activities being performed by the Attorney Defendants on Midland's behalf. (Frank Decl. Ex. 3-A ("MCM Firm Manual" provided by Midland to Attorney Defendants) at Part 15.1 (MCM-1076)).

    **Response:**     Admit.

36.     When Midland places an account with any of the Attorney Defendants for the commencement of state-court collection suit, Midland uses YGC to communicate to the firm the

alleged balance on the account. (Frank Decl. Ex. 3-A at Part 15.2.1.1 (MCM-1078, -1140).

> **Response:**    Denied in part and admitted in part. The section cited by Plaintiffs provides that outside counsel must determine the appropriate suit amount using MCM data as a starting point and taking other information into consideration, including, but not limited to: balance information, payment/adjustment data, payments received by the firm, available media and all applicable local, state and federal laws, rules and regulations. Frank Decl. Ex. 3-A at Part 15.2.1.1 (MCM-1078). Admit that Midland uses YGC, among other methods, to communicate with outside counsel.

37.    Midland uses YGC to send the Attorney Defendants a "Record 1" to tell the firm whether account-level documentation[2] is or is not available as to that account. (Frank Decl. Ex. 3-A at Part 22.1 (MCM-1119–1120)).

> **Response:**    Denied. The manual Plaintiffs cite actually states that "MCM either receives media at the time of purchase or proactively request media; that media may be available on the media website at the time of placement or sometime after." Frank Decl. Ex. 3-A at Part 22.1.2 (MCM-1119) (emphasis added). The manual makes no reference at all to instances in which account-level documentation is not available. *See id.* at MCM-1119 to 1120. Plaintiffs' contention to the contrary lacks evidentiary support as required by Local Rule 56.1(d).

38.    When no account-level documentation is available, the Record 1 alert will read "Media Available: N." (*Id.*).

---

[2] The term "account-level documentation" as used herein means records (1) created by an original lender, (2) at or near the time of the events (charges and payments) that they purport to describe, (3) pursuant to that entity's standard business practices, and (4) that were mailed to the consumer prior to account charge-off. In New York State, account-level documentation generally includes, among other business records, signed cardholder agreements, account statements, and proof of mailing of account statements.

**Response:** Denied. The material Plaintiffs cite actually states that "N" means Frank Decl. Ex. 3-A at Table 12: Record 1 Media Availability Messages (MCM-1119) (emphasis added). Plaintiffs purposely misrepresent the meaning of this notation in an effort to bolster their claims. *See* Midland's Memorandum of Law in Support of Motion for Summary Judgment at § C(5) (addressing the meaning of "Media Available: N" in a more complete fashion).

39. Whenever Midland sends a communication to any of the Attorney Defendants, Midland's YGC logs reflect the event as a "Record 9"; when an Attorney Defendant sends a communication to Midland, the event is categorized as a "Record 39." (Frank Decl. Ex. 3-A at Table 7, (MCM-1095)).

**Response:** Denied. Reference to Table 7 reflects that when Midland sends a record to an Attorney Defendant, it may be coded "Record 1," "Record 2," "Record 3," "Record 4," "Record 5," "Record 7," "Record 8," "Record 9," "Record 18," or "Record 24." When an Attorney Defendant sends a record to MCM, it may be coded as "Record 30," "Record 31," "Record 34," "Record 35," "Record 39," "Record 41," "Record 42" or "Record 46." Frank Decl. Ex. 3-A at Table 7, (MCM-1095). Further responding, Table 7 makes no representation that it is an exhaustive list of "Record" codes. *See id.*

40. When interfacing with Midland via a Record 39 sent by YGC, the Attorney Defendants rely on a list of "p-codes" each of which pertains to a particular event notification or document request. (Frank Decl. Ex. 3-A at "Record 39[:] P-Codes" (MCM-1140)).

**Response:** Admitted in part and denied in part. Midland admits that an attorney defendant may use a "P-Code" when communicating with Midland to request particular documents. Denied that the table indicates that this is the only method by which Attorney

Defendants may issue a document request. For instance, the Attorney Defendants may also obtain documents from their Vendor Specialist. *See* Frank Decl. Ex. 3-A at Table 12: Record 1 Media Availability Messages (MCM-1119) ("Firms should review media availability via MCM media website and request required media via YGC or the Vendor Specialist").

41.     One of the p-codes is "*CC:S309," by which an Attorney Defendant may request a affidavit proving chain of title, including documentary proof attached thereto, in connection with a collection suit being prosecuted in a New York State court. (Frank Decl. Ex. 3-A at MCM-1110).

            **Response:**     Admit.

42.     Upon placing Plaintiff Vazquez's alleged account with R&R, Midland informed R&R that no account-level documentation was available as to Plaintiff Vazquez's alleged account. (Frank Decl. Ex. 3-B (Midland's YGC log re Vazquez account) at MCM-0094 ("Media Available: N" appears on upper-right of page)).

            **Response:**     Denied. The notation "Media Available: N" means "Media is not available via MCM media website at the time of placement. Firms should review media availability via MCM media website and request required media via YGC or the Vendor Specialist." Frank Decl. Ex. 3-A at Table 12: Record 1 Media Availability Messages (MCM-1119) (emphasis added). Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 22.

