# Exhibit E

# In The Matter Of:

*DAVID AGOADO, et al. v.*
*MIDLAND FUNDING, LLC, et al.*

---

*MITCHELL SELIP*
*August 05, 2015*

---

## Cindy Afanador

### COURT REPORTING, INC.

Conference Suites
MANHATTAN –BRONX –BROOKLYN ·QUEENS
GARDEN CITY –·MELVILLE –HAUPPAUGE ·RIVERHEAD

HTTP://WWW.CINDYCOURTREPORTING.COM
**1-877-337-6968**

*Original File FINAL SELIP.txt*
*Min-U-Script®*

## Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NEW YORK

 3    -------------------------------x

 4    DAVID AGOADO, LEEANN
      McNALLY, CRAIG MOORE,
 5    CHRIS PIERRE, THOMAS
      SHARKEY, MADGE SHIPMAN,
 6    and DOREEN VAZQUEZ,
      individually and on
 7    behalf of all other
      similarly situated,

 8
                Plaintiffs,
 9
           vs.              Index No.:
10                          14-cv-00018-LDW-ARL

11    MIDLAND FUNDING, LLC,
      MIDLAND FUNDING, LLC
12    DBA IN NEW YORK AS MIDLAND
      FUNDING OF DELAWARE, LLC,
13    and MIDLAND CREDIT
      MANAGEMENT, INC., et al.,

14
15              Defendants.
      -------------------------------x
16
17              AUGUST 5, 2015

18              9:19 a.m.

19

20        Deposition of MITCHELL SELIP, ESQUIRE,

21    held at the offices of WILSON, ELSER,

22    MOSKOWITZ, EDELMAN & DICKER, LLP, 150 East 42nd

23    Street, New York, New York 10017, before

24    Suzanne J. Stotz, a Certified Court Reporter,

25    and a Notary Public of the State of New York.
```

## Page 2

```
 1    A P P E A R A N C E S:

 2

 3    Attorneys for the Plaintiffs:

 4         FRANK LLP
                275 Madison Avenue, Suite 801
 5              New York, New York 10016
                (212) 682-1818
 6              gfrank@frankandbianco.com
                jsaltzman@frankandbianco .com
 7         BY:  GREGORY A. FRANK, ESQ., and
                JAY SALTZMAN, ESQ.
 8
                       and
 9
           BIANCO, BYRNES & FINKEL, LLP
10              5036 Jericho Turnpike, Suite 2018
                Commack, New York 11725
11              (631) 462-4911
                afinkel@sclf.com
12         BY:  ALAN FINKEL, ESQ. (Telephonic)

13

14    Attorneys for the Defendant, Midland Funding,
      LLC and Midland Credit Management, Inc.:
15
           MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
16              2000 Market Street
                Philadelphia, Pennsylvania 19103
17              (215) 575-2765
                amschwartz@mdwcg.com
18         BY:  ANDREW M. SCHWARTZ, ESQ.

19

20    Attorneys for the Defendant, Selip & Stylianou,
      and the Witness:

21    WILSON, ELSER, MOSKOWITZ, EDELMAN &
           DICKER, LLP,
22              150 East 42nd Street
                New York, New York 10017
23              (212) 915-5638
                joseph.francoeur@wilsonelser.com
24         BY:  JOSEPH L. FRANCOEUR, ESQ., and
                JULIA FERRO, ESQ.
25
```

## Page 3

```
 1    A P P E A R A N C E S:  (Continued)

 2

 3    Attorneys for the Defendant, Rubin & Rothman,
      LLC:
 4
           ROBERT L. ARLEO, ESQUIRE
 5              380 Lexington Avenue, 17th Floor
                New York, New York 10168
 6              (212) 551-1115
                robertarleo@gmail.com
 7         BY:  ROBERT L. ARLEO, ESQ. (Telephonic)

 8

 9    Attorneys for the Defendant, Forster & Garbus,
      LLP:
10
           DAVIDSON FINK, LLP
11              28 East Main Street, Suite 1700
                Rochester, New York 14614
12              (585) 546-6448
                gfjermedal@davidsonfink.com
13         BY:  GLENN M. FJERMEDAL, ESQ.

14

15    In-house Attorneys for Pressler & Pressler,
      LLP:
16
           PRESSLER & PRESSLER, LLP
17              7 Entin Road
                Parsippany, New Jersey 07054
18              (973) 753-5100 x5134
                mwilliamson@pressler-pressler.com
19         BY:  MITCHELL L. WILLIAMSON, ESQ.

20

21

22

23

24

25
```

## Page 4

```
 1                  I N D E X

 2

 3              EXAMINATION

 4                                         Page No.

 5    MITCHELL SELIP

 6         BY MR. SALTZMAN                     9

 7

 8

 9              E X H I B I T S

10

11    Exhibit
      Name      Description               Page No.
12
      1    Plaintiffs' Amended Rule 30       28
13         (b) (6) Deposition Notice to
           Cohen & Slamowitz, dated
14         April 10, 2015

15    2    Plaintiffs' Second Amended        28
           Rule 30 (b) (6) Deposition
16         Notice to Cohen & Slamowitz,
           dated April 10, 2015
17
      3    Collection Agreement             36
18
      4    Screen shots                    137
19

20         (Exhibits attached to transcript.)

