UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x
                                        14-CV-18(WFK)
STEVEN ITALIANO, et al.,
                                        United States Courthouse
          Plaintiff,                    Brooklyn, New York

          -versus-                      September 25, 2025
                                        12:00 p.m.
MIDLAND FUNDING, LLC, ET
AL.,

          Defendants.

------------------------------x

          TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
           BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
              UNITED STATES SENIOR DISTRICT JUDGE


APPEARANCES


For the Plaintiff:        FRANK LLP
                          BY:  GREGORY FRANK, ESQ.
                               ASHER HAWKINS, ESQ.


For the Defendants:       MESSER STRICKLER BURNETT, LTD
                          BY:  ANDREW M. SCHWARTZ, ESQ.
                               MATTHEW B. JOHNSON, ESQ.

                          WILSON ELSER
                          BY:  JOSEPH L. FRANCOEUR, ESQ.

                          DAVIDSON FINK, LLP
                          BY:  GLENN MR. FJERMEDAL, ESQ.

                          BY:  ROBERT L. ARLEO, ESQ. PC
          (Continued on next page.)

2

(Appearances)

PRESSLER FELT & WARSHAW
BY:  MICHAEL PETERS, ESQ.

Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
                         Phone:  718-613-2268
                         Email:  RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

(In open court.)

THE COURTROOM DEPUTY:  All rise.  We are here for a civil motion hearing 14-CV-18, Italiano, et al vs. Midland Funding LLC, et al.

Will the parties start their appearances starting with the plaintiff.

MR. FRANK:  Good morning, your Honor.  Greg Frank from Frank LLP.  I'm here with my associate Asher Hawkins from Frank LLP on behalf of plaintiffs.

THE COURT:  Good afternoon, counsel.  Thank you for your patience.  Please be seated.

MR. SCHWARTZ:  Good afternoon, your Honor.  Andrew Schwartz.  I have my colleague Matt Johnson with me on behalf of the Midland defendants.

THE COURT:  Good afternoon.

MR. FRANCOEUR:  Joseph Francoeur on behalf of defendant Cohen and Slamowitz.

THE COURT:  Good afternoon.

MR. FJERMEDAL:  Good afternoon, your Honor.  Glenn Fjermedal on behalf of Forster and Garbus.

MR. ARLEO:  Good afternoon, your Honor.  Robert Arleo on behalf of Rubin and Rothman.

THE COURT:  Good afternoon.

MR. PETERS:  Michael Peters on behalf of Pressler and Pressler LLP.

THE COURT: Good afternoon. Please be seated. I thank you all for your patience.

When I was practicing law I wondered to what extent the judge did or didn't know a lot a little or nothing at all about the case. So let me, just by way of showing you not that I'm so knowledgeable but that I have world's best law clerks in terms of my understanding of the case, then we'll proceed with the arguments.

We're here today for oral argument in the case of Italiano, et al versus Midland Funding LLC, et al 14-CV-18, to address the parties' cross motions for summary judgment.

Background of the action is as follows. Defendant Midland Funding LLC, Midland, is a consumer debt collector. Midland buys consumer debt from originating creditor and attempts to collect the debts owed or asserted to be owed. For example, in obtaining collection Midland retained the attorney defendants to file actions in New York courts.

Plaintiffs are New York consumers against who the defendants commenced or threatened to commence lawsuits for the collection of consumer debt.

On January 2, 2014 Midland removed this action from the Supreme Court of the State of New York Suffolk County to the Eastern District of New York. Over seven years later on October 19, 2021 plaintiffs filed the fourth amended complaint on behalf of themselves and all others similarly situated.

Plaintiffs bring claims for unjust enrichment, deceptive and unfair practices, business practices in violation of Fair Debt Collection Practices Act, FDCPA, and in violation of New York general business law, and violations of NY Judiciary Law 487 with respect to the attorney defendants. Plaintiffs argue the defendants engaged in the pattern and practice of fraudulently obtaining the full judgments by bringing claims against defendants that they knew could not prove. Plaintiffs allege Midland purchases consumer debt without primary or work supporting documentation required to establish a valid consumer debt. Plaintiffs allege that Midland has filed approximately 200,000 lawsuits in New York state Courts and has received default judgments in approximately 80 percent of those actions. Furthermore, plaintiffs allege the attorney defendants facilitated Midland's collection of these unverified debts by submitting materially deceptive affidavits.

On February 11 of 2022 the defendants each moved for summary judgment, on an individual basis; and the plaintiffs moved for partial summary judgment.

The parties filed oppositions and replies to each other's motions. And we have all those motion papers printed out in chambers.

In short, the attorney defendants contend, one, they fully complied with the applicable New York law and rules when

submitting affidavits of facts in support of their default applications in the original debt collector actions. Two, they had sufficient documentation to support those underlying actions. And three, plaintiffs claims preempted by the Rooker-Feldman Doctrine.

Rooker-Feldman Doctrine arguably bars claims brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commence and inviting district court review and rejection of those judgments. That is the argument for which decided the case of Exxon Mobile Corp. versus Saudi Basic Industrial Corp. 544 U.S. 280 page 284, decided in 2005.

Plaintiff's respond, however, that the Courts in this circuit, the Second Circuit, do not apply the Rooker-Feldman Doctrine to FDCPA and GBL claims against debt purchasers for similar schemes.

Midland argues it had sufficient evidence to pursue the underlying debt collection actions against plaintiffs. Plaintiffs also raise affirmative defenses including the defense that the plaintiff's claims are timely.

Plaintiffs argue that Midland cannot prove its ownership of the debts or even produce evidence of the debts themselves. Plaintiff further allege that the defendants deceptively misquoted the FDCPA and the affidavits they filed in state court.

On January 27 of 2023 the plaintiffs filed a notice of supplemental authority stating the Consumer Financial Protection Board Bureau settle and administrative action against defendant Forster and Garbus.  Plaintiffs allege the CFPB's settlement imposed penalties on Forster and Garbus for the same violations committed against plaintiffs in this action.

On June 13, 2025 the Court scheduled the instant oral argument to the present date.

Beginning with plaintiff's counsel, is that a fair and accurate summary of the case today?

MR. FRANK:  Yes, your Honor.

THE COURT:  Thank you.  You can remain seated.

THE COURT:  Gentlemen?

MR. SCHWARTZ:  Yes, your Honor.

MR. JOHNSON:  Yes, your Honor.

MR. FRANCOEUR:  Yes, your Honor.

MR. FJERMEDAL:  Yes, your Honor.

MR. ARLEO:  Yes, your Honor.

MR. PETERS:  Yes, your Honor.

THE COURT:  Now we'll proceed.  You can proceed with your arguments.  I do not mean by going through the background to preempt anything you wish to argue.  If it would be useful after the argument, I will give the parties an opportunity for post-argument briefing should anything arise in the course of

the argument today that either side wishes to address on a agreed-upon post-argument schedule. It is an important case, a case that has taken its time -- that's the fault of this Court -- but we are now going to address the issues that are outstanding.

Who would like to go first because we have cross motions? Don't be shy.

MR. SCHWARTZ: We can go first.

THE COURT: Absolutely. Pull the microphone.