43.     No chain-of-title documentation was provided to R&R prior to its procuring the default judgment on Midland's behalf against Ms. Vazquez. (Frank Decl. Ex. 3-B at MCM-0096–0097).

            **Response:**     Denied. The evidence cited does not support the assertion and makes

no mention of chain-of-title documentation. *See* Frank Decl. Ex. 3-B at MCM-0096. Further responding, MCM-0097 is not included in Frank Decl. Ex. 3-B.

44.     On June 24, 2011—after the default judgment against Ms. Vazquez had been effectuated—R&R sent Midland a YGC communication requesting chain-of-title documentation as to Ms. Vazquez's alleged Chase account; this request was never fulfilled. (Frank Decl. Ex. 3¬B at MCM-0095 (Midland's YGC log entry for "6/24/2011" shows Record 39 from R&R to Midland using "*CC:S309" to request "CHAIN OF TITLE"); Frank Decl. Ex. 3-C (R&R's YGC log re Vazquez account) at R&R #147 (showing "CHAIN OF TITLE REQUESTED" on "06/24/11").

>       **Response:**     Denied. The cited records make no representation that a request for chain of title documentation as to Ms. Vazquez's Chase account was never fulfilled. *See* Frank Decl. Ex. 3-B at MCM-0095; Frank Decl. Ex. 3-C at R&R 147. Further, chain of title documentation is available to the Attorney Defendants from the Vender Specialists as well as via YGC: "Firms should review media availability via MCM media website and request required media via YGC or the Vendor Specialist." Frank Decl. Ex. 3-A at Table 12: Record 1 Media Availability Messages (MCM-1119). Plaintiffs make no representation that R&R did not obtain the requested documents from their Vendor Specialist.

45.     When Midland placed Plaintiff Sharkey's alleged account with F&G, Midland informed F&G that no account-level documentation was available for Plaintiff Sharkey's alleged account. (Frank Decl. Ex. 3-D (Midland's YGC log re Sharkey account) at MCM-0687 ("Media Available: N" appears at top-right of page); Frank Decl. Ex. 3-E (F&G's YGC log re Sharkey account) at F&G 103 ("Media Available N" appears as "Message [Number] 008").

>       **Response:**     Denied. Plaintiffs misrepresent the meaning of "Media Available: N." In fact, this notation means "Media is not available via MCM media website <u>at the</u>

time of placement. Firms should review media availability via MCM media website and request required media via YGC or the Vendor Specialist." Frank Decl. Ex. 3-A at Table 12: Record 1 Media Availability Messages (MCM-1119) (emphasis added). Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 15.

46.     When Midland placed Plaintiff McNally's alleged account with F&G, Midland informed F&G that no account-level documentation was available for Plaintiff McNally's alleged account. (Frank Decl. Ex. 3-F (Midland's YGC log re McNally account) at MCM-0342 ("Media Available: N" appears at top-right of page); Frank Decl. Ex. 3-G (F&G's YGC log re McNally account) at F&G 025 ("Media Available N" appears as "Message [Number] 008")).

        **Response:**     Denied. Plaintiffs misrepresent the meaning of "Media Available: N." In fact, this notation means "Media is not available via MCM media website at the time of placement. Firms should review media availability via MCM media website and request required media via YGC or the Vendor Specialist." Frank Decl. Ex. 3-A at Table 12: Record 1 Media Availability Messages (MCM-1119) (emphasis added). Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 10.

47.     When Midland placed Plaintiff Agoado's alleged Household account with C&S, Midland informed C&S that no account-level documentation was available for Plaintiff Agoado's alleged Household account. (Frank Decl. Ex. 3-H (Midland's YGC log re Agoado-Household account) at MCM-1214 ("Media Available: N" appears at top-right of page)).

        **Response:**     Denied. Plaintiffs misrepresent the meaning of "Media Available: N." In fact, this notation means "Media is not available via MCM media website at the time of placement. Firms should review media availability via MCM media website and request required media via YGC or the Vendor Specialist." Frank Decl. Ex. 3-A at Table

12: Record 1 Media Availability Messages (MCM-1119) (emphasis added). Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 5.

48.     On November 28, 2011, within days after Midland had placed Plaintiff Agoado's alleged Chase account with C&S, C&S requested the "Last Billing Statement" as to this account, but Midland rejected that request, informing C&S that "DOCUMENT TYPE NOT AVAILABLE FOR PORTFOLIO." (Frank Decl. Ex. 3-I (Midland's YGC log re Agoado-Chase account) at MCM-0297; Frank Decl. Ex. 3-J (C&C's YGC log re Agoado-Chase account) at S&S-151).

       **Response:** Denied. As the cited documents state, "Request Rejected/Cancelled," not that Midland simply "rejected" the request. *See* Frank Decl. Ex. 3-I (Midland's YGC log re Agoado-Chase account) at MCM-0297; Frank Decl. Ex. 3-J (C&C's YGC log re Agoado-Chase account) at S&S-151. To the contrary, the cited material states "Media Available: Y." Frank Decl. Ex. 3-I. Reference to the MCM Manual shows that this notation means "Media is available via MCM media website at the time of placement; Record 09 message will be sent to indicating [sic] type of media available; Download media from MCM media website, as needed." Frank Decl. Ex. 3-A at Table 12 "Record 1 Media Availability Messages" (MCM-1119). Further responding, C&S produced copies of Agoado's Chase statements in discovery. *See* Murphy-Agoado Ex. H at S&S 42-81. Further, Midland denies Plaintiff's characterization of the debt as "alleged." *See* Response to ¶ 1.