21

22

23

24

25
```

Case 2:14-cv-00018-WFK-ST   Document 35-4   Filed 02/02/17   Page 4 of 52 PageID #: 6202
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.
MITCHELL SELIP
August 05, 2015

Page 5

1        I N D E X (Continued)
2
3        R E Q U E S T S
4
5  Requests
   Name      Description              Page No.
6
7  1   Organizational Chart for          27
       Cohen & Slamowitz
8  2   Manual of Midland Funding,        41
       LLC's expectations and codes
9
10 3   Interface Table                   48
11 4   Cohen & Slamowitz, LLP,           49
       internal codes corresponding
12     with Midland Funding, LLC's
       codes
13 5   Amendments to the Midland         71
       Funding, LLC, manual
14     requested in Request No. 2
15 6   Drafts of amendments to the       72
       manual, drafts to the
16     agreement, and any e-mail in
       connection with either
17
   7   Signed agreement documents        73
18     and communications between
       Cohen & Slamowitz and
19     Midland Funding, LLC in
       connection with the manual
20     and/or agreements
21 8   Notification and production       73
       of other agreements
22
23 9   Production of e-mail             113
       communications
24 10  E-mails from Midland            188
       Funding, LLC indicating
25     changes to procedures

Page 6

1                  S T I P U L A T I O N S
2
3      IT IS STIPULATED AND AGREED by and
4  between the attorneys for the respective
5  parties herein, and in compliance with Rule
6  221 of the Uniform Rules for the Trial Courts.
7      THAT the parties recognize the provision
8  of Rule 3115 subdivisions (b), (c) and/or (d).
9  All objections made at a deposition shall be
10 noted by the officer before whom the
11 deposition is taken, and the answer shall be
12 given and the deposition shall proceed subject
13 to the objections and to the right of a person
14 to apply for appropriate relief pursuant to
15 Article 31 of the CPLR.
16     THAT every objection raised during a
17 deposition shall be stated succinctly and
18 framed so as not to suggest an answer to the
19 deponent and, at the request of the
20 questioning attorney, shall include a clear
21 statement as to any defect in form or other
22 basis of error or irregularity. Except to the
23 extent permitted by CPLR Rule 3115 or by this
24 rule, during the course of the examination
25 persons in attendance shall not make

Page 7

1  statements or comments that interfere with the
2  questions.
3      THAT a deponent shall answer all
4  questions at a deposition, except (1) to
5  preserve a privilege or right of
6  confidentiality, (ii) to enforce a limitation
7  set forth in an order of a court, or (iii)
8  when the question is plainly improper and
9  would, if answered, cause significant
10 prejudice to any person. An attorney shall
11 not direct a deponent not to answer except as
12 provided in CPLR Rule 3115 or this
13 subdivision. Any refusal to answer or
14 direction not to answer shall be accompanied
15 by a succinct and clear statement of the basis
16 therefore. If the deponent does not answer a
17 question, the examining party shall have the
18 right to complete the remainder of the
19 deposition.
20     THAT an attorney shall not interrupt the
21 deposition for the purpose of communicating
22 with the deponent unless all parties consent
23 or the communication is made for the purpose
24 of determining whether the question should not
25 be answered on the grounds set forth in

Page 8

1  Section 221.2 of these rules and, in such
2  event, the reason for the communication shall
3  be stated for the record succinctly and
4  clearly.
5      THAT failure to object to any question
6  or to move to strike any testimony at this
7  examination shall not be a bar or waiver to
8  make such objection or motion at the time of
9  the trial of this action, and is hereby
10 reserved and
11     THAT this examination may be signed and
12 sworn to by the witness examined herein before
13 any Notary Public, but failure to do so or to
14 return the original of the examination to the
15 attorney on whose behalf the examination is
16 taken shall not be deemed a waiver of the
17 rights provided by Rules 3116 and 3117 of the
18 CPLR, and shall be controlled thereby, and
19     THAT certification and filing of the
20 original of this examination are waived; and
21     THAT the questioning attorney shall
22 provide counsel for the witness examined
23 herein with a copy of this examination at no
24 charge.
25

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

**Page 9**

1              M. SELIP
2        M I T C H E L L    S E L I P,
3 c/o Selip & Stylianou, 199 Crossway Parks
4 Drive, Woodbury, New York 11797, having first
5 been duly sworn by a Notary Public, was
6 examined and testified as follows:
7
8 EXAMINATION BY
9 **MR. SALTZMAN:**
10    Q.   Good morning, Mr. Selip.
11    **A.   Good morning.**
12    Q.   My name is Jay Saltzman,
13 representing the plaintiffs in this action.
14       Would you state your name and
15 address for the record, please.
16    **A.   Mitchell Selip, care of Selip &**
17 **Stylianou, 199 Crossway Parks Drive, Woodbury,**
18 **New York 11797.**
19    Q.   And just briefly, some ground rules
20 for the deposition. I'll ask you questions;
21 obviously you'll answer. And let's try not to
22 speak over each other so that it is easier for
23 the court reporter.
24       If there are any -- if you need any
25 breaks -- I understand you've got some back

---

**Page 10**

1              M. SELIP
2 issues. If you need some breaks, feel free.
3       You might hear your counsel object
4 to certain questions. Unless he instructs you
5 not to answer the question, answer those
6 questions.
7       Is there any reason you can't
8 testify truthfully today, Mr. Selip?
9    **A.   No.**
10    Q.   Are you on any medications today
11 that would impede or impair your testimony
12 today, sir?
13    **A.   No.**
14    Q.   Sir, could you tell us your
15 educational background since high school, after
16 high school?
17    **A.   Went to University of Florida for**
18 **college; obtained a B.S. in business. Went to**
19 **St. John's for law school. Thereafter, went to**
20 **Hofstra University for several years for**
21 **computer science.**
22    Q.   Why did you go to Hofstra for
23 computer science?
24    **A.   I was considering changing**
25 **professions and leaving the noble profession of**

---

**Page 11**

1              M. SELIP
2 **law back in the early '90s.**
3    Q.   Did you practice law after
4 graduating from St. John's?
5    **A.   Yes, I did.**
6    Q.   For how many years?
7    **A.   I graduated in '91. I've been**
8 **practicing since then.**
9    Q.   What was your first job after
10 St. John's?
11    **A.   It was with the Town of Babylon**
12 **Attorney's Office as an assistant town**
13 **attorney.**
14    Q.   What year did you start there?
15    **A.   I started as a law clerk while I**
16 **was in law school. I don't remember the exact**
17 **year. I believe I started in '89.**
18    Q.   How long were you there, about?
19    **A.   I left either '91 or '92,**
20 **probably '92.**
21    Q.   And when you took the computer
22 science courses, it was around that time?
23    **A.   No. It was -- it was after that.**
24    Q.   So did you do the computer science
25 courses at night?

---

**Page 12**

1              M. SELIP
2    **A.   I did. After the town attorney's**
3 **office -- I left there. I don't remember when.**
4 **I worked in Manhattan for a firm by the name of**
5 **Zeichner, Ellman & Krause for two years.**
6       **After that I worked for a firm by**
7 **the name of Jaffe & Asher for a little less**
8 **than a year.**
9       **I left that office October '94 to**
10 **go work for Upton, Cohen & Slamowitz at the**
11 **time.**
12       **At that time I started night school**
13 **at Hofstra for the computer science classes,**
14 **which I did for approximately two to three**
15 **years at night.**
16    Q.   And in the end, you never pursued
17 anything having to do with computer science?
18    **A.   Well, I can't say that that's**
19 **wholly an accurate statement. A lot of what I**
20 **do has to do with computers now, so the**
21 **education was very -- is very relevant to what**
22 **I do now.**
23    Q.   How is it relevant to what you do
24 now?
25    **A.   A lot of the programming and**

---

Case 2:14-cv-09003-WHK-AJOodocument 358174-312 e d F02e/11/217 a gPea ge 52 of 52 2 eaPga geID #502
6204
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 13

M. SELIP

1 technology involved in the business as well as
2 in communicating with our clients is done
3 electronically via computer programs. And my
4 office has written its own computer program to
5 handle much of those tasks.
6 My computer background has allowed
7 me to write some of the programs and manage the
8 IT staff that the office has, not generally but
9 specifically in that I'm able to review their
10 code and know what it says.
11 Q. When you say "review their code,"
12 who's "their"?
13 A. My firm's IT staff. We have
14 programmers on staff.
15 Q. So it's internal?
16 A. Yes, it is.
17 Q. Okay. And you mentioned that your
18 firm uses technology to communicate with
19 clients, plural, correct?
20 A. Plural as in more than one client?
21 Q. Correct.
22 A. Yes, that's correct.
23 Q. Okay. Who are the clients with
24 whom your firm currently communicates through

Page 14

M. SELIP

1 these commuter systems?
2 A. I know I won't be able to name them
3 all, so I will give you as many as I can
4 remember. The larger clients would be Capital
5 One, Citibank, Discover, OnCore, PRA,
6 Resurgent, Target. That's as best as I can do
7 in alphabetical order.
8 Q. That's fine. And what does your --
9 now, when we talk about "your firm," we are
10 talking about Selip & Stylianou, right?
11 But did there come a time
12 relatively recently when Selip & Stylianou
13 acquired or let's just say acquired Cohen &
14 Slamowitz?
15 A. No.
16 Q. What was -- what's the relationship
17 between Cohen & Slamowitz and Selip &
18 Stylianou?
19 A. It's the same firm.
20 Q. Was there any kind of acquisition?
21 A. No.
22 Q. Was there a merger?
23 A. No.
24 Q. Was there a prior firm before

Page 15

M. SELIP

1 Selip & Stylianou other than Cohen & Slamowitz?
2 A. It's the same firm. So the other
3 than is not working in that question.
4 Q. So the name just changed?
5 A. Yes.
6 Q. Why?
7 A. The the firm took on three
8 additional partners, and we changed the name.
9 Q. Okay. So substantively it's the
10 same firm?
11 A. It is the same firm.
12 Q. So during the course of our
13 deposition today, when I refer to S&S or
14 Selip & Stylianou, I'll be referring to the
15 prior firm also, the predecessor firm, Cohen &
16 Slamowitz, just so we are not confused; is that
17 okay with you?
18 A. I prefer you refer to it as C&S.
19 Q. C&S? That's fine.
20 A. When it comes to litigation, when
21 they're on the defense side, I'd rather you
22 refer to it as C&S.
23 Q. Okay. Not a problem.
24 And among the firms you mentioned

Page 16

M. SELIP

1 was Encore, right?
2 A. Correct.
3 Q. And does C&S deal directly with
4 Encore, with any subsidiary of Encore?
5 A. I don't know the relationship
6 between all the different companies. The
7 entity that I represent is Midland Funding,
8 LLC, and I also work with Midland Capital
9 Management.
10 Q. Do you know the difference between
11 Midland Funding, LLC and Midland Capital
12 Management?
13 A. It's my understanding that Midland
14 Funding is the entity that holds the accounts
15 receivables bought by Encore, and those
16 receivables are managed by MCM.
17 Q. So we'll refer to them jointly as
18 Midland, or unless there's some specific
19 difference, that way it's easier for, I think,
20 both of us.
21 Now, you mentioned quite a number
22 of firms in addition to Encore. What is it
23 that C&S does for these companies?
24 MR. FRANCOEUR: I'd just like to

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 17

M. SELIP

1 object.  At some point we're going to go
2 off field.  Is this really relevant to the
3 litigation here?
4     **MR. SALTZMAN:** Yes, because we're
5 trying to set up the background; and then
6 we can be more specific as far as Encore.
7 **BY MR. SALTZMAN:**
8     Q.    Go ahead.
9     **A.    We represent the entities with**
10 **regard to the collection of outstanding**
11 **receivables as well as advising them on**
12 **policies and procedures related to the**
13 **collection of outstanding receivables, among**
14 **other things.**
15     Q.    You say that you also vice these
16 companies on policies and procedures regarding
17 the receivables.  Do you do that for Encore --
18 or for Midland, I should say?
19     **A.    Yes.**
20     Q.    And what sorts of policies are you
21 talking about?
22     **A.    At what point are we getting into**
23 **my client's -- which is privileged as to what I**
24 **can say that I advised them on?  Is that**

Page 18

M. SELIP

1 **speaking generally?**
2     Q.    Let's start with generally.
3     **MR. SCHWARTZ:** Let me put the
4 objection on the record ordinary, too.
5     On behalf of Midland Credit
6 Management and Midland Funding, I'm
7 raising an objection.  We're asserting
8 attorney/client privilege which is our
9 right; but beyond that, you can talk in
10 general terms.
11     **MR. FRANCOEUR:** I'm also going to
12 object on that basis.
13     **THE WITNESS:** Generally speaking, I
14 will advise them on best practices related
15 to the debt collection aspect of their
16 business.  I would also advise them on
17 New York specific laws that would affect
18 their business.
19 **BY MR. SALTZMAN:**
20     Q.    Including changes in New York law?
21     **A.    Yes.**
22     Q.    And your response, does that
23 include procedures that you would advise
24 Midland about; or is that a separate item than

Page 19

M. SELIP

1 policies?
2     **MR. FRANCOEUR:** Object to form.
3     **THE WITNESS:** Whose procedures are
4 you now referring to?
5 **BY MR. SALTZMAN:**
6     Q.    Well, you testified that you advise
7 them on policies and procedures regarding debt
8 collection.  And you just gave an answer about
9 what you advised them on.
10     So I'm asking you, is what you
11 advise them inclusive on policies and
12 procedures or is it just policies?
13     **MR. FRANCOEUR:** Let's clarify.
14 Jay, the "them" in that question, is that
15 Midland?
16     **MR. SALTZMAN:** Midland, yes.
17     **MR. FRANCOEUR:** Midland.
18     **THE WITNESS:** Okay.  That's what I
19 was -- so yes.  The answer's yes.  Yes to
20 both.
21 **BY MR. SALTZMAN:**
22     Q.    Do you have any professional
23 licenses other than your law license?
24     **A.    I have a bartending certificate.**

Page 20

M. SELIP

1     Q.    We'll talk about that after the
2 deposition, maybe later.
3     What's your title at Selip &
4 Stylianou?
5     **A.    I don't know if I have one.**
6     Q.    Partner?
7     **A.    I'm a partner, yes.**
8     Q.    And what are your current
9 responsibilities other than what we just
10 discussed?
11     **A.    My responsibilities have not been**
12 **reduced to writing.  It encompasses anything**
13 **and everything that needs to be done; managing**
14 **the different departments within the firm,**
15 **communicating with clients, reviewing legal**
16 **work.  I don't think I'm doing my role justice.**
17 **I make coffee.  It encompasses a lot.**
18     Q.    Okay.  You just mentioned that you
19 manage different departments.  What departments
20 would those be?
21     **A.    We have what we call a contested**
22 **legal department.  We have a similar**
23 **department; it's a non-contested legal**
24 **department, and it supports the legal**

Case 2:14-cv-00008-WFK-AKT Document 85-4 Filed 02/22/17 Page 52 of 52 PageID #: 6206
Case 2:14-cv-00008-WFK-AKT Document 35-1 Filed 01/27/17 Page 8 of 52 PageID #: 504

Page 21

M. SELIP

1  department.  We have a collections department,
2  judgment enforcement, IT department.  There's
3  an accounting department.  I think that's it.
4      Q.    What does the contested legal
5  department do?
6      A.    That department will review new
7  claims when they come in from our clients.
8  They will review matters for suit to determine
9  whether or not those matters should be sued.
10 They handle contested legal matters, which I
11 define as a matter on which an answer has been
12 filed by the defendant, either pro se or via an
13 attorney, or matters where a motion has been
14 filed to vacate a judgment or to otherwise
15 effect post judgment remedy.  That's about it.
16     Q.    And what is the non-contested legal
17 department?
18     A.    They support the litigation
19 process.  By that, I mean they will staple
20 Summons and Complaints together.  They will
21 make phone calls to a process server to see if
22 service has been accomplished or perhaps call
23 to stop a matter from being served.
24          They will follow up with clients

Page 22

M. SELIP

1  for Affidavits needed to support a litigation
2  matter, and they will also put together
3  documents to support the entry of a judgment.
4  All of which is done to assist the attorneys in
5  the office.
6      Q.    Are these folks attorneys
7  generally?
8      A.    No.  They are clerks.  They are
9  legal assistants.
10     Q.    And what does the collections
11 department do?
12     A.    Their role is to speak with
13 consumers in an attempt to resolve consumers'
14 outstanding bills.
15     Q.    Anything else?
16     A.    No.  But in mentioning the firm's
17 departments, I forgot to mention a compliance
18 department.
19     Q.    What is the compliance department
20 do?
21     A.    It oversees every other department
22 to ensure that the other departments are acting
23 in compliance with federal, state, and local
24 laws; ethical considerations; as well as the

Page 23

M. SELIP

1  client's requirements or expectations.
2      Q.    And I assume none of these are
3  unique to Midland.  Each department deals with
4  all of the clients?
5      A.    That's correct.
6      Q.    And what does judgment enforcement
7  do?
8      A.    That department will prepare
9  judgment enforcement documents, which would
10 include wage and bank garnishments, for review
11 and signing by an attorney as well as follow up
12 with the various enforcement officers
13 throughout the State.
14     Q.    And the IT department, they are
15 involved with the communications with the
16 client.  Is that part of their job?
17     A.    It depends on how you define the
18 word communication and communicate, and I'm not
19 trying to be difficult.
20     Q.    Well, let's go back.  Why don't you
21 just tell me what they do.
22     A.    They will upload and download files
23 to and from our clients.  They review data that
24 we receive from our clients.  They maintain the

Page 24

M. SELIP

1  hardware in the office.  It's an
2  all-encompassing role when I say IT department.
3  They also support and change the programs that
4  we have to keep track of our files.
5      Q.    Who's the head of the contested
6  legal department?
7      A.    The firm has a managing attorney.
8  Her name is Alicia Stillman.
9      Q.    How long has she been with the
10 firm?
11     A.    Approximately three or four months.
12     Q.    Who was her predecessor?
13     A.    A gentleman by the name of Stephen,
14 P-H, Giametta.
15     Q.    G-I-A --
16     A.    M-E-T-T-A.
17     Q.    And he left three or four months
18 ago?
19     A.    I believe he left in the fall or
20 early winter of 2014.
21     Q.    Where's he now?
22     A.    He's practicing on his own.
23     Q.    On Long Island?
24     A.    Yes.

Case 2:14-cv-00081-WFK-ST Document 58-13 Filed 02/02/17 Page 9 of 52 PageID #: 6207
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.
MITCHELL SELIP
August 05, 2015

Page 25

1      M. SELIP
2      Q.    And Ms. Stillman, if she's a
3  managing attorney, does she only manage the
4  contested legal department, or does she manage
5  all the departments?
6      A.    **The attorneys in the firm are**
7  **really tasked with managing all the**
8  **non-attorneys, which would include people in**
9  **other departments.**
10      **She directly manages the attorneys**
11  **in the firm, regardless of what department they**
12  **may be in, as well as the support staff.  She**
13  **will indirectly manage the attorney -- the**
14  **non-attorneys in the other departments at the**
15  **firm.**
16      Q.    And is there then a separate head
17  of the non-contested legal department?
18      A.    **There's a non-attorney manager.**
19      Q.    Who is that?
20      A.    **Her name is Meagan, M-E-A-G-A-N,**
21  **Lynch, L-Y-N-C-H.**
22      Q.    How long has she been with the
23  firm?
24      A.    **Years.  Seven, eight, nine years.**
25  **I don't recall the exact number.**

Page 26

1      M. SELIP
2      Q.    And what about the collections
3  department, who manages that?
4      A.    **The firm has a director of**
5  **operations, and one of her main tasks is to**
6  **manage the collections department.  The**
7  **collections department has two senior managers**
8  **and about a half a dozen managers.**
9      Q.    So who is the operations manager?
10      A.    **Veronica Radin, R-A-D-I-N.**
11      Q.    How long has she been with the
12  firm?
13      A.    **Six, seven years or so.**
14      Q.    And who are the other managers
15  below her?
16      A.    **There are two senior managers in**
17  **the collections department, Gene Clive**
18  **Fils-Aime, F-I-L-S, dash A-I-M-E.**
19      **Another senior manager is Shawna**
20  **Hussain, H-U-S-S-A-I-N.**
21      Q.    How long have they been with the
22  firm?
23      A.    **Somewhere probably between 10 and**
24  **15 years.**
25      Q.    Each?

Page 27

1      M. SELIP
2      A.    **I think so.**
3      Q.    And then you mentioned that there
4  were some other managers below them, I believe,
5  right?
6      A.    **In that collections department,**
7  yes, there would be some managers below them.
8      Q.    How many?
9      A.    **Let's see.  There's Adriano**
10  Sapugay.  I can get you the names afterwards --
11      Q.    Sure.
12      A.    -- if you find it relevant.  I'm
13  sorry.  I'm drawing a blank on the names.
14      Q.    Is there some kind of org chart for
15  the firm?
16      A.    **Yes, there is.**
17      MR. SALTZMAN: We would call for
18  the production of the org chart.
19      MR. FRANCOEUR: We will take it
20  under advisement.
21      (Whereupon, Request No. 1,
22  Organizational Chart for Cohen &
23  Slamowitz, was made.)
24  BY MR. SALTZMAN:
25      Q.    I'd like to mark as Exhibit 1

Page 28

1      M. SELIP
2  Plaintiffs' Amended Rule 30(b)(6) Deposition
3  Notice to Cohen & Slamowitz dated April 10,
4  2015.
5      (Whereupon, Exhibit No. 1,
6  Plaintiffs' Amended Rule 30 (b) (6)
7  Deposition Notice to Cohen & Slamowitz,
8  dated April 10, 2015, was marked for
9  identification.)
10      MR. SALTZMAN: As Exhibit 2
11  Plaintiffs' Second Amended Rule 30(b)(6)
12  Deposition Notice to Cohen & Slamowitz,
13  LLP, dated July 31, 2015.
14      (Whereupon, Exhibit No. 2,
15  Plaintiffs' Second Amended Rule 30 (b) (6)
16  Deposition Notice to Cohen & Slamowitz,
17  dated April 10, 2015, was marked for
18  identification.)
19  BY MR. SALTZMAN:
20      Q.    Have you ever seen these documents
21  before, sir?
22      A.    **I don't believe so.**
23      Q.    Do you understand that you are here
24  pursuant to a Notice of Deposition?
25      A.    **I'm sorry, could you repeat that?**

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

Page 29

M. SELIP

1
2  Q.    Do you understand that you are here
3  pursuant to a Notice of Deposition?
4  A.    Yes.
5  Q.    But you've never seen these before?
6  A.    I know that I've seen a variation.
7  I just don't -- okay.  So I believe I've seen
8  the one dated July 31 and not the one dated
9  April 30.
10  Q.    They're substantially the same.
11  Are you competent to testify about the issues
12  that are contained in Exhibit 1?
13  A.    Yes.
14          MR. FRANCOEUR: Counsel, just to
15  correct, he said he saw Exhibit 2.
16          MR. SALTZMAN: Okay.
17          MR. FRANCOEUR: For clarity of the
18  record.
19          MR. SALTZMAN: No problem.
20  BY MR. SALTZMAN:
21  Q.    Sir, have you ever been deposed
22  before?
23  A.    Yes, I have.
24  Q.    When have you been deposed before?
25  A.    Approximately 1990 as a result of a

---

Page 30

M. SELIP

1
2  motor vehicle accident.  In that case I was the
3  plaintiff.
4          I was deposed approximately four,
5  five years ago in a personal injury action
6  filed by a gentleman who was injured in my
7  landlord's parking lot.
8  Q.    Anything else?
9  A.    No.
10  Q.    Have you ever given any statements
11  or testimony to any governmental or regulatory
12  agency in connection with C&S's collection of
13  debts?
14  A.    I may have.
15  Q.    When?
16  A.    I know that the firm has requested
17  licenses from New York City, City of Yonkers.
18          MR. ARLEO: Excuse me.  Robert
19  Arleo here.  I could hear Mitchell fine.
20  Mr. Frank, if you could just speak up a
21  little bit, I'd appreciate that.
22          MR. SALTZMAN: It's Mr. Saltzman,
23  but yes, I'll speak up.  No problem.
24          MR. ARLEO: I'm sorry.
25          THE WITNESS: I'm going to try to

---

Page 31

M. SELIP

1
2  move the phone.  Maybe if you put it
3  between us, that would work for you.
4          So Jay, what did you call Rob?
5  BY MR. SALTZMAN:
6  Q.    When you say you requested
7  licenses?
8          MR. ARLEO: I want you to take
9  notes and report accordingly.  Thank you.
10  BY MR. SALTZMAN:
11  Q.    What licenses did your firm pursue?
12  A.    Debt collection licenses.
13  Q.    And did you do anything to prepare
14  for this deposition?
15  A.    I had conversations with my
16  counsel.
17  Q.    Anything else?
18  A.    I generally reviewed the document
19  marked Exhibit 2 along with some of the
20  documents that we produced as part of the
21  discovery in this matter.
22  Q.    Do you recall which documents you
23  reviewed?
24  A.    Some of the notes that my office
25  maintained with regard to the litigation filed

---

Page 32

M. SELIP

1
2  against David Agoado. I thumbed through many
3  of the documents that were turned over.  I just
4  don't remember exactly which ones I looked at.
5  Q.    Anything else?
6  A.    Anything else what?
7  Q.    That you reviewed.
8  A.    No.
9  Q.    Did you speak to anyone other than
10  your attorneys in connection with preparation
11  for this deposition?
12  A.    No.
13  Q.    Did you meet with your attorneys?
14  A.    Did I?
15  Q.    Meet with your attorneys?
16  A.    Yes.
17  Q.    When?
18  A.    Monday.
19  Q.    For how long?
20          MR. FRANCOEUR: I object.  You can
21  answer.
22          THE WITNESS: How long did I meet
23  with them in total, or how long did we
24  meet to prepare for --
25          MR. FRANCOEUR: You know, I'm going

---

Case 2:14-cv-00018-WFK-AKT  Document 358-62  Filed 02/10/27  Page 1 of 52 PageID #:
16307
Case 2:14-cv-00018-WFK-AKT  Document 354-62  Filed 02/10/27  Page 11 of 52 PageID #:
16207

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 33

M. SELIP

1    to object on privilege.  I don't think
2    you're entitled to know how long we met.
3        **MR. SALTZMAN:** I'm not asking
4    anything substantive.  I'm just asking how
5    many hours.
6        **MR. FRANCOEUR:** I'm not going to
7    let him answer.
8  **BY MR. SALTZMAN:**
9    Q.    Did you speak to anyone at Midland
10   about this deposition?
11   **A.    No.**
12   Q.    Did you speak to any of the other
13   attorney -- or anybody from any of the other
14   attorney defendant firms in this case about
15   your deposition?
16   **A.    No.**
17   Q.    Did you take any notes in the
18   course of your preparation for this deposition?
19   **A.    No.**
20   Q.    Other than preparing for this
21   deposition and appearing today, have you done
22   anything else in connection with this
23   litigation?
24       **MR. FRANCOEUR:** Object to form.

Page 34

M. SELIP

1    Answer if you can.
2        **THE WITNESS:** I'm sure at some
3    point, I reviewed the pleadings.  I
4    reviewed the discovery.  I have no present
5    recollection of exactly what I did; but as
6    part of my role with the firm, I would
7    have been involved at some point.
8  **BY MR. SALTZMAN:**
9    Q.    So you participated in managing
10   your counsel in connection with this
11   litigation?
12       **MR. FRANCOEUR:** Objection to form.
13   Do you understand the question?
14       **THE WITNESS:** Did I participate in
15   managing counsel?  Managing --
16  **BY MR. SALTZMAN:**
17   Q.    Did you give direction to your
18   counsel in direction with this litigation?
19       **MR. FRANCOEUR:** Objection.  That's
20   privileged communication.  All
21   communications between Mitchell Selip,
22   Selip & Stylianou, and counsel are
23   privileged.
24       I instruct him not to answer on any

Page 35

M. SELIP

1    information that was discussed.
2        **MR. SALTZMAN:** Well, I'm not asking
3    the content of the discussion, just
4    whether there was discussion?
5        **MR. FRANCOEUR:** I thought he
6    answered that, but you can answer that
7    again.
8        **THE WITNESS:** Yes, there was
9    discussion.
10  **BY MR. SALTZMAN:**
11   Q.    How long did C&S come in contact
12   with Midland?
13   **A.    I really don't recall.**
14   Q.    How many years ago was it that you
15   recall?
16   **A.    Without guessing, I do not have the
17   exact number of years.**
18   Q.    More than ten years?
19   **A.    I believe so, yes.**
20   Q.    And is there an agreement between
21   Midland and C&S that covers C&S's collection of
22   debt on behalf of Midland?
23   **A.    There's a retainer agreement, yes.**
24   Q.    When was that negotiated originally

Page 36

M. SELIP

1    if you recall?
2    **A.    I do not know.**
3    Q.    And was it ever renegotiated or
4    amended?
5    **A.    I really don't know.**
6    Q.    Was it amended when C&S became S&S?
7    **A.    Again, just as a remainder, it's
8    the same firm with just the name change.  So
9    there would be no need to enter into a new
10   contract because of a name change.**
11       **I do not believe that a new
12   retainer was signed.**
13       **MR. SALTZMAN:** I'd like to mark as
14   Selip 3 a document Bates stamped MCM 0838
15   through 0866, and the title is Collection
16   Agreement.
17       (Whereupon, Exhibit No. 3,
18   Collection Agreement, was marked for
19   identification.)
20  **BY MR. SALTZMAN:**
21   Q.    Mr. Selip, have you ever seen this
22   document before?
23   **A.    Probably.**
24   Q.    Do you know when the last time you

Page 37

M. SELIP

1          M. SELIP
2  saw this document was?
3    **A.**  **I don't recall.**
4    Q.  You haven't seen it recently?
5    **A.**  **I really don't recall.**
6    Q.  Take a look page at MCM 0838.  Do
7  you see in the second paragraph it says,
8  "Whereas, certain subsidiaries of MCM owners
9  own certain charge-off consumer and commercial
10  receivables"?
11        It's the first "whereas."  Do you
12  see that?
13    **A.**  **Yes.**
14    Q.  Do you know who the MCM owners are?
15        **MR. FRANCOEUR:** Objection to the
16    form.  Answer if you can.
17        THE WITNESS: In 2006 I don't --
18    since that's the date of the agreement, I
19    don't recall who the MCM owners are or
20    were in 2006.
21  BY MR. SALTZMAN:
22    Q.  What about now?
23    **A.**  **It's my understanding that the**
24  **owners are Midland Funding, LLC.  Owner.  And**
25  **there can be other owners, but I would not have**

Page 38

**M. SELIP**

1         **M. SELIP**
2  **knowledge of who they are.  I'm only familiar**
3  **with the owners as regards accounts placed to**
4  **me in New York.**
5    Q.  And that would be with Midland --
6  through Midland Funding?  Well, Midland Funding
7  the owner would be through MCM?
8    **A.**  **That's correct.**
9    Q.  And so your dealings have been with
10  MCM?
11    **A.**  **Correct.**
12    Q.  Now, if you look at the second
13  "whereas," it says, "Whereas, MCM acts on
14  behalf of the MCM owners as an independent
15  contractor in connection with debt collection
16  activities as well as general administrative
17  and non-collection activities relating to the
18  accounts."
19        Do you know what the "general
20  administrative and non-collection activities"
21  are that are being referred to there?
22    **A.**  **I can't speak to certainty as to**
23  **what those terms are all inclusively.**
24    Q.  Well, if you can't talk to it with
25  certainty and all inclusively, can you tell us

Page 39

M. SELIP

1          M. SELIP
2  what your impressions are?
3    **A.**  **As I mentioned, MCM manages the**
4  **accounts from placing them with my firm to**
5  **communicating with my firm with regards to the**
6  **status of the accounts, to paying our bills,**
7  **reimbursing us for court costs.  That's my**
8  **understanding as to what's referred to as**
9  **general administrative and non-collection**
10  **activities.**
11    Q.  And if you look under the section
12  "definitions," there's a definition for closing
13  code.  And it says "means the system code
14  placed on an account and transmitted with the
15  account at the time the firm closes the account
16  for any reason and returns it to MCM."
17        Is the closing code something that
18  is transmitted through the IT systems that we
19  were discussing a little earlier this morning?
20    **A.**  **Yes.**
21    Q.  And what is it?  What is a closing
22  code?
23    **A.**  **A code is something that is**
24  **predefined, used by MCM and all of its law**
25  **firms in order to standardize the communication**

Page 40

**M. SELIP**

1         **M. SELIP**
2  **of information.  Particular with the close**
3  **codes, it would be any one of a list of codes**
4  **that we can use to close an account that we are**
5  **no longer handling on behalf of MCM or Midland**
6  **Funding.**
7    Q.  And you mentioned that there's a
8  list of codes, correct?
9    **A.**  **Yes.**
10    Q.  Where's that list of codes reside?
11    **A.**  **Midland has a work standards**
12  **document, operations manual.  I don't recall**
13  **the exact name that it gives to this document,**
14  **but that document would include a list of the**
15  **codes that we can use.**
16    Q.  And this manual, does C&S have a
17  copy of it?
18    **A.**  **Yes.**
19    Q.  Is it a paper copy?
20    **A.**  **Both paper and electronic.**
21        **MR. SALTZMAN:** We call for the
22    production of this manual.
23        **MR. FRANCOEUR:** We'll take it under
24    advisement.
25

Page 41

M. SELIP

1        M. SELIP
2      (Whereupon, Request No. 2, Manual
3  of Midland Funding, LLC's expectations and
4  codes, was made.)
5      **MR. FRANCOEUR:** What is the manual?
6      **THE WITNESS:** It's a work --
7      **MR. FRANCOEUR:** The codes.
8  **BY MR. SALTZMAN:**
9    Q.  No.  It's more broad than that.
10  What is the manual that contains the codes?
11    **A.**  **It's a document that sets forth the**
12  **expectations that Midland has of its law firms.**
13      **MR. FRANCOEUR:** Okay.  We'll take
14  it under advisement.
15  **BY MR. SALTZMAN:**
16    Q.  When you say it sets forth the
17  expectations -- well, why don't we talk about
18  the manual.
19      So you mentioned that it has a list
20  of codes, and you also said that it sets forth
21  the expectations that Midland has for its law
22  firms.
23      What else is in the manual?
24  **A.**  **Expectations about how we are to**
25  **represent Midland both in and out of court in**

Page 42

**M. SELIP**

1        **M. SELIP**
2  **connection with the matters on which we have**
3  **been retained by them.**
4    Q.  And the expectations of how you're
5  to represent Midland in court, what does that
6  mean?
7    **A.**  **Midland generally has a code of**
8  **conduct that gives to us a general guide as to**
9  **how it wants us to handle its consumers.**
10    Q.  Is that legal advice?
11      **MR. FRANCOEUR:** Objection.  It
12  calls for a legal conclusion.  He's not
13  here as an expert.
14  **BY MR. SALTZMAN:**
15    Q.  Okay.  You said that it's a code of
16  conduct, the general guide of how --
17      **MR. SALTZMAN:** Can you read back
18  that answer.
19      **THE COURT REPORTER:** Sure.
20      (The record was read as follows:
21      Answer:  Midland generally has a
22  code of conduct that gives to us a general
23  guide as to how it wants us to handle its
24  consumers.)
25

Page 43

M. SELIP

1        M. SELIP
2  **BY MR. SALTZMAN:**
3    Q.  What do you mean by "how it wants
4  us to handle its consumers"?
5    **A.**  **How it wants us to handle our**
6  **interactions with consumers.**
7    Q.  What interactions?
8    **A.**  **When we speak with a consumer or**
9  **when we meet with a consumer in court, there**
10  **are certain guidelines that it wants us to**
11  **follow, which includes complying with all**
12  **applicable laws.**
13    Q.  Anything else?  You said including.
14  Anything else?
15    **A.**  **It indicates what steps we can and**
16  **cannot take with regard to enforcing a**
17  **judgment.  It includes procedures on how to**
18  **handle accounts where consumers have hardships.**
19  **I don't recall all the provisions within that**
20  **document.**
21    Q.  What -- in the manual, what steps
22  does the manual tell you, you can take when
23  enforcing a judgment?
24    **A.**  **My recollection is that it**
25  **generally says that we can take the steps**

Page 44

**M. SELIP**

1        **M. SELIP**
2  **permissible by state law.**
3    Q.  And what steps does the manual tell
4  you, you cannot take when enforcing a judgment?
5    **A.**  **It does not want its law firms to**
6  **take any personal property from judgment**
7  **debtors with the exclusion of funds in a bank**
8  **account or wages that can be garnished.**
9    Q.  Anything else that you cannot do
10  pursuant to this manual?
11    **A.**  **It states that we cannot take any**
12  **steps to arrest or hold a consumer in contempt**
13  **for failure to comply with a subpoena.**
14    Q.  And what does the manual describe
15  as hardships that a consumer might have?
16    **A.**  **There are medical hardships,**
17  **financial hardships.  Those are the areas that**
18  **I can recall at this time.**
19    Q.  What's the manual tell C&S about
20  how to handle such consumers who have
21  hardships?
22    **A.**  **It varies depending on the**
23  **hardship.  If it's a temporary financial**
24  **hardship, Midland asks that we work with the**
25  **consumer while it's undergoing that hardship to**

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 45

M. SELIP

1 allow the consumer to pay his or her obligation
2 within his or her means.
3 If it's a permanent hardship, we
4 would close the file and return it to Midland.
5 Q. Now, you mentioned that the manual
6 is a code of conduct as a general guide on the
7 expectations of how C&S should act in and out
8 of court.
9 What do you mean by "out of court"?
10 Are those the things we were just discussing?
11 A. If we were to speak with a consumer
12 outside of the courtroom, it would all --
13 everything I said would apply.
14 Q. Okay.
15 A. The setting doesn't matter. It
16 applies to communications whether it takes
17 place in person or over the telephone.
18 Q. And manual is C&S's guide on how to
19 do that, correct?
20 A. Yes.
21 Q. And C&S endeavors to follow that
22 guideline?
23 A. Yes.
24 Q. Are there any other manuals that

Page 46

M. SELIP

1 Midland provides to C&S in connection with the
2 debt collection?
3 A. Not that I can recall.
4 Q. What are the different closing
5 codes that you recall, sitting here today?
6 A. There may be 15 or 20 different
7 codes. They range from closing a file because
8 I don't have sufficient documentation to
9 proceed. I can close a file because I
10 generally deem it uncollectible. Fraud,
11 dispute, paid prior, hardship, paid of course,
12 settled, bankrupt, the consumer's deceased,
13 dismissed by the court both with and without
14 prejudice, the consumer moves outside of the
15 state. There's a code for that.
16 Q. Are there codes other than closing
17 codes?
18 A. Yes.
19 Q. And are those codes also referenced
20 in the manual that we've been discussing?
21 A. Yes.
22 Q. And those codes are provided by
23 Midland?
24 A. Yes.

Page 47

M. SELIP

1 Q. Is there a code for C&S to notify
2 Midland that it needs additional documentation
3 in order to proceed with the pursuit of a
4 collection matter?
5 A. There's a mechanism for requesting
6 additional documentation. I don't recall if
7 it's a code. I believe it is.
8 Q. Do you know what the code is?
9 A. No, offhand, I don't know any of
10 the codes.
11 Q. And is it -- go ahead, sorry.
12 A. And we associate the codes with our
13 internal codes. So I would not know what
14 Midland's code is. I would only know what my
15 association is.
16 Q. Okay. Just -- just so we're clear
17 so your company has its own set of codes; is
18 that correct?
19 A. Yes.
20 Q. And Midland has its set of codes?
21 A. Yes.
22 Q. So then I would assume there's some
23 kind of interface table?
24 A. That is correct.

Page 48

M. SELIP

1 MR. SALTZMAN: Okay. We call for
2 the production of the interface table.
3 (Whereupon, Request No. 3,
4 Interface Table, was made.)
5 BY MR. SALTZMAN:
6 Q. Well, do you have -- is there a
7 manual that you are firm has in connection with
8 the IT side of this, any interaction with
9 Midland?
10 A. That's a broad question. Could you
11 be more specific?
12 Q. Sure. So you testified that your
13 firm has its own codes that seem to correspond
14 with Midland's codes; is that right?
15 A. That's correct.
16 Q. Okay. So where are your codes
17 stored in your firm?
18 A. In our collection system.
19 Q. And can those be printed out?
20 A. Yes.
21 Q. I would call for the production of
22 those codes.

Case 2:14-cv-00008-WFK-AKT   Document 358-62   Filed 02/10/22   Page 15 of 52 PageID #:
16513

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

M. SELIP
MITCHELL SELIP
August 05, 2015

Page 49