MR. SCHWARTZ: There hasn't been -- obviously we've had these motions, they've been extensively debriefed, deposed, replies have been filed. There is some questions about whether the law has changed on some of these arguments.

And I think the easiest argument, the first argument we make is to reiterate, is that over and over again in this case we have provided to the plaintiffs hundreds of pages of documents specific to each debt. Overwhelming documentary evidence that we had a basis to file these collection actions for these individuals.

We have had deposition testimony from the corporate designee of Midland, twice. And she has confirmed that the documents that we produced showing, for example, the credit card statements the amounts paid, the amounts owed, the terms and conditions, communications between the consumer and the creditor, in one case there was a promissory note, we produced

the promissory note, we had this.

I want to step back. When this case was originally filed in Suffolk County and when we removed it, I had a conversation, we had a conversation amongst the parties, and I said, look, your argument is we didn't have sufficient documents at the time of these lawsuits were filed. We didn't have the documents. They weren't made available to the law firm; so therefore, these underlying collection actions are improper. They are not based on any proofs.

So in that conversation, and it was an attorney Bianco, who is no longer with the plaintiff's side. I offered before there was any discovery, I said, pick two, pick two of the plaintiffs, pick two random ones and I'll provide you with the documents that we have. He picked two, we provided them. I went back to him, I said, let's get this dismissed. Obviously we had the proofs.

Then there was a question of when did you have the documents. So we had a 30(b)(6) deponent who said we had the documents --

THE COURT: A little slower for the court reporter, slow down a little bit.

MR. SCHWARTZ: So we had these documents at the time preceding the filing of the collection actions. That these documents were available to the law firms to examine, to make sure that they had a justifiable claim.

We provided that.  And then they changed their position; they said nope, we're going forward.

It's frustrating because this case has been going on for years.  We've had the documents.  Their argument is maybe we got them after the suit was filed.  There is a logical disconnect there.  We didn't manufacture these documents.  These are documents from the original creditor.  We had them.  We had them in our possession.  We had them available to us through when they sell a portfolio documents, they download the digital information and they have the hard copies available standing.  That's how it works.

The law firms get this information, some the information through a legal cue.  We say, we send it out to a law firm.  We say, hey, is this suit worthy?  The law firm looks at the documents, says, it's suit worthy; or, we need additional documents.  Whatever.  Or they say, no, it's not worth it; then they don't go.

When they determine it's suit worthy, they collect all the information available in the cue and they file it; which is what happened here.

Account theory stated losses, they were served, consumers decided not to show up, which is a large part of what majority of people who get these suits, consumers don't show up because they owe it.  They owe the debt.  There is no reason to fight it.  They can't pay it, that's the realty of

the situation.

So the law firms have this information available to them. And if they need additional information, there is a mechanism that was explained in our procedures. I believe it's Exhibit MA to the brief that has the testimony from Zenya Murphy, who is the corporate designee of Midland. She talks about the procedure and what happens here. They provide documents, if it's not sufficient documents there is a mechanism within the system that the law firm can reach out and get the documents.

That happened with these plaintiffs. That happened with the plaintiffs that preceded these. It happened with the current players.

It's frustrating from our part where it looks like we did everything correctly, and we've been embroiled with a suit going on 11, 12 years, when the answer was given to them at the get-go.

So their argument that we didn't have sufficient documents at the time these individual collection actions were filed, is absolutely countered by the evidence, countered by the facts, countered by the testimony of the documentary evidence. So that's a frustration.

But if I can shift a little bit, because I think that's the issue. The FDCPA claim is brought by three of the plaintiffs. Agoado, McNally, and Sharkey. Three of them

brought the claim.  My client is dealing with the FDCPA, the only directed against Midland.

So there was a question initially, are their claims time barred.  The judgments were entered against these individuals more than a year preceding the filing of the state court, the Suffolk County complaint.  So on its face they are time barred.  The FDCPA has a bright line rule, it's one year from the date of the violation, which would have been the filing of the complaint.  None of these individuals said they weren't served.  They couldn't recall specifically in their depositions, some of them, whether they were served or not; but they were aware of the pending lawsuits somehow.  I believe they were served.

THE COURT:  Is there prove of service?

MR. SCHWARTZ:  There is.  In the state court there is a proof of service, there is an affidavit --

THE COURT:  Mail in mail or?

MR. SCHWARTZ:  Yes.  That is how we in New York --

THE COURT:  Okay.

MR. SCHWARTZ:  But in the depositions, obviously, long before people were, the consumers, understandably they recognized the debts, they recognized they incurred, they made purchases.  They really didn't dispute, other than one of them said something is fishy.  Some settled the cases because they got deals.  The fact is, these folks didn't say I don't owe

this. When we went through the depositions. We showed them the documents, showed them how they incurred it, showed the amounts, showed the agreements. So they have all this evidence.

But going back to the time bar. So it's beyond the one year, so we look, we say is there equitable tolling, and there just isn't. There isn't equitable tolling available.

But there was case a called Shetiwy. And Shetiwy vs. Midland was a class action. It covered the same ground as this case. It was rather unceremoniously dismissed; but it provided tolling. It provided tolling for these three.

The plaintiffs asserts FDCPA class claim. But the tolling under American Pipe does not permit them to create a tag along class.

So the FDCPA class action has to be stricken, it's time barred. The individual FDCPA claims by these three folks can go forward under American Pipe tolling.

So that part of the argument that we're kind of adding, that the FDCPA class is plainly time barred. It cannot not be extended.

The case law is clear on that. There is American Pipe, and it's followed by -- I want to make sure I get it correct, China Agritech vs. Resh from the Supreme Court, 584 U.S. 732 at 736, 2018.

THE COURT: Thank you.

MR. SCHWARTZ:  We don't believe that's the case.

And the plaintiffs can argue that the dismissal in Shetiwy was not based on the merits, it was dismissed before the class was certified.  But we do know from the Second Circuit in the case called Chavez versus Occidental Chemical Corp, 35 New York 3rd, 492 at 508, the Appellate Court in 2020.  And it was adopted by Chavez versus Occidental Chem Corp, 8 F4 at 91, 98, Second Circuit in 2021.  It says, it doesn't matter for American Pipe tolling it doesn't matter if the class was dismissed on the merits or for any reason. That's the Second Circuit proclaiming that.  So the FDCPA class action is time barred.

Now we can switch gears to the affidavit issue.  The GBL claim that Midland through its attorneys with three of the plaintiffs, not all of them, filed secured defaults.  In order to secure the judgments on the accounts stated here, they have to secure the judgments on the accounts stated here, they have to provide an affidavit to the Court to secure the judgment. And that's what we're here about.  The affidavit used in three of the six plaintiffs has language in it that the plaintiffs argue is deceptive, that it's misleading.

But this is an affidavit that is not provided to the consumer, this is an affidavit submit to the Court, so we can secure the judgment on the already existing default.

We look at some the cases that opposing counsel have been involved in.  There is a case Seaman.  It's Seaman versus

National Collegiate Student Loan Trust 2007-2, Southern District of New York, and it was a motion to dismiss that was decided on September 27, 2023.