**Plaintiffs Suffered Injuries Due To Defendants' Misconduct**

49.     Ms. Vazquez testified about how Midland subjected her to wage garnishments as a result of the judgment against her. (Frank Decl. Ex. 4-A at 41:21-42:2; 172:12-:23).

       **Response:**     Admitted in part, denied in part. Midland admits that the in cited testimony, Ms. Vazquez testified that her wages were being garnished. Frank Decl. Ex. 4-

A at 41:21-42:2; 172:12-:23. The cited testimony, however, does not indicate that "Midland subjected her to wage garnishments" and makes no reference to a judgment against Ms. Vazquez. *See id.*

50.     Ms. Vazquez does not believe she ever owed Midland anything. (Frank Decl. Ex. 4-A at 63:9-14; 178:4-179:16).

> **Response:**     Denied. Nowhere in the cited text does Ms. Vazquez deny owing money to Midland. *See* Frank Decl. Ex. 4-A at 63:9-14; 178:4-179:16. To the contrary, Ms. Vazquez admitted that when she was served with a lawsuit by Rubin & Rothman ("R&R"), she did not do anything because she thought that since she owed the debt to Chase, she could not challenge efforts to collect it. Johnson Decl. Ex. M-O at 77:2-18. Further, she admitted that she owed a balance of $10,430 on her former Chase account (Johnson Decl. Ex. M-O at 87:24-90:25) and that in bringing suit against her, R&R sued the correct person and obtained judgment for the correct amount of money (Johnson Decl. Ex. M-O at 118:5-119:2).

51.     Mr. Sharkey testified that he did not owe the debt because the original lender had told him they were writing off the debt. (Frank Decl. Ex. 4-B at 51:15-52:15; 53:8-:19).

> **Response:**     Admit. Sharkey further testified that, when he discussed his former Bank of America account with Forster & Garbus, it was his understanding that Bank of America had "sold the debt to Midland Funding." Johnson Decl. Ex. M-N at 57:12-18.

52.     Mr. Sharkey did not know the amount he purportedly owed, (*id*. 143:10-:18), but paid because he was "afraid and . . . harassed," (*id*. 64:13-65:7; 102:14-18; 170:21-171:2).

> **Response:**     Admit that Sharkey did not know the exact amount he owed, as he could not confirm whether $6,959.54 was the proper balance, but he did agree that there

was some balance that was not paid. Frank Decl. Ex. 4-B at 143:10-22. Admit that Sharkey testified that he paid Midland "[b]ecause I was afraid and I was harassed" (Frank Decl. Ex. 4-B at 64:23-25), though he further testified that he never told the sheriff's office of Forster & Garbus that he didn't think he owed the debt but thought that if he did not pay it, Forster & Garbus would go to his employer, which he believed would be embarrassing, so he voluntarily agreed to pay off the debt. Frank Decl. Ex. 4-B at 188:2-23. Mr. Sharkey also testified that once he found out Forster & Garbus had obtained a judgment against him, he "just figured that they had [the judgment] … and I had to pay it." Frank Decl. Ex. 4-B at 101:13-102:8.

53.     Mr. Sharkey never received an "itemized account of what [he] owed." (*Id.* 71:23-:24). Nevertheless, he paid $500.00 per month until the debt was fully paid. (*Id.* 74:19-75:7; 75:19-76:7; 187:7-:15). To this day, he does not know if that was the correct amount. (*Id.* 75:11-:12; 158:9-:12).

> **Response:**     As to the first contention, regarding whether Sharkey obtained an itemized receipt, deny that page 71, cited to support it, is included in Frank Decl. Ex. 4-B. Admit that Sharkey stated that he didn't receive an itemized account of what he owed (Johnson Decl. Ex. M-N at 71:21-24), but he further testified that he never asked Forster & Garbus for an itemized statement (Johnson Decl. Ex. M-N at 72:16-22).
>
>     As to the second contention, that Sharkey paid $500.00 per month until the debt was fully paid, deny that pages 74-76 are included in Frank Decl. Ex. 4-B. Admit that Sharkey testified that he paid $500 to the court per month and then made a lump payment at the end to pay the debt off. Frank Decl. Ex. 4-B at 187:6-15.
>
>     As to the third contention, that Sharkey does not know if

"that" was the correct amount, deny that page 75 is included in Frank Decl. Ex. 4-B. Admit that Sharkey testified that "I could have, I could not have [owed that amount]. I don't know." Frank Decl. Ex. 4-B at 158:9-12. Further, Sharkey testified that he had no facts to dispute the amount of debt reflected in his April 2009 statement from Bank of America of $6,959.54 (Johnson Decl. Ex. M-N at 273:4-18), that he never notified MCM that he disputed the debt, that he never requested validation of the debt and that he never contacted MF or MCM to discuss the debt (Johnson Decl. Ex. M-N at 309:5-311:6; 315:2-5).