```
 1              M. SELIP
 2         (Whereupon, Request No. 4, Cohen &
 3    Slamowitz, LLP, internal codes
 4    corresponding with Midland Funding, LLC's
 5    codes, was made.)
 6  BY MR. SALTZMAN:
 7    Q.    So internally in C&S, is there a
 8  code by which somebody in C&S can request from
 9  Midland additional documentation in order to
10  pursue a collection matter?
11    A.    Yes, there is.
12    Q.    And that would correspond to some
13  code in the Midland system?
14    A.    That's correct.
15    Q.    Okay.  What's that code?
16    A.    There are several codes that we
17  have depending on what media that we need.  Our
18  system -- the user of our system wouldn't put
19  in a code.  It would use a screen that we have
20  created.  We would go on to the screen, and we
21  would indicate on that screen what it is that
22  we need.
23         That would then send a message of
24  sorts to the clerk who, in turn, will ask for
25  that information from Midland.
```

Page 50

```
 1              M. SELIP
 2    Q.    Does the clerk actually enter a
 3  code then?
 4    A.    I don't recall if the person who
 5  needs the codes and then clicks on the spots in
 6  our screen, if that action leads to the codes
 7  being entered into my system or if it's the
 8  person who's requesting it from Midland.
 9         Midland retains a site on which it
10  keeps certain documentation.  We would -- the
11  clerk responsible for trying to receive the
12  media would go initially on to that site to try
13  to get that documentation.
14         If the information we need is not
15  there, then I think it's at that point where we
16  enter our codes that then translate to
17  Midland's codes to request specific information
18  that we need.
19    Q.    Okay.  So you're not exactly sure
20  about how it works, right?
21         MR. FRANCOEUR: Objection.
22         THE WITNESS: Our procedure has
23    changed.  And as it stands right now, I'm
24    not a hundred percent sure the details of
25    the system.
```

Page 51

```
 1              M. SELIP
 2  BY MR. SALTZMAN:
 3    Q.    Okay.  Now, if I wanted to know the
 4  details of the system -- strike that.
 5         If you get a new employee and that
 6  employee needs to know the details of that
 7  system, how is that new employee going to learn
 8  the details?
 9    A.    That person would sit with the
10  manager of the department responsible for
11  seeking media from our clients and would be
12  taught by that manager what codes to enter.
13    Q.    Would that new employee be given
14  any kind of documentation?
15    A.    Yes.  We have a procedures manual
16  on how to request the information from our
17  clients.
18    Q.    Okay.
19         MR. SALTZMAN: So we would call for
20    the production of the procedures manual,
21    please.
22         MR. FRANCOEUR: We will take it
23    under advisement.
24  BY MR. SALTZMAN:
25    Q.    How are you doing?  How's your
```

Page 52