THE COURT:  Who was the judge do you know that?

MR. SCHWARTZ:  I do it was, Paul Gardephe.  I apologize --

THE COURT:  We don't mind here in the Eastern District of New York if you mispronounce; and it's mutual.

MR. SCHWARTZ:  Thank you.  So that case was cited. What it said was, that it granted a motion to dismiss on the same argument, the same type of affidavit and the same feedback.

There were other cases.  There was a group three of those decisions that came out.

But in Seaman, the Court said that there is no standing for the plaintiffs in this case.  The affidavit is a communication to the judge.  The plaintiffs don't represent the Court, they represent the consumers who never had access to this, wouldn't have access to this.  How are they misled? No one knows, but they don't represent the Court.  And they granted the dismissal of their GBL claim premised on this affidavit issue.

THE COURT:  Was there an appeal?

MR. SCHWARTZ:  There wasn't an appeal.  It was a motion to dismiss, currently a summary judgment pending on the

other issue, which actually helps their side.  The other issue in that case was whether there was a harm -- well, the other issue in the case was -- let me pull this up, I want to be on point with this -- the sham lawsuit.  The argument in that case was, like this one, that National Collegiate Trust filed a sham lawsuit against these consumers in this class.  They argued there was an Article III standing, there wasn't -- Rooker-Feldman came into play.  The Court denied for the purposes of a motion to dismiss.  They said it's a concrete harm, first.  Being sued there is a sham complaint would be a concrete harm giving Article III standing.

Additionally, there was a distinction between whether or not Rooker-Feldman would apply to the current claim because they arise out of the same events, and the Court declined to grant a motion to dismiss on that issue at that point.  Summary judgment is currently pending.  I sure wish they had a decision, but we don't have that.

When you look at that case you go, okay, now we have the FDCPA claim where we've proven over and over and over again that the documents that supported these collection actions were available, were in the possession of Midland and were available to the law firms.  Doesn't mean the law firm necessarily needs to use all the documents, they just need the documents to advance their accounts stated claim; and if there is opposition, to prove out their claims in the state

collection action.  That what was required at that time.  It's not under the present standard, it's the time when the collection action was placed.  They are entirely lawful. That's the first part.

FDCPA class action claims are time barred.  The individual claims under American Pipe, and the cases that followed, they survive; but they fail because we have the documents.  We had the documents.  We provided them.  We have testimony showing when we had it, which shows we had it, prior to the collection action taking place and they were available to the law firms.  So that's out the door.

The affidavit issue is a non-issue.  They don't have standing to bring a claim on behalf of the Court, which is what they are trying to do.  They don't have that available.

And I'm not going to speak for the law firms, but I do say, our other arguments are compelling in our motions.  We don't believe that theirs are compelling at all.  We think that the evidence plainly shows that we are entitled to summary judgment.  And as far as the law firms, I'm going to let them speak to their own arguments because there are some issues that don't attach to us.

THE COURT:  Okay.  Counsel?

MR. FRANK:  Your Honor.

THE COURT:  We'll let them go then you'll respond.

MR. FRANCOEUR:  Thank you, your Honor.  My name is

Joe Francoeur.  I represent one of the law firms, Cohen and Slamowitz, now known as and Selip and Stylianou

THE COURT:  Spell that for the reporter.

MR. FRANCOEUR:  Cohen, C-O-H-E-N, Slamowitz, S-L-A-M-O-W-I-T-Z.  The firm is now known as Selip, S-E-L-I-P, and Stylianou, S-T-Y-L-I-A-N-O-U.

THE COURT:  Thank you, counsel.  Continue.

MR. FRANCOEUR:  Okay.  So the claims against my law firm my client are 347 and 487, deceptive trade practices and deceit or collusion with intent to deceive.  In common speak, by recklessly filing actions with no proof and no meaningful attorney review.  Just repetition, driving the motor.

That's not the case.  I don't want to take too much time of the Court.  Cohen and Slamowitz, Mitchell Selip testified that the firm does a meaningful review twice by an attorney before filing a suit.  Before Cohen and Slamowitz accepts the file, there is an attorney review of the file:  Do we have chain of title documents, do we have account statements, and the like.  Two different categories of documents.  So, does is Midland own the account and what is there to support the account.  Two types.  We review that before we accept the file.  That testimony appears in Francoeur supplemental affidavit Exhibit W page 95.

So there are two.  And the second time before filing, Cohen and Slamowitz will review before a default

judgment is filed.  I asked Mr. Selip this question he gave this answer.

THE COURT:  Page and line.

MR. FRANCOEUR:  Sure.  It's Francoeur supplemental affidavit Exhibit W page 102, line three through 18.

THE COURT:  Read it slowly.

MR. FRANCOEUR:  Sure.

Question:  When S&S makes its decision to file for default judgment how does the firm go about making that decision?

Answer:  We utilize our Phoenix system to identify accounts that have been sued, where the consumer has been served, where the 3215 notice has been sent, and more than 25 days have passed and there is no answer, it's not paying or performing, there is no compliance issues, which I would broadly define as an allegation of fraud, dispute, paid prior, identity theft, which is part of the fraud.  If the account falls within that category, it's then reviewed by a clerk who will gather the documents necessary to support the request for a judgment and give it to an attorney for review and signature.  This is the policy and procedure of Cohen and Slamowitz in every file.

So twice there is a meaningful review done.  Are we going to accept the file from Midland and before we file a default judgment.  That's the unrefuted evidence.

With regard to plaintiff ago Agoado, who is the identified plaintiff suing my client, the handling attorney was David Cohen.

David Cohen gave the following response:  With regard to the underlying collection action against David Agoado, I do not have a specific recollection as to what I reviewed, except that I am certain I followed my regular custom and practice of reviewing all documents and the client affidavit.  And I have no reason whatsoever to believe that I did not review the documents and affidavit prior to seeking the default judgment.

That's the end of the quote.  That's Cohen affidavit paragraph three.

So attorney review happens every single time.  And Mr. Cohen may have not have remembered this exact circumstance but he truthfully testified that I follow my procedure every time and I'm not aware of any reason why I wouldn't have followed it here before I file for default I review the entire file.

Then there is an allegation whether or not Cohen and Slamowitz had the documents, the account level documents and the chain of title documents.  In my reply brief, I reference the Francoeur Affidavit Exhibit N, as in Nancy, where we identify eight separate document types that were provided to Cohen and Slamowitz when they received the file, including the

card member agreements, details of the account information, the charge off statement for the Chase account dated February 6, 2010 detailing the exact current balance of $7,985.20, the bill of sale, the closing statement, the affidavits of sale by the original creditor, electronic data provided by Chase, referred to as the PO data sheet, Chase bank account statements, the personal credit line account agreement and householder accounts, and the chain of title for the household account. They had absolutely everything. All of the chain of title documents showing the Midland owned these accounts, and all of the accounts in agreements that were at issue in the collection. There is nothing more my client needed to do.

The allegations that my client was engaged in deceptive trade practices or collusion with the intent to deceive is totally false. We have met our burden with admissible evidence showing that's not the case. Cohen and Slamowitz had a policy and procedure, which they followed, to review twice before filing for default judgment all of the materials they received. They did so. And the file here has absolutely everything. They are all detailed from Francoeur Affidavit N.