Further responding, Plaintiffs materially misrepresent the quality of the information Midland could provide F&G, asserting without citation to evidence that Midland could not provide the amount of the debt "because it does not know it." Section 8.3 of the purchase agreement under which Plaintiff Sharkey's account was transferred provides, inter alia, that the loans sold under the agreement "have been originated serviced and maintained in material compliance with all applicable state and federal laws by Seller, its agents and Affiliates." Murphy-Sharkey Aff. Ex. A at Section 8.3 (MCM-0957). Further, regarding the data provided by the seller, it states "Data. To the best of Seller's knowledge, the information provided the Loan Schedule relating to the account number, book value as of the Transfer Date, the primary and Secondary accountholder's names, addresses, and social security numbers, charge-off date, breakdown of principal and interest, and the date of last payment, and the annual percentage rate was materially accurate as of the Transfer Date." Murphy-Sharkey Aff. Ex. A at Section 8.3 (MCM-0957).

54.     Mr. Sharkey testified that the language of the FDCPA recited in the default-judgment affidavit that Defendants filed against him in state court left him with the false impression there was a court presumption against him due to his alleged failure to dispute the debt

after receiving Midland's validation letter. (*Id*. 383:8-21).

> **Response:** Denied as stated. Sharkey did not testify that he ever saw the default judgment affidavit before his deposition. *See* Frank Decl. Ex. 4-B at 381:14-383:21. Sharkey agreed with his counsel that at the time of his deposition, reviewing paragraph 9 of the default judgment affidavit, he assumed that the affidavit's text meant that the debt would be assumed valid by the court. Frank Decl. Ex. 4-B at 382:16-383:21.

55.     Ms. McNally testified that she believes she paid more than she should have in order to resolve the judgment. (Frank Decl. Ex. 4-C at 53:5-:11; 54:20-55:11; 172:11-:22).

> **Response:** Admit. Further responding, McNally admitted that she borrowed $5,000 from Beneficial (Johnson Decl. Ex. M-K at 32:2-4), that Beneficial charged interest in the loan (Johnson Decl. Ex. M-K at 32:11-16), that she received a check in the amount of $5,000 from Beneficial that she signed, thus entering into a loan agreement with Beneficial (Johnson Decl. Ex. M-K at 55:22-58:2) and that she understood at her deposition how the judgment against her came to total $7,216.41 (Johnson Decl. Ex. M-K at 104:20-107:24). With interest and costs included, the judgment amount as entered was $7,216.41. Frank Decl. Ex. 1-C at F&G 016 (transcript of judgment).

56.     Ms. McNally was emotionally harmed by Defendants' conduct. She saw a psychiatrist for her ills. (*Id*. 166:14-:21; 167:21-168:14).

> **Response:** Admit that McNally so testified. Further responding, McNally also testified that she was not sure if Forster & Garbus did anything wrong in connection with collecting her debt but felt wronged because her bank account became frozen after she failed to satisfy the judgment against her. Johnson Decl. Ex. M-K at 133:14-134:10.

57.     Mr. Agoado testified that the accounts in question were opened without his

knowledge by his now-deceased wife, who struggled with gambling addiction. (Frank Decl. Ex. 4-D at 10:16-:18; 11:22-:25; 13:18-:22; 14:3-:12; 15:8-:10; 38:5-42:4; 43:23-45:4; 45:2-:4; 45:23-46:16; 46:21-47:5; 47:23-50-2; 64:10-:14; 67:8-:23; 68:12-69:6; 70:15-71:13; 107:7-:9; 142:5-:7).

      **Response:**    Admit that Mr. Agoado testified that the accounts in question were opened by his wife. Deny that the testimony identified in ¶ 57 supports the claim that Mr. Agoado's wife is deceased and deny that the testimony identified supports the claim that Mr. Agoado's wife struggled with a gambling addiction. *See* Frank Decl. Ex. 4-D at 10:16-:18; 11:22-:25; 13:18-:22; 14:3-:12; 15:8-:10; 38:5-42:4; 43:23-45:4; 45:2-:4; 45:23-46:16; 46:21-47:5; 47:23-50-2; 64:10-:14; 67:8-23; 68:12-69:6; 70:15-71:13; 107:7-:9; 142:5-:7. Admit that Mr. Agoado did testify his wife was deceased and did gamble. Further, Mr. Agoado never contacted HSBC to inform them that he had not opened the account himself. Johnson Decl. Ex. M-J at 112:8-113:25. Mr. Agoado also did not notify anyone that his wife had taken out a Chase account in his name. *Id.* at 141:24-142:11.

58.    Midland and C&S were aware of Mr. Agoado's noninvolvement with these alleged accounts at the time of the underlying collection actions against him. (*Id.* 39:8-41:2; 56:25-57:24).

      **Response:**    Denied. Frank Decl. Ex. 4-D at 39:8-41:2 fails to provide any support for this contention. Frank Decl. Ex. 4-D does not include pages 56-57 of the Agoado deposition. Further responding, Mr. Agoado testified that his wife forged his name to credit documents and that she was very good at forging his name. Frank Decl. Ex. 4-D at 69:18-71:12.

59.    Mr. Agoado was left emotionally distressed by Midland and C&S's conduct against him, which culminated with publicly recorded judgments that negatively affect his personal and financial reputation. (*Id.* 175:9-19).