```
 1              M. SELIP
 2  back?
 3    A.    It's okay.  Thank you.
 4    Q.    Are you doing okay?
 5    A.    Yes, thank you.
 6    Q.    I just want to clarify.  You
 7  mentioned media a couple of times.  What did
 8  you mean by "media"?
 9    A.    Media, as I use that term, it would
10  be an all-inclusive term to indicate any of the
11  documentation that we may need to support our
12  efforts to collect an outstanding receivable
13  from the party liable.
14         MR. FRANCOEUR: Counsel, maybe at
15    10:30 let's take a short break?
16         MR. SALTZMAN: 10:30?  Sure.
17  BY MR. SALTZMAN:
18    Q.    Let's go back to Selip 3, sir.  If
19  you look at page MCM 839, the fourth paragraph
20  mentions financial reports; and it says, "It
21  consists of reports now or hereafter existing
22  or modified, including, but not limited to, the
23  daily invoicing report and the ACH cumulative
24  report."
25         Do you see that?
```

Case 2:14-cv-00088-WFK-AST   Document 358-62   Filed 02/10/27   Page 16 of 52 PageID #:
16512
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.
MITCHELL SELIP
August 05, 2015

Page 53

M. SELIP

1     M. SELIP
2    **A.**   **Yes.**
3    Q.   Do you know what "the daily
4 invoicing report" is?
5    **A.**   **Not offhand, no.**
6    Q.   Okay. Is there some mechanism by
7 which C&S daily invoices Midland?
8    **A.**   **I don't recall.**
9    Q.   How often does C&S invoice Midland?
10   **A.**   **I don't know.**
11   Q.   Does it ever invoice Midland?
12   **A.**   **I'm not sure.**
13   Q.   How is C&S paid by Midland?
14   **A.**   **With money.**
15     **MR. SALTZMAN:** I move to strike.
16 **BY MR. SALTZMAN:**
17   Q.   How does C&S indicate to Midland
18 that it's collected debt from a consumer?
19   **A.**   **On a daily basis, we report to**
20 **Midland all of the payments received by us on**
21 **that day.**
22   Q.   And that's a daily report?
23   **A.**   **Yes, it is.**
24   Q.   And does Midland take any action
25 when it receives that report? Do you know?

Page 54

M. SELIP

1     M. SELIP
2    **A.**   **I would assume so. It's a question**
3 **better geared for Midland.**
4    Q.   Okay. But --
5     **MR. FRANCOEUR:** I'm going to object
6    and instruct the witness don't guess.
7 **BY MR. SALTZMAN:**
8    Q.   Well, why does C&S send this daily
9 report to Midland?
10   **A.**   **So that Midland knows the money**
11 **that we have collected on its end.**
12   Q.   Do you expect to get paid because
13 of that collection?
14   **A.**   **Yes.**
15   Q.   So you kind of the daily invoice in
16 a way, isn't it?
17     **MR. FRANCOEUR:** Objection to form.
18     **THE WITNESS:** It depends on how you
19    define the term "invoice."
20     What we submit to them, we consider
21    it a remit. It's a remittance statement.
22    I don't recall if that statement also says
23    how much it owes us. So I can't call it
24    an invoice.
25

Page 55

M. SELIP

1     M. SELIP
2 **BY MR. SALTZMAN:**
3    Q.   But you have an expectation of
4 getting paid based on that report, right?
5    **A.**   **Correct.**
6    Q.   Okay. Did you ever hear of
7 something called an ACH cumulative report?
8    **A.**   **Yes.**
9    Q.   What is that?
10   **A.**   **That's a report that tells us how**
11 **much money Midland is going to pull from its**
12 **escrow account.**
13   Q.   What escrow account?
14   **A.**   **We maintain an escrow account for**
15 **monies that we collect on behalf of Midland.**
16   Q.   Why?
17   **A.**   **Why what?**
18   Q.   Why do you maintain an escrow
19 account on behalf of monies collected?
20   **A.**   **Because as an attorney, we are**
21 **required to maintain an escrow account for**
22 **monies collected on behalf of our clients.**
23   Q.   When you said that the ACH report
24 tells C&S how much money Midland will pull from
25 the escrow account, what do you mean by "pull

Page 56

M. SELIP

1 from the escrow account"?
2    **A.**   **Midland will ACH from that account**
3 **an amount of money related to collections that**
4 **we -- money we collected for a given day.**
5    Q.   What does ACH stand for?
6    **A.**   **I don't recall.**
7    Q.   Does Midland leave any money in the
8 escrow account for C&S, or does Midland cut
9 checks to C&S as payment?
10   **A.**   **I'm not involved in the financial**
11 **aspect of the firm, so I do not know the answer**
12 **to that question.**
13   Q.   Who would?
14   **A.**   **Mitch Slamowitz.**
15   Q.   What's his position?
16   **A.**   **Partner.**
17   Q.   So is he the fellow to ask if I
18 have questions about how C&S is paid by
19 Midland?
20     **MR. FRANCOEUR:** Objection to form.
21    You can answer.
22     **THE WITNESS:** He would be one of
23    the people, yes.
24
25

Page 57

M. SELIP
BY MR. SALTZMAN:
Q.   Would you be able to answer questions that I might have about that?
A.   Generally, yes.  Specifically, I don't believe I have that information.
Q.   Now, the daily report that we just discussed that C&S sends to Midland, is that maintained for any length of time on C&S's systems?
A.   Yes, it is.
Q.   For how long?
A.   At least seven years.  I don't believe beyond that.
Q.   And is -- do you know why it's maintained seven years as opposed to any other number of years?
     MR. FRANCOEUR: Objection.
     THE WITNESS: I believe ethically I need to maintain records for that period of time.
BY MR. SALTZMAN:
Q.   Does Midland require C&S to maintain documents for any particular period of time?

Page 58

M. SELIP
A.   I don't recall.
     MR. SALTZMAN: Why don't we take a break now.
     (Whereupon, a short break was taken.)
BY MR. SALTZMAN:
Q.   Mr. Selip, we're back on the record.  You understand you are still under oath, right?
A.   Yes.
Q.   Going back to the collection agreement, Selip 3, if you take a look at page MCM 0840, Section 2.22, it's titled "forwarding of Accounts."
     What does it mean to forward an account?
A.   Generally speaking, it's when one entity places an account with another entity.
Q.   And when you say "entity," do you mean a law firm, an original creditor, a creditor?  What do you mean by that?
A.   Well, the term "forwarding," just generally speaking, means one person is giving something to somebody else.  So I guess it

Page 59

M. SELIP
would be all inclusive.  It could be a forwarder -- a creditor giving it to someone else, a law firm giving it to somebody else.  It was a very general question.
Q.   Okay.  So now, looking at the paragraph itself, it says, "Except as specifically permitted by this Section 2.2, the firm is not permitted and shall not forward or transfer any accounts to any third-party."
     Is that a more specific understanding for you of what forwarding is in the context of C&S's business?
A.   Yes, it is.
Q.   And what does that mean?
A.   I read that to mean that I'm not able to retain a law firm or any third-party to do the work that my firm was retained to do by MCM.
Q.   So if, for example, if -- now, let's step back just for a second.
     Your firm, it covers all of New York State?
A.   Yes.
Q.   Okay.  So if Midland places an

Page 60

M. SELIP
account for collection with C&S that's, for example, in Buffalo, does that mean that C&S has to go up to Buffalo, send one of their attorneys up to Buffalo for a hearing pursuant to this paragraph?
A.   That's correct.
Q.   And is that what C&S actually does?
A.   Yes, we do.
Q.   Does C&S ever retain, for example, local counsel in order to appear on behalf of C&S?
A.   Yes, we do.  Well, it's not to appear on our behalf.  It's to appear on behalf of our client.
Q.   Right.  Okay.  That's right.  And do you need to get permission from Midland in order to do that?
A.   It depends on the purpose of the court appearance.
Q.   Okay.  So why don't you tell me about that.
A.   If the court appearance is a non-dispositive court appearance, then we will utilize local appearance counsel to attend.  If

Page 61

M. SELIP

1  the court appearance has the potential of
2  leading to a final disposition of the case,
3  then we will send one of our own attorneys.
4  Q.    And is what you just said, is that
5  pursuant to an instruction or an agreement with
6  Midland on how to handle the accounts?
7  A.    That is my understanding and
8  reading of this section.
9  Q.    But is there something in a Midland
10 manual that tells us what you just said about
11 how to handle something that is not local?
12 A.    I don't recall.
13 Q.    Okay.  But does -- so in the case
14 of something that is non-dispositive, Midland
15 has discretion on retaining local counsel to
16 appear on behalf of -- I'm sorry, C&S has
17 discretion to retain local counsel to appear on
18 behalf of Midland if it's not non-dispositive;
19 is that right?
20 A.    That's correct.
21 Q.    And if it is potentially
22 dispositive, then Midland -- sorry, C&S is
23 going to send one of its attorneys up to
24 Buffalo or Elmira or Utica or somewhere else,

Page 62

M. SELIP

1  correct?
2  A.    That's correct.
3  Q.    If it is a dispositive motion and
4  it's not a local case, you know, for example,
5  it's up further north, upstate somewhere, are
6  there any instances where C&S requires a
7  witness from Midland to appear in that hearing?
8       MR. FRANCOEUR: Objection to form.
9       THE WITNESS: My firm doesn't
10 require Midland to do anything, relative
11 to your question.
12 BY MR. SALTZMAN:
13 Q.    Okay.  Does for one of these
14 nonlocal dispositive hearings, has C&S ever
15 requested that Midland provide a witness to
16 appear?
17 A.    Yes.
18 Q.    And has Midland sent witnesses to
19 appear at these nonlocal hearings?
20 A.    Yes.
21 Q.    How often does that happen?
22 A.    I don't really keep track.  I can't
23 tell you.
24 Q.    Does anybody keep track?

Page 63

M. SELIP

1  A.    Alicia may know.
2  Q.    And that's Ms. Stillman?
3  A.    Correct.
4  Q.    She's the managing attorney?
5  A.    That's correct.
6  Q.    And if she may know, then she might
7  keep statistics; is that right?
8  A.    She may.
9  Q.    You don't know if she does or not?
10 A.    No.
11 Q.    She's the person I would have to
12 talk to, to find out if she does; is that
13 right?
14 A.    Among others in my office, yes.
15 Q.    Who else might know if such
16 statistics were being kept?
17 A.    We have a calendar clerk.  That
18 person may know.  We have some managers,
19 non-attorney managers who may know.
20 Q.    Who's the calendar clerk?
21 A.    I think calendar is currently being
22 handled by Jen Zecher, who is also a manager.
23 I think she splits that responsibility with
24 another manager whose name is Mary Reaber?

Page 64

M. SELIP

1  Q.    Can you spell her last name,
2  please?
3  A.    R-E-A-B-E-R.
4  Q.    How long has Ms. Zecher been at
5  your firm?
6  A.    Six, seven, eight years.
7  Q.    And Ms. Reaber?
8  A.    A little shorter, perhaps four or
9  five years.
10 Q.    And who are the other people who
11 might know?
12 A.    The attorneys would know if they
13 had a Midland witness appear, of course.  Their
14 paras or legal assistants may know.
15 Q.    Now, these witnesses who appear,
16 are they Midland employees?
17 A.    Yes.
18 Q.    Are they ever employees of the
19 original creditor?
20      MR. FRANCOEUR: Objection to form.
21 Do you understand the question?
22      THE WITNESS: I do.  I'm not aware
23 of any employee of an original creditor
24 testifying at a matter where Midland is

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 65

M. SELIP

1  the plaintiff in that action.
2  BY MR. SALTZMAN:
3  Q.   And who pays for the Midland
4  employee to come out to New York -- well,
5  strike that.
6     Do these people from Midland, do
7  they reside in New York?
8  A.   I don't know.
9  Q.   So do you know if they come from
10 out of state?
11 A.   No, I don't know.
12 Q.   You don't know one way or the
13 other?
14 A.   No.
15 Q.   For any of them?
16 A.   No.
17 Q.   Do you know who pays for the
18 Midland employees to travel to the these
19 dispositive hearings?
20 A.   No.
21 Q.   Would that be something
22 Mr. Slamowitz would know?
23 A.   No.
24 Q.   Who would know?

Page 66

M. SELIP

1  A.   Midland.
2  Q.   Well, does anybody in your firm
3  know who's paying for them?
4  A.   I don't see why they would, no.
5  Q.   Why not?
6  A.   Because we're not paying them.
7  Q.   So I meant travel expenses.  The
8  same answer?
9  A.   The same answer, yes.
10 Q.   Take a look at MCM 0841 of Selip 3,
11 please.  And take a look at Section 2.3.1,
12 Notice of Disputes and Claims.  "The parties to
13 this agreement recognize that from time to
14 time, a debtor may dispute matters relating to
15 an account based on fraud, (each" and then
16 parens "(each, a 'Dispute')"  so for purposes
17 of this agreement "dispute" is defined as
18 fraud; is that right?
19    MR. FRANCOEUR: Objection to the
20 form.
21    May I have the last part of that
22 question read back.
23    THE COURT REPORTER: Sure.

Page 67

M. SELIP

1     (The record was read as follows:
2     Q ...so for purposes of this
3  agreement, "dispute" is defined as
4  fraud; is that right?)
5     MR. FRANCOEUR: That's not what the
6  document says.
7     THE WITNESS: My answer is the
8  document speaks for itself.  I'm not the
9  one who wrote the document.  I don't know
10 what the writer intended when he or she
11 wrote this.
12 BY MR. SALTZMAN:
13 Q.   Well, your company is a party to
14 the document, right?
15 A.   Yes.
16 Q.   So somebody -- you're a partner,
17 right?
18 A.   Yes.
19 Q.   And this is a contract with your
20 firm of which you're a partner, right?
21 A.   Correct.
22 Q.   And do you understand what this
23 sentence means?
24    MR. FRANCOEUR: Objection to the

Page 68

M. SELIP

1  form.
2     THE WITNESS: I understand what is
3  written, other than what is in
4  parentheses.
5  BY MR. SALTZMAN:
6  Q.   What do you understand?
7  A.   That a consumer may dispute a
8  matter relating to an account based on fraud.
9  Q.   Okay.  Now, if that happens, what
10 action does C&S take?
11 A.   We code our file that the consumer
12 is alleging fraud.  We send to the consumer a
13 certificate of fraud along with a letter asking
14 for documents to prove the fraud in connection
15 with New York State's ID theft statute, and
16 then we report the fraud to Midland.
17 Q.   Is the account closed at that
18 point?
19 A.   No.
20 Q.   It remains open?
21 A.   Correct.
22 Q.   And does C&S await instructions
23 from Midland in connection with such coding?
24 A.   I don't recall if my firm does the

Case 2:14-cv-00018-WFK-ST Document 358-62 Filed 02/10/17 Page 20 of 52 PageID #: 16516
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.
MITCHELL SELIP
August 05, 2015

Page 69

1            **M. SELIP**
2 **investigation or if Midland does the**
3 **investigation.**
4    Q.   Now, you mentioned earlier, there's
5 a compliance department, right?
6    **A.**   **Correct.**
7    Q.   So what procedures does C&S have in
8 place in order to catch the potential fraud, if
9 any?
10       **MR. FRANCOEUR:** Objection. Form.
11   You can answer.
12       **THE WITNESS:** Our collection system
13   is set up so that if a consumer, while on
14   the phone with a representative, indicates
15   that the account was open fraudulently or
16   any of the charges were as a result of
17   fraud, the firm's representative will
18   indicate that in our system, which will
19   bring the account to the attention of a
20   compliance manager for -- compliance
21   attorney, excuse me, for further review.
22      If an allegation is made in
23   writing, which can be in an answer or in a
24   letter, those documents are immediately
25   reviewed by a compliance attorney in the

Page 70

1            M. SELIP
2   first place; and that person will mark my
3   file as potential fraud.
4 **BY MR. SALTZMAN:**
5    Q.   And it is -- is it fraud -- strike
6 that.
7      If someone signs and opens up an
8 account for someone else without authorization,
9 is that something that your compliance
10 department would review as potential fraud?
11    **A.**   **If we're aware of it, yes.**
12    Q.   Okay. And if it's found that, in
13 fact, somebody else opened up the account
14 without authorization, would C&S still pursue
15 collection against the person who was
16 defrauded?
17    **A.**   **Generally speaking, no.**
18    Q.   Now, take a look at MCM 847, 848,
19 the bottom of 847, on to 848, Section 6.1.6,
20 talks about equitable relief. Then if you look
21 on to 848, the last line in the first paragraph
22 says, "The firm hereby expressly acknowledges
23 and agrees that the provisions of this
24 Section 6.1 are in addition to and independent
25 of any agreements or covenants contained in any

Page 71

1            M. SELIP
2 other agreement between the firm and MCM."
3      Now, we talked earlier about
4 agreements between MCM and C&S; and so this
5 paragraph talks about any other agreements. To
6 your knowledge, are there other agreements
7 between C&S and MCM other than the one we're
8 looking at right now?
9    **A.**   **I really don't recall.**
10    Q.   There might be?
11    **A.**   **Yes.**
12    Q.   And what might those be?
13    **A.**   **The work standards document that I**
14 **referred to earlier. There could have been**
15 **amendments to this document that I'm not aware**
16 **of.**
17    Q.   Okay. So we discussed amendments
18 to this earlier.
19       **MR. SALTZMAN:** And we would call
20   for production of any amendments to the
21   agreement.
22      (Whereupon, Request No. 5,
23   Amendments to the Midland Funding, LLC,
24   manual requested in Request No. 2, was
25   made.)

Page 72

1            M. SELIP
2 **BY MR. SALTZMAN:**
3    Q.   Are there drafts of these
4 amendments?
5      If there are amendments, I would
6 image there are drafts. Are there?
7    **A.**   **I don't know.**
8       **MR. SALTZMAN:** Well, we would call
9   for drafts of any of these amended
10   agreements, drafts of this agreement, and
11   any e-mails in connection thereof.
12       **MR. FRANCOEUR:** We will take it
13   under advisement.
14      (Whereupon, Request No. 6, Drafts
15   of amendments to the manual, drafts to the
16   agreement, and any e-mail in connection
17   with either, was made.)
18 **BY MR. SALTZMAN:**
19    Q.   Now, also you mentioned -- we are
20 talking about agreements, and you mentioned
21 manual, right?
22    **A.**   **Yes.**
23    Q.   So is the manual an agreement? In
24 other words, is that a signed document; or is
25 that just something that's provided by MCM to

Page 73

M. SELIP

1  C&S?
2   **A.   That's one of the things I don't**
3  **recall.  I don't remember if there was a**
4  **document that somebody in my firm may have**
5  **signed stating that it agrees to whatever with**
6  **regard to that document.**
7   Q.    Okay.  So we would call for the
8  production of that also.  If there were signed
9  documents and if there's back-and-forth in
10 connection with any of these documents, we
11 would request any of the communications between
12 C&S and Midland in connection with manual,
13 agreements.
14      (Whereupon, Request No. 7, Signed
15 agreement documents and communications
16 between Cohen & Slamowitz and Midland
17 Funding, LLC in connection with the manual
18 and/or agreements, was made.)
19      (Whereupon, Request No. 8,
20 Notification and production of other
21 agreements, was made.)
22      **MR. SALTZMAN:** And if there are
23 other agreements, we would request that we
24 be notified of that and that there's

Page 74

M. SELIP

1  production?
2      **MR. FRANCOEUR:** We'll take it under
3  advisement.
4  **BY MR. SALTZMAN:**
5   Q.    So let's move along.  Let's look at
6  page MCM 852, Exhibit C, fee schedule.
7      Do you see where it says "gross
8  collection target"?
9   **A.   Yes.**
10  Q.    What does that mean?
11  **A.   I have no idea.**
12  Q.    This is a fee schedule, right?
13 That's what it says.
14  **A.   The document speaks for itself.**
15  Q.    It's a fee schedule, right?  And is
16 your understanding that this determines what
17 your firm, at least partly determines, what
18 your firm's getting paid by Midland?
19      **MR. FRANCOEUR:** Objection.
20      **THE WITNESS:** It's my understanding
21 that this document has been superseded by
22 another document because the language here
23 is not my understanding of the current fee
24 schedule between my firm and Midland.

Page 75

M. SELIP

1      So I know you've asked for
2  additional documents.  I'm not sure if
3  that would be one of the documents that we
4  will look for.
5      **MR. SALTZMAN:** Okay.  So we're
6  going to reserve the right to call back
7  Mr. Selip, okay, because we don't have,
8  apparently, the latest document, not
9  produced by MCM and not produced by C&S.
10 So we're reserving that right.
11      **MR. FRANK:** This came up during the
12 Midland 30(b)(6), didn't it, Andrew.
13      **MR. SCHWARTZ:** Yes, yes, it did.
14      **MR. FRANK:** That was about a month
15 ago.
16      **MR. SCHWARTZ:** Yes.
17      **MR. FRANCOEUR:** Why are you
18 reserving the right?  Why wasn't this
19 resolved before Mr. Selip showed up?  He's
20 not coming back.
21      **MR. SALTZMAN:** Well, we're
22 reserving the right.
23      **MR. FRANCOEUR:** You can do whatever
24 you want.

Page 76

M. SELIP

1  **BY MR. SALTZMAN:**
2   Q.    Now, this -- when was the last
3  document -- when was the last -- when was the
4  fee scheduled last revised?
5   **A.   I don't remember.**
6   Q.    Do you have any understanding --
7  well, do you have any understanding of what the
8  gross collection target means at all?
9   **A.   No, I don't.**
10      **MR. SALTZMAN:** I just also want to
11 state for the record that -- strike that.
12 **BY MR. SALTZMAN:**
13  Q.    C&S is in possession of the latest
14 fee schedule; is that right?
15      **MR. FRANCOEUR:** Objection.  You can
16 answer.
17      **THE WITNESS:** I would think so.
18      **MR. SALTZMAN:** Okay.  Just for the
19 record, 30(b)(6) deposition notice the
20 Schedule of Topics is communications
21 between you -- No. 15, "Communications
22 between you and any defendant in the
23 above-captioned litigation concerning the
24 collection of consumer debt acquired by

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 77

M. SELIP

1  M. SELIP
2  the Midland defendants."
3  Our reading of it is it includes
4  these kind of documents, and they were not
5  produced by C&S. So again, you can say
6  what you want. We're reserving the right
7  to call him back. And if we have to go to
8  court to do it, we'll do it. We can
9  discuss it at another time. I don't want
10  to waste your time or his.
11  **MR. FRANCOEUR:** Well, you're
12  already wasting everybody's time with
13  making for the record. So let me just
14  respond for the record.
15  Apparently, this issue has come up
16  over a month ago. You didn't take any
17  action to make sure you had the documents.
18  You waived any rights that you had. And
19  he's not coming back.
20  So I suggest you use today to the
21  full extent because he's not coming back.
22  **MR. SALTZMAN:** We'll see.
23  **MR. FRANK:** It wasn't clear that
24  you -- he failed to comply today.
25  **MR. FRANCOEUR:** We didn't fail to

Page 78

M. SELIP

1  M. SELIP
2  comply with anything. We received the
3  30(b)(6) notice a couple of days ago, but
4  you should have made sure you had your
5  documents before he wasted his time coming
6  to New York City.
7  **BY MR. SALTZMAN:**
8  Q.  Okay. Take a look at page MCM855.
9  **MR. SCHWARTZ:** I'm sorry, what
10  number?
11  **MR. SALTZMAN:** 855.
12  **BY MR. SALTZMAN:**
13  Q.  Do you see the chart, Exhibit B?
14  **A.  Yes.**
15  Q.  Does the latest version of --
16  strike that.
17  Do you see where it says on the
18  left side towards the bottom "Arrange
19  full-balance payment plans"?
20  **A.  Yes.**
21  Q.  Do you have any understanding of
22  what that means?
23  **A.  I'm not really sure what it's
24  referring to.**
25  Q.  What about below that, "Arranged

Page 79

M. SELIP

1  M. SELIP
2  settlement plans"?
3  **A.  Those three words taken alone do
4  not tell me what's intended here.**
5  Q.  Okay. And then the one we just
6  discussed "arrange full-balance plans" you said
7  you're not really sure. What do you think it
8  means?
9  **A.  It's my understanding that this has
10  to do with the terms -- excuse me, the
11  repayment terms that my firm was authorized to
12  accept when a consumer was agreeing to pay the
13  full balance owed to Midland.**
14  Q.  So that's a business instruction,
15  would you say, as opposed to a legal
16  instruction?
17  **MR. FRANCOEUR:** Objection. You can
18  answer.
19  **MR. SCHWARTZ:** I'm going to assert
20  a privilege objection. I mean, you can
21  answer in general terms; but it seems
22  clear to me that you've got a client and
23  attorney involved in the communication
24  specific to the attorneys. But if you can
25  answer, go ahead.

Page 80

M. SELIP

1  M. SELIP
2  **THE WITNESS:** Right. To me, this
3  is my client telling me what terms under
4  which I can accept payments from a
5  consumer when that consumer is paying full
6  balance owed.
7  **BY MR. SALTZMAN:**
8  Q.  Let's go to 858. Do you see the
9  top row? It says, "pre-suit expectations."
10  **A.  Yes.**
11  Q.  What does that mean to you?
12  **A.  I'm really not sure.**
13  Q.  Whose expectations do you think are
14  being discussed there?
15  **A.  Midland's expectations of its --
16  well, in this case of my law firm.**
17  Q.  And "post-suit expectations," what
18  does that mean? Is that also Midland's
19  expectations?
20  **A.  That appears to be what it is
21  saying.**
22  Q.  What does "post-suit" mean?
23  **A.  I take post-suit to mean after a
24  lawsuit has been filed with the court.**
25  Q.  And post-judgment?

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

Page 81

M. SELIP

1
2  **A.    That would refer to expectations**
3  **once judgment has been entered by the Court.**
4      Q.    And without telling me the details,
5  do you know what it means for Midland to have
6  pre-suit expectations for counterclaims or
7  appeals?
8          MR. FRANCOEUR: Objection.
9          THE WITNESS: No, I don't.
10 BY MR. SALTZMAN:
11     Q.    And the same question for post-suit
12 expectations?
13     **A.    It's too broad.  I really can't,**
14 **without guessing, answer that question.**
15         MR. FRANCOEUR: Don't guess.
16         THE WITNESS: Which I'm not going
17     to do.
18 BY MR. SALTZMAN:
19     Q.    Did you ever hear of something
20 called the MCM Training Manual?
21     **A.    Not specifically.**
22     Q.    Generally?
23     **A.    I'm not sure.**
24     Q.    You've heard the term?
25     **A.    I'm not sure.**

---

Page 82

M. SELIP

1
2      Q.    Did you ever hear of something
3  called Midland Third-party Management Policy?
4      **A.    That title does not ring a bell.**
5      Q.    We discussed manuals a little
6  earlier.  Does C&S have any input into
7  Midland's manual, the one that we discussed
8  this morning?
9      **A.    I don't know what Midland uses or**
10 **does to create its manual.**
11     Q.    As far as you know, then, is it