There is no basis for this whatsoever. Cohen and Slamowitz complied with the law. They were given everything they needed from Midland. There is simply no case here.

There are some other arguments that I'll leave to the papers, your Honor. I know I took sometime here, but the plaintiff doesn't have any standings. They never paid anything on the accounts. I do believe Rooker-Feldman bars the claims. I will rest on the papers for those arguments.

THE COURT: Thank you. Other counsel?

MR. FJERMEDAL: Good afternoon, your Honor. Glenn Fjermedal representing Forster and Garbus.

We have the same type of scenario as what stated by Joe Francoeur here with respect to Selip and Stylianou.

But Forster and Garbus, they filed lawful proper lawsuits with back-up proof. They procured proper default judgments against Sharkey and McNally over debts that these individuals admit that they owed. There are affidavits of facts signed by Midland and filed by F&G in support of default judgments, which were not false, not fraudulent, which supported by sufficient documentation of the debts which were not disputed by the plaintiffs Sharkey and McNally.

There is a reference to junk accounts spreadsheets, and Midland's counsel addressed that, but these are legitimate business records incorporating critical data and information, as well as documentation supporting all of the debt. There are representations and warranties from Midland. There are documents verifying the existence in the amount of the debt owed by Sharkey, McNally. And the right to produce additional

information upon request.

Now, there is a series of cross checks to make sure that everything is accurate and there is sufficient documentation to back up the claims. Forster and Garbus and Joel Leaderman submitted two declarations with respect to the Sharkey accounts and the McNally accounts, and I refer to them. But there is a strict policy of reviewing the data and making sure that there is accurate statements.

We're not talking about inaccurate amounts of debt or that I don't owe the debt. I mean, what is incredulous is that the plaintiffs Sharkey and McNally really said that, yeah, I signed that personal note for $5,000. I took out that Bank of America line of credit and I used it.

And I think that that's the ultimate problem, is that we've submitted and proven the entitlement to default judgment and we have the back-up information. It's been provided in discovery. And again, I'll just cite to the arguments that have been made and they are pretty consistent with respect to the law firms.

THE COURT: Thank you, counsel.

MR. FJERMEDAL: Thank you, your Honor.

THE COURT: Other counsel wish to be heard?

MR. ARLEO: Yes, your Honor. In order to expedite our presence here today, I'm going to invoke Ed Norton of the Honeymooners and ask your Honor for permission: May I echo

those words?

THE COURT:  You may echo those words.

MR. ARLEO:  Thank you, your Honor.

I think it's important that you have to look at the purpose of statutes.  You have to see why legislatures passed statutes and why consumers need protection.  I represent Rubin and Rothman, I'm defending this case, but working under the FDCPA for 35 years.  I've represented plaintiffs also.  I'm adamant about fair application of the statute; but is not present here.

So what I think is important, and it's in the file -- and I did try and get the docket numbers for the deposition transcripts of Pierre and Vasquez, who are the plaintiffs against my client, but there is problems with PACER.  I cannot log in without code words.  They've changed the system for security.

THE COURT:  I cannot begin to tell you.  Today, for example, I had the absurdity in a criminal case of a prosecutor who filed a document within the last 48 hours which he cannot longer access.  And he asked if I could enter and order that would allow him to access on PACER and ECF the document that he had just filed.  I then had to reach out to my very distinguished courtroom deputy who is the mistress and master of the universe and who now spends a lot of time off loading documents from the old system into a new system only

to be told by the AO that we have to take those documents and put them into the new, new system.  And so now we have a system where the Assistant United States Attorney in a criminal case files a document he can no longer access it. The trial judge who is supposed to review the document, cannot access it.  The courtroom deputy has to go in and provide access to the trial judge and to the prosecutor and to defense counsel who can access it.  Oh, yes, there is a matter of the public, since we are in a republic where when you're filing documents in criminal cases especially, as well as important civil cases, they ought to be accessible to the public.

Other than that, I have no problems with the new system that our friends in Washington have designed.  Because obviously, they have a lot of time on their hands as opposed to working as trial lawyers and judges.  I'm not criticizing them, I'm just observing.  Go ahead.

MR. ARLEO:  My wife is my law clerk she will tell that you she's tried to get in here and she will confirm to you that had I done that there would be four punched out windows and 12 punched out walls.  I, as an attorney, should be able to come in here look at that docket and tell your Honor exactly what I'm doing.  If I'm able to do that after today, I will communicate the docket numbers of the depositions.

THE COURT:  We'll work with you on that.  And my

courtroom deputy, Ms. Ortiz, will certainly be available to work with both sides in facilitating access to the documents.

I want to assure you that your frustration is felt not only by this Court but all of my judicial colleagues. Because the new system is challenging and it was put in place, I'm fairly convinced, by people who have never tried cases or haven't tried cases in many decades. Because no one who is a trial lawyer or trial judge would design a system where you file a document, you can't access it, the Court can't access it, your adversaries can't access, and the public cannot access it. Not even in Hogwarts with wizards that fly around do you design systems like this.

Otherwise, no criticism of what the very bright people at the AO are doing. I want to make that clear.

MR. ARLEO: As they say: Not that there is nothing wrong with it.

THE COURT: Exactly. I hear you. Go ahead.

MR. ARLEO: So the first client is Pierre. And I'm going to sum up what he said at his deposition. He used his credit card. He has no proof that he did not owe the moneys demanded by Midland. He never told either Rubin & Rothman or Midland that he did not owe the debt or that the amount was incorrect. He agreed to pay $100 per month on the debt. He received a copy of default judgment in the mail, filed an order to show cause.

THE COURT:  Slower.

MR. ARLEO:  Filed an order to show cause to vacate. He acknowledged the Chase debt, and requested an opportunity to set up a payment plan.  Rubin and Rothman vacated the judgment and agreed to let him pay.

He reviewed the bill of sale from Chase, and understood that Midland had the accounts transferred.  He understood that the information Chase provided to Midland was true and correct.  He admitted he has no proof that Midland did not buy his debt from Chase.  He never disputed the charges with Chase.  He never asked Midland for verification.

This is all his sworn testimony.

He agreed that based on documents Midland produced he can demonstrate the existence of his former Chase debt.

The allegation that Midland did not obtain documents from Chase was inaccurate, that's his claim.  So at his deposition he's saying that's not true, even though the complaint says I said that.  He was not aware of any fraudulent affidavit.  He admits that at the time Rubin and Rothman were paying the judgment, Midland owned his Chase account.  He admits he was properly served with the summons and complaint.

He has no evidence to prove Rubin and Rothman lacked a reasonable basis to file a lawsuit.  He has no facts to prove Midland conveyed any false information to him.  That's

plaintiff Pierre.

The second plaintiff is Vasquez, who by the way, didn't pay anything so she's out on standing; that would be without prejudice on her dismissal to refile in the state court, but because of a couple of cases issued by the Second Department, the Second Department confirmed that New York state courts file the same injury and fact required in federal court for Article III standing. So if she wants to go and refile, I would make the same motion.