> **Response:**      Denied. Page 175 of the Agoado deposition is not included in Frank Decl. Ex. 4-D.

**Defendants Never Mailed Plaintiffs Documents Correctly Quoting The FDCPA**

60.      At deposition defense counsel introduced the default-judgment affidavit submitted in state court against each Plaintiff, as an exhibit for that Plaintiff to review during deposition, counsel asked, "Do you remember receiving this document in the mail?" (Frank Decl. Ex. 4-B at 150:6–:21).

> **Response:**      Denied as stated. Admit that the cited portion of the Sharkey deposition shows that defense counsel showed Mr. Sharkey Exhibit Sharkey 6 and asked if Mr. Sharkey recognized the document. Denied that Plaintiffs cited to evidence as to what any of several defense attorneys asked any Plaintiff other than Mr. Sharkey.

61.      Plaintiff Sharkey does not recall any letter in the mail from Midland prior to suit being filed, and containing a correct recitation of Section 809 of the FDCPA. (Frank Decl. Ex. 4-B at 306:2–:22).

> **Response:**      Denied. Page 306 of the Sharkey deposition is not included as part of Frank Decl. Ex. 4-B. Reference to the page 306 of the deposition transcript shows that it does not provide support for the facts asserted in this paragraph.

62.      Plaintiff McNally does not recall any letter in the mail from Midland prior to suit being filed, and containing a correct recitation of Section 809 of the FDCPA. (Frank Decl. Ex. 4-C at 220:15–221:5).

> **Response:**      Denied. The cited text provides no support for the alleged facts identified. To the contrary, the cited testimony establishes that Ms. McNally testified that McNally Exhibit 19, marked MCM-311 to MCM-313, did not look familiar.

63.     Plaintiff Agoado does not recall any letter in the mail from Midland prior to suit being filed, and containing a correct recitation of Section 809 of the FDCPA. (Frank Decl. Ex. 4-D at 88:21–89:12).

> **Response:**     Denied. The cited testimony reflects that Mr. Agoado confirmed that a letter marked Exhibit Agoado 13 (MCM-0127 to MCM-0129) was properly addressed to his residence but that he did not recall seeing the letter before.

64.     Defendants have provided no proof of mailing of any such letters.

> **Response:**     Denied. Plaintiffs fail to provide a citation to evidence which would be admissible as required under Local Rule 56.1(d).

## Statement of Additional Facts

65.     In the agreement under which the McNally debt was purchased, § 4.6 provides that the seller represented that to "the best of Seller's knowledge, all Accounts are the legal, valid and binding obligation of the applicable Borrowers and there are no credits or offsets that exist against such Account;" in Section 4.9, the seller represents that "[a]ll information provided by Seller and/or its agents related to the Accounts including, without limitation, the information set forth in the Sale File, is (a) materially complete and materially accurate; (b) constitutes Seller's own business records that pertain to such Accounts and accurately reflects in all material respects the information in Seller's database; (c) was kept in the regular course of business at or near the time the underlying activity occurred by a person with knowledge of the data entered into and maintained in the Seller's database; and (e) it is the regular practice of Seller's business to maintain and compile such data." Murphy-McNally Aff. Ex. A at §§ 4.6 & 4.9 (MCM-0971 to MCM-0972). Further, the seller warrants that "[t]o the best of Seller's knowledge, all Account data transferred to Purchaser by means of electronic media is materially accurate" and that the seller was the

original lender. Murphy-McNally Aff. Ex. A at §§ 4.12 & 4.15 (MCM-0972).

66.     The purchase agreements that MF entered into to purchase the accounts of Plaintiffs each specifically provide that Midland will obtain certain account-level documentation at purchase and may request further account-level documentation after purchase. Murphy-Agoado Aff. Ex. L at Part 6(d) (MCM-001232)  (providing that purchaser shall, to the extent such account statements are reasonably available, be entitled to receive digitized media representing eighteen months of account statements for a minimum of 85% of the Charged-off Accounts within 30 days of purchase of the debts) and Part 6(a) (NCN-001231) (providing that Midland can obtain copies of signed Account applications, applicable terms and conditions and other media relating to the Charged-off accounts from the seller of Agoado's Chase account either for free or at a de minimus cost); Murphy-Agoado Aff. Ex. A at Part 11 (MCM-0877) (providing that the seller  of Agoado's HSBC account shall, to the extent Account Documents are reasonably available, provide Purchaser with an electronic copy of approximately 60% of all account documents at no charge, upon request as needed for the next 90 days and for a $10 fee thereafter); Murphy-McNally Aff. Ex. A at Part 11 (MCM-0977) (providing that the seller of McNally's account shall, to the extent Account Documents are reasonably available, provide Purchaser with an electronic copy of approximately 60% of all account documents at no charge, upon request as needed for the next 90 days and for a $10 fee thereafter); Murphy-Moore Aff. Ex. A at Part 5.3(a) (MCM-0904 to MCM-0905) (providing that the seller of Moore's account shall provide account documents at no charge upon request for the first twelve months after purchase and for a small fee thereafter); Murphy-Pierre Aff. Ex. A at Part 6 (MCM-1000 to MCM-1001) (providing that the seller of Pierre's account shall, for three years after the purchase of accounts, provide account media at no charge for a portion of the accounts and a small fee for further media; further that the purchaser is entitled to receive