12 fair to infer from your answer that, as far as
13 you know, C&S is not involved with drafting of
14 the manual?
15         MR. SCHWARTZ: I will put an
16     objection on the record.  I think we're
17     getting confused as to the manuals.
18         THE WITNESS: I don't know.
19 BY MR. SALTZMAN:
20     Q.    Now, earlier you testified that C&S
21 has an interface with Midland and its an
22 electronic system, correct?
23     **A.    The interface is an electronic**
24 **interface.**
25     Q.    Right.  And the system on C&S's

---

Page 83

M. SELIP

1
2  side, is that electronic also?  It's a computer
3  system?
4      **A.    Yes.**
5      Q.    Okay.  What other computer systems
6  does C&S utilize in its debt collection duties?
7      **A.    What do you mean by "computer**
8  **systems"?**
9      Q.    Systems to help run the business.
10     **A.    We have a network of computers**
11 **hooked up to each other that all run software**
12 **programs that allow us to represent our**
13 **clients.**
14     Q.    What software programs do you
15 utilize?
16     **A.    We utilize one called CLS.  We have**
17 **written a proprietary program that we refer to**
18 **as Phoenix.  We use WordPerfect, Word, Excel,**
19 **Microsoft suite of products.  We use -- there**
20 **are some accounting programs that we use.  I**
21 **don't recall the name of them right now.**
22     Q.    Are those proprietary?
23     **A.    No.  QuickBooks may be one.  There**
24 **may be other interfaces that we use.  I don't**
25 **know if they would be considered computer**

---

Page 84

M. SELIP

1
2  programs, though.
3      Q.    Let's start with the CLS.  What is
4  that?
5      **A.    It stands for commercial legal**
6  **software.**
7      Q.    And it's not proprietary?
8      **A.    It's not proprietary.**
9      Q.    What's that system do?
10     **A.    It's a database that allows us to**
11 **store data.  It allows us to communicate with**
12 **our clients by creating maintenance files, just**
13 **generally, files that we would then send to our**
14 **clients.  It allows us to receive electronic**
15 **files from our clients.  It assists in certain**
16 **document creation.  It has a program that**
17 **assists us in posting payments and costs to**
18 keep track of a consumer's balance, among other
19 things.
20     Q.    You say that it allows C&S to
21 receive electronic files from clients.  Is it
22 utilized to receive electronic files from
23 Midland?
24     **A.    Yes.**
25     Q.    What type of electronic files are

---

Page 85

M. SELIP

1
2    received by Midland -- from Midland through
3    CLS?
4         **A.    It's files that contain notes from**
5    **Midland with regard to the files placed with**
6    **us.**
7         Q.    What do you mean by "notes"?
8         **A.    By way of example, if a consumer**
9    **were to make a payment to Midland, we would get**
10   **a code indicating that a payment was made. So**
11   **then we can adjust our file.**
12           **We would also get placements from**
13   **Midland via this mechanism.**
14        Q.    You heard of -- have you heard of
15   the YGC system?
16        **A.    I don't know if it would be called**
17   **a system; but yes, I am familiar with it. It**
18   **is a recognized format for the transmission of**
19   **data.**
20        Q.    And does CLS interface with YGC?
21        **A.    Generally speaking, yes. It would**
22   **allows us to take a file utilizing the YGC**
23   **standard and read it into your our collection**
24   **system.**
25        Q.    So CLS is another interface with --

Page 86

M. SELIP

1
2    well, we didn't say this, but YGC is used by
3    Midland?
4         **A.    Yes, it is.**
5         Q.    So CLS is another interface with
6    Midland's systems?
7         **A.    No.**
8           **MR. FRANCOEUR: Objection.**
9    BY MR. SALTZMAN:
10        Q.    No. Go ahead. Why don't you
11   explain if I am mistaken.
12        **A.    CLS is a file management program.**
13   **It will create a file, but it doesn't**
14   **communicate with Midland. We would send the**
15   **file created by CLS in the YGC format to**
16   **Midland.**
17        Q.    What system is used to send the
18   messages to Midland?
19        **A.    It's human intervention. We send**
20   **the files. I believe it goes to Midland's SFTP**
21   **site. It's not a system.**
22        Q.    What's a Phoenix system?
23        **A.    That's our internal system that**
24   **allows us to keep track of our files.**
25        Q.    Is that the system we were

Page 87

M. SELIP

1
2    discussing this morning that interfaces with
3    Midland's system?
4           **MR. FRANCOEUR: Objection.**
5           **THE WITNESS: I think we're getting**
6      confused here with interface.
7    BY MR. SALTZMAN:
8         Q.    Go ahead.
9         **A.    There's no direct connection**
10   **between any of my systems and any of my**
11   **clients' systems.**
12        Q.    Okay. So earlier then -- I'm
13   confused. So then earlier we discussed that
14   C&S has a system that has a table that
15   translates C&S's codes into Midland's codes,
16   right?
17        **A.    We missed a step.**
18        Q.    Go ahead.
19        **A.    CLS along with Phoenix will create**
20   **a file that contains YGC codes. We will then**
21   **send that file to Midland.**
22        Q.    And but YGC codes are Midland
23   codes?
24        **A.    I can't speak to that.**
25        Q.    Okay. But are YGC codes C&S codes?

Page 88

M. SELIP

1
2         **A.    No. They are YGC codes.**
3         Q.    Okay. So is there some C&S code
4    that corresponds to YGC code?
5         **A.    Yes.**
6         Q.    Which one of these systems, if any,
7    of them contains that table that has the
8    corresponding codes?
9         **A.    Both CLS and Phoenix would be able**
10   **to capture a list of our codes and the**
11   **corresponding YGC codes.**
12        Q.    In what instances would CLS be used
13   as opposed to Phoenix?
14        **A.    We use CLS to create the base file**
15   **that we would send to Midland. We use Phoenix**
16   **to ensure that the data in the base file is**
17   **accurate and in the right format before we send**
18   **it to Midland.**
19        Q.    What is the data that is created in
20   that file generally?
21        **A.    What is it -- could you --**
22        Q.    Well, you mentioned that -- well,
23   you mentioned that CLS creates a file with
24   data, correct?
25        **A.    Yes.**

Case 2:14-cv-00018-WFK-ST  Document 354-62  Filed 02/10/27  Page 25 of 52 PageID #:
16521
Case 2:14-cv-00018-WFK-ST  Document 358-62  Filed 02/10/27  Page 25 of 52 PageID #:
16253

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

Page 89

**M. SELIP**

1
2    Q.    What's that file with data composed
3  of?
4    **A.    It's composed of records, one**
5  **record for each account that's being sent on**
6  **that day with YGC codes, which may include**
7  **subcodes. It's all coding, YGC coding. I'm**
8  **not aware of anything else that would be**
9  **contained in that file.**
10   Q.    So just so I'm clear, there's a
11  record that identifies the account; and then
12  there would be a series of YGC codes, and
13  that's what's transmitted to Midland?
14   **A.    A field. It's a field that has**
15  **Midland's code. So that's how Midland system**
16  **knows what file the codes are referring to.**
17   Q.    And how is it physically
18  transmitted to Midland? Is it sent through
19  Phoenix code? Does somebody at the end of the
20  day push a button? How does that go?
21   **A.    Manually. Somebody in my office**
22  **will create the file by running a program, and**
23  **then that person will send the file to**
24  **Midland's designated site.**
25   Q.    Via e-mail?

---

Page 90

M. SELIP

1
2    **A.    No, no. I think it's SFTP**
3  **whatever.**
4    Q.    Okay. All right. So what is
5  Phoenix's purpose?
6    **A.    It's many. In our minds it does a**
7  **superior job of allowing us to keep track of**
8  **placements. It's also the system that's used**
9  **by the account representatives when**
10  **communicating with consumers. It's used for**
11  **the creation of some documents. It stores all**
12  **of our data as well as documents. It stores**
13  **financial information. Generally, it's similar**
14  **to CLS, but it's just a different program.**
15   Q.    And when we were discussing these
16  different programs, you also mentioned there
17  might be other interfaces besides these two.
18  What are those other interfaces?
19   **A.    I'm not sure of all of them. I'm**
20  **thinking of Experian. We obtain information**
21  **from Experian, so there is an interface between**
22  **my office and Experian.**
23   **We also have other clients with**
24  **their own systems. So we would have interfaces**
25  **with those other clients as well.**

---

Page 91

**M. SELIP**

1
2    Q.    And the interfaces with the other
3  clients, do you have the same kind of
4  arrangement internally and then you translate
5  codes for the other clients?
6    **A.    Typically, yes.**
7     MR. FRANCOEUR: I'm going to
8    object.
9  BY MR. SALTZMAN:
10   Q.    Do you know who at Midland decides
11  which accounts are given to C&S for collection?
12   **A.    No, I don't.**
13   Q.    Do you know how they decide?
14   **A.    I do not.**
15   Q.    How does Midland place the accounts
16  with C&S? In other words, are they given
17  periodically, let's say, every three months in
18  groups of 500; or is it random? How does that
19  work?
20   **A.    I need to backtrack. When we send**
21  **and receive files to and from Midland, it's not**
22  **Midland's SFTP site. It's YGC's site that we**
23  **use. So I apologize about skipping that step.**
24   **So YGC is not only a standard**
25  **format with codes, but they are also an entity**

---

Page 92

**M. SELIP**

1
2  **that will be the middleman for the receiving**
3  **and sending of records.**
4    **So back to your question, do I know**
5  **how they do it? We get files from them, if**
6  **they have any files to place with us, I believe**
7  **it's on a weekly basis; but there's no -- I do**
8  **not have any -- sorry.**
9     MR. SCHWARTZ: Beyond that, I'm
10    going to object as privileged.
11  BY MR. SALTZMAN:
12   Q.    And is there a particular number
13  that they send every week?
14   **A.    No.**
15   Q.    It could be one? It could be ten?
16   **A.    Yes.**
17   Q.    How do they physically send those?
18   **A.    I don't know what they're doing on**
19  **their end.**
20   Q.    How do you receive them?
21   **A.    We log on to YGC's site, and we see**
22  **their files waiting for us; download those**
23  **files.**
24   Q.    Do those files come with documents?
25   **A.    Come with documents?**

---

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

Page 93

M. SELIP

1
2  Q.    Well, when you receive a new
3  account, what physically is received by
4  Midland -- I'm sorry, by C&S?
5  A.    We receive an electronic file of
6  data from YGC.
7  Q.    What is the data?
8  A.    What is the data?
9  Q.    You said that you receive
10 electronic files of data.  I'm asking what is
11 the data?
12 A.    Information relating to that
13 specific account.
14 Q.    What type of information?
15 A.    Name and address, consumers social,
16 account opened date, charge-off date,
17 charge-off amount, last pay date, last pay
18 amount, certain notes about what happens with
19 that account while it was in Midland's
20 possession, original creditor name, original
21 creditor account number.
22       If there are any intermediate
23 account owners, then we would get there
24 information as well, meaning their name, the
25 date of sale, the date of their purchase.  I'm

---

Page 94

M. SELIP

1
2  sure there are some things that I'm not
3  recalling right now.
4  Q.    Are any documents related to the
5  new account attached to the file you receive
6  through YGC?
7  A.    Attached?  No.
8  Q.    Do you receive any documents
9  related to new accounts?
10 A.    Yes.
11 Q.    What documents do you receive?
12 A.    It will vary depending upon the
13 account, but it typically includes chain of
14 title, bill of sale, account statements.  At
15 times it could include copies of payments from
16 the consumer, terms and conditions or card
17 number agreement, whatever you want to refer to
18 it as.  Did I say bill of sale?  If I didn't,
19 bill of sale.
20 Q.    Are those items always provided?
21 A.    Not every one of those.  There may
22 not always be a copy of payment available to us
23 at the time of placement.  But if we need it
24 for whatever reason, we then ask for it; and
25 then we get it if it's available.

---

Page 95

M. SELIP

1
2  Q.    And if it's not available, you
3  can't get it?
4  A.    We can't get it.
5  Q.    Okay.  If those documents aren't
6  sent through the YCG [sic] system, how does C&S
7  access those documents?
8  A.    They are not available -- they are
9  not sent via YGC.  YGC is used only to place
10 electronic data.  Midland maintains a portal on
11 which it places all of the media that it has
12 available at that time.
13       So when we get a new placement, we
14 log on to their media portal or whatever name
15 of the portal and we download the information
16 once we get the electronic file from YGC.
17 Q.    And do you save -- does C&S
18 download the information?  You used the word
19 "information."  Do you mean documents?
20 A.    Documents, yes.
21 Q.    Okay.  And then is it saved on
22 C&S's system?
23 A.    Yes, it is.
24 Q.    Once C&S gets the account, how does
25 your firm allocate responsibility for that

---

Page 96

M. SELIP

1
2  account among its staff?
3  A.    When it first comes in, it's
4  reviewed by the data processing folks to ensure
5  that it's entered into the system properly.  If
6  any information is missing, those folks would
7  be the first ones to reach out to the client to
8  ask for anything that is missing.
9       After the data processing folks
10 review it and approve, it then goes to an
11 attorney.  It's not assigned to a particular
12 attorney, but it's made available to all the
13 partners and several other attorneys who will
14 then go into the file, review the file to
15 ensure that it's something that we should be
16 accepting and handling on behalf of a client.
17 Q.    How do you make the determination
18 whether it's something that you should be
19 accepting?
20 A.    Based on a review of everything
21 that we get in along with the documents that
22 are associated with the file.  We'll review it.
23 And if it -- if in our opinion everything is
24 there that we need in order to litigate an
25 account, we will accept it.

---

Page 97

**M. SELIP**

1  
2  Q.    Under what conditions would you not
3  accept it?
4      **A.    If I'm missing an address, if the**
5  **balance doesn't seem right, by that, I mean**
6  **since I'm giving a charge-off amount, if the**
7  **balance is, for example, higher than the**
8  **charge-off amount, knowing that the client**
9  **doesn't charge anything post-charge-off, I**
10 **would question it or one of the attorneys would**
11 **question it; and we would seek additional**
12 **documentation to ensure that the balance is the**
13 **correct balance.  We would look again at the**
14 **last payment information pre- or**
15 **post-charge-off to make sure that the balance**
16 **is correct.  Things of that nature.**
17     Q.    Where does C&S obtain the last
18 payment information from?
19     **A.    It's provided to us in the new**
20 **claim file we receive from a client.**
21     Q.    In a document?
22     **A.    It's electronic.**
23     Q.    So it's through the YGC system?
24     **A.    Since we're talking Midland, yes,**
25 **it's through YGC.**

Page 98

**M. SELIP**

1  
2  Q.    Well, it's through the YGC system.
3  So it's just electronic -- it's a number that's
4  provided to you?
5      **A.    In the YGC file, it's data.  And**
6  **then we will get media from the Midland's media**
7  **portal, and that may include statements from**
8  **the original creditor.  Some statements may**
9  **reflect the last payment date.**
10     Q.    And sometimes they don't?
11     **A.    That's correct.  There isn't always**
12 **a payment.**
13     Q.    Do you know on average for C&S how
14 much it costs to prosecute a case against a
15 debtor?
16         **MR. FRANCOEUR:** Objection.
17         **THE WITNESS:** We don't prosecute
18     debtors.
19 BY MR. SALTZMAN:
20     Q.    To pursue a claim -- let me
21 rephrase it.
22         Do you know how much it costs on
23 average for C&S to pursue a claim against a
24 debtor?
25         **MR. FRANCOEUR:** Objection to form.

Page 99

M. SELIP

1  
2      **THE WITNESS:** I can't answer that
3  question.
4  BY MR. SALTZMAN:
5      Q.    Do you know?
6      **A.    No.**
7      Q.    Does the firm track the costs?
8      **A.    Not that I'm aware of, no.**
9      Q.    Your firm doesn't track the costs
10 of pursuing claims against debtors?
11     **A.    Not that I'm aware of.**
12     Q.    Do you know how much fees are for
13 process service?
14     **A.    Not offhand.**
15     Q.    But within the firm, there's some
16 institutional knowledge of that?
17     **A.    Of course, yes.**
18     Q.    Who would be the person to ask
19 about that?
20     **A.    The people in my accounting**
21 **department who would post the bills.  The**
22 **people in the clerical department whose**
23 **responsibility includes reviewing the bills**
24 **along with the files.**
25     Q.    And would the answer be the same

Page 100

M. SELIP

1  
2  for filing fees, I would have to go to the same
3  people?
4      **A.    No.  I know the filings fees.**
5      Q.    Oh, what are the filing fees?
6      **A.    You're talking about filing a state**
7  **court action?**
8      Q.    Yes.
9      **A.    In regard to a matter we're**
10 **handling for Midland against the consumer would**
11 **be $170 in Supreme Court and $45 in district,**
12 **city, and civil.**
13     Q.    Are there any other costs involved
14 in pursuing legal action against a debtor other
15 than process serving and filing fees?
16     **A.    Whose costs?**
17     Q.    C&S?
18     **A.    Well, we have staff that we pay.**
19 **So we have rent.  We have electric.  Again,**
20 **it's a very general question.**
21     Q.    Go ahead.
22     **A.    So we have all the expenses that**
23 **any law firm typically has in running a**
24 **business.**
25     Q.    Anything specific to pursuing the

Page 101

M. SELIP

1 claim other than overhead?
2    **A.**   **Are you referring to disbursements**
3 **incurred in connection with filing a lawsuit?**
4    Q.   Yes.
5    **A.**   **No. Then there are none.**
6    Q.   There's travel also, right, if
7 you're going up to Buffalo, like we said this
8 morning? You have travel costs?
9    **A.**   **Right. Any costs that are**
10 **typically incurred by a law firm is not going**
11 **to be any different because of the type of law**
12 **we practice.**
13    Q.   Have you ever heard of the term
14 "account stated"?
15    **A.**   **Yes.**
16    Q.   What does that mean?
17       **MR. FRANCOEUR:** Objection. Calls
18   for a legal conclusion.
19 BY MR. SALTZMAN:
20    Q.   What's your understanding of what
21 that means?
22    **A.**   **It's a cause of action recognized**
23 **in New York.**
24    Q.   What type of cause of action?

Page 102

M. SELIP

1    **A.**   **It's a civil cause of action.**
2    Q.   When C&S makes its decision to file
3 for default judgment, how does the firm go
4 about making that decision?
5    **A.**   **We utilize our Phoenix system to**
6 **identify accounts that have been sued, where**
7 **the consumer has been served, where the 3215**
8 **Notice has been sent and more than 25 days has**
9 **passed and there's no answer; it's not paying**
10 **or performing; there's no compliance issues**
11 **which I would broadly define as allegation of**
12 **fraud, dispute, paid prior, identity theft**
13 **which is part of fraud. If the account falls**
14 **into that category, then it's reviewed by a**
15 **clerk who will gather the documents necessary**
16 **to support the request for a judgment and give**
17 **it to an attorney for review and signature.**
18    Q.   Do you know who Shane Teusch is?
19    **A.**   **He's an employee of Midland.**
20    Q.   Have you ever met him?
21    **A.**   **Yes.**
22    Q.   Under what circumstances have you
23 met him?
24    **A.**   **I've met him in my office when he's**

Page 103

M. SELIP

1   **come to visit. I've met him in San Diego when**
2 **I've gone out to visit with Midland. I met him**
3 **in industry conferences over the years.**
4    Q.   Do C&S personnel ever meet with him
5 as part of their job other than something like,
6 you know, seeing him at a trade conference?
7 Does C&S personnel interface with him?
8    **A.**   **Yes.**
9    Q.   In what capacity?
10    **A.**   **If there's an account-related**
11 **question, a procedure-related question, we**
12 **would contact him for assistance; or**
13 **alternatively, if he has questions for us, he**
14 **would contact us.**
15    Q.   What type of questions specifically
16 would you go to Mr. Teusch with?
17       **MR. SCHWARTZ:** I object
18   specifically as attorney/client, but
19   certainly in general.
20       **THE WITNESS:** Generally, it's the
21   same answer I gave. It's just a question
22   about procedure or how they would want an
23   account handled or if there's a question
24   about a specific account, we would

Page 104

M. SELIP

1 communicate with him.
2 BY MR. SALTZMAN:
3    Q.   What's his job at Midland?
4    **A.**   **I believe he is a manager, a firm**
5 **liaison manager. I'm guessing.**
6       **MR. FRANCOEUR:** Don't guess.
7       **THE WITNESS:** I shouldn't be
8   guessing. I'm not sure of his exact
9   title.
10 BY MR. SALTZMAN:
11    Q.   What about Rita Melconian. Did you
12 ever hear of her?
13    **A.**   **Yes.**
14    Q.   Have you ever spoken to her?
15    **A.**   **Yes.**
16    Q.   Does C&S personnel ever meet with
17 her or speak with her?
18    **A.**   **Yes.**
19    Q.   In what context would they speak
20 with her?
21    **A.**   **We would speak with Rita if we had**
22 **questions about Midland's procedures or**
23 **questions, perhaps, about specific accounts if**
24 **there was a need to. I would communicate with**

M. SELIP

1      her regarding issues of state law, federal law.
2      Q.    Is she an attorney?
3      A.    Yes, she is.
4      Q.    Is Shane Teusch an attorney?
5      A.    No.
6      Q.    Is he a paralegal?
7      MR. FRANCOEUR: Don't guess.
8      THE WITNESS: I don't know if he
9      has a paralegal certificate.
10 BY MR. SALTZMAN:
11      Q.    Do you know who Mike Bender is?
12      A.    Yes.
13      Q.    Who is he?
14      A.    I know he works for Midland.
15      Q.    Do you know what he does for
16 Midland?
17      A.    I'm not a hundred percent sure.
18      Q.    Do C&S personnel ever meet with
19 him?
20      A.    Yes.
21      Q.    In what context?
22      A.    General meetings with regard to the
23 industry, Midland's procedures, expectations,
24 conferences.

M. SELIP

1      Q.    When you say that they discuss with
2 Mike Bender expectations, you mean Midland's
3 expectations of C&S?
4      A.    Yes.
5      Q.    Does that include C&S's
6 performance, vis-a-vis collection of debt on
7 behalf of Midland?
8      A.    You're talking about Mike Bender?
9      Q.    Yes.
10      A.    The answer's no.
11      Q.    Is there someone who does that, who
12 keeps track of C&S's performance on behalf of
13 Midland?
14      MR. FRANCOEUR: Objection.
15      THE WITNESS: It's a Midland
16      question.
17 BY MR. SALTZMAN:
18      Q.    Do you ever interface with anybody
19 at Midland regarding C&S's performance,
20 vis-a-vis collection on behalf of Midland?
21      A.    Yes.
22      Q.    With whom do you interface?
23      A.    The personnel will vary. What time
24 period are we talking about?

M. SELIP

1      Q.    Let's start in 2006?
2      A.    I don't remember.
3      Q.    What do you remember most recently?
4      A.    Most recently the person with whom
5 we've been speaking would be Shane, a gentleman
6 by the name of Sasha whose last name I can't
7 recall or spell.
8      I've spoken with Danielle
9 Wohlfordth, a couple of other names that I
10 can't recall right now.
11      Q.    Shane, Sasha, and Danielle, those
12 are the most recent?
13      A.    Yes.
14      Q.    Do you remember anybody prior to
15 them?
16      A.    Let me fill in, Joe Gugal,
17 G-U-G-A-L, I think.
18      Q.    And those four people, they are the
19 most recent people?
20      A.    Yes.
21      Q.    You continue to have discussions
22 with them about performance?
23      A.    Yes.
24      Q.    Anybody before them that you

M. SELIP

1 discussed performance?
2      A.    Yes, but I can't recall names right
3 now.
4      Q.    Maybe you can get back to us.
5      And when you discuss with Shane
6 Teusch performance, what's the nature of the
7 discussion?
8      MR. FRANCOEUR: Objection.
9      MR. SCHWARTZ: Objection
10 attorney/client privilege. I'm going to
11 instruct you not to answer that.
12      MR. FRANCOEUR: I join in the
13 objection.
14 BY MR. SALTZMAN:
15      Q.    When you discuss the performance of
16 C&S in regard to debt collection on behalf of
17 Midland with Mr. Teusch, what's the nature --
18 what do you discuss with him?
19      MR. SCHWARTZ: Again, objection.
20 Objection. Attorney/client privilege. If
21 you can do it generally, I suppose that
22 would be fine but nothing specific.
23      MR. FRANCOEUR: I join in the
24 objection.

Case 2:14-cv-00018-WFK-ST   Document 158-62   Filed 02/10/27   Page 30 of 52 PageID #:
16526
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

Page 109

M. SELIP

1  THE WITNESS: We'll discuss money
2  that we collect on behalf of Midland.
3  We'll discuss legal aspects of the
4  business, discuss any challenges that we
5  may be having or needs that we have.
6  Nothing else to add at this point.
7  BY MR. SALTZMAN:
8  Q.    And what about Sasha, is the answer
9  the same?  Any discussions with Sasha?
10  MR. SCHWARTZ: Objection.
11  Attorney/client privilege.  Go ahead.
12  MR. FRANCOEUR: I join.
13  THE WITNESS: My discussions with
14  Sasha are more data-related.  My
15  understanding is that he is an analyst of
16  sorts.
17  BY MR. SALTZMAN:
18  Q.    What do you mean by "data-related"?
19  A.    The general status of accounts
20  placed with my office.
21  Q.    What do you mean by "status"?
22  A.    The litigation status and the
23  collection status.
24  Q.    Of particular accounts?

Page 110

M. SELIP

1  A.    No.  We discuss generalities.
2  Q.    What about Danielle Wohlfordth?
3  A.    My conversations with her are very
4  general as well, about the firm's performance,
5  for lack of a better word, in handling or
6  representing Midland.
7  Q.    And what about Joe Gugal?
8  A.    Joe is more of a person who can
9  assist us with regards to particular accounts