But what she said at her deposition, and it confirms what Mr. Schwartz said. A lot of these plaintiffs who get these lawsuits know they owe the money, they know they can't defend, they let them go to default. Other than what her attorneys told her, she had no knowledge as to what documents were missing. She can't demonstrate anything improper done by Rubin and Rothman. She did possess Chase credit cards and she had excess of $10,000 in debt as alleged by Rubin and Rothman. She testified she does not know what laws Rubin and Rothman violated or the legal basis of her own claims.

It's important understand to understand, your Honor, we all think that the lawyers are making the arguments in the case, lawyers aren't the parties. These are the parties. The parties are the ones with the burden to prove their case; and both of these plaintiffs demonstrably fail woefully against my client.

She did not possess proof that Midland cannot prove that they purchased the debt. I'm almost done. She did not respond to the summons and complaint because she knew she could not defend. She admits Midland could get documents from Chase. She does not know how Rubin and Rothman failed to conduct a reasonable investigation. She admitted Rubin and Rothman sued the right person and obtained a default judgment in the correct amount.

This is the plaintiff. This is what she's saying. Here is my lawsuit and this is all the allegations. But when I raise my and and swear under oath your guy didn't do anything wrong, but by the way, my complaint alleges a 487 claim, which I take grave offense against that. That's a deep fraud on the court intentionally by lawyers. That's a serious claim. And under this testimony to have that claim is outrageous. That should be stricken sua sponte immediately.

There is no evidence that Midland did not have proof. She cannot remember any out-of-pocket expenses that she had. So because you can't prove unjust enrichment, you can't prove the 349 claim, you can't prove the 487 claim, we win on summary judgment.

If we don't win, then these two plaintiffs are going to sit in front of people in that jury who are going to look at each other and say: What?

And, potentially, a ten-minute verdict, I would

predict.

Is outrageous. We need to get summary judgment. This case has gone on for 11 years. These lawyers are not schemers, conartists. They are terrified. They hire lawyers for FDCPA compliance to make sure they are doing the right thing. But they are sitting here and it's target practice.

How about this, your Honor. Consumer Financial Protection Bureau issues the first letter for FDCPA compliance. What do these lawyers do? Well, we got to use that letter. You know what the Courts say? That letter doesn't protect you from an FDCPA violation.

What is left of my hair I could pull out. That's maddening and it's not fair. It's not fair. This is all about fairness. This is an illogical case. It needs to go. Thank you, your Honor.

THE COURT: Thank you. Counsel?

MR. PETERS: Thank you, your Honor. Michael Peters from Pressler for the defendant Pressler and Pressler LLP, now known as Pressler, Felt, & Warshaw LLP.

I will be brief. Counsel for the defendant have already summed up all the arguments. I will echo that Craig Moore, who is the plaintiff that dealt with Pressler and Pressler also admitted that he had the underlying account, that he never paid the outstanding balance, that he owed the money, that he never saw the affidavit that was utilized in

support of the default judgment application, that he had no basis to challenge whether those documents were correct --

THE COURT:  A little slower when you read.

MR. PETERS:  That he had no basis to challenge Midland's access to those documents when it prepared and reviewed its affidavit.  And no basis to challenge the money was not due on that account, or that it was not due in the amount that Pressler sought to collect from him.

The case against Craig Moore was a simple credit card case.  The documentation that Pressler received from Midland was the charge-off statement that was in the amount that Pressler sought to collect from Mr. Moore.  In addition they received an activity statement that showed payment on the account.  Even under today's newer standards, those are the two primary documents that a collection attorney would need to have in their possession to file the suit.  That is the type of thing that was produced by Midland.  They had those documents those were reviewed.  Those documents were available.  Those are the very same things, a charge-off statement and an activity statement.  Those are the things that a consumer would be used to seeing and shows activity on that particular account and those were the documents that were available here on this very simple credit card case.

As far as it goes, Mr. Moore has not responded to the lawsuit.  The judgment remains outstanding.  He has made

no payments on this particular judgment.  And he's taken no challenges to the entry of the judgment or appeals in that particular case.  Thank you, your Honor.

THE COURT:  Thank you.  I'll hear from plaintiffs counsel.

MR. FRANK:  Thank you, your Honor.

We came here prepared to argue the law and are sort of surprised to find that the plaintiffs and defendants appear to exist in very different factual worlds.  So I wanted to really hammer down on the facts and take a close look at the documents that the defendants are relying on for their defense.

I noticed something, and the Court may have noticed as well on the papers, the defendants attempt to defend their thread-bones spreadsheet; and the plaintiffs have argued under New York law these types of spreadsheets are plainly not allowed.  So it appears that defendants have very aggressively pivoted to instead attempt to rely on what is called so-called account level documentation and are representing to this Court that they have always been in possession of account level documentation.  That that account level documentation, while we all agree is hearsay because it was produced by another party, that it meets the requirements of the business records exception to the hearsay rule.  And they simply haven't even attempted to do so.

I'd like to draw attention to opposing counsel's, one of his first statements, was that the parties disagree about when these documents were supposedly entered into Midland's computer systems but that Midland relies on some testimony from a 30(b)(6) and they think that's enough.

As the Court knows, when a party ordinarily attempts to enter hearsay and obtain an exception under the business judgment rule, they do a number of things. They have an affiant who submits an affidavit who informs the Court when these hearsay documents were entered into the defendant's computer systems, who tells the Court about how they relied on those documents from a day to day perspective, and other indicia of reliability. Here today, after all of that vociferous, loud argumentation about all of the things that they look at, when the Court turns back to look at the affidavits that they submit, after ten years they can't offer a single human being who says I looked at these documents at the time, I know that these supposed account statements were entered into Midland systems on March 3rd 2012 and I know the manner in which they were entered. And they don't offer any of that.

Opposing counsel acknowledged there is a debate between the parties on when these documents appeared. How is it possible that defendants routinely relied on these documents if we don't know where they came from even today.

So for example, we heard a very passionate argument from opposing counsel representing some of the lawyers who have a heightened duty to protect as officers of the court the process before the court. And yet still to this day not a single affidavit from not a single lawyer on their side says I looked at this account statement, I looked at this account level documentation. No one has furnished the even the slightest bit of evidence that would enable the Court to do a wholesome analysis based on the hearsay rule.

And this is particularly troublesome because they say this case is a very standard case, but that's simply not true. That as the Court is aware, the FTC has looked into the debt collection registry, has observed that for most cases, as you would expect when one sells tens of millions of dollars of assets, it comes with warranties that the assets are legitimate. Yet, we invite the Court to take a close analysis of what these sellers are saying to Midland immediately before Midland decides to wash these documents and make them clean and make them trustworthy and make them reliable for a Court. That before, when they receive the documents, the person who created them is telling them, I quote: The seller does not represent nor ensure the accuracy or completeness of any information or its sources of information contained in the information provided.

This includes both the spreadsheets and any physical

paperwork that they've mattered to dredge up along the way, we have no idea when.

From a simplest level on this case, your Honor, the defendants know that all of these documents that they are so proud that they washed that they are proud of, on day one the seller said, I don't know what this says. This doesn't say anything. You can't say to me it says anything.