digitized media, to the extent reasonably available, representing eighteen months of account statements for at least 85% of the accounts transferred); Murphy-Sharkey Aff. Ex. A at Part 3.1 (MCM-0949) (providing that the seller of Sharkey's account will provide account media for up to 10% of the accounts sold in the first twelve months after purchase at no charge and for a fee should the number of accounts for which media is requested exceeds 10% or are requested over a year after purchase of the accounts); Murphy-Vazquez Aff. Ex. A at Part 4.4 (MCM-1023 to MCM-1024) (providing that the seller of Vazquez's account shall provide chains of title for each purchased account, with provide terms and conditions of accounts upon request and will provide other account media at the prices set forth in Ex. D to the agreement (at MCM-1035 to MCM-1036).

67.     At the time of purchase, each seller provided an electronic spreadsheet that included, for each account, the account number, along with the consumer's name, Social Security number, address and balance. Murphy-Agoado Ex. B (Household/HSBC account data); Murphy-Agoado Ex. G (Chase account data); Murphy-McNally Ex. B (Beneficial account data); Murphy-Moore Ex. B (General Electric Capital Corp. account data); Murphy-Pierre Ex. B (Chase Bank USA, N.A. account data); Murphy-Sharkey Ex. B (Bank of America account data); Murphy-Vazquez Ex. B (Chase Bank/WaMu account data provided by SquareTwo Financial Corp.).

68.     Further, the sellers provided additional data and documents as set forth below:

**68(a) Agoado- Chase:** Upon completion of the portfolio sale with Chase that included Agoado's Chase account, Chase provided, to the extent that account statements were reasonably available, digitized media representing eighteen months of account statements for a minimum of 85% of the charged-off accounts (Murphy-Agoado Chase Aff. II ¶ 5 & Ex. L at Part 6(d) (MCM-001232)) and, for each account, seller's account number, the debtor and co-debtor's name, the social security number of the debtor, the debtor's

address, the unpaid balance amount and the charge off date. Chase also contracted to provide, if available, the co-debtor's social security number, the debtor's home and work phone numbers, the last payment date, the last payment amount, the charge off amount, the contract date and the first date of delinquency. Murphy-Agoado Chase Aff. Ex. L at Agreement Ex. D (MCM-001246). Specifically to Agoado, Chase provided Agoado's name, account number, contract date, address, home phone, social security number, charge off date, last payment date, last payment amount and outstanding balance. *Id.* ¶ 8 & Ex. G (MCM-0268). Chase also provided several months of account statements for Agoado's Chase account. *Id.*¶ 9 & Ex. H (S&S000042-000081). Finally, Chase provided the terms and conditions applicable to Agoado's Chase account. Murphy-Agoado Chase Aff. ¶ 11; Murphy-Agoado Ex. J.

**68(b) Agoado-HSBC:** Upon completion of the portfolio sale with HSBC that included Agoado's HSBC account, HSBC provided the "Sale File" containing at a minimum for each account the account number, borrower name, borrower social security number, account balance, borrower address, date of last payment, date of delinquency and date of charge off as well as 60% of the account documentation, consisting of applications, statements and records, copies of previous payment checks, driver's licenses, correspondence, contracts or other documents relating to the accounts. Murphy-Agoado HSBC Aff. ¶ 5 & Ex. A at Agreement Ex. C (MCM-0888). Specifically as to Agoado's HSBC account, HSBC Consumer Lending USA provided Agoado's account number, name, social security number (partially redacted in exhibit), address, contract date, date of last payment, balance due, identity of original lender, date of birth, charge off amount, accrued interest amount and amount of last payment. Murphy-Agoado HSBC Aff. ¶ 8 & Ex. B (MCM-0180). HSBC also provided an arbitration rider, personal credit line account

agreement *signed by Agoado* and a revolving loan voucher, which HSBC represented governed Agoado's account. *Id.* ¶ 10 & Ex. D.

 **68(c) McNally:** Upon completion of the portfolio sale with HSBC that included McNally's HSBC account, HSBC provided the "Sale File" containing at a minimum for each account purchased the account number, borrower name, borrower social security number, account balance, borrower address, date of last payment, date of delinquency and date of charge off as well as 60% of the account documentation for the pool of accounts, consisting of applications, statements and records, copies of previous payment checks, driver's licenses, correspondence, contracts or other documents relating to the accounts. Murphy-McNally Aff. ¶ 6 & Ex. A at Agreement Ex. C (MCM-0988). Specifically as to McNally's account, HSBC provided her account number, name, social security number, home phone, work phone, address, date account was opened, last payment date, amount of debt, identity of her original creditor, date of birth, amount of interest accrued and her last payment amount. Murphy-McNally Aff. ¶ 8 & Ex. B (MCM-0314). HSBC also provided a copy of the offer of credit and governing terms and conditions that the original creditor (Beneficial) provided to McNally (*id.* ¶ 9 & Ex. C (MCM-0316-0317)) and a copy of the front and back of the offer as accepted by McNally in the form of a $5,000 check endorsed and payable to McNally (*id.* ¶ 10 & Ex. D (MCM-0318-0319)).