10  that if we need some additional information, if
11  we have questions as to what they want us to --
12  Midland would want us to do, in a specific
13  situation we would speak with Joe or Shane.  It
14  would be similar.
15  Q.    Do you ever discuss with them their
16  satisfaction with C&S's performance?
17  A.    Yes.
18  Q.    And would that be with Shane?
19  A.    Yes.
20  Q.    With Joe?
21  A.    Not really.
22  Q.    Sasha?
23  A.    No.
24  Q.    Danielle?

Page 111

M. SELIP

1  A.    Yes.
2  Q.    Why with Danielle and Shane and not
3  the other two?
4  MR. FRANCOEUR: Objection.
5  THE WITNESS: That's the topics
6  they bring up to me.  As why they bring
7  them up and not others, it's not for me to
8  know.
9  BY MR. SALTZMAN:
10  Q.    It's not the other folks' purview;
11  is that your understanding?
12  A.    That's my understanding.
13  Q.    Do you know who Xenia Murphy is?
14  A.    Xenia.
15  Q.    Xenia.
16  A.    Yes.
17  Q.    And do you speak to her ever?
18  A.    On occasion, yes.
19  Q.    And do C&S personnel speak to her?
20  A.    I don't think so.
21  Q.    When you talk to her without
22  details, what do you discuss with her?
23  MR. FRANCOEUR: Objection.
24  MR. SCHWARTZ: Objection.

Page 112

M. SELIP

1  Attorney/client privileged.  You can
2  answer it generally.
3  THE WITNESS: We don't really speak
4  specifics about the business.  Our
5  discussions are more nonbusiness-related
6  at this point.
7  BY MR. SALTZMAN:
8  Q.    Okay.  When you say "at this
9  point," was there a point where they were
10  business-related?
11  A.    Yes, but not on behalf of Midland
12  that I can recall.
13  Q.    On behalf of whom?
14  A.    Xenia worked for another one of my
15  firm's clients.
16  Q.    Now, communications that you have
17  with Shane and Danielle are there ever
18  communications regarding C&S's performance via
19  e-mail?
20  A.    We do communicate via e-mail.  I
21  don't recall right now if any of the e-mails
22  would have commented on performance.
23  Q.    Would they have commented on any of
24  the topics we discussed under the heading of

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

Page 113

M. SELIP

1  
2  performance that you discuss with them?
3  **A.     We discuss these things over the**
4  **phone.**
5  Q.     Any e-mails?
6  **A.     How are you defining performance?**
7  Q.     Well, let's not use the word
8  performance and rather use the items that you
9  just said that you discuss with Shane and
10  Danielle.
11       You mentioned that you discussed a
12  few things in general terms.  I'm talking about
13  those things.
14  **A.     So I think with Shane, yes, there**
15  **have been times where the items I mentioned**
16  **earlier were the topics of e-mail**
17  **communications.**
18       MR. SALTZMAN: So we would call for
19  the production of those e-mail
20  communications.
21       MR. FRANCOEUR: Those are all going
22  to be privileged.
23       (Whereupon, Request No. 9,
24  Production of e-mail communications, was
25  made.)

---

Page 114

M. SELIP

1  
2  **BY MR. SALTZMAN:**
3  Q.     We discussed a little earlier,
4  briefly, we mentioned YGC, right?
5  **A.     Yes.**
6  Q.     Okay.  Does C&S communicate on a
7  daily basis with MCM through YGC?
8  **A.     I don't believe we do so on the**
9  **weekends.**
10  Q.     On business days then?
11  **A.     Yes.**
12  Q.     And that --
13       MR. FRANCOEUR: Counsel, I need to
14  take a short bathroom break.
15       MR. SALTZMAN: Certainly.
16       MR. FRANCOEUR: You're okay?
17       MR. SALTZMAN: Yes.
18       (Whereupon, a short break was
19  taken.)
20  **BY MR. SALTZMAN:**
21  Q.     Mr. Selip, once an action is
22  initiated against a debtor, if the debtor is
23  representing himself and serves discovery on
24  Midland, are there any particular steps that
25  your firm takes in response to that?

---

Page 115

M. SELIP

1  
2  **A.     It depends on the type of discovery**
3  **asked for.**
4  Q.     Okay.  So why don't you take us
5  through that if there are different types of
6  discovery, please.
7  **A.     If it's a doc demand, we would put**
8  **it together with the documents that we have.**
9  **If we don't have documents, we would ask**
10  **Midland for the documents that we don't have.**
11  Q.     And do you request it through the
12  YGC system or some other way if you request it
13  from Midland?
14  **A.     It's through the YGC system, yes.**
15  Q.     Go ahead.
16  **A.     If time is of the essence, then we**
17  **will request it via e-mail.  If it's documents**
18  **related to questions, we would prepare the**
19  **answer and send it to Midland for their review**
20  **and approval.**
21  Q.     Anything else?
22  **A.     No.**
23  Q.     And what if the debtor interposes
24  an answer, is there something that C&S does in
25  that instance?

---

Page 116

M. SELIP

1  
2       MR. FRANCOEUR: Object.  Do you
3  understand the question?
4       THE WITNESS: It's too general of a
5  question.
6  **BY MR. SALTZMAN:**
7  Q.     What don't you understand?
8  **A.     If we get an answer, what do we do?**
9  **What do we do in regard to what?**
10  Q.     Do you take any action if you get
11  an answer from a debtor?
12  **A.     With regard to what?**
13  Q.     With regard to the claim against
14  the debtor?
15       MR. FRANCOEUR: Counsel, I'm
16  confused by the question.  Are you saying
17  after he gets an answer, do you try to get
18  an answer?
19       MR. SALTZMAN: No.
20  **BY MR. SALTZMAN:**
21  Q.     After C&S gets an answer, they get
22  an answer, do you communicate to Midland in any
23  way?
24  **A.     That's a different question.  So**
25  **yes, we will let Midland know we received an**

---

Page 117

M. SELIP
1  answer.
2
3   Q.   Do you do anything else?
4   A.   It's too general a question.  We go
5 for lunch.  We go to the bathroom.
6   Q.   Well, obviously, I'm not talking
7 about that?
8   A.   Tell me what it is you're talking
9 about.
10   Q.   So when you receive an answer, do
11 you analyze the answer?
12   A.   Yes.
13   Q.   Once you analyze the answer, do you
14 take any other action other than going to the
15 bathroom or going for lunch?
16     MR. FRANCOEUR: Objection.
17     THE WITNESS: With regard to what?
18 BY MR. SALTZMAN:
19   Q.   With regard to that case?
20   A.   It depends on the circumstances
21 surrounding that case.
22   Q.   In what way does it depend on the
23 circumstances surrounding that case?
24   A.   It depends on what's in the answer.
25 It depends on whether they're allowed to speak

Page 118

M. SELIP
1
2 with the consumer, depends on whether it's set
3 down for a court date.
4   Q.   Whether your allowed to speak to
5 the consumer.  Is that something that's
6 governed by the manual that's received from
7 Midland?
8   A.   It's governed by federal law.
9   Q.   And if you communicate that, if an
10 answer was served to Midland, do you then await
11 an instruction from Midland?
12   A.   No.
13   Q.   What do you do vis-a-vis Midland?
14   A.   What do we do vis-a-vis Midland?
15   Q.   Yes.  When you notify Midland an
16 answer is served, do you wait for a response
17 from Midland at all?
18   A.   No, we don't.
19   Q.   You proceed with what we just
20 discussed; and depending on whether you can
21 communicate with the debtor, etcetera?
22   A.   We handle the case as lawyers would
23 handle any other case.
24   Q.   And the when you notify Midland
25 that an answer was served, do you do that

Page 119

M. SELIP
1 through a code also?
2   A.   Yes.
3   Q.   And if a counterclaim is served, do
4 you notify Midland?
5
6   A.   Yes.
7   Q.   Do you then wait for Midland to
8 instruct you on how to proceed?
9   A.   No.
10   Q.   Do you go to lunch or to the
11 bathroom?
12     MR. FRANCOEUR: Hold on.  Don't
13 answer the question.
14     Counsel, you can't harass the
15 witness.  We could derail the deposition.
16 We could get into a screaming match.
17     MR. SALTZMAN: I'll withdraw.
18     MR. FRANCOEUR: Thank you.
19 BY MR. SALTZMAN:
20   Q.   When you get a counterclaim, what
21 do you do?
22   A.   Again, your question is too broad.
23   Q.   In connection with the case where
24 you receive a counterclaim, does C&S take any
25 action other than notifying MCM that you

Page 120

M. SELIP
1
2 received a counterclaim?
3   A.   We represent our client as we would
4 in any other matter.
5   Q.   Do you respond to the counterclaim?
6   A.   Yes, we do.
7   Q.   Does C&S have leeway to respond to
8 the counterclaim on their own, or do they have
9 to wait for any instructions from Midland; or
10 is there a discussion with Midland?
11   A.   I don't recall.
12   Q.   When was the last time you saw a
13 counterclaim served in one of these cases by a
14 debtor?
15   A.   I don't recall.
16   Q.   Was it recent?
17     (Telephone interruption.)
18     MR. FRANCOEUR: Do you want to
19 repeat your question.
20 BY MR. SALTZMAN:
21   Q.   Was it recent?
22   A.   I haven't personally seen a
23 counterclaim in quite some time.
24   Q.   Does C&S maintain records -- I
25 think I might have asked you this.  Does C&S

Page 121

M. SELIP
1
2 maintain records of the communications with
3 Midland through YGC?
4 **A. Yes.**
5 Q. Does it maintain those for seven
6 years?
7 **A. At least, yes.**
8 Q. Does C&S ever have contact with the
9 original creditors in connection with debt
10 collection for -- on behalf of Midland?
11 **MR. FRANCOEUR: Objection. Asked**
12 **and answered. You can answer again.**
13 **THE WITNESS: On occasion.**
14 BY MR. SALTZMAN:
15 Q. Under what circumstance would that
16 happen?
17 **A. There have been occasions where I**
18 **have attempted to assist Midland in connection**
19 **with the purchase of receivables. There have**
20 **also been some instances where we have**
21 **subpoenaed original creditors for records.**
22 Q. In instances where C&S has
23 subpoenaed the original creditors for records,
24 is that because the original creditors have
25 refused to produce records?

Page 122

M. SELIP
1
2 **A. I can't tell you what transpired**
3 **between the original creditor and Midland.**
4 Q. Well, has, in those instances, did
5 C&S contact the original creditors prior to
6 serving the subpoena in order to try to procure
7 those records that they were trying to get?
8 **A. Not that I recall.**
9 Q. So under what circumstance, would
10 C&S subpoena the original creditors for
11 records?
12 **A. The attorney who was handling that**
13 **particular matter felt that that was the**
14 **prudent course of action to take.**
15 Q. Because he couldn't get the
16 documents in another way?
17 **MR. FRANCOEUR: Objection.**
18 **THE WITNESS: I don't know why he**
19 **felt that was the best thing to do, but**
20 **that was his course of action.**
21 BY MR. SALTZMAN:
22 Q. Do you remember a specific instance
23 where this happened?
24 **A. No, I don't.**
25 Q. Does C&S often subpoena original

Page 123

M. SELIP
1
2 creditors for records?
3 **A. No.**
4 Q. Do they ever get original creditor
5 records without subpoena?
6 **A. Can you rephrase that question?**
7 Q. Sure. You said that sometimes C&S
8 subpoenas original creditors for records
9 because the attorney handling feels that that's
10 the best way to go about obtaining those
11 records, right?
12 **A. Yes.**
13 Q. Okay. Are there other ways of
14 obtaining those records rather than through
15 subpoena?
16 **A. Yes.**
17 Q. What are those ways?
18 **A. We can request those documents from**
19 **Midland.**
20 Q. Any other way?
21 **A. We can request information from the**
22 **defendant.**
23 Q. So if C&S doesn't have documents
24 that they need, they sometimes will rely on the
25 defendant for those documents?

Page 124

M. SELIP
1
2 **MR. FRANCOEUR: Objection.**
3 **THE WITNESS: No.**
4 BY MR. SALTZMAN:
5 Q. When would C&S request documents
6 from the defendant?
7 **A. In almost every matter.**
8 Q. There's always a document request
9 to the defendant?
10 **A. That's not what I said.**
11 Q. What did you say?
12 **A. I said -- excuse me.**
13 **THE WITNESS: Could you, please,**
14 **read back my answer.**
15 **THE COURT REPORTER: Sure.**
16 **(The record was read as follows:**
17 **Answer: In almost every matter.)**
18 **THE WITNESS: That's my answer.**
19 BY MR. SALTZMAN:
20 Q. What do you mean by "matter"?
21 **A. Litigation.**
22 Q. Against the debtor?
23 **A. Yes.**
24 Q. You always --
25 **A. We engage in discovery.**

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 125

M. SELIP

1
2    Q.    And you always -- well, I asked you
3    that, do you always have a document request to
4    defendant.  You said no.
5         MR. FRANCOEUR:  Objection.  He said
6    in almost every matter.
7         THE WITNESS:  You asked me in every
8    matter do I do it.  I said no, because my
9    answer previously was in almost every
10   matter.
11   BY MR. SALTZMAN:
12   Q.    In almost every matter you serve a
13   document request?
14   A.    That's correct.
15   Q.    And if you can't get the document
16   from the defendant or Midland, then do you try
17   to get it from the original creditor?
18   A.    What point in time?
19   Q.    Any point in time.
20   A.    So yes.
21   Q.    Are there ever requests made to the
22   original creditor other than through subpoena?
23   A.    Yes.
24   Q.    In what way would you request the
25   documents from the original creditor other than

Page 126

M. SELIP

1
2    through subpoena?
3    A.    Telephone or e-mail.
4    Q.    And who would make that request
5    from C&S?
6    A.    Me.
7    Q.    It wouldn't be somebody from one of
8    the -- from one of the departments we
9    discussed?  It wouldn't be a clerk?
10   A.    No.
11   Q.    And why would it be you as opposed
12   to a clerk making the request?
13   A.    Because I have the contacts with
14   the original creditors to make that call.
15   Q.    Is it relatively rare that you have
16   to do that?
17   A.    Yes.
18   Q.    And if they are not responsive,
19   then is the subpoena the next step?
20   A.    Not necessarily.
21   Q.    What might transpire between your
22   contacting an original creditor and actually
23   subpoenaing the original creditor for the
24   documents C&S needs?
25   A.    We may decide we don't need the

Page 127

M. SELIP

1
2    documents.  We may get the documents from
3    another source, or the case may be resolved.
4    Q.    So those are instances where C&S
5    determines that it needs additional documents
6    other than what it's received from Midland in
7    connection with collecting a particular debt,
8    correct?
9    A.    Yes.
10   Q.    And why would C&S need such
11   additional documents?
12   A.    It may depend on the answer or
13   perhaps a counterclaim interposed by the
14   consumer, defendant at that point.
15   Q.    Would those documents -- additional
16   documents -- and here I'm not limiting myself
17   to -- from the original creditor, but rather
18   even from Midland.
19        Would such additional documents be
20   needed for filing for default judgment against
21   a debtor?
22   A.    No.
23   Q.    Why not?
24   A.    Because the state of law in New
25   York wouldn't require it.

Page 128

M. SELIP

1
2    Q.    During what time period did the
3    State of New York law not require it?
4         MR. FRANCOEUR:  Objection.  It's
5    calling for a legal opinion.  You can tell
6    him about your current practice.
7         THE WITNESS:  I would refer to the
8    OCA and the recent rules.
9         MR. SALTZMAN:  Can you read back
10   his prior answer?
11        (The record was read as follows:
12        Answer:  Because the state of law
13   in New York wouldn't require it.)
14   BY MR. SALTZMAN:
15   Q.    Did the state law change such that
16   it would not or would not be required at some
17   point during your tenure at C&S?
18   A.    What is "it"?
19   Q.    Additional documents?
20   A.    Additional -- I can't answer that
21   because you're assuming things that are not
22   stated in your question.
23   Q.    You stated that New York State
24   doesn't require additional documents for filing
25   default judgment, correct?

Page 129

M. SELIP

1 
2    THE WITNESS: Can you repeat that?
3    (The record was read as follows:
4    Question: You stated that New York
5    State doesn't require additional documents
6    for filing default judgment, correct?)
7    THE WITNESS: I don't know.
8 BY MR. SALTZMAN:
9    Q.   You don't know?
10    A.   Without knowing what you're
11 referring to as additional documents, I'm not
12 really sure what your getting at.
13    Q.   In addition to what you have while
14 you're pursuing the case.
15    A.   Depends on what I have in that
16 particular matter.
17    Q.   And if you need additional
18 documents, do you request those documents from
19 Midland to pursue the collection?
20    A.   On a default judgment matter or a
21 contested matter?
22    Q.   Default judgment.
23    A.   Prior to the recent OCA changes, I
24 would not need additional documentation to
25 obtain a default judgment.

Page 130

M. SELIP

1 
2    Q.   Now you do?
3    A.   I refer you to the OCA rules.
4    Q.   And how do you go about getting
5 those documents from Midland?
6    A.   It has not been an issue.
7    Q.   You have not -- what do you mean by
8 that?
9    A.   I have not commenced any lawsuits
10 under the New York, the new rules.
11    Q.   When were the new rules
12 implemented?
13    MR. FRANCOEUR: Objection. If you
14 know.
15    THE WITNESS: There were two
16 different dates, July 1 and then I believe
17 March 1. I don't recall the exact date.
18 BY MR. SALTZMAN:
19    Q.   Of what year?
20    A.   This year.
21    Q.   And so you haven't commenced any
22 additional actions since March; is that right?
23    MR. FRANCOEUR: Objection.
24    THE WITNESS: I filed lawsuits
25    since March.

Page 131

M. SELIP

1 BY MR. SALTZMAN:
2    Q.   What about since July 1?
3    A.   No.
4    Q.   Why not since July 1?
5    A.   I have not received any placements
6 from Midland that would require me to take any
7 action to commence a lawsuit.
8    Q.   Have you received any placements
9 from Midland at all since July 1?
10    A.   No.
11    Q.   Do you know why?
12    A.   No, I don't.
13    Q.   Have you asked anybody at Midland
14 why?
15    A.   I have.
16    Q.   And who did you ask?
17    A.   I have asked Shane.
18    Q.   Anyone else?
19    A.   I don't believe so.
20    Q.   What did -- when you asked Shane
21 that question, what did he answer?
22    MR. FRANCOEUR: Objection. That's
23 privileged communication.
24    MR. SCHWARTZ: Yes. I'm going to
25 

Page 132

M. SELIP

1 
2 object, too.
3    MR. SALTZMAN: How is that
4 privileged?
5    MR. SCHWARTZ: Well, No. 1, it's a
6 communication between -- there's still a
7 retainer agreement. It's an
8 attorney/client communication.
9    MR. FRANK: About the collection of
10 a debt?
11    MR. SCHWARTZ: About anything.
12 About policies and practices. I mean, he
13 didn't -- my objection is attorney/client
14 privilege.
15    I can articulate it if you'd like.
16 I just don't believe you want me to
17 testify on the record.
18    MR. SALTZMAN: No. It's okay.
19 That's all right.
20    MR. FRANK: No. We know.
21    MR. SCHWARTZ: All right.
22 BY MR. SALTZMAN:
23    Q.   Prior to July 1 of this year, were
24 there ever any instances in which C&S requested
25 documents from -- additional documents from MCM

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

---

Page 133

M. SELIP

1             M. SELIP
2  and they were not provided?
3     **A.**   **Yes.**
4     Q.   Under what circumstances did that
5  happen?
6         **MR. FRANCOEUR:** Is there a time
7     frame in that question.
8  **BY MR. SALTZMAN:**
9     Q.   I gave a time frame prior to
10  July 1, 2015.
11         **MR. FRANCOEUR:** In the last 25
12     years?
13  **BY MR. SALTZMAN:**
14     Q.   We can start with the last ten
15  years.
16     **A.**   **Under what circumstances?**
17     Q.   Yes. You said that there were
18  instances when Midland did not provide
19  documents when they were requested. I'm asking
20  you what happened.
21         **MR. FRANCOEUR:** I object to the
22     form of the question. If you're able to
23     answer the question, go right ahead.
24         **THE WITNESS:** I asked for
25     documents. I didn't get them.

---

Page 134

1             M. SELIP
2  **BY MR. SALTZMAN:**
3     Q.   What kind of documents did you ask
4  for that you didn't get?
5         **MR. FRANCOEUR:** Objection to the
6     form.
7         **THE WITNESS:** It varied by case.
8     It could have been --
9  **BY MR. SALTZMAN:**
10     Q.   Well, generally.
11     **A.**   **It could have been a pay clip. It**
12  **could have been certain statements, generally.**
13     Q.   And did Midland -- in those
14  instances, did Midland explain why they didn't
15  produce -- didn't provide to you those
16  documents?
17     **A.**   **No.**
18         **MR. FRANCOEUR:** Objection to form.
19  **BY MR. SALTZMAN:**
20     Q.   They just would not provide them?
21     **A.**   **Correct.**
22         **MR. FRANCOEUR:** Objection.
23  **BY MR. SALTZMAN:**
24     Q.   And they wouldn't give you an
25  explanation?

---

Page 135

1             M. SELIP
2     **A.**   **I didn't ask for an explanation.**
3     Q.   Okay. Now, if you don't get a
4  document that you requested -- well, let me
5  step back.
6        Is it fair to assume that if you
7  request a document, it's a document that C&S
8  determines it needs for some purpose in
9  connection with collecting a debt?
10         **MR. FRANCOEUR:** Objection.
11         **THE WITNESS:** No.
12  **BY MR. SALTZMAN:**
13     Q.   It's not fair to assume that?
14     **A.**   **That's correct.**
15     Q.   Okay. So other than in the
16  circumstance where you're trying to collect
17  debt, when would C&S request additional
18  documents from Midland?
19         **MR. FRANCOEUR:** Objection.
20         **THE WITNESS:** It wouldn't.
21  **BY MR. SALTZMAN:**
22     Q.   So they would only request
23  additional documents when they believe it's
24  necessary to pursue the debt; is that right?
25         **MR. FRANCOEUR:** Objection.

---

Page 136

1             M. SELIP
2         **THE WITNESS:** No.
3         **MR. FRANCOEUR:** Mitchell, you've
4     got to give me a chance to object.
5         **THE WITNESS:** Oh, okay.
6  **BY MR. SALTZMAN:**
7     Q.   When does C&S request additional
8  documents from Midland in connection with
9  pursuing a debt?
10     **A.**   **When it believes it would be**
11  **helpful in collecting from the consumer.**
12     Q.   And in such a circumstance, if
13  Midland does not provide you with the document,
14  does C&S then make a determination on whether
15  to proceed with pursuing the debt?
16     **A.**   **Yes.**
17     Q.   And are there times when C&S will
18  pursue the debt regardless of not having that
19  document?
20     **A.**   **Correct.**
21         **MR. FRANCOEUR:** Counsel, we're
22     approaching four hours. I think we should
23     talk about lunch.
24         **MR. SALTZMAN:** Whatever is good for
25     the witness.

Case 2:14-cv-00018-WFK-ST   Document 358-62   Filed 02/10/27   Page 37 of 52 PageID #: 16283
Case 2:14-cv-00018-WFK-ST   Document 358-62   Filed 02/10/27   Page 37 of 52 PageID #: 16283

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 137

1  M. SELIP
2  (Discussion held off the record.)
3  MR. SALTZMAN: I'd like to mark as
4  the next exhibit, I believe it's four.
5  (Whereupon, Exhibit No. 4, Screen
6  shots, was marked for identification.)
7  BY MR. SALTZMAN:
8  Q.  So we've mark as Exhibit Selip 4 a
9  document that's Bates stamped S&S 00151 through
10  160.
11  And I would ask you, sir, do you
12  recognize this document?
13  A.  Yes.
14  Q.  And what is it?
15  A.  Screen shots of notes from my
16  Phoenix system.
17  MR. FRANCOEUR: Just let the record
18  reflect that it's 12:58, and this is the
19  first question having to do with the
20  plaintiff in this case.
21  Continue counsel.
22  BY MR. SALTZMAN:
23  Q.  What does this document reflect?
24  We can go through the columns if you like, and
25  I can ask you a question about each column.

Page 138

1  M. SELIP
2  Tell me what this is about, and we could save a
3  little time.
4  A.  It reflects notes from my client as
5  well as notes from my office either entered
6  manually or read in from the client's file that
7  it would have sent to us.
8  Q.  Is that in the text column, the
9  notes?
10  A.  The text would represent either
11  free form text, or it would be predetermined
12  text based on the code that's entered in the
13  fourth column.
14  Q.  And the code that's represented in
15  the fourth column under the heading code
16  number, is that a Phoenix code?
17  A.  It's a combination of Phoenix codes
18  in addition to some YGC codes and other codes
19  sent to me by my client.
20  Q.  So let's just take the second code
21  that's in the Column CC; W122. There's an
22  asterisk first.
23  So what does the asterisk
24  represent?
25  A.  That entire code taken as a whole

Page 139

1  M. SELIP
2  is a YGC code. I can't tell you what any part
3  of the code means. It's just a YGC code.
4  Q.  So is there a Phoenix code that you
5  could point us to in that column?
6  A.  The first one that I see is the
7  XVERPROP.
8  Q.  Okay. And then it says, "Property
9  ownership verified," in text; and that
10  corresponds to that code; is that right?
11  A.  That's right.
12  Q.  Where it says user for that
13  particular entry, it says administrative. Is
14  that a C&S administrator?
15  A.  It depends on the computer that
16  read the note into the Phoenix system. So it's
17  not necessarily the person who entered the
18  note.
19  Q.  It reflects the computer where the
20  entry is made?
21  A.  Correct -- no, not where the entry
22  was made, but where it was read into my system.
23  Q.  And read into your system from
24  where?
25  A.  From the -- depending on the code,

Page 140

1  M. SELIP
2  it could be from a client; it could be from a
3  vendor; or it could be from one of the firm's
4  employees.
5  Q.  So what does "administrative" mean?
6  A.  The person who logged into the
7  computer to read the notes in for that day
8  logged in as administrator. So it would have
9  been an IT manager.
10  Q.  That's a C&S IT manager?
11  A.  Correct.
12  Q.  Okay. And where it says -- above
13  that there are quite a few entries. It looks
14  like electronic interface; is that right?
15  A.  Yes.
16  Q.  What does that represent?
17  A.  These are notes were read in by a
18  computer who the login for that computer was
19  the electronic interface login.
20  Q.  And that would be from Midland?
21  A.  No, no. Somebody in the firm will
22  read the notes into our system. Midland
23  doesn't read notes into our system.
24  Q.  What is ED -- it looks like an I --
25  EDI2?

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 141

M. SELIP

1    A.    **Same thing. Just a different user.**
2    Q.    Is that a particular computer?
3 What does it stand for?
4    A.    **It's a username used to log in to a**
5 **particular computer. Although, it could have**