It's so powerful how strong the wording is in these sales agreements. The seller, quote, has not and does not represent, warrant or covenant the nature, accuracy, or completeness of any of these accounts, the sale file and/or collect collateral documents.

These are the very documents that defendants just finished spending an hour grandstanding on that are very clearly business records and reliable -- so reliable, that the sellers expressly told them they are not reliable.

So on day one, defendants hatched a scheme where they found a niche area in the debt area with such junk debts that the sellers say, give us some money, but when you're gone, you're gone. It could be a lemon or it could not be, it's a used car. And now before the Court, they are busy grandstanding about how they've got this and that. But where did it come from?

In a typical case, your Honor, assuming it was the original creditor you don't produce from your file a piece of

paper, you have to produce mailing records. You have to prove that these documents were sent, when, by whom, when were they placed in the mails. Defendants don't have any of that. They have nothing, your Honor. And really their defense is predicated on this house of cards.

If I may address some of the more minor issues. We also believe that when the Court takes a close examination of the testimony, the Court may be surprised to find that the plaintiffs witnesses didn't say: You got me, I don't have a case. Why are we even here. As per defense counsel's interpretation that plaintiffs admitted everything. It boggles the mind. It's not true.

MR. ARLEO: Your Honor, I'm --

THE COURT: Whoa, whoa. We don't do it that way. It's not state court.

MR. FRANK: Thank you, your Honor.

If I can address the other issues.

THE COURT: Take your time. I cleared the deck so you can take as much time as you need. Go ahead.

MR. FRANK: Thank you, your Honor, I appreciate that.

One issue that is a slam dunk before the Court right now is they simply don't have change of title for plaintiff Vasquez's account. In very least, that is a slam dunk claim for them. They don't even attempt to manufacture chain of

title, which is very interesting, it shows how bad their spreadsheet is that so much of their defense is based on this idea of the inviability of the documents.  But now that we've gotten into discovery they have some stuff.  But for example, Agoado doesn't have the last statement.  They have indicia of the fallibility of these records.  They know based on what happen we have here before us, that there are errors in the records that they are relying on and attempting to sanitize before the Court.

And then in terms of the Rooker-Feldman issue, your Honor, we're well aware that the Court is an expert on this. I want to draw down the issue a little more narrowly.

As the Court is aware, yours truly, plaintiffs have succeeded on a number of cases in this jurisdiction defeating Rooker-Feldman challenges.  One of the points we would like to emphasize, part of the point is the nature of the damages that the plaintiffs are alleging.  That we aren't simply alleging cash harms.  Many the plaintiffs are also alleging emotional distress from the defendant's fraud, which is both a concrete harm for purposes Article III standing.  As per the Toohey case and Michelo case and other cases in this jurisdiction, are not challengeable under the Rooker-Feldman Doctrine.

And then my last point, your Honor, concerns the limitations period and the coverage of American Pipe tolling. I would like to refer the Court to a couple of cases that we

think very clearly stand for the proposition that in this jurisdiction tolling of class members in a class action continues in spite of the Supreme Court tolling.  We invite the Court to please take a close look at Fund Liquidation Holdings LLC v. Bank of America Corp. whereby --

THE COURT:  Citation on that.

MR. FRANK:  991 F.3d 370, Second Circuit 2021. Where the Second Circuit expressly disagreed with defendant's argument here that American Pipe tolling no longer applies to class action, it clearly does.  Just a week ago, your Honor, in MBADIWE s. Amazon.com 2025 U.S. district Lexus 183705, that's in S.D.N.Y. September 18, 2025 last week.

THE COURT:  Who was the judge, or initials?

MR. FRANK:  I don't think I got it in the copy paste.

THE COURT:  That's okay.  We'll find it.  Go ahead.

MR. FRANK:  The Court said, I quote:  Indeed Courts in this circuit have applied American Pipe tolling to subsequent class actions when the issue of class certification was not decided in the prior class action.

Which was the case in the case, which defendants have expressly admitted is on all fours with the claims in this case.

Then also one other case, your Honor.  Famular v. Whirlpool Corp. and that's 2021 U.S. District Lexus 21432.

That is Judge Briccetti. Similarly, the Court found tolling class survived.

Let me look quickly.

THE COURT: Sure, take your time.

MR. FRANK: Your Honor, I think that covers it.

THE COURT: Thank you. I will hear any response.

MR. SCHWARTZ: Your Honor, it's probably one of the more infuriating parts of the litigation. What is a half truth, it's a lie.

I direct the Court -- before I discuss that -- I direct the Court to I believe this is a sealed exhibit, ECF332, the account purchase and sales agreement for Agoado. There was ECF330 Bates stamped -- that's the credit card agreement. I take that back.

ECF336, which is the confidential purchase agreement for Ms. McNally or DeRosa was her other name.

ECF341, which is the confidential forward flow receivables purchase agreement between Midland and GE Money Bank for Mr. Pierre.

For Thomas Sharkey there is also the ECF343, Bates stamp 943 to 936, that's the sealed confidential purchase between FAI Card services and Midland Funding.

Doreen Ryan Vasquez, ECF344, the sealed bill of sale.

And that is ECF344 Midland MCM 1017 to MCM 1054. I

believe that's it.

So I'll go back. The plaintiffs read about how unreliable the information is that the seller is disclosing in those agreements, and I pinpointed the agreement. It's a half truth. That paragraph goes "except for," then as you read in there are guarantees as to the accuracy of the documents throughout. The Court has those documents. It's right there on the face of the documents. The information that Midland Funding acquired from these various creditors that are incorporated into their business records are reliable. They are unquestionably reliable. There are affidavits.

The plaintiffs brings up an argument of hearsay, which is peculiar. I believe the affidavits would overcome hearsay objection at trial for any of these documents.

There is testimony from the corporate designate, Zanya Murphy, who talks about how they are used in the normal course of business. These are the records, the financial records, the credit card statements, the agreements. All the documents that end up supporting the lawsuits that were filed, they were in Midland's possession at the time of purchase. That's the testimony. They offered nothing. That's the testimony. The documents were there at the time of purchase. The documents were with Midland at the time of purchase. They were available to the law firm.

They were documents viewed through the legal cue and

the lawyers look at it and say I want this and this, I need this and this.  By the way, if some of those documents are missing, the lawsuit isn't filed.

Now, are there going to be errors?  Sure.  There were apparently, according to the plaintiff, 200,000 lawsuits, I'm sure one or two where there was an oops.  It's inevitable.  As a standard practice with respect to these plaintiffs everything was pristine.  The documents were there that supported the lawsuits.  The collection actions.  There was no fraud.  There was known inconsistency.  There was no inaccuracy.

They were filed.  The consumers received notice of the claims, and decided not to challenge them.

I would direct you to look at the deposition transcripts of the various consumers, because I disagree with their representations as to what was said.  I happen to be involved in pretty much all of them.  They were conciliatory, they were concessionary.  They said, we owe these debts.  None of them disputed them.

We put the records in front of them.  They agreed that those records were valid, that it reflected the accuracy of the transactions in their cases, that this were these debts.  That we had the right to collect.