 **68(d) Moore:** Upon completion of the purchase that included Plaintiff Moore's account, his original creditor provided a data file including, for each account, the original account number, the social security number, the home telephone number, the work telephone number, the charge off amount, the last payment date, the open date and the charged off date. Murphy-Moore Aff. ¶ 6 & Ex. A at Part 27 of Exhibit to Agreement (MCM-0930). Specific

to Moore's account, GE Money Bank provided his account number, name, social security number, address, home telephone number, date account was opened, date account was charged off, date of last payment, amount of last payment, balance and the identity of the entity under which the account was branded (JC Penney Consumer). Murphy-Moore Aff. ¶ 8 & Ex. B (MCM-0365).

**68(e) Pierre:** Upon completion of the portfolio sale with Chase that included Plaintiff Pierre's Chase account, Chase provided, to the extent that account statements were reasonably available, digitized media representing eighteen months of account statements for a minimum of 85% of the charged-off accounts (Murphy-Pierre Aff. ¶ 6 & Ex. A at Part 6(d) (MCM-1000 to MCM-1001)) and, for each account, the seller's account number, the debtor and co-debtor's name, the social security number of the debtor, the debtor's address, the unpaid balance amount and the charge off date. Chase also provided, if available, the co-debtor's social security number, the debtor's home and work phone numbers, the last payment date, the last payment amount, the charge off amount, the contract date and the first date of delinquency. Murphy-Pierre Aff. ¶ 6 & Ex. A at Agreement Ex. D (MCM-1014). Specifically to Pierre's account, Chase Bank USA, N.A. provided his name, account number, balance, date account was opened, address, home telephone number, work number, social security number, charge off date, date of last payment and amount of last payment. Murphy-Pierre Aff. ¶ 8 & Ex. B (MCM-0004). Chase also provided a series of account statements for Pierre's account dated August 3, 2007 through January 3, 2009 (Murphy-Pierre Aff. ¶ 9 & Ex. C (MCM-0010-0045)) and two sets of the terms and conditions that governed, at different times, Pierre's former Chase account (Murphy-Pierre Aff. ¶ 10 & Ex. C (MCM-0047-0052)).

**68(f) Sharkey:** Upon completion of the portfolio sale with FIA Card Services, N.A. that included Plaintiff Sharkey's FIA Card Services, N.A. account, FIA provided, to the extent available, Sharkey's loan number, the name, address, social security number and telephone number of the obligor, name of any co-maker, date of charge-off, the last payment date, the interest rate immediately preceding charge-off and the current balance. Murphy-Sharkey Aff. ¶ 5 & Ex. A at Section 1.14 (MCM-0946). Specific to Sharkey's account, FIA provided Sharkey's account number, charge off date, name, address, social security number, two telephone numbers, balance, last payment amount, date of last payment, date account was opened, Sharkey's date of birth and credit card affinity entity. Murphy-Sharkey Aff. ¶ 8 & Ex. B (MCM-0667).  Further, FIA provided a copy of the charge-off statement for Mr. Sharkey's account. Murphy-Sharkey Aff. ¶ 9 & Ex. C thereto (MC0670-0671). FIA also provided the terms and conditions for Mr. Sharkey's account. *See* Frank Decl. Ex. H-5 at MCM-0604-0665. Midland obtained these terms and conditions upon purchase of the account. *Id.* at MCM-0596 (providing that Sharkey's creditor sold a pool of charged-off accounts to MF and "electronic records and other records were transferred on individual accounts" to MF; *id.* at MCM-0604-0665 (the terms and conditions provided for Plaintiff's account); Murphy-Sharkey Aff. ¶¶ 3, 7 (affirming that MF purchased Sharkey's former FIA account and FIA provided media in computerized form regarding each charged-off debt MF purchased).

**68(g) Vazquez:** Upon completion of the portfolio sale with Square Two Financial Corp/CACV of Colorado, LLC/CACH, LLC, the sellers provided certain information related to each account transferred, which the sellers warranted was kept in the regular course of business. Murphy-Vazquez Aff. ¶ 5 & Ex. A. Specific to the Vazquez account, the sellers

provided Vazquez's account number, credit originator, date account was opened, date account was charged off, balance due, social security number, name, employer, address and home telephone number. Murphy-Vazquez Aff. ¶ 8 & Ex. B. The sellers also provided an account statement for Vazquez's account (issued by Chase) dated April 17, 2009, and the terms and conditions applicable to Vazquez's account. Murphy-Vazquez Aff. ¶¶ 9-10 & Exs. C (MCM-0069-70) & D (MCM-0071-79).

69.     When MF purchased the Vazquez account, the seller (SquareTwo Financial Corp.) represented in the purchase agreement that it had purchased the debt from Chase Manhattan Bank USA, N.A. Murphy Vazquez Aff. ¶¶ 4-5.

70.     In the purchase agreement, the seller included representations that it was the sole owner of the account and that the information provided regarding the accounts purchase was accurate, stating that the account information provided to MF constituted the seller's own business records "together with the unadulterated electronic records of Seller's predecessor in interest [Chase]." Murphy-Vazquez Aff. ¶ 10.