6 **been used to log in to any computer. So it's**
7 **not a particular computer.**
8    Q.    So that EDI2 is a particular
9 person?
10    A.    **It's a username associated with a**
11 **function.**
12    Q.    What does "house" mean also in the
13 user column?
14    A.    **Just another username.**
15    Q.    It's just not clear to me. So I
16 apologize. But if it's a username and it's
17 associated with a function? I don't get that.
18    A.    **We will use usernames to log in to**
19 **a computer to run certain functions that are**
20 **being done on a daily basis.**
21    Q.    And is a particular username
22 associated with a particular function and only
23 that function?
24    A.    **It doesn't have to be, but that's**

Page 142

M. SELIP

1 **typically how we do it.**
2      MR. FRANCOEUR: I'd like to ask
3    counsel a question. Are you recording
4    this?
5      MR. FRANK: No. That's Alan who's
6    been calling in. He's on the record.
7      MR. FRANCOEUR: Okay.
8 BY MR. SALTZMAN:
9    Q.    And at the top of the document on
10 the first page, there are, it looks like, tabs;
11 and are those different functions within
12 Phoenix?
13    A.    **Not functions as much as screens**
14 **with information.**
15    Q.    What is diary?
16    A.    **That captures information that's in**
17 **the CLS system that we don't use anymore.**
18    Q.    Like what?
19    A.    **Diary codes, that sets things up**
20 **for future review; but we don't use that**
21 **function.**
22    Q.    What about employer?
23    A.    **If we know where a consumer works,**
24 **we would add that information into that tab.**

Page 143

M. SELIP

1    Q.    And PPA?
2    A.    **We use that tab to enter payment**
3 **arrangements on that file.**
4    Q.    And banks represents banks that are
5 associated?
6    A.    **Consumers banking institution.**
7    Q.    What's scrub?
8    A.    **We run certain automated tasks to**
9 **see if a consumer has filed bankruptcy or if**
10 **they're deceased or in the military, if a phone**
11 **number is a cell phone number. All of that**
12 **information is stored there as well as certain**
13 **information being in the screen we're looking**
14 **at now, which is the notes screen.**
15    Q.    What is ADVATTY?
16    A.    **Adversary attorney, if a consumer**
17 **has attorney information.**
18    Q.    And links?
19    A.    **That will lead to a screen that has**
20 **functions available to employees so that they**
21 **can do certain things on a file or outside**
22 **website links that we may need.**
23    Q.    When you say "they can do certain
24 things on a file," what do you mean by that?

Page 144

M. SELIP

1    A.    **If I want to close a file, I would**
2 **go to links; and within that screen, there's a**
3 **place for me to go and close the file.**
4    Q.    What kind of file are you talking
5 about?
6    A.    **The legal file.**
7    Q.    Oh, when you say "close," like a
8 closing code?
9    A.    **Yes.**
10    Q.    Okay. And priority notes?
11    A.    **If we want notes to appear as soon**
12 **as the person goes into a file, we would edit**
13 **there. And then as soon as they go into the**
14 **file, those notes jump out it at that person.**
15    Q.    And recordings?
16    A.    **Phone recordings. We record all**
17 **phone calls, incoming and outgoing; and we can**
18 **access them from that tab.**
19    Q.    And this is all the Phoenix system,
20 just to be clear?
21    A.    **Yes.**
22      MR. SALTZMAN: Okay. It's a good
23    time to take a break.
24      (Whereupon, a lunch break was

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 145

M. SELIP

1   taken.)
2   BY MR. SALTZMAN:
3   Q.    Mr. Selip, before lunch would we
4   were talking about what steps C&S takes in
5   certain situations, for example, if an answer's
6   interposed or if discovery is served, and I
7   believe you testified that a code was sent to
8   Midland to indicate that one of these events
9   happened; is that right?
10  A.    Yes.
11  Q.    Do you know who at Midland reviews
12  these codes?
13  A.    No.
14  Q.    If you were awaiting instruction
15  from Midland in any of these cases, who would
16  at Midland would be the person to contact
17  someone at C&S?
18      MR. FRANCOEUR: Object to form.
19      THE WITNESS: It depends on what we
20  are waiting for.
21  BY MR. SALTZMAN:
22  Q.    Okay. If you're waiting for
23  instruction regarding an answer, is there a
24  particular person?

Page 146

M. SELIP

1   A.    I previously testified that we
2   don't wait for instructions after we submit an
3   answer code.
4   Q.    What about for if discovery is
5   served on machines?
6   A.    What about discovery?
7   Q.    And you submit a code to MCM
8   indicating discovery was requested?
9   A.    Okay.
10  Q.    Do you wait for a response from
11  somebody at Midland?
12  A.    No.
13  Q.    Are there any instances where you
14  wait for a response from somebody at Midland?
15  A.    I believe that if a counterclaim is
16  filed, I need to get approval to bill.
17  Q.    And who does that approval come
18  from at Midland?
19  A.    I don't know.
20  Q.    How do you know that you've
21  received approval?
22  A.    The legal department would handle
23  that. I'm not sure who would get that
24  approval.

Page 147

M. SELIP

1   Q.    Who at the legal department? Would
2   it be anybody there?
3   A.    It could be Alicia, Jen, or Mary.
4   Q.    When Midland first sends a new
5   account to C&S for collection, does Midland
6   provide every document that it has in its
7   possession to C&S regarding that account?
8       MR. FRANCOEUR: Objection to form.
9       THE WITNESS: Since I don't want to
10  guess, I'm going to say I don't know.
11  BY MR. SALTZMAN:
12  Q.    So it's possible that they don't
13  send every document?
14      MR. FRANCOEUR: Objection. I'm not
15  sure he has any knowledge. Answer that
16  question if you can.
17      THE WITNESS: I don't have that
18  knowledge.
19  BY MR. SALTZMAN:
20  Q.    Who would know?
21  A.    Midland would know.
22  Q.    So when -- only Midland would know
23  if they send every document; is that what
24  you're testifying to?

Page 148

M. SELIP

1   A.    I would imagine the original
2   creditor would know.
3   Q.    Okay.
4   A.    I would probably find out at some
5   point in time.
6   Q.    So to your -- so when you say "I
7   would probably find out at some point in time,"
8   you mean C&S would find out?
9   A.    Correct.
10  Q.    So when C&S first gets the account
11  from Midland, they don't know whether they
12  received every document that Midland has in its
13  possession in connection with that account?
14  A.    That's correct.
15  Q.    Does C&S ever ask Midland to
16  provide Affidavits in support of its litigation
17  against debtors?
18  A.    Yes.
19  Q.    In what instances would C&S ask for
20  such Affidavits?
21  A.    To support a motion or to support
22  the request for the Entry of Judgment.
23  Q.    And how does C&S go about
24  requesting that from Midland?

Page 149

M. SELIP
1
2    A.    We draft the Affidavit, and we send
3 it to them.
4    Q.    Is there a code that's sent through
5 the YGC system?
6    A.    There is.  In certain instances, we
7 will send a code if it's an Affidavit for a
8 specific purpose and then they would draft the
9 Affidavit and send it to us.
10    Q.    For what purposes would Midland
11 draft the Affidavit?
12    A.    If we're requesting a default
13 judgment.
14    Q.    The Affidavit that Midland drafts,
15 is that -- do they draft that from scratch each
16 time C&S makes such a request?
17    A.    I'm not sure what you're getting
18 at.
19    Q.    Is there a template, as far as you
20 know, for Midland Affidavits that they send to
21 C&S in connection with default judgments?
22    A.    Yes.
23    Q.    That's what I was getting at.  So
24 there's some template.  Now, the template who
25 drafts the template?

Page 150

M. SELIP
1
2    A.    I don't know who at Midland
3 initially drafted it.
4    Q.    Does C&S participate in the
5 drafting of the template?
6    A.    Yes.
7    Q.    And they would work collaboratively
8 with Midland in drafting the template; is that
9 right?
10    A.    Yes.
11    Q.    Does that template ever change?
12    A.    Yes.
13    Q.    Under what conditions would the
14 template change?
15    A.    Without being all-inclusive, it
16 could change if the legal requirements would
17 change.
18    Q.    Has the template changed in the
19 last ten years?
20    A.    Yes.
21    Q.    How many times has the template
22 changed in the last ten years?
23    A.    I really don't know.
24    Q.    Has it changed more than once?
25    A.    I don't remember.

Page 151

M. SELIP
1
2    Q.    Has it changed since March of this
3 year?
4         MR. FRANCOEUR: Objection.  If you
5 know.
6         THE WITNESS: I don't remember.
7 BY MR. SALTZMAN:
8    Q.    Has it changed since July of this
9 year?
10         MR. FRANCOEUR: Same objection.
11         THE WITNESS: No.
12 BY MR. SALTZMAN:
13    Q.    Has it changed in the last year?
14    A.    I don't know.
15    Q.    Has it changed in the last five
16 years?
17    A.    I don't know.
18    Q.    Who participates -- from C&S, who
19 participates in the collaborative effort to
20 draft or revise this template?
21    A.    I do.
22    Q.    You did personally?
23    A.    Yes.
24    Q.    When is the last time you did that?
25    A.    I don't recall.

Page 152

M. SELIP
1
2    Q.    Did you participate in the last six
3 months?
4    A.    Not that I can remember.
5    Q.    Did you participate in the last
6 year?
7    A.    Not that I can remember.
8    Q.    Did you participate in the drafting
9 of the template in the last two years?
10    A.    I don't remember.
11    Q.    You don't remember any time;
12 although, you testified that you are the one
13 who participated with Midland in drafting the
14 Affidavit -- any revisions to the Affidavit,
15 correct?
16    A.    Yes.
17    Q.    But you don't remember when you
18 ever did that; is that fair?
19    A.    That's correct.
20    Q.    Now, this template, does C&S send
21 the template to Midland when they -- when C&S
22 needs such an affidavit?
23    A.    No.
24    Q.    Does that template reside at
25 Midland?

Case 2:14-cv-00008-WFK-ST   Document 358-62 Filed 02/10/27   Page 41 of 52 PageID #:
Case 2:14-cv-00008-WFK-ST   Document 354-62 Filed 02/10/27   Page 41 of 52 PageID #:
16537
16537

DAVID AGOADO, et al. v.                                                    MITCHELL SELIP
MIDLAND FUNDING, LLC, et al.                                              August 05, 2015

Page 153

M. SELIP

1              M. SELIP
2    **A.   As far as I know, yes.**
3    Q.   Okay.  So does C&S send anything to
4  Midland when they request such a template, any
5  information I should say?
6    **A.   Yes, we do.**
7    Q.   What information do you send?
8    **A.   We send a code indicating which**
9  **template we want along with other pieces of**
10  **information to allow Midland to complete the**
11  **Affidavit.**
12    Q.   And you indicate which template you
13  want that seems to indicate that there's more
14  than one template; is that right?
15    **A.   There may be two that we use in**
16  **New York. I know that Midland has more for use**
17  **in other states.**
18    Q.   Okay.  So there were two templates
19  that C&S utilizes in New York, correct; is that
20  right?
21    **A.   I don't remember if we use a second**
22  **template for summary judgment motions or if we**
23  **are currently drafting those in-house and**
24  **sending it to them.**
25    Q.   Okay.  All right.  But so let's

Page 154

M. SELIP

1              M. SELIP
2  back up and ask you, what are the two templates
3  that you know about?
4    **A.   One is for a default situation, and**
5  **I believe the other one is for summary judgment**
6  **situation.**
7    Q.   And on the summary judgment, you're
8  not sure if Midland has a template that they
9  use or whether C&S drafts it; is that correct?
10    **A.   Yes.  Every client has a different**
11  **procedure, and I don't remember Midland's**
12  **specific requirements -- procedures.**
13    Q.   So let's go back to the default
14  situation.  You said that you provide certain
15  of the information to Midland, and they
16  populate the template, correct?
17    **A.   Correct.**
18    Q.   And that information, what is it
19  based upon?
20    **A.   I don't remember all the different**
21  **fields of information that is taken from my**
22  **collection system and sent to YGC pursuant to**
23  **the -- as part of the YGC file that we create**
24  **data.**
25    Q.   So the actual data is included in

Page 155

M. SELIP

1  the YGC record that goes to Midland, correct?
2    **A.   It's part of the data that we sent**
3  **to YGC.**
4    Q.   Right, okay.  Now, how does
5  somebody at -- well, first who at C&S, the
6  department I should say, at C&S works on
7  populating or gathering the information for
8  populating the Affidavit?
9    **A.   It would be the legal department.**
10    Q.   Is that the contested legal
11  department or the non-contested legal
12  department?
13    **A.   It could be either one, but**
14  **typically the non-contested legal department.**
15    Q.   And how does someone in the
16  non-contested legal department go about
17  collecting the data that they need to send
18  through the YGC system to Midland for this
19  purpose?
20    **A.   We get the information as part of**
21  **our regular course of filing the lawsuit.  Some**
22  **of the information that I recall being sent**
23  **would be the index number.  So once we file a**
24  **Summons and Complaint, we enter the index**

Page 156

M. SELIP

1            **M. SELIP**
2  **number into our system.  We enter the date that**
3  **the index number was purchased.**
4    **And again, I don't recall the other**
5  **fields that are being sent; so I don't want to**
6  **speak to how they get into the system.**
7    Q.   Do you know how long it typically
8  takes to gather that data in order to send it
9  to Midland?
10    **A.   It varies depending on the court**
11  **and the matter.**
12    Q.   And the summary judgment affidavit,
13  is it substantially different than the one used
14  in the default situation?
15    **A.   It depends on your definition of**
16  **substantial.  So there are differences, yes.**
17    Q.   What are some of those differences?
18    **A.   It's my recollection that we are**
19  **drafting it.  We will tailor it to the facts of**
20  **the specific case at hand.**
21    Q.   And once it's completed in the
22  drafting form, do you send it to Midland for
23  review?
24    **A.   Yes.**
25    Q.   And is it -- how is the Affidavit

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 157

M. SELIP

1  M. SELIP
2  sent to Midland?
3  **A.    I think we send it by FedEx.**
4  Q.    So it's not sent electronically?
5  **A.    I don't believe so because there**
6  **are exhibits attached to it.**
7  Q.    And then do you know what happens
8  once Midland gets it?
9  **A.    I can't speak to that.**
10  Q.    Do they ever -- once they receive
11  it, do you get it back from them?
12  **A.    Yes.**
13  Q.    And when you get it back, is it
14  typically executed by somebody at Midland?
15  **A.    Yes.**
16  Q.    Do you know if they review it at
17  Midland?
18  **MR. FRANCOEUR: Objection.**
19  **THE WITNESS:** I can't speak to
20  that. You know, I can speak to that. I
21  have been advised that they have a very
22  thorough affidavit review process that
23  does require employees to look at it and
24  analyze it and sign it when appropriate.
25

Page 158

M. SELIP

1  M. SELIP
2  BY MR. SALTZMAN:
3  Q.    And who so advised you?
4  **A.    I have been to a bunch of Midland**
5  **meetings. I have had conference calls where**
6  **this issue may have come up. I cannot point**
7  **out to you the exact date or the person who was**
8  **doing the talking at that time.**
9  Q.    Typically, once you submit the
10  Affidavit -- strike that.
11  Typically, once you submit the
12  information through YGC to Midland, how long
13  does it take for Midland to turn around and
14  provide -- turn it around and provide an
15  Affidavit to C&S?
16  **A.    I don't recall the exact time**
17  **period.**
18  Q.    And how about for summary judgment?
19  **A.    The same thing, I don't recall.**
20  Q.    Is the time it takes to return a
21  summary judgment affidavit executed by somebody
22  at Midland longer than the time it takes for
23  them to turn around and default judgment
24  affidavit?
25  **MR. FRANCOEUR: Objection.**

Page 159

M. SELIP

1  M. SELIP
2  **THE WITNESS:** I'm not aware.
3  BY MR. SALTZMAN:
4  Q.    In connection with the default
5  judgment affidavits, do you know what
6  department in Midland is in charge of reviewing
7  the Affidavit?
8  **A.    I'm not familiar with the names of**
9  **the different departments that Midland has.**
10  Q.    Do you know any individual persons
11  who review these?
12  **A.    Not that I'm aware of.**
13  Q.    Who's the affiant in those
14  affidavits?
15  **A.    An employee of Midland Credit**
16  **Management.**
17  Q.    Do you know who the notary is on
18  those typically?
19  **A.    Not personally.**
20  Q.    I don't mean the personal
21  individual, but do you know who does the
22  notarization for them generally?
23  **MR. FRANCOEUR: Objection.**
24  **THE WITNESS:** I'm not sure if I
25  understand what you're asking.

Page 160

M. SELIP

1  M. SELIP
2  BY MR. SALTZMAN:
3  Q.    These -- the people who review the
4  Affidavits, whether it's for the default
5  judgment or for summary judgment, do you know
6  what office they work out of for Midland?
7  **A.    No. I'm not a hundred percent**
8  **sure.**
9  Q.    What do you think?
10  **A.    I believe it's their St. Cloud,**
11  **Minnesota, office.**
12  Q.    Do you know if any particular
13  people in Midland are assigned to work with
14  your particular firm as opposed to working with
15  or for many of the different firms?
16  **MR. FRANCOEUR: Objection.**
17  **THE WITNESS:** It's a general
18  question. Are you asking generally if
19  there's somebody at Midland who is
20  assigned to my firm without regard to
21  subject matter?
22  BY MR. SALTZMAN:
23  Q.    No. In connection with the
24  Affidavits?
25  **A.    In connection with the Affidavits?**

Page 161

**M. SELIP**
1
2    Q.    Yes.
3    A.    No, I don't recall.
4    Q.    Is there somebody who is generally
5    assigned to work with C&S?
6    A.    Yes.
7    Q.    Who?
8    A.    Shane.
9    Q.    Anybody else?
10   A.    I believe Joe Gugal.  You know, I'm
11   not sure if anybody else is.
12   Q.    Aside from the specific
13   consumer-related data in connection with the
14   default judgment affidavits, does the language
15   of the affidavit change within New York State
16   jurisdictions?
17         In other words, if you're filing
18   something in Manhattan Court as opposed to
19   Nassau County or upstate, do those change or is
20   it one template for New York State?
21   A.    The caption will reflect the
22   different court.
23   Q.    Right.  But other than that, the
24   substance of it?
25   A.    We don't change the cause of action

Page 162

**M. SELIP**
1
2    based on the venue; so no, the substance is the
3    same.
4    Q.    Okay.  Does your firm maintain
5    copies of the Affidavits once they're created
6    and filed?
7    A.    Yes.
8    Q.    For how long do you maintain those?
9    A.    Seven plus years.
10   Q.    Are they maintained -- are they
11   scanned into your system?
12   A.    Yes.
13   Q.    And you get rid of the paper
14   copies?
15   A.    The paper copies are submitted to
16   the court.
17   Q.    Sure.  But do you keep a paper
18   copy?  Does anybody keep paper a paper copy?
19         Now, we earlier discussed actual
20   physical people appearing as witnesses at trial
21   on behalf of Midland, Midland personnel
22   appearing on behalf of Midland.
23         Do you know how many times that's
24   happened, say, in the last ten years in
25   New York State?

Page 163

M. SELIP
1
2    A.    No, I don't keep track of this
3    personally.
4    Q.    Does anybody keep of track of it?
5    If you don't personally keep track of it,
6    anybody it at C&S?
7    A.    I don't think so.
8    Q.    If somebody at C&S wanted to know,
9    boy, how many times did we bring in a witness
10   from Midland?  I wonder how many could they
11   find that out?
12   A.    I don't think so.
13   Q.    Is there a code within the Phoenix
14   system indicating that a request for a physical
15   witness has been made to Midland?
16   A.    Yes.
17   Q.    And is there a code from Midland to
18   C&S indicating that that request would be
19   granted?
20   A.    Not that I'm aware of.
21   Q.    So just let's run through the
22   procedure just so I understand.  So when
23   somebody at C&S believes that they need a
24   physical witness, they will enter a code in the
25   Phoenix system which translates that into the

Page 164

M. SELIP
1
2    YGC system and now -- no?
3    A.    No.
4    Q.    Tell me what happens?
5    A.    So somebody will enter the code in
6    my system so that we know we need a witness.
7    Somebody else in my office will make a request
8    to Midland.  It is a form that's filled out.
9    And I don't remember if it's mailed or faxed to
10   the client.
11         Once that request is sent, we know
12   this has been a request and is sent back to me.
13   Q.    Okay.  So it doesn't go through the
14   YGC system?  It's actually a paper request?
15   A.    That's my understanding, yes.
16   Q.    Okay.  And then after that, C&S
17   doesn't keep track of whether that request has
18   been granted or not; is that what you're
19   saying?
20   A.    No, we do not.
21   Q.    Okay.  Is there a code for whether
22   the case is going to trial?
23   A.    Yes.
24   Q.    And by that, just let me be
25   specific.  What I mean is whether a trial date

Case 2:14-cv-00008-WFK-ST Document 358-62 Filed 02/10/27 Page 44 of 52 PageID #: 16540

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

M. SELIP

MITCHELL SELIP
August 05, 2015

Page 165

M. SELIP

1  has been set.  Is there a code for that?
2  **A.  Yes.**
3  **A.  Yes.**
4  Q.  Okay.  With respect to plaintiff
5  Agoado -- one second.  Is there a code for a
6  trial date being adjourned on the Phoenix
7  system?
8  **A.  I don't remember if we put in a**
9  **code to indicate that it was adjourned or if we**
10 **put the same code in when the first date comes**
11 **in so we just use that first code the second**
12 **time.**
13 Q.  So the system would show the same
14 code twice on two different dates so the user
15 could see that it was put over from this date
16 to this date?
17 **A.  Exactly.**
18 Q.  Okay.  Now, if somebody never
19 applied for credit and they claim to C&S as a
20 defense, they never applied for this credit,
21 somebody else did, I think we discussed a
22 little bit earlier is that something that C&S
23 would look into as possible fraud?
24 **A.  Yes.**
25 Q.  And would they -- what steps would

Page 166

M. SELIP

1  C&S take to investigate whether the defendant
2  debtor is right about that?
3  **A.  We would send a letter to the**
4  **consumer asking for documentation in a**
5  **particular document to show where the consumer**
6  **lived at, the time the account was opened; and**
7  **we also will send a certificate of fraud or ID**
8  **theft asking that the consumer give us certain**
9  **information to allow us to investigate the**
10 **claim.  And we would also contact our client,**
11 **let them know about the allegation.  And if**
12 **they needed additional documents, we would ask**
13 **the client for it, in particular, pay stubs --**
14 **sorry, copies of payments to see if the payment**
15 **was made by the consumer who is now alleging**
16 **fraud.**
17 Q.  And what if -- what happens if
18 Midland cannot provide that information?
19     **MR. FRANCOEUR:** Objection.
20     **THE WITNESS:** It depends on the
21     circumstances.  I can't give you a
22     one-size-fits-all answer to that.
23 **BY MR. SALTZMAN:**
24 Q.  So for example, give me one

Page 167

M. SELIP

1  example.
2  **A.  A consumer provides a copy of his**
3  **or her license.  It shows that he or she lived**
4  **in Texas at the time the account was opened,**
5  **provides utility bills, mortgage, rent,**
6  **whatever.  All shows the person lived in Texas.**
7  **We take a look at the application and the**
8  **statements, and they all go to somebody**
9  **somewhere in New York.  That would be a**
10 **situation where we would close that file and**
11 **tell Midland to close its file as a result of**
12 **fraud.**
13 Q.  Do you know how many debt
14 collection actions have been filed by C&S on
15 behalf of Midland in the past year?
16 **A.  I don't know the exact number.**
17 Q.  Do you know an estimate?
18 **A.  I would estimate it at about 2,500.**
19 Q.  And what about since, let's say,
20 2013?
21 **A.  At this point I don't have idea.**
22 Q.  Do you know how many of those had
23 witnesses from Midland actually appeared?
24 **A.  No, I don't know.**

Page 168

M. SELIP

1  Q.  Do you know what -- well, let me
2  ask you this:  So on the Phoenix codes, is
3  there a code for a claim being dropped because
4  of lack of evidence?
5  **A.  There's a close code for no**
6  **documentation.**
7  Q.  So if I wanted to know how many
8  times -- what percentage of cases were closed
9  for lack of documentation, I could actually run
10 those numbers pretty easily, right?
11 **A.  Yes.**
12 Q.  And could I figure out the
13 percentage of claims that are -- that went to
14 default judgment the same way?
15 **A.  Yes.**
16 Q.  Does C&S internally keep reports on
17 its performance in collecting debt for Midland?
18 In other words, do they keep track of how many
19 cases were successfully pursued, how much money
20 was recovered, how much C&S was able to keep
21 after being paid or something like that?  Are
22 those reports kept by C&S?
23     **MR. FRANCOEUR:** Objection.
24     **THE WITNESS:** It's a general

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 169

M. SELIP

1  question; but yes, we have the ability to
2  run reports.
3  BY MR. SALTZMAN:
4     Q.    And the data that the reports
5  runoff of, that's also data that's kept for
6  seven years?
7     A.    Yes.
8     Q.    Does C&S ever send any of these
9  reports on its own performance to Midland?
10    **A.    We just started to send a couple of**
11 **internal reports to Midland.**
12    Q.    When was that?
13    **A.    Probably earlier this year.**
14    Q.    What month?
15    **A.    I'm not sure.**
16    Q.    Before July?
17    **A.    Yes.**
18    Q.    Before March?
19    **A.    I don't think so.**
20    Q.    And does Midland ever send to C&S
21 its reports on C&S performance?
22    **A.    Yes.**
23        MR. FRANCOEUR: Objection.

Page 170

M. SELIP

1  BY MR. SALTZMAN:
2     Q.    How often do they do that?
3     **A.    Monthly.**
4     Q.    And do you personally ever review
5  those reports?