So when they start saying that we have a lot of fanfare but no substance, no.  We have substance.  They take a

convoluted approach to it.  They deliberately -- as a perfect example, the agreements.  To say that we agree that the information being purchased maybe have these problems except it guarantees the information is accurate, it guarantees the amounts are accurate, it guarantees there is no bankruptcy, it guarantees at least at the time they are not deceased.  There are guarantees in there that make these documents absolutely reliable.  There is no question.  The information we get from the creditors is reliable.

So that's all I have to say about it.  But it just is part of our -- when I look at our reply, I say, gosh, we were angry, I was really angry.  I'm not usually like that, but I was angry because of that kind of conduct.

Half truths are a problem.  If I'm wrong on the law, I'm wrong on the law.  If they are wrong on the law, they are wrong on the law.  Don't try to skim the game.  That's all.

When they brought that up, the documents are right there in the file in the system.  You can take a look at them and you can see what the language says; but it is reliable.

THE COURT:  Other responses?

MR. FRANCOEUR:  A brief comment, your Honor.  Joe Francoeur.

Just to respond to a comment from my friend for the plaintiff who said for Agoado there was no Chase Bank statements.

I produced from Selip's records Bates SNS42 through 81, 40 pages of Chase Bank statements. I personally took the deposition of Mr. Agoado and went through each charge. At the time I thought it was over doing it. It was a comic moment he recognized the charges and says, that's my wife, that's my wife. So he admitted these are their charges. 40 pages of bank statements, so I don't know why there is a representation today that didn't have Chase Bank statements for the Agoado account. I spent all day going over them. That's my only comment.

THE COURT: Thank you.

Other comments from counsel?

MR. ARLEO: Thank you, your Honor. I'm well aware that judges don't want sandbox fighting between lawyers. I'm going to try to avoid that. But it's pretty outrageous what Mr. Frank said. And while I was sitting here thinking, talking to myself to stay calm because some lawyer just said that I basically misrepresented his client's testimony, that's kind of an outrageous thing to say; but I'm not surprised that he said it. Then I thought, you know what, if he has to misinterpret what his clients say and try to say that they didn't say what they did say, he knows he's got a problem.

It's the plaintiff's, again your Honor, it ain't the lawyer, it's the plaintiff's burden to prove their case. And these plaintiffs testified, notwithstanding Mr. Frank's

attempt to say that I twisted their testimony, I didn't, I wouldn't, I've been practicing for 35 years, I don't need to do that. They said it. And as someone very close to me would say: Deal with it. He's got a problem, his own client said that.

Let's presume for one second he's right on the documents. The whole issue of their case is, you defrauded these people because they don't owe this money. They admit that they did. What am I missing? I don't get it.

Thank you, your Honor. And one further comment. I very much appreciate your Honor's attention. And I don't intend to impugn any other judges in this court or any other court, but it's a pleasure to have a judge look at you and listen and know that he's really drinking your argument in and you're going to get a fair shot, so thank you, your Honor.

THE COURT: Thank you counsel.

Any other comment?

MR. PETERS: Yes, your Honor, I'll be brief.

Again, going back to Mr. Moore. He received and was at the same address. He got his initial communication. He received a lawsuit with a mandatory summons. He got a settlement letter from my client. He was served with an additional copy of the lawsuit. He was served with notice of entry of the judgment. None of those mailings came back. If Mr. Moore wanted to raise hearsay issues and dates that things

were sent to him, the time to do that was when he received the summons that told him how to challenge that particular lawsuit.

As far as the voracity and accuracy of these documents that the law firm defendants received and that Midland had available, in my reply brief I directed the Court to a New Jersey case. And it talks about the proofs for New Jersey, a neighboring state, that going back to 1992 they talked about the elaborate regulatory schemes involved with issuing and sending credit card statements to consumers. And how that imbues them with voracity. And that's why in the state of New Jersey those statements, and even the electronic data represented from those statements, is sufficient proofs.

As far as the accuracy of thought those documents, the representations and warranties made, as Mr. Schwartz addressed, were there. They were sufficient documents. But the documents in and of themselves I believe the Court should find have that inherent reliability.

THE COURT: Thank you.

Any response counsel?

MR. FRANK: Your Honor, may I ask the Court or opposing counsel to get to the bottom of this. On which date exactly --

THE COURT: You have to address the Court.

THE COURT: This is your chance to respond to their

arguments.

MR. FRANK: The Court still doesn't know as we sit here on which dates exactly the account level documentation purportedly for Vasquez' account was entered into Midland's computer system. Today we still do not know on which date these supposed account level documents were entered into any of the law firm's computer systems. Because they don't have any actual witnesses that have provided what would ordinarily be the basis for a business records exception to tell you how, how it was done, on what dates, who did it. They don't know. I invite the Court to ask them today as we sit here, they are very proud that they built the facts for a business records exception, let's go through it. Let's go through for each the plaintiffs when exactly, what date they received those documents, who received the documents, who added them to their systems so that they then routinely relied on it. They don't have witnesses who say they relied on any specific account statement. It's been a lot of sort of wordsmanship about, well, they say we didn't have it, look we probably did have it. No one individual with personal knowledge on that entire side has said on this date I received it from the third-party and I entered into the computer system. They are just so far from what would ordinarily build a business records exception to the hearsay rule that we're hearing a lot of, how dare opposing counsel do this.

But I really invite the Court to try to get to the bottom of the facts as we sit here today to see what they do and don't have.  Because they don't have a lot.  And they are really asking this Court to sort of whitewash a lot of what is non-standard practice within that industry, and that's what is really important.

This whole thing about how it's standard practice in the debt collection industry to have these quizzical, confusing, seemingly contradictory clauses is bizarre and makes no sense.

In fact, for that very specific reason if the Court takes a close look at the FDC's guidance.  The FDC had wind that there were certain bad actors trying to invent this bizarre exception to the law where we say no warranties, everything is wrong, but some is right.  It makes no sense.

It's as if I was to attempt to sell you a car and say I'm not representing anything is good about this car, no guarantees, anything I may have told you about this car is wrong, but also it's a pretty nice car.

If you were to go around and attempt on rely on what I said to the third-party to say it's an amazing car, the guy who owned it said it was a perfect car; it's not true.  The presence of the very, very incapsulating, nothing I tell you is real, which would be the sales documents, overrides any clever sentence they threw in.  Their argument that this best

knowledge clause allows one to sell something warranteeless for cheap, but we all treat it as if it was good enough warranties, simply makes no sense.

I have a couple of cases, your Honor, on this sort of best knowledge area because other courts have been faced with this issue before. I'd like to direct the Court's attention to Price Auto Group v. Dannemann, Delaware Supreme Court Lexus 252, that's in the Delaware Superior Court September 25, 2002. Where Chancellor Slights who is pretty famous on this issue did a survey of opinions on these best knowledge clauses and found that they protect the sellers, not that they protect Midland and the debt buyers. That their purpose is not to provide any type of assurances of reliability in spite of the many assurances of non-reliability, that would make no sense.