71.     SquareTwo transferred the information regarding the portfolio of debts sold to MF in computerized form through a spreadsheet containing account level information as well as medial file containing documents associated with each account. Murphy-Vazquez Aff. ¶ 13.

72.     As the information SquareTwo provided bore indicia of reliability (*see* Murphy-Vazquez Aff. ¶¶ 10, 14-15) Midland was able to incorporate the information into Midland's system of record and rely thereupon (Murphy-Vazquez Aff. ¶¶ 16-17).

73.     In addition to providing general data about the Vazquez account (Murphy-Vazquez Aff. ¶ 18), SquareTwo and/or its subsidiaries provided MF with an account statement from Vazquez's Chase account and a copy of the terms and conditions applicable to the account

(Murphy-Vazquez Aff. ¶¶ 19-20.

74.     Midland produced copies of each initial letter sent to Agoado, McNally and Sharkey, including the proper § 1692g language, as well as affidavits attesting to the mailing of those letters. *See* Murphy-Agoado Chase Aff. ¶ 16 (citing letter marked Murphy-Agoado Ex. I); Murphy-Agoado HSBC Aff. ¶ 16 (citing letter marked Murphy-Agoado Ex. C); Murphy-McNally Aff. ¶ 18 (citing letter marked Murphy-McNally Ex. E); Murphy-Sharkey Aff. ¶ 16 (citing letter marked Murphy-Sharkey Ex. C).

75.     Agoado confirmed that Midland's initial letter to him concerning his HSBC account, dated September 3, 2011, marked MCM-127 to MCM-129, was properly addressed to him at his residence at the time. Johnson Decl. Ex. M-J at pp. 88-89 (discussing Murphy-Agoado Ex. C). The letter includes the proper § 1692g language. Murphy-Agoado Ex. C at MCM-128.

76.     Agoado confirmed that Midland's initial letter to him concerning his Chase account, dated September 26, 2011, marked S&S 38-40 (included as Murphy-Agoado Ex. I), was properly addressed to him at his address in 2011. Johnson Decl. Ex. M-J at p. 150. The letter includes the proper § 1692g language. Murphy-Agoado Ex. I at S&S 39.

77.     McNally confirmed that Midland's initial letter to her concerning her Beneficial account, which was dated October 19, 2011, marked MCM-311 to MCM-313, was properly addressed to her at his residence at the time. Johnson Decl. II Ex. M-R at pp. 221-226 (discussing Murphy-Agoado Ex. C).  The letter includes the proper § 1692g language. Murphy-Agoado Ex. C at MCM-312.

78.     Sharkey verified that an MCM letter regarding his former BOA account, dated March 31, 2011, was properly addressed to him at his residence at the time and said it was possible he had received it. Johnson Decl. Ex. M-N at 305:2-22; Murphy-Sharkey Ex. D. The

letter includes the proper 1692g language. Murphy-Sharkey Ex. D at MCM-602.

79.     Each of the agreements pursuant to which Midland purchased Plaintiffs' accounts included multiple representations that the records were complete and accurate to the best of the seller's knowledge. Murphy-Agoado Chase Aff. ¶ 8; Murphy-Agoado HSBC Aff. ¶ 8; Murphy-McNally Aff. ¶ 8; Murphy-Moore Aff. ¶¶ 8-9; Murphy-Pierre Aff. ¶ 9; Murphy-Sharkey Aff. ¶ 8; Murphy-Vazquez Aff. ¶ 10.

Dated: January 13, 2022

                              Respectfully submitted,

                              **GORDON REES SCULLY MANSUKHANI, LLP**

                              Matthew B. Johnson
                              One Battery Park Plaza, 28th Floor
                              New York, New York 10004
                              Tel: (212) 402-2298
                              Fax: (212) 269-5505
                              mbjohnson@grsm.com

                              Andrew M. Schwartz
                              Three Logan Square
                              1717 Arch St., Suite 610
                              Philadelphia, PA 19103
                              Tel: (215) 717-4023
                              Fax: (215) 693-6650
                              Amschwartz@grsm.com

                              *Attorneys for Defendants,*
                              *Midland Funding, LLC,*
                              *Midland Funding, LLC d/b/a in New York as Midland*
                              *Funding of Delaware, LLC,*
                              *and Midland Credit Management, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID AGOADO, LEEANN MCNALLY, CRAIG MOORE, CHRIS PIERRE, THOMAS SHARKEY AND DOREEN VAZQUEZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MIDLAND FUNDING, LLC, MIDLAND FUNDING, LLC DBA IN NEW YORK AS MIDLAND FUNDING OF DELAWARE, LLC, MIDLAND CREDIT MANAGEMENT, INC., RUBIN & ROTHMAN, LLC, FORSTER & GARBUS LLP, COHEN & SLAMOWITZ, LLP and PRESSLER & PRESSLER LLP, <br><br> Defendants. | Civil Action No. <br> **2:14-cv-00018 (WFK)(ST)** |

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January 2022, a copy of **DEFENDANT MIDLAND FUNDING, LLC AND MIDLAND CREDIT MANAGEMENT, INC.'S RESPONSE TO LOCAL CIVIL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** was served via e-mail to all counsel of record.

Matthew B. Johnson

1195301/63861550v.1