6     **A.    Yes.**
7     Q.    Does Mr. Slamowitz review them?
8     **A.    I don't know.**
9     Q.    Do you review them with anyone
10 else?
11    **A.    Yes.**
12    Q.    With whom?
13    **A.    I review them with Veronica Radin,**
14 **who I mentioned is the director of operations;**
15 **Alicia, managing attorney; some of the senior**
16 **collection managers; the IT managers; Megan,**
17 **who I mentioned is one of the managers in the**
18 **legal department; as well as Jen.**
19    Q.    How is C&S paid by Midland?
20        MR. FRANCOEUR: Objection. I'm
21    going to direct the witness not to answer.
22    It's privileged communication.
23    Compensation has already been ruled upon,
24    it's my understanding, with the Motion to

Page 171

M. SELIP

1  Compel; and then you're digging into the
2  area of what and how they were paid is all
3  privileged.
4        MR. FRANK: There was no mention of
5    privilege in the Court's order on the
6    Motion to Compel.
7        MR. SCHWARTZ: Okay.  Let me
8    respond since it was our order.  The order
9    specifically stated that they weren't
10   privy to financial information related to
11   purchase agreements.
12       I have no problem with you asking
13   how they were paid, but certainly not
14   percentages or amounts.  If you're going
15   to do that, then I preserve that
16   objection.
17       MR. SALTZMAN: I had no intention
18   of asking that.
19       MR. SCHWARTZ: Okay.  That's --
20   whether you're asking if he's hourly or
21   whatever.
22   BY MR. SALTZMAN:
23    Q.    I want to know was the company, was
24 C&S paid on a percentage basis?  Yes or no?

Page 172

M. SELIP

1     **A.    Yes.**
2     Q.    And in addition to on a percentage
3  basis, is there an hourly rate paid to C&S?
4     **A.    On counterclaim matters.**
5     Q.    And is C&S reimbursed for expenses
6  by Midland?
7     **A.    What expenses are you asking about?**
8     Q.    What expenses are they reimbursed
9  for?
10    **A.    Court costs, process server fee,**
11 **any fee charged by the court, county clerk,**
12 **enforcement officer.  I think that's it.**
13    Q.    Does Midland reimburse you for
14 sheriff's poundage?
15    **A.    The sheriff takes his own poundage**
16 **out of money he collects from the consumer.**
17    Q.    Restraining orders to bank
18 accounts?
19    **A.    There are no costs involved.**
20    Q.    Property executions?
21    **A.    Yes.  That's an enforcement officer**
22 **fee.**
23    Q.    Are getting Affidavits of
24 nonmilitary service?

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 173

M. SELIP

1 **A.    There are no costs involved.**
2     **MR. SALTZMAN:** I'm almost done.
3 Why don't we take a break.
4     (Whereupon, a short break was
5 taken.)
6     **MR. FRANK:** Joe, when you
7 instructed the witness not to answer
8 questions about the compensation that his
9 firm receives in association with debt
10 collection, and I just wanted to
11 clarify --
12     **MR. FRANCOEUR:** I'm sorry.
13     **MR. FRANK:** I'm sorry.  Earlier you
14 went on the record and instructed the
15 witness not to answer questions regarding
16 the compensation that his firm receives
17 for the debt collection services that it
18 provides to Midland.  And I just wanted to
19 clarify the basis of that objection.
20     Are you -- is it your position,
21 because there was some confusion.  Is it
22 your position that the compensation that
23 your client receives, that that's
24 information that's privileged?

Page 174

M. SELIP

1     **MR. FRANCOEUR:** I'm not taking -- I
2 believe that was resolved.  Wasn't that
3 resolved with Andrew's objection?  I mean,
4 the privilege belongs to the client.
5     **MR. FRANK:** Okay.  But it's an
6 assertion of privilege; is that what's
7 going on?
8     **MR. SCHWARTZ:** No.  My objection is
9 you're not entitled to that information at
10 all.  It's got absolutely nothing, no
11 bearings on the complaint.  And if you
12 have an issue with that, we can go talk to
13 the judge.
14     **MR. FRANK:** So it's a relevance
15 objection?
16     **MR. SCHWARTZ:** It's more than a
17 relevance objection.
18     **MR. FRANK:** What does more than a
19 relevance objection mean?
20     **MR. SCHWARTZ:** Because it's not
21 only utterly irrelevant to the claims, but
22 it's also -- how do I say -- there's
23 privilege and then there's -- it's a
24 fishing expedition that goes so far beyond

Page 175

M. SELIP

1 the fishing expedition that my client is
2 not going to give that information up
3 without the court ordering him to.
4     **MR. FRANCOEUR:** And also it's
5 proprietary.  What one company percentage
6 gets could give another company
7 competitive advantage.
8     So it's definitely something that's
9 private and something that's going to be
10 protected.  We cannot allow the client to
11 talk about without under a court order, a
12 seal something.
13     **MR. FRANK:** Okay.  Well, it is
14 plaintiff's position that the economic
15 system does incentivize wrongdoing, which
16 was clarified in our letter to the Court.
17 And so the notion that the economic
18 incentive system is by definition
19 irrelevant is simply not true based on the
20 theory set forth.
21     **MR. SCHWARTZ:** Okay.  I can speak
22 to this, because the order specifically
23 allowed us to provide it redacted without
24 that information.

Page 176

M. SELIP

1     **MR. FRANK:** The order does not
2 specify what information should or should
3 not be redacted.
4     **MR. SCHWARTZ:** I would like to see
5 a copy of the order.  In fact, I pull it
6 up right now.
7     **MR. FRANK:** I asked for it.
8     **MR. FRANCOEUR:** Gregory, the
9 witness did testify that there is a
10 percentage, what the actual number is.
11 You could try to get that, but you know --
12     **MR. FRANK:** I just want it on the
13 record what the form of objection is, you
14 know, what specifically --
15     **MR. SCHWARTZ:** It's privileged.
16 It's proprietary.  It's confidential.
17     **MR. FRANK:** Okay.  So the
18 proprietary, what is your position as to
19 why the Court's confidentiality order does
20 not obviate the proprietary objection?
21     **MR. SCHWARTZ:** Okay.  Let me just
22 read -- let me just read from order of the
23 Court.  And again, this is not -- this is
24 the same subject matter or the same issue,

Page 177

M. SELIP

1
2  but it's not the same document.  It's the
3  purchase agreement.
4       And judge's order specifically --
5  Magistrate Judge Lindsay stated -- and I'm
6  only going to read.  Quote, "It is
7  defendant's position that redaction is
8  necessary because the pricing information
9  is highly confidential and the protection
10 of pricing information is of great value
11 to both Midland and the original
12 creditors."
13      MR. FRANK: The pricing of the debt
14 purchased by Midland.
15      MR. SCHWARTZ: Okay.
16      MR. FRANK: Is there any mention of
17 the fee structure in the order?
18      MR. SCHWARTZ: No.  Because that
19 issue is not before the Court.
20      MR. FRANK: Okay.
21      MR. SCHWARTZ: But following the
22 same logic, plaintiff's Motion to Compel
23 argues -- quote, "Plaintiff's Motion to
24 Compel argues the production of the
25 purchase agreements are a central

Page 178

M. SELIP

1
2  component to the plaintiff's case, but do
3  not offer any justification for the
4  broader request for, 'All documents
5  reflecting or related to the sale of
6  plaintiff's alleged debt.'"
7       MR. FRANK: Okay.  Sale.
8       MR. SCHWARTZ: And then -- hold on.
9  And then finally, "Having considered the
10 arguments of both parties, the defendants
11 are hereby ordered to produce the purchase
12 agreements relevant to the accounts of
13 each presently named plaintiff in the
14 present litigation in redacted form," end
15 quote.
16      So while this issue isn't before
17 the Court yet --
18      MR. FRANK: There was no mention at
19 all in the Court's orders of these fees.
20      MR. SCHWARTZ: Correct.  But it's
21 the same logic.  If you want to send a
22 letter to the Court, we'll respond
23 appropriately, see what they have to say.
24      MR. FRANK: So it's your position
25 because IT'S irrelevant, but you're still

Page 179

M. SELIP

1
2  instructing him not to answer based on
3  relevance?
4       MR. SCHWARTZ: It's irrelevant.
5  It's proprietary.
6       MR. FRANK: That's where I'm
7  running into -- my problem is simple, and
8  that is you may prevail and the answers
9  may be struck; but it is improper to
10 instruct him not to answer questions
11 because you consider them irrelevant.
12      MR. FRANCOEUR: Relevance is not my
13 objection.
14      MR. FRANK: Okay.
15      MR. FRANCOEUR: Even though I think
16 it's way not relevant.
17      MR. FRANK: So what's the
18 specific --
19      MR. FRANCOEUR: It's proprietary,
20 and I do believe that this is a privileged
21 communication.  I also think it's been
22 waived, and it should have been addressed
23 before my client trucks in here to
24 New York City.
25      So I have a proprietary.  I will

Page 180

M. SELIP

1
2  assert relevance, and I will say it's been
3  waived.  So I have a threefold --
4       MR. FRANK: We've been asking about
5  the fees and things forever.
6       MR. FRANCOEUR: You never should
7  have had my witness step foot in the room
8  if you wanted this information.  It should
9  have been reserved first.  It's been
10 waived.
11      MR. FRANK: At what time did you
12 state that you weren't going to state the
13 fee information.
14      MR. FRANCOEUR: I'm not here to
15 testify.  You asked me the basis.  I gave
16 you the three-pronged basis.
17      MR. FRANK: That you feel that it's
18 privileged information.  The amount of
19 compensation --
20      MR. FRANCOEUR: For propriety.
21 It's a fourth.  I do think there's some
22 privilege aspect to this.
23      So he's not testifying.  He's not
24 going to give you any numbers.
25      MR. FRANK: Okay.  Let's go on.

Page 181

M. SELIP

1  BY MR. SALTZMAN:
2  Q.    From 2011 on, in cases where C&S
3  prevailed at trial, does C&S provide Midland
4  with information indicating that through a
5  code?
6  A.    We send a code when the judgment is
7  entered.
8  Q.    And how many cases in the last year
9  has C&S on behalf of Midland won at trial?
10 A.    I don't know the exact number.
11 Q.    Is it more than 100?
12 A.    No.
13 Q.    Is it more than 50?
14 A.    No.
15 Q.    Is it more than 20?
16 A.    To save you the trouble, I believe
17 it would be in the single digits.
18 Q.    In connection with requesting a
19 witness for motions for default judgment, are
20 there any economic considerations that C&S
21 takes into account before requesting such a
22 witness?
23 A.    Witnesses are not needed to enter
24 the default judgment.

Page 182

M. SELIP

1  Q.    In connection with trial and
2  bringing in a witness, are there economic
3  considerations that C&S takes into account
4  before requesting a witness?
5  A.    No.
6  Q.    What's the basis for making that
7  request?
8  A.    If there's a trial that requires a
9  witness, we make that request.
10 Q.    And is that the case even if the
11 debt is only for, let's say, $500?
12 A.    My answer won't change.
13 Q.    Do you know about how many Midland
14 witnesses are -- are produced in the past year
15 at trial for -- on behalf of C&S?
16 A.    I don't know.
17 Q.    Again --
18 A.    In this case, I won't have idea
19 regardless of the range of numbers you throw
20 out.
21 Q.    Okay.  At the beginning of the day,
22 we discussed the different departments at C&S.
23        Who is the head of the judgment
24 enforcement division of C&S?

Page 183

M. SELIP

1  A.    When you say "the head," the
2  attorneys at the firm are all responsible for
3  managing the departments.
4  Q.    Is there one person who manages the
5  judgment enforcement department, one particular
6  person?
7  A.    There isn't just one person, no.
8  Q.    And what about the compliance
9  department?
10 A.    That's the same thing.  There are
11 several attorneys, all of whom have a role in
12 managing that department.
13 Q.    When -- do they meet periodically
14 to discuss management of that department?
15 A.    Every week.
16 Q.    Is there a weekly meeting for each
17 of the departments, or is it a weekly -- is it
18 a weekly meeting of all partners and
19 everything's discussed?
20 A.    Most of the departments have a
21 weekly meeting.  I'm not sure about some of
22 them.  And then the heads of all the
23 departments have a weekly meeting in addition
24 to the departmental meetings.

Page 184

M. SELIP

1  Q.    Okay.  So when the heads of all the
2  departments meet, how many people are in that
3  meeting?
4  A.    It's the director of operations,
5  the managing attorney, the IT managers, myself,
6  and the other partners depending on the day.
7  Q.    And who -- the director of
8  operations is who?
9  A.    Veronica Radin.
10 Q.    And then you said it's the director
11 of operations?
12 A.    Which is Veronica.
13 Q.    Managing partner?
14 A.    Not managing partner.  I said
15 managing attorney.
16 Q.    Managing attorney.
17 A.    Alicia to be clear.
18 Q.    Okay.  And who else?  Why don't you
19 just give me the position and the name.  It
20 would be easier.
21 A.    Ed Wilkinson, who is an IT manager.
22 Keith Bush, another IT manager.  It'll be one
23 or the other of them.  And then it will be the
24 five partners on occasion.  The two Jersey

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 185

M. SELIP

1  partners don't always come up to this meeting.
2  Q.    The Jersey firm does the same
3  business as New York?
4  A.    Well, it's our -- yes.  They handle
5  the litigation in the state of Jersey.
6  Q.    Are the procedures the same for the
7  Jersey firm as New York?
8  A.    That sounded like a wise-ass -- the
9  legal procedures is vary state by state.
10  Q.    Right.  But the -- procedures, how
11  things are handled internally.
12  A.    That office handles New Jersey
13  litigation.  So procedures relative to the
14  practice of law in New Jersey apply to that
15  office.
16  Q.    You testified that you started in
17  Upton, Cohen & Slamowitz in about October
18  of '94, correct?
19  A.    Yes.
20  Q.    What was your position when you
21  started there?
22  A.    Attorney.
23  Q.    And you moved up, I assume?
24       MR. FRANCOEUR: Objection to form.

Page 186

M. SELIP

1       MR. SCHWARTZ: Objection.  It's a
2  trick question.
3       THE WITNESS: I promoted myself
4  in '96 to managing attorney, and then I
5  promoted myself to director of operations
6  in '99.
7  BY MR. SALTZMAN:
8  Q.    So but when you started, you were
9  not a partner, right?
10  A.    No.
11  Q.    Okay.  So --
12  A.    Not of Upton, Cohen & Slamowitz in
13  New York.  In about '96, we formed a
14  partnership in New Jersey by the same name; and
15  I was a partner of that firm.
16  Q.    Okay.  And that was in '96.  And
17  then you became -- what was your next position?
18  A.    After the director of operations, I
19  gave myself the title of chief compliance
20  officer; and then in January, just plain old
21  partner.
22  Q.    Plain old?
23  A.    Plain old partner.
24  Q.    And I believe we discussed what

Page 187

M. SELIP

1  your role is as director of operations earlier
2  today, right?  I think we discussed what your
3  tasks are.
4       What about as chief of compliance?
5  A.    The main function of that
6  continuing role is to ensure compliance with
7  federal, state, and local laws as well as
8  compliance would your clients' procedures.
9  Q.    And the clients' procedures are all
10  contained in the manual we discussed earlier
11  today?
12  A.    Midland's procedures are, yes.
13  Q.    Yes.  And are Midland's procedures
14  contained anywhere else?
15  A.    They may on occasion send an e-mail
16  qualifying a procedure, adding or changing a
17  procedure.
18  Q.    If one of those e-mails comes into
19  C&S, is it incorporated in some way into the
20  manual; or is it just an e-mail that's out
21  there that people are aware of?
22  A.    It's incorporated into my firm's
23  procedures.  If Midland issues an update to its
24  manual, then the update becomes the operating

Page 188

M. SELIP

1  document.
2       MR. SALTZMAN: So we would request
3  those e-mails from Midland that might be
4  changes to procedures pursuant to
5  Midland's requests.
6       MR. FRANCOEUR: We will take it
7  under advisement.
8       (Whereupon, Request No. 10, E-mails
9  from Midland Funding, LLC indicating
10  changes to procedures, was made.)
11       MR. SCHWARTZ: I'm sorry, is there
12  a question?
13       MR. SALTZMAN: No.
14       MR. FRANK: We're going to take a
15  short break and confer with Alan.
16       MR. SALTZMAN: I think we're pretty
17  much done.
18       (Whereupon, a short break was
19  taken.)
20       MR. FRANK: We reserve the right to
21  call the witness back to answer questions
22  about the fee structure; and otherwise, we
23  have no further questions.
24       MR. SALTZMAN: No further

Case 2:14-cv-00018-WFK-ST   Document 358-62   Filed 02/10/27   Page 560 of 52 PageID #: 10546
DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 189

M. SELIP

1  questions.
2  **MR. SCHWARTZ:** No questions.
3  **MR. FRANCOEUR:** Did you want to
4  articulate what your question is about the
5  fee structure?
6  **MR. FRANK:** We were -- we've been
7  beating this to death. You want to read
8  the back the questions that he didn't
9  answer?
10  **MR. FRANCOEUR:** No. Is there a
11  specific question that you want to ask?
12  **MR. FRANK:** Yes. We wanted to know
13  what the compensation structure is and
14  what the incentivization structure is for
15  Cohen & Slamowitz's prosecution of
16  Midland's actions.
17  **MR. FRANCOEUR:** Why don't we take a
18  moment. Let us have a moment and just
19  revisit issue.
20  **MR. SCHWARTZ:** I don't know what
21  the answer is. Well, come out here and
22  come out and talk.
23  **THE WITNESS:** Give me a second. So
24  I think I can give you the answers you

Page 190

M. SELIP

1  want without violating any privileges.
2  (Whereupon, a short break was
3  taken.)
4  **MR. FRANCOEUR:** So this is what we
5  want to do.
6  We believe we are in a position to
7  answer all of your questions, everything
8  about the structure, anything you want to
9  ask except the actual number.
10  If it turns out later on you're
11  entitled to the number, we will respond
12  and disclose the number.
13  **MR. FRANK:** What do you mean by
14  "the number"?
15  **MR. SCHWARTZ:** The percentage, the
16  rate. If you want to know whether it's 80
17  percent, whether it's one percent, the
18  answer is you're not going to get that
19  answer.
20  If you want to know how the
21  structure is beyond the specific
22  percentage, I have no problem with that.
23  **MR. FRANK:** Actually, really what
24  we're focused on is how Midland's

Page 191

M. SELIP

1  compensation compares to the other
2  creditors because one of our theories is
3  that the quality of the actual cases
4  differs; and so that's where we're going.
5  I don't know if you can do
6  comparison that way. If that's within --
7  **MR. SCHWARTZ:** If you want to say
8  in general what his impression is, he
9  knows. I don't know.
10  **THE WITNESS:** I have to tell you
11  guys, I don't know. So if that's what
12  your looking for, I apologize. I can't --
13  without going back and checking my
14  records, I can't give you that
15  information.
16  **MR. FRANCOEUR:** But we're going on
17  the record, we're not instructing him not
18  to answer the question. He's here. You
19  guys still have time. You can ask him any
20  question you want about the fee structure,
21  all but for the actual number, whatever
22  the percentage number it is.
23  I think that's something that if
24  you're entitled to it, we can supplement

Page 192

M. SELIP

1  in a notice to admit or some other form.
2  **MR. FRANK:** Give us a second.
3  (Discussion held off the record.)
4  **MR. FRANK:** So we're -- both sides
5  are going to reserve our rights with
6  respect to the disagreements over the
7  actual numbers.
8  Pending that reservation, we'll --
9  CONTINUED EXAMINATION
10  BY MR. SALTZMAN:
11  Q. So we established earlier today
12  that part -- that C&S gets paid some percentage
13  basis on its -- on what it collects for
14  Midland, correct?
15  A. Yes.
16  Q. And C&S gets reimbursed for certain
17  expenses, which we went through, correct?
18  A. Yes.
19  Q. And C&S gets paid on an hourly rate
20  on I believe it was counterclaims, correct?
21  A. Yes.
22  Q. Is there any other methods by which
23  C&S is paid by Midland?
24  A. Earlier this year, they bought us

DAVID AGOADO, et al. v.
MIDLAND FUNDING, LLC, et al.

MITCHELL SELIP
August 05, 2015

Page 193

M. SELIP

1 breakfast. Besides that, I can't think of any
2 other way.
3
4     Q.    Are there -- so is that the sum and
5 substance of the structure under which C&S is
6 paid by Midland? Our whole discussion has been
7 we can ask you questions about the structure.
8          So now I'm asking you specifically,
9 is that the entire structure?
10    A.    Yes, it is.
11    Q.    Thank you very much for giving us
12 permission to ask a question that I asked
13 earlier today without any further response.
14 And we'll have to just deal with it with the
15 judge.
16          Now --
17          MR. FRANCOEUR: What are we going
18    to deal with, with the judge? I thought
19    he just responded to your question.
20          MR. SALTZMAN: No, no, no, no. I'm
21    talking about the fee numbers.
22          MR. FRANCOEUR: The numbers.
23          MR. SALTZMAN: The numbers. As far
24    as the structure, I established that this
25    morning or early this afternoon. So the

Page 194

M. SELIP

1
2 structure's been established.
3          MR. FRANCOEUR: I want the record
4    to be clear. If there's a line of
5    questioning surrounding the fee structure,
6    the witness is here ready to testify.
7          The actual number shouldn't affect
8    the question.
9 BY MR. SALTZMAN:
10    Q.    Do you negotiate the fee structure
11 with Midland?
12    A.    I did not.
13    Q.    Did somebody at C&S?
14    A.    I don't know.
15    Q.    Do partners negotiate fee
16 structures with Midland? Do C&S partners
17 negotiate fee structures with Midland?
18    A.    I don't know if one of the two
19 partners of Cohen & Slamowitz did that when the
20 contract was signed.
21    Q.    The contract has been revised a few
22 times. I think we established that, correct?
23    A.    Yes.
24    Q.    At those times when the contract
25 was redone, was the fee structure redone?

Page 195

M. SELIP

1
2    A.    I'm sorry, I don't have information
3 regarding the change in the structure.
4    Q.    Were you involved in the
5 negotiation when the agreement, the retainer
6 agreement -- it's called the collection
7 agreement here in Selip 3 -- were you involved
8 in the negotiations between C&S and Midland?
9    A.    No.
10    Q.    Who was?
11    A.    I believe it was David Cohen.
12    Q.    Is he still with the firm?
13    A.    Mentally or physically? Yes.
14    Q.    I Believe you testified that when
15 C&S became S&S, some new people came on board;
16 is that right?
17    A.    Yes.
18    Q.    Who are the new people who came on
19 board?
20    A.    Partners, employees, or both?
21    Q.    Partners?
22    A.    Partners, Rich Eichenbaum and Harry
23 Stylianou.
24    Q.    And Mr. Eichenbaum and
25 Mr. Stylianou, is their experience also in debt

Page 196

M. SELIP

1
2 collection?
3    A.    Part of what they do is debt
4 collection. They do additional work. They
5 represent banks in tangential areas of law.
6    Q.    What do you mean by "tangential
7 areas of law"?
8    A.    Harry defends banks and actions
9 brought against them, not necessarily
10 representing banks seeking to recover money
11 from others. It's defense work.
12    Q.    It's commercial litigation?
13    A.    Well, he does defense work. They
14 both do a little commercial litigation, but
15 Harry in particular does defense work.
16    Q.    And what about Mr. Stylianou?
17    A.    That is Harry.
18    Q.    Oh.
19    A.    Harry will do defense work. And
20 Rich will do collection litigation, which can
21 be either consumer-related or
22 commercial-related.
23    Q.    And, again, you have no
24 understanding of what gross collection target
25 means in connection with the structure of fees

---

M. SELIP

1 earned by C&S?

3     **A.   No. I just know that what we get**
4 **now is a percent of everything collected**
5 **without regard to --**

6     Q.   Does the percent change based on
7 the dollar amounts collected by C&S? In other
8 words, is it a smaller percentage at a lower
9 collection amount and it shifts?

10     **A.   No, no, it doesn't. The only thing**
11 **that would affect the commission is that any**
12 **costs that are incurred in connection with the**
13 **matter are first reimbursed before we determine**
14 **the commission rate.**

15     Q.   So the commission rate that that
16 percentage is, is a flat percentage across
17 whatever you collect?

18     **A.   Right. Regardless of the amount**
19 **collected, regardless of the litigation status,**
20 **it does not change. If he uses us to try to**
21 **collect pre-suit because all the monies are**
22 **commissionable; whereas if we have to collect**
23 **it post-suit, then we have to reimburse the**
24 **costs. But we actually collect less money by**
25 **litigating.**

---

M. SELIP

2     Q.   So the quicker and cheaper you can
3 do collection, the better it is for the firm?

4     **A.   As in any business, sure, the more**
5 **you collect, the sooner you collect, because**
6 **the net present value of the dollar is better.**

7     **MR. SALTZMAN:** No further
8 questions.

9     **MR. FRANCOEUR:** Anyone else?

10     **MR. SCHWARTZ:** No.

11     **MR. FRANCOEUR:** Thank you.

12     **MR. SALTZMAN:** Thank you, sir.
13 (The witness is excused.)
14 (Deposition of MITCHELL SELIP
15 concluded at 3:51 p.m.)

---

1             C E R T I F I C A T E

4        I, SUZANNE J. STOTZ, a Certified
5 Court Reporter, and Notary Public in and for
6 the State of New York, do hereby certify that
7 the foregoing is a true and accurate transcript
8 of the stenographic above-captioned matter.

11         _____

12        SUZANNE J. STOTZ, C.C.R.
13     My Commission Expires October 17, 2017

16 DATED: AUGUST 20, 2015

19 NOTE: THE CERTIFICATE APPENDED TO THIS
20 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
21 OF THE SAME BY ANY MEANS, UNLESS UNDER THE
22 DIRECT CONTROL AND/OR DIRECTION OF THE
23 CERTIFYING COURT REPORTER.

---

1        E R R A T A   S H E E T
2     I have read my testimony in the foregoing
3 transcript and believe it to be true and
4 correct to the best of my knowledge and belief
5 with the following changes:

6 PAGE    LINE         CHANGE
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____

18 _____ _____
19 WITNESS SIGNATURE       DATE

21 Sworn and subscribed to before me this
22 _____ day of _____ , 2015.

24 Notary Public of the
25 State of _____.

---