Similarly, your Honor, I would like to draw the Court to Higgins vs. 120 Riverside Boulevard at Trump Place Condo, and that's at 2022 U.S. District lexus 157466 S.D.N.Y. August 31, 2022. I apologize, I don't know which judge.

THE COURT: We'll find it.

MR. FRANK: There the Southern District of New York recently held that a sophisticated real estate purchaser cannot cite a best knowledge clause as a guarantee of validity when the sale terms are as-is, because the law recognizes that the purpose of selling something as-is is to deliberately not

provide guarantees.

So, your Honor, the defense doesn't make any sense.

Just to fix one factual dispute. Opposing counsel misunderstood what I said about the Agoado account. I was observing that even the documents they furnished are incomplete. And counsel went on about how they had 40 pages or whatnot, but they still didn't have the last account statement. That in spite -- even in circumstances where we still maintain they went back and they got these documents from third-parties later, since they in no way have been able to prove other wise, those documents are damaged just like the sellers say in all of their warnings. That they simply didn't have complete documentation that would be required.

That if I was in civil court and attempting to raise a claim on a credit card debt, there are only two claims available to me; it's a breach of contract or and account stated claim. In the breach of contract claim they would need to have, obviously, a whole bunch of documentation adding up to the debt, usually they don't have that, so they rely on an account stated claim. For an account stated claim they need that last piece of paper; they know that, they are lawyers. And yet, they pursued the claim any way bragging about the 40 pages of what wasn't enough. But they knew that they needed more, and did it any way.

That's why we would like the Court to bear down on

how flimsy this entire defense is about their hearsay documents. That so much of it is about their hearsay documents, that when you strip out the hearsay documents, they have nothing. And then when you look at their basis for admitting the hearsay documents, it's just -- we don't have affidavits from people saying I looked at this account, I'm a lawyer I looked at this account statement in 2014 and it was in the Agoado account. It's all reverse engineered, well, if you breakdown the 30(b)(6) testimony.

But that's not how it works, your Honor. If we're admitting a business record, we're talking about a specific piece of paper, a specific account statement. They have to prove that they relied on Agoado's account statement. That they looked at it and relied on it at the time of collection. That's their business.

If they didn't look at it, they didn't rely on it. If they didn't have it, they couldn't look at it.

And this whose defense attempting to manufacture what they had and didn't have, doesn't even have dates. How do they say they have it without being able to tell us when they got it? It all feels like a smoke screen, your Honor.

And a consistent problem in this case has been, as we've beaten to death here -- I do these cases all the time -- we're very frequently fighting over what is and isn't hearsay because they are third-party debt purchasers. And there is a

very deep analysis on the business judgment rule that always breaks down the affidavits that the other party submits talking about when the records were added, how familiar their people were with the record keeping systems, when and how they relied on these records in the ordinary course of business.

Yet here, no one has said I relied on this account statement. They merely have taken a step back and said here is the testimony where they said they reviewed all the records. They reviewed the records, here are the records, they reviewed them. But no one said, I reviewed this account statement; therefore, this account statement meets the business judgment rule, it was admitted September 12, 2012. Until they do that, what are we doing?

THE COURT: To answer the question what do we do, I'm now going to address what we're going to do going forward.

As I stated at the beginning of the argument today, this is an important issue. It's been well argued by both sides. I appreciate the time and attention and detail. I also stated earlier that the Court would be amenable to post-hearing submissions, and I think that will be helpful to the Court.

So here is what I'm directing the parties to do. By 5:00 p.m. on October 31, a day that will live infamy and history, I want you to submit on ECF proposed findings of fact and conclusions of law simultaneously both sides by 5:00 p.m.

Then I will give you additional time to the eve of Thanksgiving to submit objections to the proposed findings and fact and conclusions of law. In other words, I'm giving you essentially a month each side to propose their findings of fact and conclusions of law to the Court on notice to the other side. Then I'll give you approximately three weeks to file your respective objections to the proposed findings of the fact and conclusions of law that you receive from the other side.

After that the Court will issue an opinion.

So you're having your post-argument briefing, you will be able to submit in the context of proposed findings of fact and conclusions of law your proposed findings of fact and conclusions of law. I'm not limiting you with respect to pages. I'm not limiting you with respect to topics. I'm not limiting you at all. I'm just saying submit your proposed findings of fact and conclusions of law by 5:00 p.m. on October 31. And then I'm giving you an additional three weeks to the day before Thanksgiving.

What day would that be in November? When is Thanksgiving?

THE COURTROOM DEPUTY: Thursday, November 27; so Wednesday, November 26.

THE COURT: 5:00 p.m. on ECF you can submit your objections to which you received you from the other side.

After that, because I will be known as judge cranky pants over the holiday season, I'll be reviewing the submissions and I will issue a decision in the fullness of time a based on everything you submitted to date and the final arguments we've had today on your proposed findings of fact and conclusions of law.  And after I review your respective objections and why do I think there will be objections to the other side's proposed findings of fact and conclusions of law, and then I will issue my decision.

I trust that is sufficient from plaintiff's point of view in terms of briefing?

MR. FRANK:  Yes, your Honor.

THE COURT:  Defense counsel?

MR. SCHWARTZ:  Yes.

MR. FRANCOEUR:  Yes, Judge.  Two questions.

THE COURT:  Of course.

MR. FRANCOEUR:  Will we be able to get the transcript of today's argument?  And would you like one argument?

THE COURT:  The first answer is, yes.  You can see the smile on the court reporter's face because you will allow her to buy a third Mercedes when she gives you the bill for this.  I assure you, the Court has no profit interest in this, but you can be sure that when you walk out of here if you see a nice Mercedes it belongs to this court reporter or one of

her sister or brothers.  The short answer is, yes, and you will make your arrangements with the court reporter.

MR. FRANCOEUR:  Would you like one combined submission from the defendants?

THE COURT:  Whatever works for you folks.  If you want to do a master combined, and then with sub-tendrils, that's fine too.  I know when I was in private practice 33 years on Wall Street, sometimes we would all get together and put in one master submission, sometimes it would be a main submission with the particular concerns of the respective parties.  I don't mean to hamstring you in having to agree as to what is most important and what is not most important.  As I said, I didn't perhaps practice at the level that you gentleman do, but I did do this for 33 years.  And as one of my Texan law partners used to put it:  Even a blind hog finds an acron once in a while.

So I was able, occasionally, to get some of the structural issues correct.

MR. FRANCOEUR:  Thank you, Judge.

THE COURT:  I want to commend counsel.  I know this is an important and a complicated case.  You have argued it on both sides passionately and respectfully to the Court and each other.

As you can imagine, it is very nice to be the Court to sit here and not have to worry about sandbox dimension to

law practice; not that I ever engaged in anything that approached sandbox, of course. And it's nice to have the spirited argument by distinguished counsel. And I appreciate on all sides.

I apologize for the delay it took to get to this point of the case. But we have taken it very seriously. I want to thank you. And all can I say is, have a good holiday season, now you'll allow the court reporter to buy her third Mercedes. We're adjourned.

(Whereupon, the matter was concluded.)

*     *     *     *     *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Rivka Teich*
Rivka Teich, CSR RPR RMR FCRR
Official Court Reporter
Eastern District of New York